UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION DERIVATIVE LITIGATION | ) ) ) | Master Docket No. 1:07-cv-00372(SLR)(MPT) |
| _____ | ) ) | (Consolidated Action) Magistrate Judge Mary Pat Thynge |
| THIS RELATES TO ALL ACTIONS | ) ) | |
| _____ | ) | |

**CONSOLIDATED, AMENDED, AND
SUPPLEMENTAL VERIFIED COMPLAINT**

Plaintiffs allege, upon information and belief based upon, *inter alia*, the investigation made by and through their attorneys, except as to those allegations that pertain to the Plaintiffs themselves which are alleged upon knowledge, as follows:

1. The jurisdiction of this Court is founded upon 28 U.S.C. §1332 and 28 U.S.C. §1367. The Plaintiffs are citizens of the Commonwealth of Pennsylvania. The defendants are all citizens of states other than Pennsylvania. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. It could exceed, actually, $3 billion.

2. The claims herein arise under the laws of the several states including, particularly, the State of Delaware.

3. Plaintiffs bring this derivative action in the right of and for the benefit of Countrywide Financial Corporation (the "Company" or "Countrywide").

4. This action is not a collusive one to confer jurisdiction that the court would otherwise lack. This is an action for breach of fiduciary duty under Delaware law in that the individual defendants, while in possession of material inside adverse information, caused the Company to repurchase more than 60 million shares of its stock at a price more than double its value, at the same

time that they sold shares of the Company's stock at prices at more than double its value.

A.    **The Parties**

5.    Plaintiffs are stockholders of the Company and were stockholders at the time of the wrongs alleged herein, and have been such continuously since then.

6.    The Company is incorporated in the State of Delaware. Its principal place of business is not in Pennsylvania. The Company's stock is listed on the New York Stock Exchange. Its last fiscal year ended on December 31, 2007. As of September 30, 2007, Countrywide had outstanding 576,376,128 shares of common stock and 20,000 shares of preferred stock, not redeemable until August 22, 2017, convertible into common stock at $18 per share. On February 8, 2008, the last reported sales price by the close of market of the common stock was $6.58 per share. Through its subsidiaries Countrywide is engaged in mortgage lending and other real estate finance related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities, and insurance underwriting.

7.    The individual defendants in this action include Angelo R. Mozilo, Robert L. Donato, Harley W. Snyder, Jeffrey M. Cunningham, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, Keith P. Russell, Michael Dougherty, Henry C. Cisneros, and Kathleen Brown. Defendant Michael E. Dougherty was a member of the Company's board of directors since the year 1998, who did not stand for re-election in 2007. Defendant Henry G. Cisneros was a member of the Company's board of directors since the year 2001, who resigned on October 18, 2007. Defendant Kathleen Brown was a member of the Company's board of directors since the year 2005, who resigned on March 29, 2007. All the other individual defendants are members of the board of directors, In addition, David Sambol, who was identified as a defendant in the *Blumberg* action, became a director on September 26, 2007, and he is still a director. He did not, as a director,

authorize the Company's repurchase of its stock, but his activities, if any, in support of those repurchases have not been publicly disclosed. To the extent that he participated with the directors in committing the acts alleged herein or aided and abetted those acts, plaintiffs seek relief against him.

8.      The Company has a staggered or classified board of directors. Each year approximately one-third of the board is elected for a three-year term.

**B.      Demand on the Board of Directors**

9.      Plaintiffs have not made any demand on the Company's board of directors to institute this action against the individual defendants. Under Delaware law, if a demand is made and rejected, the stockholder's challenge must be not to the underlying transaction, but to the board's decision not to bring the lawsuit. Delaware law thus substantially alters the nature of a derivative plaintiffs' claim where demand has been made and conversely gives shareholders considering litigation good reason not to make demand.

10.      A majority of the board is either interested in the transactions and events alleged herein, or they otherwise lack independence. All ten individual defendants who were members of the board when the IBEW complaint was filed on June 12, 2007, caused Countrywide to repurchase 38,639,876 shares of its common stock on November 9, 2006, while they were in possession of material adverse inside information concerning the business and assets of Countrywide. At the same time, eight of them sold their own shares of Countrywide stock while in possession of materially adverse inside information. Of the nine individual defendants who were members of the board when the Blumberg complaint was filed, eight of them caused Countrywide to repurchase 21,503,512 shares of its common stock in May 2007, while they were in possession of material adverse inside information concerning the business and assets of Countrywide. At the same time, seven of them sold shares of the Company's stock for millions of dollars while in possession of materially adverse

inside information. David Sambol was not a member of the board of directors of Countrywide until September 26, 2007, but he did sell his own shares of Countrywide stock while in possession of material adverse inside information concerning the business and assets of Countrywide. Accordingly, he is not now a disinterested or independent director. The price at which the directors caused the Company to purchase its stock and at which they individually sold that stock was more than double its value

11.     The individual defendants have sought to entrench themselves as members of the Company's board of directors by establishing and maintaining a staggered or classified board, and by soliciting proxies for their own re-election for three-year terms.

12.     Even in the absence of a traditionally interested (or non-independent) board, demand is excused under the facts at bar.

13.     The demand requirement and its exceptions are to encourage intra-corporate resolution of disputes and to obtain the business judgment of the board on whether the litigation is in the best interest of the corporation and its shareholders.  However, where a stockholder sues the board of directors over an act that is not the product of a valid exercise of business judgment, such as waste, Delaware law excuses demand. Delaware law excuses demand whenever the challenged act of the board is not the product of a valid exercise of business judgment, regardless of whether a majority of the board is disinterested and independent. The board's causing the Company to repurchase its stock, its conduct concerning the misrepresentations and omissions in proxy statements, and in committing acts in violation of their duty of loyalty are not matters of business judgment, and they are not protected by the business judgment rule for the following reasons:

(a)     The board of directors' decision forcing the Company to repurchase its own common stock was given while a majority of the board was in possession of materially adverse inside

information. They caused the Company to repurchase its stock at a price that was more than double its value. Such conduct is waste. The board is not protected by the business judgment rule for the repurchase of the Company's common stock.

(b)      Waste is egregious misconduct that is not protected by the business judgment rule, and it provides an excuse for not making demand.

**C.      The Connection Between the Price Of
Homes and Countrywide's Financial Condition**

14.      Countrywide makes mortgage loans on single family homes, and, accordingly, it is very important to Countrywide that the borrowers repay the loans. But the risk of delinquencies in mortgage loan repayments, which can lead to defaults, is a factor in its business. Countrywide has studied that risk, and it has found that the faster home prices appreciate, the less chance there is of delinquency in mortgage loan payments. Conversely, the more slowly that home prices appreciate, the greater are the chances of delinquency in mortgage loan payments. And, when home prices actually decline, rather than appreciate, the chances of delinquency mount further. These are facts of cardinal importance to a mortgage lender.

15.      Countrywide has actually compiled the data and prepared graphs that show the correlation between the rate of home price appreciation — or decline, i.e., negative appreciation — and mortgage payment delinquency. Those graphs are attached as Exhibit 1 to this complaint and also are paper filed in color.  On page 3. (D.I. 21) Footnote 1 of the graphs states that the data source is Countrywide. The graphs are shown for different kinds of mortgages, i.e., first mortgages, home equity lines of credit ("HELOC") and other second mortgages, fixed and adjustable rate mortgages, and subprime mortgages.[1]  They are shown for mortgages with CLTVs, i.e., Combined Loan to

---

[1] The vertical scale represents loans in arrears for 90 days or more at the end of the first two years of the loan. The horizontal scale represents the percentage price appreciation, or depreciation, at the end of two years.

Value of the property, ranging from less than 80% to more than 95%. The graphs all show the same thing: The faster that home prices appreciate, the less chance there is of mortgage delinquency, and vice versa. And when home prices decline, the chance of mortgage delinquency skyrockets.

16.     This page of graphs was posted in color on the Internet for an analysts' conference call held by Countrywide on July 24, 2007. Countrywide also posted the text of the conference on the Internet. That text is attached as Exh. 2 to this complaint. At that conference, John McMurray ("McMurray"), Countrywide's chief risk officer, described the graphs at page 3 of Exh. 2, and said:

> Across these four loan types we observe a similar pattern, where high
> serious delinquency rates are negatively correlated with home price
> appreciation. The higher the appreciation rate, the lower the serious
> delinquency.

Thus, even when home prices are appreciating, the risk of mortgage delinquencies will rise if the *rate* of appreciation declines.

## D.    The Movement Of The Price of Homes

17.     By the fourth quarter of 2005 there began a sudden, long-term decline in the rate of home price appreciation, which signaled to Countrywide's board that mortgage delinquencies were poised to rise. In the years between 1992 and 2005, in all metropolitan statistical areas ("MSA") in the United States, as defined by the United States Census Bureau, the weighted average single family residence home price index experienced a year-over-year appreciation calculated for each month. Not only that, there was an increase in the *rate* of appreciation. From 1992 until late 2005, the percentage rate of year-over-year increase itself increased, from less than one percent to nearly 13 percent per year.

18.     The.graphic representations of these market conditions, shown as Exhs. 3 and 4 to this complaint, and also separately in color (D.I. 21), were posted in color on the Internet by Countrywide

for its analysts' conference call on July 24, 2007. Exhibit 3 is also marked as Page 1 of the presentation. It is described by McMurray in Exh. 2, at Page 2-Page 3, where he explained that the horizontal line at the bottom of Exh. 3 shows the 30-year period from 1977 to May 2007. The left vertical line is the percentage of year-over-year rate of appreciation of home prices as measured "each month by looking back exactly one year." The light blue bars "represent a range of year-over-year appreciation by MSA." The top of the light blue bars "represents an average of the five fastest appreciating MSAs. The bottom of each [light] blue bar represents an average of the five slowest appreciating MSAs." McMurray further explained that "[A]pproximately two-thirds of the MSAs will be represented by the darker portion of each blue bar." In other words, the dark blue portion of the graph shows the range of prices of most of the homes in the United States.

19.    The yellow horizontal line of dashes on Exh. 3, at 0% on the vertical scale, represents the place on the graph where there was neither a gain nor loss in year-over-year home prices. The red line "through the middle of the chart represents what is happening to home prices nationally." Exh. 2, Page 2-3. McMurray further said, "For May [2007], which is on the far right-hand side of this chart, national home prices actually declined by 0.4% year-over-year. This is the first national decline for the entire [30-year] period shown on this chart." Exh. 2 at Page 3.

20.    For most months shown on Exh. 3, home prices were actually declining in many MSAs. But "beginning around 1998 and 1999 and continuing into 2006 .... [t]here were essentially no MSAs experiencing price declines .... [But] As of May 2007, the percentage of MSAs with year-over-year price declines is up to 50%." Exh. 2 at Page 3. This decline had begun in the fourth quarter of 2005 and was very deep by November 2006. The right vertical scale of Exh. 3 is the percentage of MSAs with year-over-year price declines. "The orange area at the bottom of the chart [Exh. 3] shows the percentage of MSAs with negative year-over-year appreciation ..." i.e., with

price declines.

21.     The red line on Exh. 3, representing home prices nationally, is presented as "an uncluttered close up" on Exh. 4, also shown at page 2 at D.I. 21. It was put on the Internet as Page 2 of the Presentation by Countrywide at the analysts' conference call on July 24, 2007. Exh. 2 at Page 3. As McMurray said, "You can see the steepness of the current decline more prominently in this chart than in the previous chart."

22.     As shown by Exh. 4, beginning late 2005 the percentage rate of increase in the year-over-year appreciation began a steady decline. By the beginning of the fourth quarter of 2006, the percentage rate of increase in the year-over-year increase was less than four percent. By the end of 2006, the rate of year-over-year increase in the weighted average single family residence home price index had declined to two percent. By the fourth quarter of 2006, these conditions had put pressure, in the form of rising delinquencies in mortgage payments, on the value of Countrywide's assets and business. (Exh. 1.) Exhibit 4 shows the red line extending below the yellow horizontal line in the year 2007 to show that, nationally, home prices had entered a period of year-over-year decline for the first time in 30 years.

## E.     The Countrywide Board's Possession of Facts

23.     Countrywide's own records show that Countrywide and its board had possession of facts that this decrease in the rate of price appreciation was correlated to a material increase in the delinquency rate on all mortgage loans that Countrywide made, whether to the most creditworthy or most sub-prime borrowers, and that, as an inevitable result, its assets and business had suffered material declines in value. It was Countrywide itself that compiled these data. (Exh. 1.) Even with the dire situation of the housing market in November 2006 and May 2007, the board of directors still forced the Company to repurchase its own stock at a price that did not reflect its fair market value,

given the facts available to the board. And before, during, and after this period, the directors were selling their own stock in the Company. They had the facts that the home price appreciation rate was at a sharp decline and, in turn, that it was and is causing a high rate of delinquency in every kind of home mortgage loan. (Exh. 1, Exh. 2, pp. 2-3.) These facts, and particularly the functional relationship between the rate of home price appreciation and mortgage payment delinquency, were in the possession of Countrywide's board members.

24.    The directors' attentiveness to Countrywide's business has received comment in the press. *The Wall Street Journal* weekend edition of November 3-4, 2007, reported upon criticism that the Countrywide board was giving itself excessive compensation and the board's response to that criticism. The following was reported:

> But members of the company's board also have above average compensation....
>
> The pay range is far above median total compensation for directors of the 200-largest U.S. concerns....
>
> Harley Snyder, Countrywide's lead director, said that the board "has been actively engaged in every significant issue facing the company" and that Countrywide has a long history of success. The board has held 31 meetings this year, not including committee sessions, he said. [Ironically,] Snyder said the directors' shareholdings in the company keep it aligned with the interests of other shareholders.

(Attached as Exh. 5. to this complaint.)

25.    On November 12, 2007, The New York Times quoted a Countrywide spokesperson making similar comments about the board's compensation and attentiveness. (Exh. 6, at Page 8, to this complaint):

> "Countrywide's board of directors has always been actively engaged in overseeing the company's senior management and business strategy," Mr. Simon said. "Countrywide has an outstanding track record for its financial performance and creation of shareholder value,

and the board deserves credit for the important role it has played in these accomplishments."

Nonemployee directors at Countrywide have also been well compensated for its accomplishments. Every year, they receive cash, stock and other compensation, according to securities filings. Last year, they earned from $345,000 to $539,000 each.

**F.    The Board's Causing of Countrywide to Repurchase Its Stock**

26.    The correct course of action for the Company's directors at the beginning of the fourth quarter of 2006 was to disclose the material adverse changes in the housing market and to make the accounting changes to reflect these facts. Such disclosures would have undoubtedly resulted in a material decrease in the price of Countrywide's common stock to reflect its fair market value. Instead, however, the individual defendants, acting as Countrywide's board of directors, authorized a program for Countrywide to repurchase its common stock and on November 9, 2006 caused Countrywide to purchase 38,639,876 shares for $1,508,596,000, or $39.04 per share. Countrywide's repurchase of 38 million shares of its stock helped to keep the price up, to the benefit of the directors who were in the process of selling their own Countrywide stock.

27.    Pursuant to the program to repurchase stock, in May 2007, Countrywide's board of directors caused it to repurchase 21,503,512 shares of its common stock for $863,556,000, or $40.16 per share. At the time of the May 2007 repurchase, home prices nationally were in year-over-year decline for the first time in 30 years. Countrywide's total expenditure in November 2006 and May 2007 was $2,372,152,000. Countrywide's repurchase of 21 million shares of its stock helped to keep the price up, to the benefit of the directors who were in the process of selling their own Countrywide stock.

28.    Countrywide's 2006 third quarter SEC Form 10-Q reported that on September 30,

2006, Countrywide had 616,748,918 shares outstanding.[2] Countrywide purchased a total of 60,143,388 of its own shares in 2006 and 2007, or 9.75 percent of the number of shares outstanding.

The individual defendants caused Countrywide to pay substantially more for its stock than its value. After Countrywide reported impairment charges of $417 million in the second quarter in 2007 (Exh. 2, p. 2), and as more information about the mortgage problems became known, the market learned the true state of conditions at Countrywide, and the price of its stock fell to approximately half of the price that the directors had forced Countrywide to pay. And then, on August 22, 2007, the directors caused Countrywide to issue 20,000 shares of 7.25 percent preferred stock, convertible into common stock at $18 per share, in exchange for $2 billion in cash. This amount of cash is $372 million less than the directors caused Countrywide to pay to purchase its stock, before considering the non-tax-deductible dividends of $145 million per year for this preferred stock. If all the preferred stock is converted, Countrywide will issue 111,111,111 common shares. At $18 per share, the loss to Countrywide is $1,289,571,016, again without considering the preferred dividends. More recently, in the five trading days ending February 8, 2008, Countrywide's stock has been traded in the $6 to $7 range. On January 11, 2008 it was announced that Bank of America would acquire Countrywide for approximately $4 billion, all in stock, or approximately $6.67 per Countrywide share, based on the then current price of Bank of America stock.

29.    Countrywide's repurchase of any of its own stock was a material deviation from its previous history. Countrywide's financial statements reflect that, at least since March 1, 1991, it had never redeemed or repurchased any of its common stock until November 9, 2006. In 2004, there

---

[2]This is the number in the unaudited Consolidated Statement of Changes in Shareholders' Equity. The total includes 15,438,630 shares issues pursuant to stock-based compensation plans. In Note 3's subpart Stock-Based Compensation, however, it is reported that 13,120,577 stock options were exercised, 365,456 restricted shares were granted, and 29.982 restricted shares were cancelled. This equals 13,456,051 shares issued pursuant to stock-based compensation plans, a difference of 1,982,579 shares.

were two separate special meetings of Countrywide's stockholders — on January 9 and August 17 — to vote upon proposals to increase the number of authorized shares of common stock under the certificate of incorporation. In each instance the board of directors solicited stockholders' proxies for the proposals. In each instance the proxy statement omitted to state that common stock would be repurchased by the Company. The sudden repurchases of its own stock in such large amounts and near its peak price have not been explained by any of the defendants.

## G.    The Board Members' Sale of Their Own Countrywide Stock

30.    It was bad enough that the directors caused Countrywide to repurchase its own shares after the directors learned that Countrywide's assets and business were exposed to the market risks coincident with a declining rate of appreciation and, even, absolute decline in the weighted average single family residence home price index. (Exh. 3, Exh. 4.). Even more egregious was that, during the same period, nine current and former members of the board of directors sold thousands of their own shares of Countrywide common stock for millions of dollars.

31.    CEO Mozilo sold 8,256,964 Countrywide shares for more than $304 million since July 6, 2005, and through and after the time that the individual defendants forced Countrywide to repurchase its own stock. Defendant Dougherty sold 170,929 Countrywide shares for more than $6.8 million between November 29, 2006, and June 15, 2007. Defendant Snyder sold 120,000 Countrywide shares for $4,718,040 between April 19, 2006 and December 19, 2006. Defendant Robertson sold 272,000 Countrywide shares between November 15, 2005 and July 27, 2007 for $10,215,668. Defendant Cunningham sold 75,000 Countrywide shares for more than $3 million between April 3, 2006 and February 2, 2007. Defendant Donato sold 54,142 Countrywide shares for $2,142,068 on October 27 and December 15, 2006. Defendant Cisneros sold 111,479 Countrywide shares between August 8, 2005 and May 30, 2007 for $4,173,776.20. Defendant Russell sold 10,000

Countrywide shares on December 12, 2005 for $371,243.52. Defendant Sambol, who has been a named executive officer since 2005, sold 1,009,825 Countrywide shares between July 8, 2005 and July 19, 2007, for $37,711,725.66. An itemization of their sales is attached hereto as Exh. 7.

**H.     The Injury To Countrywide and the Measure of Relief**

32.     The prices at which Countrywide repurchased, and the directors sold, the stock were the market prices on the dates of repurchase and sale. But those prices did not reflect the value of the stock. Market price only equals value when the market is well-informed. The market price may not reflect a stock's fair value if the market is manipulated. A free and open market is necessary to make the market a fair reflection of the judgment of the buying and selling public.

33.     The measure of relief against officers and directors for breach of the duty of loyalty must meet the standard that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct. Moreover, the damages flowing from that breach are to be liberally calculated. Delaware public policy seeks to remove all temptation for fiduciaries to breach their duty of loyalty. To that end, when fiduciaries breach their duty of loyalty, Delaware law loosens normally stringent requirements of causation and damages.

34.     In this complaint plaintiffs seek to recover only for the harm to Countrywide from the stock repurchases, leaving for others the recovery of the profits made by the individual defendants from their insider sales. The measure of recovery for breach of the fiduciary duty of loyalty is rescissory damages, *i.e.*, the difference between the price that Countrywide paid for its stock and the value of its stock on the date of judgment. The directors caused Countrywide to repurchase 60,143,388 shares of its stock for $2,372,152,000. In the five trading days ending February 8, 2008, the market price of Countrywide stock was between $6.17 and $7.63 per share. Taking $6.50 per share as the value on the date of judgment, which is approximately the price of the Bank of America

all stock acquisition, rescissory damages would be $1,981,219,978, calculated by taking the original cost, $2,372,152,000, less $390,932,022, calculated by taking $6.50 per share times 60,143,388 shares. But if the price of Countrywide stock recovers, there should be a floor of $1,289,571,016. This is the difference between the repurchase price of the shares and the $18 conversion price of the preferred stock, times 60,143,388 shares.

35.     The 20,000 shares of convertible preferred stock issued on August 22, 2007, pay a dividend of $145 million per year. The common stock that the directors caused Countrywide to repurchase paid a dividend of $0.60 per share per year, or $36,086,032.80 annually. The dividend difference is $108,913,967.20. Countrywide cannot redeem the preferred stock until August 22, 2017. The present value of the dividend difference for 10 years at an annual interest rate 7 % per annum is approximately $765 million. To make Countrywide whole, it should recover the dividend difference, as well.

36.     The directors of Countrywide breached their fiduciary duties to it by simultaneously causing Countrywide to buy its stock at an inflated price and selling their own Countrywide stock. The court should award judgment in the amount of the greater of

$$\begin{array}{r} \$1,289,571,016 \\ \underline{765,000,000} \\ \underline{\$2,054,571,016} \end{array}$$

or, the difference between $2,372,152,000 and the value of 60,143,388 of its shares on the date of judgment, plus $765 million.

WHEREFORE, Plaintiffs prays for the following relief:

A.     An equitable accounting against all the individual defendants in favor of the Company for the injuries that it has sustained and will sustain by virtue of the conduct alleged herein;

B.      Equitable relief against defendants from hereafter engaging in the practices as particularized above;

C.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable accountants', experts' and attorneys' fees; and

D.      Granting such other, further relief, whether similar or different, as by this Court may be deemed just and proper.

BIGGS and BATTAGLIA

Dated:  February 13, 2008                 By:      /s/ Robert D. Goldberg
                                                   Robert D. Goldberg (I.D. No. 631)
                                                   921 North Orange Street
                                                   Wilmington, DE  19899
Of Counsel                                         Tel: (302) 655-9677
Barrack, Rodos & Bacine                            Fax: (302) 655-7924
Alexander Arnold Gershon                           goldberg@batlaw.com
Regina M. Calcaterra                               Attorneys for Plaintiffs
Gloria Kui
1350 Broadway, Suite 1001
New York, New York 10018
(212) 688-0782

Barrack, Rodos & Bacine
Daniel E. Bacine
Two Commerce Square
2001 Market Street B Suite 3300
Philadelphia, Pennsylvania 19103
(215) 963-0600

Country\CONSOLDComp

## **VERIFICATION**

I, **ALEXANDER ARNOLD GERSHON**, hereby do declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.      I am a partner in the law firm of Barrack, Rodos & Bacine, of counsel for plaintiffs in the above entitled action. I have read the foregoing CONSOLIDATED, AMENDED and SUPPLEMENTAL VERIFIED COMPLAINT and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because both Lead Plaintiffs are absent from New York County where I maintain my office.

3.      My firm has sent copies of the consolidated complaint and the verification to the client, and I will make the filing with this court promptly upon receipt of same.

Executed this 13th day of February 2008 in New York, New York.

_____

**ALEXANDER ARNOLD GERSHON**

# EXHIBIT 1



Delinquency and Home Price Appreciation(1)

(1) Data source: Countrywide    (2) Combines prime HELOC and prime closed end fixed rate second

# EXHIBIT 2
# (PART 1)

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

1 of 52 DOCUMENTS

Copyright 2007 Voxant, Inc.
All Rights Reserved.
Copyright 2007 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

July 24, 2007 Tuesday

**TRANSCRIPT:** 072407as.787

**LENGTH:** 24020 words

**HEADLINE:** Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final

**BODY:**

OPERATOR: Ladies and gentlemen, thank you for standing by. Welcome to the Countrywide Financial Corporation's second-quarter 2007 earnings conference call. During this teleconference, Countrywide's management may make forward-looking statements within the meaning of the federal securities laws regarding their beliefs, estimates, projections, and assumptions with respect to, among other projections and assumptions, -- excuse me, among other things the Company's future operations, business plans, and strategies, as well as industry and market conditions, all of which are subject to change. Actual results and operations for which -- for any further period may vary materially from any past results discussed during this teleconference.

Factors which could cause actual results to differ materially from historical results or those anticipated include, but not are limited to, those items described in the second-quarter press release and detailed in documents filed by the Company with Securities and Exchange Commission from time to time. The Company undertakes no obligation to publicly update or revise any forward-looking statements.

At this time, all phone lines are muted or in a listen-only mode. However, after today's presentation, we will be taking questions; and we certainly encourage your participation at that time. (OPERATOR INSTRUCTIONS) As a reminder, today's call is being recorded for replay purposes. We ask that you stay on the line at the conclusion of today's meeting to receive the replay information.

With that being said, here is -- here now is your host, Countrywide's Chairman and Chief Executive Officer, Mr. Angelo Mozilo. Please go ahead, sir.

ANGELO MOZILO, CHAIRMAN, CEO, COUNTRYWIDE FINANCIAL CORPORATION: Thank you. Good morning and welcome to Countrywide's earnings teleconference call for the second quarter of 2007. Joining me on the call today are David Sambol, our President and Chief Operating Officer; Eric Sieracki, our Chief Financial Officer, Kevin Bartlett, our Chief Investment Officer; Carlos Garcia, our Chief of Banking and Insurance; Ron Kripalani, President of Countrywide Capital Markets; Bob James, President of Balboa Life & Casualty; John McMurray, our Chief Risk Officer; and Ann McCallion, our Chief Financial Operations and Planning.

If you have not done so already, please download the second-quarter supplemental presentation from our website. John McMurray has prepared a detailed slide deck to walk you through the credit trends and Countrywide's credit costs for this quarter.

Since most of you already have seen this morning's press release, I will not spend time going through all of the information contained within it. Instead, for those who may be traveling or hadn't had a chance to read it, I will briefly summarize the earnings results, so that we allow plenty of time for Q&A at the end.

So to quickly recapped, diluted earnings per share were $0.81 for the second quarter of 2007, which compares to $0.72 for the first quarter of 2007 and $1.15 for the second quarter of 2006. Countrywide's results for the second quarter

Case 1:07-cv-00372-SLR    Document 37-4    Filed 02/13/2008    Page 3 of 18

Page 2
Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

of 2007 reflect the strength in our core Loan Production business, but were adversely impacted by continued weakness in the housing market.

During the quarter, softening home prices continued to affect many areas of the country and delinquencies and defaults continued to rise across all mortgage product categories as a result. Due to these adverse conditions, we incurred increased credit-related costs in the quarter, primarily related to our investment in prime home equity loans.

Credit-related costs in the second quarter included impairment charges of $417 million taken during the quarter on the Company's investment in credit-sensitive retained interests. This included $388 million of impairment on residual securities collateralized by prime home equity loans, which equates to approximately $0.40 in earnings per diluted share based on a normalized tax rate.

In addition, the provision for losses on HFI, the loans that occurred in the second quarter, was $293 million, driven primarily by a loan-loss provision of $181 million on prime home equity HFI loans in the banking segment. Those are loads held-for-investment.

Partly offsetting increased credit costs, our residential Loan Production sector delivered strong results during the quarter. Consolidated quarterly funding volume was the third-highest in our history. Prime production margins were relatively stable, and subprime production margins substantially improved. As a result, Loan Production sector pretax profit for the quarter was $439 million, its highest level since the first quarter of 2005.

Looking to the second half of 2007, we expect difficult housing and mortgage market conditions to persist. Nonetheless, we remain optimistic that the long-term future growth prospects and profitability of the Company as the industry continues to consolidate.

We updated our guidance for 2007 and expect diluted EPS to range from $2.70 to $3.30. This compares to our previous guidance $3.50 to $4.30. The reason for the reduced earnings per share estimate relates to our anticipation that the second half of 2007 will be increasingly challenging for the industry and for Countrywide. Absent a reduction in mortgage interest rates, production volumes are expected to fall and competitive pricing pressures are expected to increase. In addition, volatility in the secondary market has increased significantly early in the third quarter; and liquidity for mortgage securities has been reduced as a result. These conditions are expected to adversely impact secondary market execution and further pressure gain on sale margins.

Furthermore, additional deterioration in the housing market -- specifically in home prices -- may further impact credit costs. We have taken or are continuing to take a number of actions in response to changing market conditions.

These include tightening of credit guidelines, particularly related to subprime and prime home equity loans; further curtailment of subprime product offerings, including the recent elimination of certain adjustable-rate products; risk-based pricing adjustments; use of mortgage insurance for credit enhancement; and expense reduction initiatives.

Notwithstanding current environment factors and their near-term impact on earnings, we believe that the Company is well positioned to capitalize on opportunities during this transitional period in the mortgage business, which we believe will enhance the Company's long-term earnings growth prospects. We expect to leverage the strength of Countrywide's capital liquidity positions, superior business model, and best in class workforce to emerge in a superior competitive position coming out of the current housing downcycle.

Furthermore, the ongoing integration of our bank and mortgage company is expected to enhance our business model through operational efficiencies, reduce funding costs, and enhance liquidity, among other competitive advantages.

That concludes my prepared remarks. I will now turn the call over to John McMurray, our Chief Risk Officer, who will go through the presentation with you.

JOHN MCMURRAY, SENIOR MANAGING DIRECTOR, CHIEF RISK OFFICER, COUNTRYWIDE FINANCIAL CORPORATION: Thanks, Angelo. With the supplement this morning, we are going to cover briefly several topics including a look at home prices, a look at how home prices affect loan performance, a look at delinquency trends, a look at some of our key credit exposures, and then we will conclude with a summary of actions we have either taken or have underway to address the transitioning environment.

Let's start on page 1 with an update to a chart we have used previously. This chart was put together using the MRAC repeat sales home price indices. The red line running horizontally through the middle of the chart represents

what is happening to home prices nationally. It is measured on a -- each month by looking back exactly one year to calculate a rate of appreciation. For May, which is on the far right-hand side of this chart, national home prices actually declined by 0.4% year-over-year. This is the first national decline for the entire period shown on this chart.

The light blue bars each month represent a range of year-over-year appreciation by MSA. MSA is a metropolitan statistical area, which the Census Bureau defines as a city or town with a population of 50,000 or higher. There are currently 381 MSAs in the US. The tip of each blue represents an average of the five fastest appreciating MSAs. The bottom of each blue bar represents an average of the five slowest appreciating MSAs.

For most months shown on this chart the slowest appreciating MSAs are actually experiencing home price depreciation. In other words, home prices are going down. The darker blue portions of each bar represent plus or minus one standard deviation from the red line. So approximately two-thirds of the MSAs will be represented by the darker portion of each blue bar.

Most of the MSAs that make up the very bottom of the blue bars in recent months are from Central California around Stockton and Modesto. According to Moody's economy.com, these MSAs also have the highest mortgage delinquencies as well. Ruth Simon of the Wall Street Journal did an article last Thursday that you may want to look at. It addresses delinquencies and highlights this area; it is on the top right of page D3.

Another useful source of home price information is S&P/Case-Schiller. 14 of the major 20 MSAs that they track are showing negatives as of April.

The orange area at the bottom of the chart shows the percentage of MSAs with negative year-over-year appreciation. It uses the right-hand vertical scale.

Pay close attention to the time period beginning around 1998 and 1999 and continuing into 2006. There were essentially no MSAs experiencing price declines. This recent period of appreciation was very broad geographically, and it lasted a long time. As of May 2007, the percentage of MSAs with year-over-year price declines is up to 50%. The transition from practically no MSAs with declines to 50% of the MSAs with declines has been rather abrupt.

Let's turn to page 2. On page 2, you see an uncluttered close-up of the red national home price line from page 1. This time series is a housing unit weight -- housing unit weighted average of all 381 MSAs. You can see the steepness of the current decline more prominently in this chart than the previous chart. So far, the home price appreciation rates -- or the decline in home price appreciation rates now underway basically matches the size of the drop we saw in the late '70s and early '80s. So that decline ended before the appreciation rate hit zero. And the current decline isn't over.

Let's turn to page 3. The graphs on page 3 show delinquency over a range of cumulative home price appreciation rates. For each graph, the x or horizontal axis represents the amount of cumulative home price appreciation for the first 24 months of the loan's life. The y or vertical axis for each of these charts represents the serious delinquency rate for each bucket or range of cumulative home price appreciation on the x-axis. The serious delinquency measure used here is an over-90-day delinquency using the MBA standard and expressed as a percentage of the starting count of loans.

We show three first lien types along with home equity. Home equity consists of HELOCs and fixed-rate closed-end seconds. The top two graphs are first lien conventional loans and include both conforming and nonconforming conventionals. The chart at the lower left shows home equity; and the chart at the lower right shows subprime first lien.

Across these four loan types we observe a similar pattern, where high serious delinquency rates are negatively correlated with home price appreciation. The higher the appreciation rate, the lower the serious delinquency.

Another important pattern is CLTV, which is the combined loan-to-value ratio at origination, giving effect to both the first and any second lien that may exist. Notice that higher CLTV loans, the ones with more leverage, tend to have high serious delinquency rates across the spectrum of home price appreciation rates. You can see this pattern for all loan types shown here, though the effect is somewhat less pronounced in subprime.

Let's turn now to page 4. Here on page 4 we provide a refreshed look at some of the odds ratios shared with you in our previous serious delinquency presentations. We are showing these charts again for several reasons. First, we wanted to provide an update. Second, we now have data that reflects recent home price declines. Third, the type of variables used to put together these studies are among the types we use in our automated underwriting scorecards as well as our pricing models.

These graphs were generated using empirical models and Countrywide data. The models control for numerous loan and borrower attributes, as well as environmental variables such as seasonality and home prices. The purpose of the study is to understand how each attribute affects loan performance on an isolated basis, which in these cases is measured is an over-90-day delinquency. In all charts, the y or vertical axis represents an odds ratio which can be thought of as a risk multiplier.

Let's use the FICO chart on the top left of page 4 as an example. We use a FICO of 800 as a base; so we will set that FICO to a value of 1. If we look at the blue line, which represents prime first liens, we can see how the odds ratio increases as the FICO declines. A prime FICO loan -- a prime loan with FICOs in the low 500s is going to be over 30 times more likely to be seriously delinquent than a prime loan with an 800 FICO, holding all other variables constant.

On the right side of page 4, we show odds ratios for origination CLTV. For first liens in the upper right, an origination CLTV of less than or equal to 50% is set to the baseline of 1. For second liens in the lower right, an origination CLTV of 51 to 80% is set for the baseline of 1.

The pattern here is consistent with the charts on the prior page. Leverage at origination matters. More leverage means more serious delinquencies.

On the bottom of page 4, we show odds ratios for documentation types with full doc being the baseline of 1. Let me explain the various doc types that we are showing here. A streamline is a streamlined refinance. Preferred is a low documentation approach offered by a number of institutions; -- Countrywide's is called Fast & Easy -- where borrowers who meet certain criteria are allowed documentation waivers. A SIVA is a stated income verified asset program; it's sometimes called reduced doc. A NIVA is a no income verified asset program. The primary difference between SIVA and NIVA is that the borrower states but does not document their income for a SIVA loan, but neither states nor documents their income for a NIVA loan. Assets are verified for both SIVA and NIVA.

A SISA loan is a stated income stated asset; the borrower is stating but not documenting their income and assets. A NINA is a no income no asset loan; the borrower is neither stating nor documenting their income or assets.

The takeaway from this chart is that documentation matters. The less documentation, the higher the serious delinquency, all else equal.

Let's move to page 5. On page 5, you see four more adds ratio graphs for occupancy, property type, and loan size. I won't spend a lot of time on this page, but let me summarize some observations. Remember that these observations are also on an all else equal basis using the same serious delinquency measure I described previously.

Owner occupied loans are generally less risky than investor properties. Loan or line size matters, with higher loan or line amounts generally being more risky, with the exception of very small first liens.

For property types, manufactured housing exhibits elevated risk. While the other property types seem to be very similar, I think two to four units and condos may be worth watching in the months and years ahead. In past downturns, say the late '80s or early '90s in the Northeast, two to four units properties tended to have worse performance than single-family.

There are a couple reasons I think condos deserve extra attention. First, they appear to be oversupplied in certain markets. Miami and San Diego are two MSAs that come to mind. Second, there have been more conversions of apartments to condos.

Let's turn now to page 6. Page 6 shows the composition of three important portfolios. The first column of numbers on the left is the home equity HFI portfolio in the bank. As a quick reminder, HFI stands for held-for-investment. The second column of numbers shows the portfolio of loans underlying home equity residuals. The column of numbers on the right shows the HFI pay option portfolio in the bank.

Let's take a look at the rows for this table starting from the top. You can see the size of each portfolio both in terms of UPB as well as loan counts. There is a row labeled piggyback that shows the percentage of loans where a combination of a first and second were used in the transaction. In many cases, piggyback transactions were done as a substitute for mortgage insurance. I point this out because it is an important difference between our HELOC business compared to traditional HELOC business.

The next row down shows weighted average CLTV. You will also see a distribution of CLTVs towards the bottom of this page. We also show weighted average origination FICOs. Just below the CLTV distribution at the bottom of the page, we show a distribution of FICOs.

Next, we show the percentage of low documentations in the middle of the page. Just below the low doc row are two rows that show margin for these loans that are floating rate. Floating rate loans will include HELOCs, which float over prime, and pay options, which have accrual rates that change monthly based on various indices such as COFI, MTA, and LIBOR.

In addition to showing the weighted average margin over prime for HELOC, we also show an estimate of the rate spread compare to LIBOR. So normally prime is 275 basis points or so above LIBOR; and so we wanted to provide that calculation for you as well.

For pay options, the non LIBOR indices are lagging, but generally approximate LIBOR over time, so the margin can be thought of as a margin over LIBOR as well as over the index.

Let's move to page 7. Page 7 is a portfolio composition similar to what we saw on the prior page, except here we are looking at subprime. Starting on the left, the first column of numbers show the portfolio of loans underlying our subprime residuals for the 2006 vintage. We expect the 2006 vintage to be one of the worst performing vintages ever for both us and the industry at large.

The right-hand column of numbers shows the composition of our 2007 Q2 subprime originations. Most of the rows match what we saw on the previous page, with a couple important distinctions. There is only one basic version of low documentation in subprime, and that is called stated. We also show a row that shows the percentage of loans that are both stated doc and have origination CLTVs above 90%. Also notice that the FICO distribution range here has been adjusted for nonprime collateral.

One of the most important points on this page is the difference between 2006 and more recent originations. As a result of guideline adjustments and other actions, the mix of loans has generally improved. The one area where the mix has not improved is FICO. The high CLTV loans that were previously done required higher FICOs; so part of the trade-off in eliminating the higher CLTV programs was that the FICO mix deteriorated in that process.

Let's turn to page 8. Page 8 shows total delinquency for our servicing portfolio using both the MBA and OTS standards. We introduced in this topic on the last call and I wanted to spend a little more time this morning on it again. While we normally use the MBA standard for corporate purposes, many other institutions use the OTS standard. Because most mortgage loans are due on the first day of the month, there can be a large difference between the two delinquency measures; and you can see that here on this page.

We show delinquencies on the left side of page 8 -- total delinquencies, I should say; and 90-plus delinquencies on the right side. 90-plus is our standard for nonperforming assets. Notice that we are using UPBS, or unpaid principal balances, as our denominator.

I have sometimes seen nonperforming ratios calculated as a percentage of assets. The percentage of total assets approach will obviously decrease the delinquency ratio. On top of that, the usefulness of the ratio is perhaps diminished by adding securities, furniture, and other non loan assets to the denominator. I hope you can see how important is to know the calculation standard when evaluating or comparing delinquencies.

In addition to delinquency trends for the servicing portfolio, we also show delinquency trends for the bank HFI portfolio and for loans underlying our residuals. These two sections show delinquencies using the MBA standard.

Before leaving this page, let me provide a comment or two on pay options. The pay option trend in delinquencies is being affected by at least three components. First, delinquencies are up significantly in their own right. The slope of this trend is exacerbated by two additional factors. One is seasoning. Loans in recent quarters are more seasoned than those in earlier quarters. For June, the weighted average life for pay option loans in our servicing portfolio was 17 months, up from 14 months in the first quarter of 2007, and up from seven months from the first quarter of 2006.

The second additional factor is the denominator effect. We are seeing more pay options prepaying than are being added to the portfolio. The total pay option servicing portfolio is down 3.7% in UPB and 4.2% in loan count for the servicing portfolio again, in just the last quarter.

The effect is even more pronounced in the bank HFI portfolio. As you will see on page 11 in just a moment, bank HFI payout option UPBs declined by almost 10% in just the last quarter.

Let's turn to page 9. Page 9 is a duplicate of a page shown in last quarter's supplement. We include it again as a reference to summarize the financial statement geography of how credit costs manifest themselves on our income statement and balance sheet. Rows represent major risks; columns represent the relevant financial statement treatment for the various credit costs.

Let's turn now to page 10. On page 10, we refresh a schedule presented to you in last quarter's supplement. The rows match what appear on the previous page. Let me describe the columns. For each of the major columns we show values for both the second and first quarter of 2007.

Balance sheet assets, which are the first two columns on the left, is simply the carrying value of these assets on our balance sheet. The underlying loan UPB is the unpaid principal balance for the loans underlying each asset or risk. The provision/earnings charge is the amount we recognized on our income statement. Some of these charges are to a loss provision and some are charged directly to gain on sale.

Balance sheet reserve/estimate for losses is the amount that we have on our balance sheet for future losses. As shown on the prior page, this could take the form of a reserve in some cases, or the reduction of the asset's value in other cases.

We are going to cover the bank HFI portfolio in residuals in more detail on subsequent pages, but before leaving this page let me provide some color on some of the other current period charges. You will see a $91 million charge in the first row of numbers for HFS, which stands for held-for-sale, compared to $266 million last quarter. Last quarter's charges were heavily influenced by subprime. Approximately $81 million of the $91 million this quarter pertains to approximately $484 million of loans that were moved from HFS to HFI during the quarter. The loans were marked to the lower of cost or market as they moved from HFS to HFI.

These loans consist of delinquent government, prime, subprime, HELOCs, and fixed-rate seconds. As with our loan sale decision, the decision to move assets into HFI is done on a best execution basis. We often realize better economics by retaining delinquent loans than by selling them.

On the next row down for HFI, there is a $297 million charge for provisions. This provision includes the liability we accrue for unfunded HELOC draws, which is why there is a difference between $297 million here and then the $293 million that you will see in the press release. $246 million of the $297 million is for the bank HFI portfolio; we will see more on that momentarily.

The remaining amount relates to the HFI held outside of the bank; and most of that was additional provisions we booked on subprime loans. Recall from last quarter's presentation that the nonbank HFI portfolio is very different from that inside the bank. The nonbank HFI portfolio consists of loans that are part of our government rewarehousing program; rep and warranty related repurchases; repurchases made in connections with our exercising cleanup calls on securities; and loans moved from HFS.

Another important distinction between these two portfolios is the balance sheet credit held for future losses. Both HFI portfolios rely on traditional reserves and credit enhancements. The nonbank portfolio will also include basis adjustments where the loan's balance sheet carrying value was reduced through a charge to earnings. The rep and warranty charges principally reflect normal deal activity this quarter as well as some increased incidence of early defaults.

Mortgage insurance, which is roughly three-quarters of the way down the page, reflects normal activity this quarter. Recall that last quarter included the release of approximately $74 million of reserves associated with the 2003 mortgage reinsurance book.

Servicing advances are the last row of numbers on page 10. Charges here are up over last quarter as a result of increased delinquency and foreclosure activity.

Let's turn to page 11. Page 11 shows reserves and reserve flow for banking operations for the held-for-investment portfolio. Let's start at the top and work down.

The first section shows the flow of reserves for the past five quarters. Each quarter, we start with a beginning reserve, add provisions, and then deduct charge-offs to get an ending reserve. Footnote 3 is important for understanding recent charge-off activity.

Case 1:07-cv-00372-SLR    Document 37-4    Filed 02/13/2008    Page 8 of 18

Page 7
Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

The current quarter's charge-offs are elevated as a result of moving to a more aggressive charge-off policy for the entire HFI portfolio. We estimate the timing effect to be in the neighborhood of $30 million for banking operations and $50 million on a consolidated basis.

The second section of this page shows reserves by key loan type for the same five quarters. Note that the reserve includes ALLL as well as the liability for undrawn HELOCs.

The next section shows UPBs in total and for key loan types. The far right-hand column in this section shows the percentage of loans -- or the percentage of UPB, rather, covered by credit enhancement. In the second quarter, we secured approximately $5.7 billion in additional credit enhancement for pay option loans held in the bank's HFI portfolio. Of the 77% of pay option loans now covered by credit enhancement, approximately 48% of this coverage is first loss coverage, and approximately 29% is mezzanine coverage.

At the bottom section of this page, we show reserves as a ratio of UPB, nonperforming loans, and as a percentage of the nonperforming loans that are not covered by credit enhancements.

Let's turn to page 12. Page 12 is an update of a schedule we showed you in last quarter's supplement where we show information for residuals. Residuals are first loss securities and represent one of our most significant credit exposures. The creation of residuals comes about mostly from the securitization of subprime and home equity loans.

The top section of this page shows subprime residuals, and the bottom section shows home equity. As with prior pages, home equity includes both HELOCs and fixed-rate seconds. Let's work across the columns from left to right.

The first pair of columns with numbers show the carrying value at the end of Q2 and Q1. Note that the home equity carrying values include both residuals and transferor's interest.

The next column is UPB for the loans underlying these residuals. Moving to the right, we see the pool factor, which is simply the percentage of the pool that is currently outstanding compared to the original pool. The final four columns on the right show losses in dollars and percents for this quarter and last quarter for each of these residual categories.

Subprime valuations this quarter are similar to the end of the first quarter, except for the addition of new deals during this quarter. Home equity valuations are down quarter-over-quarter, primarily as a result of higher future loss expectations.

Let's turn to page 13. Page 13 summarizes the major actions we have taken or have underway in response to the transitioning environment. The guideline cutbacks in subprime include the elimination of all second liens, the eliminations of the 2/28 program, the elimination of stated loans with CLTVs greater than 90%, the curtailment of 100% financing, the imposition of additional restrictions on first-time homebuyers, and increased FICO requirements for interest-only loans. More restrictions are either underway or being contemplated.

In prime, guideline cutbacks include curtailment of 100% financing and adjustments to 95% financing. Exception boundaries have been tightened. As with subprime, more restrictions are underway.

In addition to guideline adjustments, we have made and are making a number of other control enhancements. CLUES, our automated underwriting system, consists of a rule set and quantitative scorecards. As we note on page 13, the quantitative scorecards have been recalibrated to reflect recent experience. We have also increased escalation requirements for higher-risk loans.

Other controls are designed to detect and address speculative activity on the part of either the borrower or the property seller. We continue to use geography-based controls including filtering out certain geographies for the bank HFI portfolio.

With that, this concludes my comments, both on this page as well as the supplemental presentation. I will turn the call back over to Angelo.

ANGELO MOZILO: Thank you, John. Before we go into the Q&A period, many of you are aware of the increased volatility in the secondary market. I thought it was appropriate that Kevin Bartlett, our Chief Investment Officer, provide a few brief comments on what has recently occurred and its implications to Countrywide. Kevin?

KEVIN BARTLETT, EXECUTIVE MANAGING DIRECTOR, CHIEF INVESTMENT OFFICER, COUNTRYWIDE FINANCIAL CORPORATION: Thank you, Angelo. In the secondary market, three key events have occurred this year. First, we had the disruption in the subprime markets in the first quarter. When we discussed this

event during the first-quarter earnings call, the market for subprime loans had worsened; and the opening questions at the time were the spillover impacts to Alt-A and other products like pay options.

The other unknown was the impact on the CDO participants, which had been the largest buyers of principally mezzanine credit risk for some time and had previously pushed credit spreads to historic lows. The more traditional buyers of credit risks -- banks, insurance companies, money managers, and hedge funds -- were in part driven out of these markets due to the lower spreads.

Also during the first-quarter earnings call, we discussed changes in our subprime programs. We noted that we expected the mix to change rather dramatically and overall volumes to decrease. John McMurray covered this in one of his slides as part of the supplemental presentation.

During the second quarter, the market for subprime loans improved dramatically as CEO investors returned to buy the reduced supply of credit-sensitive securities, owing to the perceived improved quality of the newer production as underwriting guidelines were tightened. Credit spreads for key portions of the securitization structure rivaled the tight spreads the market saw before the disruption in the first quarter.

Our resulting gain on sale for subprime loans reflected this improved market. In addition, we also saw the Alt-A market improve, and subordinate bonds off those securitizations and whole loan sale exits were purchased at tighter spreads.

Towards the end of June, the second key event occurred, BSAM. As is well known, the BSAM funds came under pressure as a result of investments in credit-sensitive securities and resulting negative performance. As it became evident to the markets in late June, BSAM's sizable holdings added a significant uncertainty about the supply of credit-sensitive bonds to the market. As a result, spreads began to widen, and the last few second-quarter securitizations were impacted negatively.

Despite this late June development, we distributed most of the credit-sensitive portions of our securitizations during June.

For home equity loans, the increased costs of those securitizations as a result of recent performance trends made portfolio investments in these loans economically more attractive. As a result, we retained a substantial portion of our second-quarter home equity production in our investment portfolio.

Finally, the third key event happened after quarter end on July 10, when S&P placed on credit watch for potential downgrade a large number of subprime-related securitizations and also enumerated changes to their rating approach. Changes to their approach are not well understood by market participants, as S&P did not fully disclose the exact impact of their newer methodologies. The market has been left with future downgrade uncertainty for many credit-sensitive products -- Alt-A, second liens, and pay options, in addition to subprime loans.

At present, our view of the market is that, until the market can understand future rating actions, buyers don't know what to expect on their portfolios and don't desire to purchase additional credit-sensitive bonds until the impact on ratings are better identified.

In addition, shortly after S&P's actions, Moody's downgrade many subprime deals. As the rating agencies' intent becomes more apparent, my personal view is that the traditional investors in credit-sensitive bonds -- like banks, money managers, insurance companies, and hedge funds -- should reemerge as credit spreads widen and the market perceives the greater level of protection afforded by the new rating agency approaches compensates for the risks and reduces downgrade uncertainty.

But a large question mark remains as to whether the CDO investment vehicles will recover to become buyers again.

As for the impact on Countrywide, our current views are that we will be able to sell at least the AAA-rated portions of our nonagency products; but that we are prepared to invest in the subordinate bonds until market conditions improve. We believe that we have the capital and liquidity to make these investments until the market adjusts. Our expectations are that the current market forces are likely more likely to force the weaker mortgage companies to either reduce their activities or align with stronger players.

We have also made many changes to our product offerings, pricing, underwriting guidelines, and processes, in order to improve the quality and secondary market execution of our production. John McMurray spent a few minutes on these changes during his presentation.

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

While the exact impact on volumes and gain on sale margins is unknown, we expect to see lesser volumes and reduced gain on sale margins until the current market adjusts. Angelo, I will turn it back to you for the start of Q&A.

ANGELO MOZILO: Thank you, Kevin. Okay, now the floor is open for Q&A. So we will start taking some questions.

OPERATOR: (OPERATOR INSTRUCTIONS) Paul Miller from Friedman, Billings, Ramsey.

PAUL MILLER, ANALYST, FRIEDMAN, BILLINGS, RAMSEY: Thank you very much. Angelo, you have been through a lot of these different cycles out there. This doesn't seem -- this seems to be becoming a lot stronger and a lot harder than a lot of people thought. When do you think this ends? I know you have been quoted out there you think this -- maybe it is an '09 event.

But what's some of the things we have to see? We have to -- does the CDO market have to come back? Or does liquidity have to come back? Or do the inventories in the housing market have to go away? What are some of the things that we need to look for?

ANGELO MOZILO: I think the first thing is that the inventory in the house supply has to reverse itself. Because as I view it, and I have been through a lot of these things in 54 years, although the market is a lot bigger now, so the problems are a lot bigger. But as I try to walk through what happened here, and could a lot of this have been foreseen? [These] tend to try to reflect on your own activities, and should we have known, could we have seen it?

But as I do reflect on it, and I do a lot, that nobody saw this coming. S&P and Moody's didn't see it coming, but they simply just downgrade bonds, they don't take hits. Bear Stearns certainly didn't see it coming. Merrill Lynch didn't see it coming. Nobody saw this coming.

So it was the deterioration in real estate values that was the base cause of all of this. We had none of these problems as real estate values were going up. So it is an oversimplification, admittedly, but clearly the deterioration in real estate values -- as a result of the affordability issue and an oversupply.

So I think one turning point is the supply of housing. Because I think once that turns around, the psychology of the country changes. Because now the borrowers -- potential buyers simply say, look, I will just wait, because I will be able to buy the house cheaper tomorrow than I can today. That psychology has to change; and the only thing that is going to change it is supply.

The other -- just so I can reflect on this as you people think of your questions. The other is that the Fed knowingly -- knowing that well over 50, 60, 70% of the loans made in 2003, '04, '05, and '06 were indexed variable-rate loans, indexed one way or another to the Fed funds rate, increased the Fed funds rate 17 times. 17 consecutive times, with most of the product out there being variable-rate product.

You know, and you never knew when they were going to stop increasing. But the fact they did that had a material impact on affordability. As people went to refinance or people went to buy. Major, major impact.

So for a Fed Governor to say that the lending industry had this coming is unbelievable when the Fed, to a great extent, was a contributing -- unknowing contributing factor to this. Plus they came in with the Fed, with the joint [AC] guidelines which restricted the amount of -- the type of loans we could make, in an environment where we had limited liquidity to start with.

The other was the rapid increase in real estate values that we have faced over the last few years caused people to stretch themselves and their financial resources in order to get into a home. There is a high desire for people to own a home. The mortgage product then was developed to try to help them get into the home, which was known as exotic products of various kinds. But there was a secondary market for it. There was plenty of liquidity for that. So the primary market responded to that.

I say also the traditional underwriting standards, which John McMurray alluded to, were altered to use more technology and more credit scoring as a judgmental factor in whether a loan could qualify or not, versus the traditional documentation.

And you had on top of that, which again John related to, was speculation. So I just want to share those thoughts with you.

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

Now getting back to your base question, as I say 2009 because my experience is that it just takes a long time to change, to turn a battleship around. This is a huge battleship and it is headed in the wrong direction. So first, we have to get it to slow down, then stop, and then turn. I think that that -- this is just a gut feeling, based upon what I have seen in the past and the size of this market -- is that it's going to take 2007, the balance of this year, to get this thing to look like it is slowing down; 2008 to get it to slow down and stop; and 2009 to head in the other direction.

My feeling is that by that time, you will have reduced competition, very substantial pent-up demand, because of all of the people who have been closed out of housing, probably lower interest rates. I do think that this ultimately has to have an effect on the economy. I just can't believe that this economy is totally insulated from housing. And will be 2009, 2010, 2011, I look to as sort of like 2003, 2004, 2005. Great years for the industry.

PAUL MILLER: Thank you very much, Angelo.

OPERATOR: Ken Posner.

KEN POSNER, ANALYST, MORGAN STANLEY: Good morning, Angelo, and John. I wanted to ask, if I could, about the performance in the prime portfolio. I have got a lot of questions from investors wondering does this mean that all prime mortgages are in trouble? Or is there something specific about your portfolio that could explain the increase in charge-offs from 4 basis points last year to 19 basis points in the first quarter to around 47 basis points in the second quarter?

What specifically is driving that, because these are prime people, right; they haven't lost their jobs and the housing markets have only just started to soften?

ANGELO MOZILO: Since you mentioned that, before I turn it over to John on this issue, so far what we have seen in delinquencies to a great extent are not resets at all but people losing their jobs, loss of marriage, loss of health. And the problem is they can't either refinance because the value of their homes have gone down, so they are under water, or the program that they used to get into the home is no longer available to them.

So right now, the delinquencies are being driven by more traditional issues than they are by the concern about resets. John?

JOHN MCMURRAY: Sure. So the way I think about prime is that it covers a very vast spectrum, so I don't thank you can paint it with a single brush. Part of the reason that we shared the odds ratios charts with you is to show you some of the key things that are driving both prime and subprime performance.

So in the prime sector, recall how I showed you the line that covered FICO. There is a belief by many that prime FICOs stop at 620. That is not the case. There are affordability programs and Fannie Mae, expanded approval, as an example, that go far below 620, yet those are still considered prime.

Documentation and leverage are also important factors. So if you have the existence of one of these high risk factors or the combination of several of these factors in a prime loan, it is going to exhibit higher delinquencies.

KEN POSNER: I understand. John, would it be safe to say then that in Countrywide's prime portfolio, it would not be the FICO scores, obviously; they're very high. It would not be the LTVs; they're very moderate.

But we should assume then that there are, in fact, multiple risk factors that are driving the spike to 47 basis points in charge-offs, because that is just not a charge-off ratio one would expect for a -- at least for an old-fashioned prime portfolio.

JOHN MCMURRAY: Well, a couple things. Again, remember even in prime, there is a very broad distribution. So even though on average, the FICOs are very favorable and the CLTVs are very favorable, you're still going to have tails at both ends, both very good loans and loans with a lot of high risk factors.

The charge-offs ratio that you're seeing in the bank -- also, as I said, be sure to see footnote 3 -- a substantial portion of what you see this quarter relates to a change in our charge-off practices. So some of the charge-offs that would have been taken in future quarters were accelerated into this quarter. So.

KEN POSNER: John, I will confess, I missed footnote 3. Could you explain what the magnitude of that effect is, and maybe just take a second if that is an important factor?

JOHN MCMURRAY: Sure. So for the HFI portfolio across the firm, we adopted a 180-day charge-off standard. Prior to that, for much of the HFI portfolio we used a standard that is similar to what is used in our securities, where we wait for the loan to go into foreclosure and through REO before doing the final charge-off.

The advantage of the approach to that we were using is that it is much more precise. The later we go in the process, the more certainty we are going to have, exactly, with respect to what is charged off.

The advantage of the approach that we moved to is that you charge the loans off earlier, though you do lose some of the precision. But in any case, by adopting those standards firm-wide, as I said, we moved some of the charge-offs that we would have had in future quarters into this quarter.

KEN POSNER: Did you quantify the impact from that change? Then I would like to go back in line.

JOHN MCMURRAY: I did, but just as a quick reminder -- and I wanted to make one other comment. So inside of the banking operations segment, the impact is going to be in the neighborhood of $30 million for the quarter. On a consolidated basis, it's going to be in the neighborhood of $50 million.

One final quick comment. As we have talked about in prior calls and during our presentations, Countrywide is a mortgage supermarket, so we generally offer what is offered by the market at large. So it is my belief that the portfolio that we have for the most part is going to be a good reference for what exists on a broader basis.

Then also, keep in mind the comments I had on the delinquencies. Many firms report out using the OTS standard. Eventually those delinquencies are going to catch up with the MBA standard, but you're not going to get as early of a read.

KEN POSNER: Thank you very much.

ANGELO MOZILO: Ken, I would also comment that when you made the comment about the traditional prime and don't expect that kind of delinquency, I do think it is -- be important to observe what happens going forward, because we are experiencing home price depreciation almost like never before, with the exception of the Great Depression. So I think using standards or frames of reference on prime and the performance of prime in other environments may not be a fair comparison in light of what is happening to real estate values.

KEN POSNER: Point taken. Thank you.

DAVID SAMBOL, PRESIDENT, COO, COUNTRYWIDE FINANCIAL CORPORATION: Ken, this is David Sambol, let me also weigh in. I think you were attempting to identify what maybe subsegments of the portfolio have contributed to higher charge-offs and delinquency trends. If we had to identify any particular category of the home equity portfolio, it certainly would be the higher CLTV and the higher CLTV reduced documentation loans that we have in the portfolio, that are disproportionately contributing to charge-offs and delinquencies.

Many of those stem from the higher concentration of piggyback financing that we did and that we have in the port stemming from what was occurring in the market. I point out that when we originated those loans we certainly were cognizant of the fact that they would perform differently than traditional home equity loans; and we attempted to price for that.

So that one of the data points on John's presentation that you might have noted was the pricing on our average HELOC book, expressed as a margin over prime, and it is close to prime plus 190. You would compare that to, for example, typical stand-alone HELOCs historically done would be priced at prime flat, or even prime minus for many of the banks.

So that was a risk premium that we add to the pricing for those loans. But certainly, we didn't anticipate what would happen with HPI. Again, as John illustrated, the correlation between significantly up-sloping losses and the kind of environment that we are seeing.

We also enjoyed very robust earnings on that book with negligible charge-offs and losses historically as a result of the very benign environment we have come out of the last two years. Now we are really seeing some that risk premium we charged or embedded in the loan being absorbed. So that is kind of the way I look at it -- it's another way to look at what we are seeing.

KEN POSNER: That makes a lot of sense. Thank you, David.

OPERATOR: Eric Wasserstrom.

ERIC WASSERSTROM, ANALYST, UBS: Thanks. Just one point of clarification and then one question. I guess the point of clarification is I kind of summarize these comments that you have made on credit quality. Is it just too simple to say in areas, whether they were in subprime or prime, where you had excessive risk layering with an excessive dependence on home price appreciation that you're currently seeing the process of that unwinding in terms of the credit performance?

ANGELO MOZILO: I think that is an oversimplification. We didn't rely upon home price appreciation. We relied upon an appraisal of current value as a lender. You can't forecast as a lender which way values are going to be going, up or down. You at least traditionally and historically use appraisals, with certain protocols to establish what the value is; so you can determine what kind of loan-to-value you want to establish based upon the quality of the credit of the borrower.

So we did not make these loans based upon value is going to go up forever, because we know they are not going to go up forever. But you don't know what they are going to do, whether they are going to stabilize, go down; if they do go down, how far? It is just unpredictable.

So in our business, you're limited to what you believe the value to be based upon a professional appraiser valuing a piece of property at that time.

ERIC WASSERSTROM: Maybe I will follow up with a little bit more about that off line. The question I have is -- just to get away from this topic for a moment -- you know, you guys have engaged in some capital optimization and some other elements of financial engineering. I think efforts to migrate some of your MSR assets into the Bank. Can you just give us update on where those various efforts are currently and what that suggests about capital optimization from here?

JOHN MCMURRAY: Yes, well, two things. In terms of our capital position, I would characterize where we are at as we are in good shape and strong capital position. We have talked in the past about having excess capital. We remain of the view that we have excess capital in the near-term, certainly over the next quarter or so. We intend to put that capital to use by investing in the balance sheet.

As Kevin mentioned, we expect to use our balance sheet to hold additional assets as a result of some of the volatility out there until the secondary market conditions normalize.

We also as a result of credit spread widening, we view this as an environment that will throw off opportunities for the Bank to accelerate growth of their loan portfolio, their HFI investment portfolio. That is evidenced by our decision during the quarter to move some home equity loans that we originated into the Bank.

So this environment will give us an opportunity to deploy capital back into the business as a result of spread widening. We also expect that other opportunities will present themselves over the quarter as the stressed environment results in issues for some of our competitors. In fact, we're already beginning to see -- this is a leading indicator I could share with you -- that over the last quarter our growth in the sales force was probably at a one- to two-year high. I am trying to determine the last time we grew it at that pace.

But all because things are beginning -- consolidation is beginning to accelerate and that means more opportunities, hopefully more production of volume, which will require balance sheet. So we don't expect -- we talked about cap optimization in the past; we don't expect, certainly in the near-term, any buyback.

In terms of your question about MSRs and the Bank, I think we previewed that it was our -- that we have a process that is occurring whereby we are seeking to migrate our mortgage banking operation from CHL into the Bank as part of our plan. We anticipated that beginning in 2008, we would start investing in MSRs within the Bank. We are still on track for that. Our plans are on track, but that is unlikely to occur before next year.

When it does occur, what we will see happening is the Bank MSR portfolio beginning to grow, and the MSR portfolio in CHL beginning to shrink.

ERIC WASSERSTROM: Thanks very much.

OPERATOR: Chris Brendler.

CHRIS BRENDLER, ANALYST, STIFEL NICOLAUS: I guess one thing I'm struggling with is the undiscounted losses embedded in your home equity and subprime, and I guess also the Bank portfolio. I'm surprised that you haven't seen I guess issues besides life events in terms of rising delinquencies. So what I'm trying to get a handle on is, given

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

how it seems like we're still early in the housing price decline that could accelerate as the year progresses and into 2008, how conservative or how appropriate are these marks today? What is the housing outlook embedded in there?

Maybe you could give us any color. I do think we have seen some resets hit in the second quarter. How are the resets performing? Doesn't that add a wave of pressure on these valuations?

Also, what is happening from a loan modification standpoint? Thank you.

KEVIN BARTLETT: All right, let me work backwards from your questions. On the loan modification front, it has been our long-standing practice to always pursue a modification or a workout with a borrower as a first line of attack for somebody that falls delinquent or gets into trouble.

Two reasons for that. One is it's the right thing to do for the consumer; and secondly, for Countrywide it usually results in better economics. So on the modification, in the area of modifications, we are going to continue with the philosophy that we have had, although there obviously will be more of that activity.

With respect to your second to the last questions, which had to do with resets, we haven't seen a lot of that activity yet, with the exception of subprime. So if you look at the 2/28 and 3/27, if you look at the 2/28 and 3/27 subprime loans, most of the loans tend to prepay prior to the reset. But those that are left subsequent to the reset tend to have much higher delinquency rates.

So, one of the concerns that we have is just the less availability of subprime financing as a result of the guideline cutbacks. So we are watching that carefully.

Now, let me go back to your first question. So did you want me to address that with respect to residuals?

CHRIS BRENDLER: Residuals, I guess, and the bank portfolio. It seems like it is hard to figure out where we are. I thought last quarter --?

JOHN MCMURRAY: Let's do a couple things. Let's start with a key distinction between the Bank portfolio and residuals. In the Bank HFI portfolio, credit losses are provided for via a traditional reserve. So that reserve is going to consist of two parts.

The first part is a general reserve. So that is going to cover loans that we expect to become 90 days or more past due in the next 12 months. So it provides for 12 months of coverage there. On loans that are now 90 plus or higher delinquent, we provide for a lifetime loss expectation. So that is the Bank HFI portfolio.

In the residual valuation, there what we're doing is we are estimating losses over the life of those loans; and then that is being incorporated into the cash flow. So you're going to have a combination of interest-only cash flows or excess servicing in effect, plus the projection of losses. Those are netted together and then discounted back to the present. So on residuals, we are able to always contemplate our current view of lifetime loss expectations; that is not going to be the case in the bank portfolio.

Kind of the final comment here is that given the environment that we are in, I still think there is a fair amount of uncertainty with respect to anyone estimating what future losses will be. In fact, most of the increase in loss estimates that we made on the home equity residual portfolio this quarter was basically entirely on loans that are currently not delinquent. In other words, they are current. So they are loans that we expect to become delinquent and default in the future.

CHRIS BRENDLER: Let me just ask it a different way, I guess. The sequential change in some prime loss rate was zero; so you are still looking at 6.3% losses. If I took the pool factor of 54%, so you're looking at cume losses I think which are basically half that, assuming that most of the early loans didn't have any losses. They prepaid.

So given Angelo's comments about the housing downturn extending into 2008, maybe 2009, I'm trying -- and given the fact that housing data over the last three months has been pretty much a train wreck -- how do we reconcile? How do I feel comfortable that there is not further residual write-downs coming?

JOHN MCMURRAY: Well, we believe we have a -- well, not we believe; we have a housing price forecast embedded in the valuation that is more severe than anything that we have seen in the past. I hesitate to give any comfort, because the future is uncertain. So it is possible that it will have to be revisited. We hope that is not the case.

DAVID SAMBOL: This is Dave Sambol, let me see if I could give a little bit of extra color. With respect to the remaining losses we have provided for on an undiscounted basis in the subprime portfolio, it is the case that it is ap-

proximately 6.3% as John reflects. But it's a much higher number on more recent vintages like 2006, and a lower number on older vintages that have more accumulated'equity appreciation.

So I would make that point. I would also make the point that the entire balance sheet exposure in subprime residuals -- while not immaterial on an absolute sense -- is only $382 million, representing -- excuse me, $442 million, representing an aggregate kind of cap as to what the exposure could be if we were wrong and additional impairment was necessary.

As it relates to the home equity write-downs that we took, and fairly significant increases in projected future losses that drove that write-down and is embedded in our current numbers that John showed, I would point out that we're providing not only -- a significant portion of that is on current loans, and not necessarily on delinquent loans.

We're providing for future losses at a level that is greater than anything that we have ever seen. Just the size, kind of the scope of it. Again, absent a crystal ball, we don't know. But it is probably. as it relates to the home equity portfolio, our view, more conservative than what -- from our reading of other press releases and so forth -- that we think others are providing for.

In terms of rate resets, that was mentioned and Angelo commented on that. Just to elaborate on that, as we -- and I think I discussed this last quarter. As we look at and do an autopsy or post mortem on loans that go through the foreclosure sale process, for the purpose of identifying the driving cause and what the consumer told us, it really is to date the case that a very, very small percentage of those customers that lost their home through a foreclosure lost the home as a result of payment shock or rate reset.

I think the numbers are close to 60% are attributable to some form of loss of income or material curtailment of income, something happened, or -- and this is slightly under 60%. Another 25% is attributable to death or divorce or disability and illness. Then increasingly we're seeing investors; a significant percent now is explained by investors that are unable to get out of the property. A very small percent really, so far, is explained by rate resets.

In terms of the last topic you mentioned, modifications, as John mentioned we do, I think, as much if not more than most everybody in ensuring that we keep people in their homes. Not only because that is the right thing to do, but because it mitigates our losses as well, as I'm sure you know.

Just in the month of June, we effected approximately 2,000 modifications on loans that were otherwise in the foreclosure process, that resulted in the loans leaving the foreclosure process. That compares to approximately 1,000 -- it is more than doubled or approximately doubled -- one year ago. So modifications are being used, wherever it makes economic sense and otherwise makes sense for the borrower.

ANGELO MOZILO: Okay, I just wanted to make a clarification. I know the press is on the line and (inaudible) you out of that statement that -- I am not saying that house prices are going to decline (inaudible) 2009. Going back to my battleship analogy, I think it is going to take all of 2007, part of 2008, to get this whole negative process -- house prices, increased delinquencies and foreclosures -- to slow down; and the balance of 2008 to get this battleship stopped; and 2009 to get it going in the right direction.

As to when house prices will decline, I don't know. What I was referring to was in terms of the performance of the industry, performance of Countrywide more specifically, that at least my view of it -- and just take it as that. This is a visceral view of it just based upon past experience. It does not mean it's going to happen that way.

But that we at least internally prepare ourselves to make sure that we are doing everything we can during the next year and a half to reverse the trend, and then to take advantage of the opportunities we're going to have in 2009. That it is what I am referring to, not that -- I don't know when house -- the cessation of house pricing declines are going to take place.

CHRIS BRENDLER: Thank you very much.

OPERATOR: Moshe Orenbuch.

MOSHE ORENBUCH, ANALYST, CREDIT SUISSE: Thanks. I was wondering, in the slide presentation you mentioned that about three-quarters of your option ARMs were covered by mortgage insurance. Could you talk about, first of all, how that will play out in terms of when you will actually be able to draw on that; and how that is going to impact; and your future expectations for the provisioning within the Bank?

JOHN MCMURRAY: Sure. Well, to start with, the provisions that we make contemplate this credit enhancement. As I mentioned, roughly 62% -- or I think I said which equates to $47 million out of the $77 million or so -- is first loss. So what that means, as soon as a loan that is covered by that policy defaults, because the coverage is first loss, we will be able to submit a claim immediately.

There's other coverage that is mezzanine coverage. So the way that will work is the pool of loans that are covered by those policies are going to have to accumulate a certain level of losses before we are able to start submitting claims.

But again, on just under two-thirds of the coverage it's first loss, so we from the very first loss on loans that are covered we can submit claims.

MOSHE ORENBUCH: How does that impact your provisioning as you go forward? And what should we look for in terms of that provisioning?

JOHN MCMURRAY: It affects the -- if a loan is covered by a credit enhancement, particularly a first loss credit enhancement, that is going to affect the calculation of our reserve, because the expected loss is provided for via a credit enhancement as opposed to charging it off against a reserve that we're holding on the balance sheet.

MOSHE ORENBUCH: Do you have a sense as to how much that benefited the current quarter?

JOHN MCMURRAY: It basically has had very little to no benefit so far, so those benefits are going to come in future quarters. So it is not been used heavily yet; but it is there standing by in case pay option losses start to ramp up.

OPERATOR: Fred Cannon.

FRED CANNON, ANALYST, KEEFE, BRUYETTE & WOODS: Thank you and good morning. A question. You guys floated about $4 billion in convertible securities in the second quarter, and they had a pretty low coupon on them because of the convert. I know there were some accounting issues. I was wondering if you could tell us what the interest charge that went through the income statement for the quarter on those was?

ERIC SIERACKI, EXECUTIVE MANAGING DIRECTOR, CFO, COUNTRYWIDE FINANCIAL CORPORATION: Hi, Fred. You are correct. We did issue $4 billion of convertible debt. One of the key advantages that we had -- and there were many. We were able to tap investor groups other than MTN investors. We were able to save a significant amount of coupon; probably about 325 basis points was the savings on the coupons. So $4 billion, 325 basis points for a quarter would have been theoretically the savings.

We didn't have those converts outstanding for the entire period. But it also should be noted that there are some ramifications of future accounting promulgations. We may see in line with fair value reporting the GAAP benefit go away from the difference in the coupon. But at least for now, until that new promulgation comes about, we do get the benefit of the lower coupon through P&L.

Again, it would be 325 basis points times the $4 billion; if it was outstanding for the full quarter, you would have to quarterize that.

FRED CANNON: Okay. Then, I know they have a fairly short option on them, for the owners to put them back to you. If that occurred, would you -- what is your thinking on this security, Eric? Did you like it? Would you do it again, I guess, is the question?

ERIC SIERACKI: Obviously, we like the security. We were able to place almost 40% of our full-year financing away from MTN investors, away from term debt investors. Got the 325 basis point reduction in the coupon. We are able to fill the Delta short in connection with that trade as well. So it was a great trade.

There were two tranches, $2 billion each. One was 17 months, one was 24 months. So we would very happily consider issuing additional converts in the future.

One of the things we're trying to do was monetize very high [VOL] in CFC equity, which is a Company asset that is difficult to monetize. Through this trade, we were able to do that.

The bottom line is that we were at $48 million in interest expense on those $4 billion of converts during the quarter.

FRED CANNON: Great. One other question. I know you're talking about making incremental investments given the market conditions. I noted at the Bank I think your securities portfolio was -- most of the growth in the Bank assets

was -- in fact, all of that lives in the securities portfolio, which would appear to be earning a relatively modest spread in this environment. Could you kind of expand on the strategy regarding securities investments at the Bank?

ANGELO MOZILO: Let me just -- we will have, I guess, Carlos cover that, but let me. I would just point out, maybe modest, but it's safe. (inaudible) particularly in this environment.

Secondly, it was an alternative course because we couldn't find the assets, the appropriate assets, that met all our hurdles for the Bank. It was a good alternative for us at the time to put assets in the balance sheet.

The negative part of that is that it exacerbates delinquencies because you can't put that in your denominator in your delinquency calculation. It is not a loan. So the delinquencies in the Bank are exacerbated by that factor. But they're a good safe AAA investment. So Carlos, do you want to talk about it?

CARLOS GARCIA, EXECUTIVE MANAGING DIRECTOR BANKING & INSURANCE, COUNTRYWIDE FINANCIAL CORPORATION: Yes, I would mirror what Angelo just said and just add that in this period where credit risk is a key consideration, these securities offer the Bank a transitional investment strategy that provides us with, A, a low level of credit exposure, very high-quality assets, low risk base capital implications, and predictable returns on the security cash flow themselves.

But I should remind you that the securities are short-term in terms of their expected life, and they have a significant prepayment. Those prepayments will be reinvested; and the ultimate return will depend highly on what those cash flows that come back to us get reinvested in.

We don't see the housing market staying permanently this way. We don't know what to call the end of it. But certainly at some point in time it should improve.

FRED CANNON: I guess, Carlos, a question I had also is kind of vis-a-vis Kevin's comment about willing to invest in certain parts of the straight loans. Given that growth in the securities portfolio, should we expect that to stabilize or decline, given that short duration? Start to see loans go back up? Or are you guys being pretty cautious regarding credit risk at the Bank at this point in time?

CARLOS GARCIA: First, let me say that we are being very cautious with regards to credit risk. Secondly, let me say that in this environment, I think Kevin and others alluded that credit spreads are widening; and (inaudible) investment is a good thing. Because that means a better return. So we will be very opportunistic about what assets we select. But the opportunities, I think, will be greater.

I should also point out that some of the suboptimal returns that you may see in the current quarter represent a snapshot in time of the return of an asset. The lifetime returns of these assets are very good, but we have just come out of a period that suffered benign credit into a very difficult period. So we're transitioning something that required less reserves to something that requires a lot of reserves. And that is all getting concentrated in a few quarters.

But going forward, the returns -- you know, assuming our assumptions about the future are correct -- these reserves will start to improve. Certainly the new assets that we put on the books are all priced at very acceptable, in fact attractive, returns.

FRED CANNON: Thank you.

DAVID SAMBOL: Yes, I would also add -- this is Dave Sambol -- that maybe emphasize that one of the positive byproducts of the current volatility in the market is this widening of credit spreads. It is just providing the Bank an opportunity to grow at HFI portfolio, its residential loan portfolio, more than it has been able to over the last several quarters.

Because credit spreads have been so tight that we do not believe that we were getting sufficiently compensated for credit risk, and that explains why our investment strategy became weighted to more very liquid high-quality securities.

That is changing. In the near term, we do expect -- as is the case in the second quarter -- to maybe divert more production that otherwise meets the Bank's credit criteria filters to the Bank as a result of wider credit spreads. Kind of the flipside of maybe the negative impact on the production sector margins that we anticipate from these wider spreads and lesser sales and associated gain on sale in the second half of the year.

FRED CANNON: Thanks.

ERIC SIERACKI: Fred, I have a correction on that interest expense on the convertible. Based on the amount of time the convert was actually outstanding for the period, the interest expense on the convert was actually $11 million; and the approximate savings versus term debt that would have been comparable to that would have been about $14 million. So correction -- the amount of the expense was $11 million.

FRED CANNON: Thanks.

OPERATOR: Brad Ball.

BRAD BALL, ANALYST, CITIGROUP: Thanks. Trying to sort of work through how this all shakes out in the end, it seems like the problems at first were contained within subprime; we attributed it all to irrational behavior, some players that were overly aggressive during the decline in industry volumes doing things they shouldn't have done.

Now it seems that we have shifted to a discussion that surrounds prime. I am curious if you would characterize some of the behaviors in the marketplace as irrational. I wonder if you could comment, given that we have the benefit of hindsight, if we went back a year or two and you were in the marketplace at that time, what would you have done differently? Would you have put in place the actions that you have underway today, the operational responses that you discussed? Could you have put those in place a year or two ago?

ANGELO MOZILO: Yes, I think your last question is a very good one. Could you have put it in place? The obvious answer is that the deterioration in house values, we knew that; that it was going to go back. We would have had to really stop doing that business, and the Company would have been a very different Company because you can't do this absent competition.

So our volumes, our whole place in the industry, would have changed dramatically because we would have arbitrarily made a decision that was contrary to what everything appeared to be. Values going up, and no delinquencies, no foreclosures, and we suddenly stop the music and say that we're not going to participate in home equity loans, in subprime, in high LTVs, no docs, and that sort of thing.

It would have been an insight that only, I think, that a superior spirit could have had at the time. So I don't mean -- because I think it is a very good question. Because I ask myself that all the time as CEO. That is the kind of question I ask. What should I have known and when should I have known it, and what should I have done about it?

As I go through that process, it is obvious that if we had stopped participating in those major areas of the business, we just couldn't stop it there. It would have affected us through the entire spectrum of our lending operations. Because you can't simply say we are out of subprime, we only want prime. Because the providers of loans provide both subprime and prime both, and will not give you the prime if you're not willing to take the subprime. That kind of thing.

So. But I think in the theoretical sense, would we do things a lot differently, knowing what we know now? Absolutely. We would have done a lot of things differently. But we didn't. The fact is we didn't know.

I think as John pointed out, the first part of your question as to prime, prime is a -- does have a lot of definitions attached to it. It is CLTV driven, it is FICO driven, it is credit, it is all downpayment driven, it is credit history driven. So it is hard to say that a prime loan is not a 70% LTV, 780 FICO. It is just not; it is a mixture of a lot of things.

So the spillover into prime, I don't think is something that should shock anybody once you understand the definition of prime. Because I think the basic issue you see today, particularly with Countrywide, is the spillover into the HELOC portfolio. At least for this quarter, it's not really a subprime story; it is a HELOC story and the deterioration in that, and the piggybacks that were originated in order to assist the mortgagor to avoid PMI and all the advantages that that avoidance provided for the borrower. And reduced costs and tax deductibility at the time, because PMI insurance was not taxdeductible at the time.

So it is a -- these are difficult things to retrace your steps on. But I think the issue now for us, speaking for Countrywide, is the HELOC portfolio. We will have to see what happens with subprime going forward. But I think that David pointed out that there is a limit to this in terms of our total. The total residual on our balance sheet is about $400 million. If everything collapsed, that would be the extent of our residual exposure.

But I do think it is a question of what happens in Alt-A. Alt-A is again a very broad definition of Alt-A, even broader than prime. We will have to see what the spillover effect is. But the bottom line is, as values decrease, the options for borrowers, homebuyers and borrowers, people who (inaudible) -- and the combination of limiting their product available to them, is exacerbating the problem. We will just have to see how long that plays out.

# EXHIBIT 2
# (PART 2)

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

In fact the Fed joint agency guidelines seriously restricted liquidity for borrowers to either refinance or for people to buy homes. I am not making a judgment whether it was right, wrong, or indifferent. It is just that that is what it did. Then combined with a volatile secondary market -- if you think about the perfect storm, that is the perfect storm.

BRAD BALL: So it sounds like you are saying that what we are experiencing right now is not the product of irrational behavior, like the subprime debacle that came upon us late last year. But rather the product of an industry with excess capacity and pretty intense competition and a market environment that looked pretty good at the time.

ANGELO MOZILO: I think that is fair to say. I mean, even in the HELOC if you look at the history of HELOCs by banks, I mean they -- very often it was 100% LTV. When they came in out of piggyback, when somebody came in for a second mortgage on their home or home equity line, it is very common to provide that type of financing by banks. And in an ordinary market, it worked fine.

It's this sudden and severe and deep deterioration in values, and particularly in certain parts of the country, has really exacerbated. Any even minor judgment area you're going to make has become a major issue. David?

DAVID SAMBOL: Yes, just some additional perspective on the topic. I agree with Angelo. Certainly hindsight being 2020, there are things that would all maybe do differently. But I think it is important to emphasize some of the things we did do, and we are pleased that we did.

First, as it relates to the majority of our production, as you know, we sold all of the credit risk on the majority of the production, and that was the case in the majority of the Alt-A. Virtually all of the Alt-A production maybe with the exception of pay option ARMs, both fixed and adjustable rate, to retain no credit, retain interest.

We also sold last year a good portion of our subprime residuals, approximately 50%. We, as you now know, credit enhanced a significant portion of our held-for-investment portfolio in the bank.

So we took a lot of actions to mitigate risk, and beyond all that, we, of course, as I said at the time, priced -- where we and the market liberalized guidelines, we sought to price for more risk and more liberalized guidelines. And much of that translated into fairly significant earnings over the last several years, where today only some of that is really now clawing back.

So that maybe gives some additional perspective on the topic.

BRAD BALL: Thank you.

OPERATOR: Bob Napoli.

BOB NAPOLI, ANALYST, PIPER JAFFRAY: Thank you. We have a different moderator today. A couple questions. I guess, first of all, on the growth of the sales force in this environment is it -- why do you feel that it is a good thing to be growing the sales force? There is overcapacity in industry. Overcapacity finally seems to be starting to roll over.

There is a lot of risk in the market, home prices are unstable. Yet, I think that Countrywide is one of the few companies that has been aggressively growing its sales force in this environment.

UNIDENTIFIED COMPANY REPRESENTATIVE: Yes, Bob. The reason is -- a lot of that is coming to us. The reason is that on the retail side, our investment and the costs associated with that sales force is very variable.

So the volume, the incremental volume, we pay them to the extent that they source incremental volume. And the incremental volume that they source is accretive to our bottom line, and it helps offset -- it will help offset some of the pressures on earnings from some of the other dynamics that we talked about.

So we are not paying big premiums applicable to the sales force expansion. We're not paying significant goodwill or big M&A premiums. It is coming to us organically, and the breakeven economics for new sales force hires is very compelling.

Several months after they're boarded, to the extent that they pass our filter, which they need to before we hire them, their contribution is accretive to us.

ANGELO MOZILO: Bob, a couple things I think you should think about. One is that our market share, although rising 18%, 19%, as you saw this last quarter, in the retail sector it is very, very low. It is below 10%. And that is our most profitable, our most stable business.

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

We get repetitive business from them, cross-selling, refinances and insurance product. So it is very, very important that we take this opportunity, which is a rare opportunity to get high-quality salespeople into the retail sector to pick up our market share and to continue to grow the business.

The most stable part of the business we have is retail. And these people are very difficult to get when things are going well. So, as David pointed out, the economics for these people are very compelling.

The second point you raised, which is with deteriorating values and the danger of making loans today, it would seem to me that this is the time to be making loans when values are lower. Otherwise, you would only make loans when values are higher and always expose yourself to a deteriorating situation.

So that as values are going down and you stay in the business, sort of you're continuously building a better book of business, rather than just laying back, not playing in the game until values go back up and then get caught in that cycle again.

So you have to be in the game every day in a major way. I wouldn't -- the capacity in the business is being driven out quite rapidly, as you will see over the next six months, as announcements are made as to people going out of business or just merging. Again, this at least historically has been an opportune time for us to strike.

BOB NAPOLI: So we shouldn't expect to see any announcements out of Countrywide you're laying off 500 people or -- I mean, is that --?

ANGELO MOZILO: No, I think you could -- yes. You certainly -- there's two ways, two things you have to look at. You have to bifurcate Countrywide's operations. One is its sales force, the people who make something out of nothing, who create value by bringing in business. And those who process that business, and that whole processing operation is driven by -- the number of people involved in it is driven by the volumes flowing through the operations.

As that volume decreases you, by certain measurements, begin laying off people. So it is certainly -- we are deeply involved right now in cost reduction measures. So that -- and our history is that we will, as you know, you have been involved with the Company a long time, we will take the appropriate steps in terms of reducing personnel costs when appropriate.

BOB NAPOLI: Okay. Just maybe some color on the gain on sale margins that you have in your outlook. If you can give some color on the volatility in the secondary market. I mean, the agency business, where, how are the margins in the agency business? Is it -- are those margins stronger today? And the nonconforming business, how much of that would you feel comfortable holding on your balance sheet?

DAVID SAMBOL: Bob, it's Dave. It is the case that the volatility that we made reference to today, and that which we anticipate, is primarily applicable to the nonagency business. Our forecast with respect to production margin -- again sale margin in the second half of the year was particularly adversely impacted by what we envision in the near term for the nonagency production.

Really, the reason for the forecast is the convergence of a number of factors that are creating what we see to be a very stressed second half, particularly the third quarter. We have seen recent trends on the application side, both refinance applications and purchase applications trend downward. We have seen, as interest rates have increased the latter part of the second quarter, and volume as new apps have fallen, increased front-end pricing pressures, competitive pressures on our margins, across the board.

Then, most notably here in the latter part of the second quarter as Kevin mentioned, and the beginning part of the third quarter, this very material disruption in liquidity for nonagency related products and widening of spread will we believe have a material impact on the back end on our gain on sale margins. Particularly for inventory that we carried into this environment from the second quarter.

We had a very healthy pipeline in inventory coming into the third quarter that is going to be subject to the spread widening stemming from what is occurring in the nonagency markets today. Really, we don't know when that will normalize and subside.

In terms of our capacity, we of course, in planning for a worst, for a stressed case, one where I think Kevin mentioned if we had to keep for all nonagency originations, all bonds below AAA, the approximate amount -- Eric, can you give us some numbers on the approximate monthly volume of additional assets we would be retaining in capital that that would consume?

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

ERIC SIERACKI: Sure. Talking about subprime, HELOC, fixed-rate, second, Alt-A, and pay option ARMs, contemplating only selling the AAA, keeping all the securities underneath that credit level, the incremental monthly equity drain would be about $100 million. The amount of debt we would have to raise would be about $600 million. That is incremental over our normal course of operations. That is a monthly level.

That is something that our contingent liquidity planning more than amply provides for. So I wouldn't call it rounding, but it is very easy for us to provide that additional financing.

DAVID SAMBOL: Now the impact on second quarter or second half, I should say, production margins stems from the fact that even if we retain it we have to mark to market. So we expect that margins will be impacted by the wider spreads, certainly on the inventory coming in.

We also, as I mentioned, expect to sell less, particularly in the third quarter, and maybe divert more to the Bank given this environment, which will adversely impact production margins. And all of those factors are converging and were considered in our guidance and estimate of second-half production sector performance.

BOB NAPOLI: Okay, that mark-to-market would go through the gain on sale line for the inventory?

DAVID SAMBOL: Yes.

BOB NAPOLI: Just on the credit side, we got -- it seemed to accelerate, obviously, in this quarter. As you said it was more of a HELOC issue this quarter. It was subprime last quarter. Fortunately, the job market has been pretty strong through this. So I wonder what it would look like if the job market starts to fall apart.

But do you see an acceleration coming out of this quarter into the back half of the year on the negativity of the credit statistics? I don't know if you can give any color on the rate of trend of change in credit statistics that you see.

JOHN MCMURRAY: Well, I think you make a good point, Bob; the unemployment situation has been favorable. So I do think if that was more adverse, we would see higher delinquencies and defaults.

ANGELO MOZILO: I think that, however, again, these numbers are averages. If you look at three states were there's very serious problems -- in Michigan, in Ohio, and Indiana, where the unemployment rate is very high -- we are experiencing high delinquencies today in those three states.

BOB NAPOLI: That was one of my questions as well, the geography. How regional is the problem on the credit side?

ANGELO MOZILO: I'm sorry, just generally speaking and I will let John do this, but where you have had high acceleration in prices -- for example, in California where people stretched themselves to get into the home, as John pointed out in Sacramento, Fresno, Modesto, Stockton, you see high delinquencies for that reason.

In the states that I just mentioned, you see high delinquencies as a result of unemployment. In Dade and Broward County, in San Diego, as John pointed out, you see high delinquencies because of oversupply of condos and speculation. So it is regional, but each of these regions have their specific reason as to why we see exacerbated delinquencies. John, would you agree with that?

JOHN MCMURRAY: I would not only agree with that and let me just make two quick points. So geography matters a great deal. The first region -- the first reason it matters is with respect to home prices. So we see big differences from MSA to MSA, even MSAs that are close to one another.

The second reason that geography matters is, even after we adjust the effect of home prices out of the equation, we still see many geographies underperforming. So the Midwest as Angelo mentioned is an example which doesn't show up on a lot of the charts as having a serious risk of home price depreciation going forward; still has very bad performance even after adjusting both for home prices and all loan attributes.

DAVID SAMBOL: I would also point out that in the scenario where the economy worsened and we begin to see what has happened in housing spillover, the broader economy, and if unemployment picks up, the business as I imagine you know is subject to somewhat of an intrinsic hedge. It is an inversely correlated risk we have would suggest (inaudible) that the Fed in that kind of a scenario would be motivated to maybe ease. With an easing we would expect a bond market rally. And with a reduction in long-term interest rates, the nature of our model is such that we believe that the increased origination volumes and profits will likely more than offset the increased credit cost in that kind of an environment. So, that is important to understand as well.

ANGELO MOZILO: It just doesn't go one way, Bob. Dave is absolutely right, historically, that if in fact this does have an impact on the economy, unemployment begins to increase, the Fed would have to lower rates. That is the overall cure for all of this, lower rates.

BOB NAPOLI: Last question is any easy one. What was the ending fully diluted share count?

ANGELO MOZILO: It's obviously not so easy (multiple speakers).

BOB NAPOLI: Thank you. You can get back to me with that.

ERIC SIERACKI: We will announce that shortly, Bob.

BOB NAPOLI: Thank you.

ERIC SIERACKI: 595, 540.

BOB NAPOLI: Thank you.

OPERATOR: Ken Bruce.

KEN BRUCE, ANALYST, MERRILL LYNCH: Good morning. Thank you for the question. There is not a lot of encouraging news that we are hearing today. I was hoping maybe to go back and get you to answer a question that you danced around with Bob but I think is important.

Could you reflect back to how much of your business is agency eligible, and what the pricing dynamic is within that market, please? Obviously there is quite a bit of uncertainty as it relates to the nonprime or the nonagency business. But if you could just maybe discuss what the implications are for your margins with respect to prime and how that business may reshape or begin to reassert itself in terms of the prime component of your business model going forward, please?

ANGELO MOZILO: We understand the question. The question is how much of our business that we're doing is agency eligible?

KEN BRUCE: Yes. You said in the past about 75% is GSE eligible. I had hoped to maybe update that number and just give us some sense as to what the pricing dynamic is there, please.

DAVID SAMBOL: I would -- these are just rough estimates, but at the height of the housing and refi boom, the percentage of agency production in total production fell into the 30s where the non GSE eligible production was in the 60s, maybe even approaching 70.

The agencies have since, in the last several quarters, picked up dramatic market share. Our mix of business, the weighting has increased materially towards the agency side, where today -- between Fannie, Freddie, and Ginny eligible production -- it exceeds 50%.

In terms of the margins on that business, historically the margins on the agency business were lesser than the nonagency business; although in a stressed environment where spreads have widened, mostly in nonagency, I would say the agency margins are superior to the nonagency margins over the last month or so, as a result again of widening on the nonagency side.

But the agency business is affected as is the overall volume that we are originating by competitive pressures that are increasing and impacting that business as well. So margin trends are on the decline or under pressure, I would say.

KEN BRUCE: Do you see that generally speaking having any impact in terms of your prospective business, as it relates to just positioning in terms of the different products that you're focusing on? I mean, if you look back over the course of the last few years, there has been such a profit-driven increase in the origination of some of these nonprime assets or these alternative assets, that in many ways that is ultimately kind of creating its own demand.

As that market goes away because of the dislocation in the capitol markets, are you seeing an increasing interest in that GSE product that -- different maybe in terms of margins, but just in terms of stability is going to be a very different marketplace going forward?

DAVID SAMBOL: Very much. One notable area where we are seeing a material shift in mix emerging is in the government side. We have seen over the last several months and quarters the FHA business growing. In fact it has dou-

bled. While it's been very stagnant and really very immaterial, it is still not hugely material to us; it is 5% of our overall volume; but it was as low as 2%.

I think the FHA programs are growing in popularity with the decline in the declining offerings in the Alt-A and subprime market. So that is a trend that is notable to mention.

In terms of our posture, I think somebody mentioned that the best way to look at Countrywide is somewhat of a supermarket. We offer all products that are otherwise appropriately or legitimately offered in the marketplace; and we don't try to direct or divert people, necessarily, into one product versus the other. We just provide for a complete menu, except in educating our customers as to the pros and cons of the alternatives available to them.

Just market forces right now are such that business mix is shifting towards the agency products, government and conventional.

ANGELO MOZILO: Let me just intercede here. Two things. One, Bob Napoli's question was not answered correctly. He asked for the ending shares at the end of the period outstanding; and we gave him the average number. We will get back to him on the ending number of shares.

In terms of the agencies, Fannie and Freddie would love to take this opportunity that they have, which is a unique opportunity, and play a much more compelling role in taking in more product. But they do have, despite the tremendous improvement in performance in both of those entities, they still are laboring under restrictions from their regulator. Therefore, even though they are willing and able to participate more in this market, take advantage of the situation, at least at this juncture, unable to do as much as they would like to do.

DAVID SAMBOL: You know, Kevin Bartlett, our Chief Investment Officer, just handed me a note to convey that while I mentioned that slightly over 50% of our volume today or in Q2 was agency eligible, if you include -- that does not include agency eligible Alt-A. If you include agency eligible Alt-A, the number that we're delivering to the agencies is closer to 70%. It's 68%.

KEN BRUCE: Okay, thanks, that is closer to the number you had mentioned earlier this year. Maybe one other piece of color from Kevin. Is there a time frame that you think is going to be required to have the secondary market begin to calm down or otherwise distill what the S&P ratings changes are, and ultimately might suggest what this dislocation -- or at least in tenure what the duration of this dislocation in the capital markets may be?

KEVIN BARTLETT: Yes. Sure. I think the first thing that we need to have happen is that the rating agencies need to clear up the uncertainty that relates to how they are going to rate different loan programs going forward.

The one area where we have a little bit of certainty is on the subprime area. But the other products, I think they are still open. So we need them to clear up their uncertainty.

Then the next thing is I think once the new deals are rated by the agencies and they come into the market, I think the market is going to see that the greater level of protection afforded by their new levels will make the new securities more attractive. I think the market will come back for those securities, and probably become somewhat bifurcated from kind of post-rating agency changes and pre-rating agency changes.

So I think the market will probably separate and the new stuff will eventually find either the traditional buyers of credit, which I mentioned in my remarks earlier -- the banks, the insurance companies, money managers, et cetera. Then perhaps, we will see some reformed CDO machine that rehabilitates itself for the future. But at this point, the press on the CDO machine is not real positive.

KEN BRUCE: Thank you for all of your comments.

OPERATOR: [Samuel Crawford].

SAMUEL CRAWFORD, ANALYST: Thank you for taking the question. I wonder if I could get just a brief idea of how important fraud has been in the course of this quarter as a cause of loss relative to Q4 or Q1. Is it just as relevant? Is it dropping off precipitously? Is it increasing? What is happening?

ANGELO MOZILO: Again, I think like all of these definitions, they are very broad. I think the primary issue has been an issue of speculation, rather than fraud. I am not saying there hasn't been some fraud in the traditional -- where people, just crooks, got involved in totally fraudulent transactions, straw buyers and that kind of thing. I think that appears to be de minimis.

It is really where people have given us information in terms of a variety of issues where really their intention was always to speculate on the properties. I think it is more of this speculation issue, which the builders try to address, the homebuilders in their contracts, which was deemed to be unconstitutional and they couldn't do that. But in these condos, particularly in the condo area there is a lot of speculation. I think that is where the -- I think history -- we will only know a couple years from now, but that seems to us where the problems are, more than the speculative area. Would you agree with that, David?

DAVID SAMBOL: Yes.

SAMUEL CRAWFORD: Okay, and you have --?

ANGELO MOZILO: Now obviously, in terms of your credit question, about has it slowed down, I would think it's probably nonexistent today because everything has tightened up so much, that everybody's antenna has been so sensitized to all the possibilities here, that it's pretty hard to get through the system now if you're not telling us the truth.

SAMUEL CRAWFORD: All right. You all have tried to speak, I think, very clearly about the situation in regards to resets. But I am afraid I am still a little lost as to where Countrywide finds itself in the process of absorption.

If you think back to the portfolio as it stood at the beginning of 2006, and you look forward from that date, the historical portfolio; and you look forward to the resets this summer and the resets again in 2008, the two bunches, of those resets is it possible to give us an idea what portion of that original early 2006 portfolio has by now refinanced itself out of the way of danger?

ANGELO MOZILO: Yes, we can, I think. Do you have that number, John?

JOHN MCMURRAY: Are you speaking of subprime or --?

ANGELO MOZILO: No, no. Total.

SAMUEL CRAWFORD: I was talking about total, but you know the rubber hits the road on subprime.

JOHN MCMURRAY: Typically, typically the behavior that we have observed over many years is that most borrowers do refinance prior to the reset. One of the worries that we have going into this environment is there may not be as many (inaudible) [hands] for the borrowers to refi into it as had been the case in the past.

But so far, going up to the point now, we still see a substantial number of the borrowers refi-ing prior to that point.

ANGELO MOZILO: Do you have the percentage? We had a percentage at one time that I was using in terms of the 2006 book that had refinance. Do we have that number?

JOHN MCMURRAY: Not handy. You know, when we take a look at the remaining loans, in any given vintage, after the reset and within the six to 12 months after the reset, it's a very small percentage of the original balance. So the vast majority, the overwhelming majority of the original book will have refinanced out or otherwise paid off.

The exact number I don't have. Do we have factors, though?

UNIDENTIFIED COMPANY REPRESENTATIVE: We're looking.

ANGELO MOZILO: Okay, we will give you that as soon as we find it.

SAMUEL CRAWFORD: All right, I will come back around for that. One very last question if I may, please. When S&P took its most recent ratings action, some of the press releases that they put out in connection with that action, struck me that while they were not saying explicitly this, they were substantially saying this -- that they felt they gotten so far outside of the realm of normal experience with certain types of assets that their models simply were irrelevant. They had to go back and redo the whole thing.

I am just wondering if you felt like they did encounter -- was that your impression as well? -- they encountered that degree of model risk, and it shocked them so severely that they basically just started tearing up method and going back to rewrite?

Did you all encounter anything in your scoring or your advanced modeling which surprised you with equal drama in terms of unexpected model risk that appeared?

ANGELO MOZILO: I think your S&P question, and not to skirt -- I don't really know the answer to that. Because I don't know what emotional trauma they went through or what their conclusions were and why they came to those conclusions that caused the actions they have taken.

I think the obvious -- it seems to me, the obvious conclusion you come to is that the models were not working the way they thought they were going to work; and they began the process adjusting those models so that they performed in accordance with what their expectations were. But that seems to me to be the case, but I don't have the insights into that, do you? Into what caused them to do that?

KEVIN BARTLETT: This is Kevin. I think that the rating agencies were looking at recent performance in the context of the housing decline. They're concerned about the -- I think you have seen this in the press and also directly in some their publications. They're concerned about the '06 to early '07 vintages of loans. I think when they saw the performance of those loans versus their models, they are trying to make appropriate adjustments to those models to reflect their new views.

DAVID SAMBOL: As we have, by the way, and I think it is safe to say -- this is Dave Sambol -- that with credit having liberalized in the market the last several years, with higher LTVs and limited documentation and the combination of those things, they're really had not been for our models or for the rating agencies' models very much in the way of historical empiricals for that kind of product going through such a significant HPI decline. Home price decline, with which to accurately develop models.

As empirical data has now presented itself, I know in our case and now certainly based on what the rating agencies are saying in their case, everybody's models have or are being adjusted accordingly.

ANGELO MOZILO: Including corporate debt. I mean as I think about it and reflect upon it, it's been common knowledge at least among observers that it appeared that the market in all debt categories, whether it be corporate debt or home finance debt, they were not pricing for risk. You can see all those adjustments are taking place now throughout the entire debt universe.

JOHN MCMURRAY: We can dimension the resets for you. So in the prime sector, 24% of the loans to be reset in 2007 and 35% scheduled to reset in 2008 are still currently active. That would compare to 30% and 38% at the end of Q1.

In subprime, 36% of subprime loans scheduled to reset in 2007 remain active. 60% scheduled to reset in 2008 remain active. That compares with 37% and 66% at the end of the first quarter.

SAMUEL CRAWFORD: That's very helpful. Thank you very much, John. Thank you all for your time.

OPERATOR: [Gary Gordon].

GARY GORDON, ANALYST: Okay, thank you. In light of your outlook for credit, I thought about your captive insurance, reinsurance business, and how you are treating that. Any particular changes in the business? Specifically, MGIC had about 45% of its loans insured in the second quarter, were 100% LTV. Does your reinsurance in Q2 have anything like that kind of 100% LTV proportion?

ANGELO MOZILO: I think first of all, it is important to understand the level of risk we're taking. We're taking the mezzanine risk, so we don't have the first loss nor do we have the cat piece. We have the middle piece of it.

Now, in terms of your question about the type of loans that we have reinsured, do you know if you have that?

JOHN MCMURRAY: The type of loans that we reinsure will cover the whole spectrum, so it would include some of the 100% that you're talking about. Though I don't know whether it is as high as the figures that you quote for MGIC.

This high LTV business, along with the high CLTV business that we talked about earlier, is going to be subject to -- and in some cases has already been subject to -- the cutbacks that we described. I would anticipate the mortgage insurers tightening up their guidelines as well.

DAVID SAMBOL: I would also add, by the way, that we only reinsure in our reinsurance entity primary mortgage insurance and not pool insurance of the type that MGIC and others write. While I am not certain, I would guess that if there was that high percentage of 100% LTV financing that they insured, it must have emanated in material part from pool insurance policies they wrote. Because 100% financing in the primary MI business would represent, I think, John, a small percentage, would it not?

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

JOHN MCMURRAY: I believe that is the case. The other important point, just to piggyback on Dave's pool insurance comment, many of the pool insurance policies are written -- are called modified pools. So they will be subject to a loan level stop loss. So they're still pool-style coverage, but oftentimes some of the insurers include that or report that, at least, as primary business. Or they have in the past.

GARY GORDON: Okay, thanks. On subprime, just to check some numbers, the residual, the subprime residual, your residual balance grew by $31 million so far this year. I believe your write-downs are $256 million, so the math would say $287 million of new retained residuals. Does that number sound about right?

JOHN MCMURRAY: It sounds close. All of the increase between Q2 and Q1 relates to new deals. In fact, it is probably more than all of the increase between Q2 and Q1.

GARY GORDON: Okay, and one last question for Angelo. You assume that the industry should see some consolidation or shrinkage in light of shrinking demand, tough competition. The industry is fairly concentrated at this point. The top 10 players I think are 70% of the business, which would argue that to really get a capacity shrink you would need to see some of these big players pull back in a material way. Is that your assumption?

ANGELO MOZILO: Let me just break it down this way. I think that about 50% of the originations are from mortgage brokers or small mortgage bankers. I think clearly most of those, many of those, are going out of business today. They are fed into what you just talk about, the 10 top players.

But even if you look at the 10 top players, some of those there's been public announcements about problems among the top 10. That I believe what you're going to see over the next few years is a concentration down to five. They are the five major players today. At least that I -- again, I could be wrong on all of these things.

But I am just seeing continuous consolidation. Several years ago I said it would be about 10. It is about 10 now, and I think we will get to five for two reasons. One, it is increasingly becoming a more complicated business. It requires a lot of capital scale to make this thing work. So I think you can see further consolidation in the mortgage banking portion of the 10 players.

You have seen it in terms of Wachovia and World and Fleet and Bank of America and -- all big players at one time. I think nothing is out of the realm of possibility in this environment. So I think you're going to see further capacity shrink, even among the top 10 players.

GARY GORDON: Okay, thanks.

DAVID SAMBOL: Also, I think you will be seeing more of this from us in future disclosure when we talk about market share; but what we are going to seek to do is increasingly clarify the components of our market share and what is happening, I think, also in the market relative to consolidation. The way we look at market share internally is separately, when we look at our originated share, which is our wholesale and retail operations -- and that share, by the way, today for us is a number less than 10%, so a little bit above 9%. Earlier Angelo was talk about the retail-only share. That number is slightly above 5%.

So we look at our share in the market separately in what we described as originated share, which is wholesale and retail; and then purchased share, which represents our correspondent business and our capital markets conduit purchases and the bulk purchases that our Bank does. That is what gets our share up to the 18% that we quote in the aggregate.

But if you looked at the market and the share of the top 10 just on the basis of originated share, you would see that that number is still below 50% and not 70%, suggesting that there is a lot more consolidation in the origination market than what would be implied with a 70% number for the top 10 players.

And for us, by extension, a lot more opportunity than what might be apparent if you looked at the 20% number, considering that where we expect share growth for Countrywide is to come from the higher margin originated, or origination channels, excluding our purchased and lower margin business there.

GARY GORDON: Okay, thanks a lot for that. Take care.

OPERATOR: [Adam Weinrich].

ANGELO MOZILO: I guess Adam is out dancing. Can we go to the (multiple speakers)?

OPERATOR: [Howard Shapiro].

HOWARD SHAPIRO, ANALYST: Thank you very much. I just wanted to ask two questions. The first is on the decision to keep all of the residual securities or all the bonds below the AAA. Given your share price today of -- it just passed below $30 a share, you have got to think that the IRR on retaining these assets is significantly higher than repurchase. So I'm wondering if you can share with us even approximately what you think the IRR on those investments would be? Then I do have one follow-up.

KEVIN BARTLETT: This is Kevin. I think first of all, I think, Howard, what we plan to do is we are reacting to the secondary market to the extent that there is still uncertainty posed by the rating agencies in their approach to new transactions.

We anticipate holding the below AAAs to the extent that they can't be distributed at attractive levels. I think if we look at the levels that we think that we would retain them at, we are going to see ROEs in the North -- probably North of the high teens to very high returns, depending on which particular bond class we are retaining.

So part of it is just in reaction to the secondary market. What we will do is we are going to adapt as the market returns in terms of the liquidity of those particular bond classes. We will distribute them when it makes sense to do so.

HOWARD SHAPIRO: Okay, and just the other question, just to clarify. When you value your residuals, are you essentially using a mark-to-market methodology or a mark-to-model methodology? Could you just explain?

KEVIN BARTLETT: Well, it is a bit of a combination of both. The assets are carried at market value. The way we do that is we approximate it by using models that many in the industry would use as well. We use discount rate speeds and loss assumptions that we believe the market would employ.

HOWARD SHAPIRO: Okay, so then given the lack of liquidity in the market today, how comfortable are you with your model?

KEVIN BARTLETT: I think, with the most recent loss in prepay estimates and discount rates, I think we are comfortable.

HOWARD SHAPIRO: Okay, thank you very much.

OPERATOR: [Jim Fowler].

JIM FOWLER, ANALYST: Thank you. Two questions, please. Kevin, could you give me the subordination levels of the AAA across the broad mortgage classes that you will be retaining?

KEVIN BARTLETT: Yes, sure. It kind of depends on the product. You know, for Alt-A, depending on the -- like on the hybrid side, you are probably in the 7% area. In the fixed Alt-A, you are at, I would say, let's call it for the Alt-A stuff that is hybrids, probably in the mid 7s to low 7s; low to mid 7s.

For the fixed-rate stuff, you are probably around 7%. For the subprime, I believe we are probably in the 17% range.

In the HELOCs, it is -- we will probably hold that stuff in the HFI portfolio; so it's going to be the capital that is required by the rating agencies, not so much the subordination requirements. In the pay options it is around 12% that is the support level for AAAs.

JIM FOWLER: Other than the subprime, are there [over-finalization] accounts required in any of these? Or are these just principal subordination levels?

KEVIN BARTLETT: Those are principal subordination levels. If you want to look at subprime, you would add around -- it is about the same level that you would see on the balance sheet for residuals.

JIM FOWLER: Okay, and then one question more broadly, please. You made mention earlier on in the conference call on modifications. I think you noted 2,000 in the month of June. I'm wondering a couple things.

Specifically, is there a type of modification that you are finding that you're using more, such as deferment or capitalization of unpaid or rate and term adjustments? Just some thoughts there.

Then secondly, I'm wondering if since these loans haven't cured up until foreclosure, what is it that is being modified so that the foreclosure doesn't -- isn't just pushed into the future, I guess is a clumsy way to say it? What is it that you're doing? What tack is generally being taken that you think will change the prospects at the borrower level that your collection and curing attempts from 30-day to 90-day hasn't been as successful? Thanks for the answer.

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

KEVIN BARTLETT: Most of the modifications do represent the first two categories I think you mentioned. They represent a deferment of past-due interest or capitalization of the past-due amounts. To a far lesser extent -- in fact, it is not very material at all -- the percent that represent interest rate reductions.

The criteria that we use when we decide to modify is an assessment of the borrower's condition and our conclusion that we believe that, in effecting the modification, the borrower would in fact thereafter have the wherewithal to pay as agreed on the modified loan.

We make that assessment by getting our hands around the reasons for the default, what is happening with the borrower's income, and we only will effect the modification if we believe we are not just delaying a loss.

OPERATOR: [Michael Harkins].

MICHAEL HARKINS, ANALYST: Angelo, I'm one of your biggest fans, so I don't mean this to seem impertinent; but you are 68 years old. Aren't you tempted to just sell this asset and let somebody else fix it?

ANGELO MOZILO: Yes, absolutely.

MICHAEL HARKINS: Okay, that was my question. Thank you.

ANGELO MOZILO: If I wasn't so emotionally attached to this Company and the people in it -- it is a difficult time for all of us here at Countrywide. But I do have moral responsibilities to the shareholders, to the people in the Company, first, I think. And I do have contractual responsibilities, and it is important that I continue to carryout those responsibilities. And I will.

We have a very good team here. We have been through a lot before. We've come out of it always stronger, and I believe we will come out of this stronger even stronger than we ever have in the past, because we are a much bigger and better Company than we ever, ever have been in the past.

MICHAEL HARKINS: Thank you.

OPERATOR: [Jim Delice].

JIM DELICE, ANALYST: Hello. I had a question. Looking at the presentation you had a category in there I'm unfamiliar with seeing, which is the reserves for reps and warranties.

ANGELO MOZILO: Okay, do you want us to explain that?

JIM DELICE: Well, I guess my question is, has it been there before, and I just glossed over it? Or is this something kind of after the thing has been sold for a while, after the EPD period has ended, there is still some contingent liability that we have to reserve for?

JOHN MCMURRAY: First of all, it has been there before; and in fact, we talked about it in the last quarter supplement. So the way that works is that reserve is accrued at the time the loan is sold, and it's going to fall into two categories. The much smaller category is EPD; and that tends to -- that liability tends to turn over fairly quickly.

The majority of that rep and warrant reserve are for the rep -- representations and warranties we make as part of our securitizations and whole loan sales. So again it is accrued at the time that -- it is first accrued at the time that the loan is sold or securitized; and then each period it is trued up.

ANGELO MOZILO: Before we take the next question, we have been in the conference here for two hours and 40 minutes, and we appreciate and respect the desire of the remaining 509 people still on the line to answer their questions. But we do for your sake have a Company to run. So we will go another 20 minutes, that will put us exactly 3 hours on the -- to answer questions. Hopefully most of your questions at that point will be answered. The next question?

OPERATOR: [Larry Rittel].

LARRY RITTEL, ANALYST: Thanks. You were speaking earlier about the prime and also the subprime loans from -- that are still active that still need to be rest. I'm wondering, and maybe you addressed this earlier, and if you did I apologize. But I'm wondering, with you all and some of the other lenders taking the 2/28 product off the shelf, where will these borrowers go? Because they obviously won't be able to afford the higher reset rate. What are they going to do? Where will they go to--?

ANGELO MOZILO: It is not good news. It's a very good question you are asking. It is problematic. The secondary market -- first of all, the joint agency guidelines attacked that first because they have to -- to be qualified (inaudible) [fully next rate]. We sort of took it out anyway. Then the secondary market backed up on that product; and therefore on the 2/28s and the 3/27s you can see a couple of companies have announced -- major companies announced eliminating that product.

But they have -- these are people who got the home under one set of rules and in the middle of the game the rules have been changed on them. That is why we are trying to use modifications, we are trying to use every tool we have available, to see if we can refinance them in some other product that is affordable for them. But that is the crux of the issue that we face with these people who have not yet refinanced.

LARRY RITTEL: It is no secret, Angelo, that this train is coming. I'm just wondering the extent to which you all have analyzed the pipeline if you will of resets coming at you and figured out which -- what percentage will be refinanced into another product. I am not sure what product, but any products. What percent will be modified, and so on? If you could help us understand that, that would be great.

ANGELO MOZILO: It depends what interest rates are at the time we go to reset. But I think John answered that earlier. But give the corollary of that -- what yet of the, let's say, '05 and '06 vintage of the reset loans are going to reset in '07 -- '08, rather. Are yet -- have already refinanced, what percentage? Is it 60%?

JOHN MCMURRAY: It is on the order of two-thirds have refinanced already. And just --.

ANGELO MOZILO: So I understand it's about -- it's only one-third of it is left. So you can't -- the mistake made by everybody including the press here was to take the entire book of business originating in '05 and the entire book of business in '06; made it static; and said that that is going to reset in '08 and '09. And it is not, because people have moved very quickly to refinance themselves out of that into some other product that made some sense for them. So it is one-third of that book that we are looking at.

JOHN MCMURRAY: And let me share some other rough numbers with you. So on subprime hybrids, as we just pointed out most of them do refinance before the reset. So if we look at those that refinance, approximately 50% of those borrowers refinance into a prime loan. Of the remaining 50%, 25% refinance into a subprime fixed-rate loan. Then the remaining 25% rolls back into another hybrid.

So it is that third category that would have ordinarily rolled back into a hybrid that we are particularly concerned about, because those programs are going away. We have already eliminated the 2/28; and the 3/27 seems to be vulnerable at this juncture.

DAVID SAMBOL: But our exposure -- this is Dave Sambol. It is important to emphasize, because we talked about modifications, that our exposure is mitigated by our view that for those borrowers that have the wherewithal to make the current payment before the reset, and the desire to stay in the house, we believe that -- either through in their case through a refinance if they have equity and/or if they have credit; or through a payoff; or through a modification -- that they will be able to stay in the house.

And that the losses associated as a result from resets will be dampened as a result of, at least in our case, our own modification strategy. So it's not the case because 3/27s and 2/28s are not available that necessarily translates into a loss to us.

LARRY RITTEL: Okay, okay. That's helpful. Then if I could just quickly ask you about what you see coming in the Alt-A market, I guess there are some new guidelines coming out. What do you think that might do to volumes?

DAVID SAMBOL: It will further reduce volumes. The interbank regulators did recently publish new guidance applicable to subprime lending. In fact the subprime ARMs specifically.

The two notable things which have an impact on volume in those guidelines were the requirement that subprime ARMs be underwritten at the fully indexed and fully amortizing rate. The second notable change was a guidance that would effectively limit what could be offered in stated income loans to subprime ARM borrowers.

The impact of both of those provisions of the guidance will, without question, reduce subprime volume in the market further. It is our estimate that the reduction would be in the -- will likely be in the neighborhood of say 25%, without considering other factors such as further tightening and spread widening and associated increases in interest rates, which these wider spreads are translating into, that will further put downward pressure on volume.

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

The other aspects of the guidance are things such as clearer disclosures, which in our case we have -- had complied with even before the guidance for the most part. And some restrictions on prepayment penalties and when they need to expire, the impact of which we don't believe will be material (multiple speakers).

LARRY RITTEL: Did you see -- do you foresee an impact from the guidelines specifically on Alt-A? I may have misspoken.

DAVID SAMBOL: The guidance did not cover Alt-A, although another notable environmental factor worth mentioning is that currently the Federal Reserve is considering -- and they are holding hearings and meetings with industry groups for the stated objective of maybe announcing some changes to their rules and regulations. Including changes to what they call HOPA, the Home Ownership Protection Act, and possibly the Truth in Lending Act.

We understand that the Fed is considering maybe making some rules that might impact prepayment penalties and disclosures themselves, and stated income loans is something that they are considering. So it is possible that that might have a downward impact on volumes as well.

We are very supportive, by the way, of these actions that the Fed is considering. Particularly because I think they're motivated to make sure that whatever the rules in the marketplace are, are applicable to all lenders, not just regulated institutions.

LARRY RITTEL: Right, okay. Terrific, thank you very much.

OPERATOR: [Mike Hill].

ANGELO MOZILO: (inaudible) go to the next one? He's not there.

OPERATOR: [Satesh Pull].

SATESH PULL, ANALYST: Good afternoon. I had a couple of questions. The first one was based on the supplemental presentation that you kindly provided. I'm looking at page 6, where you look at -- where you sort of give us some detail on your portfolio composition. Within that, I guess what I'm looking, drawing from our experience overall on the subprime sector, is whether you could give us any detail on what the rating agencies like to call layered risks.

I.e., how much of the loans, for example in pay option, Bank HFI, that have a FICO less than 660 or less than 699, also have a high loan-to-value and also have a low doc. That kind of thing. Would it be possible at some point for Countrywide to provide us with that kind of detail?

JOHN MCMURRAY: Well, it might be possible at some point in the future; we will have to reflect on that. But one -- two important things to keep in mind. So the way the guidelines work is there are generally trade-offs. So while you will have some layered risk, the guidelines are going to restrict certain dimensions. So as an example, the lower that you go in terms of FICO, the less likely, for example, that you would be able to get a high CLTV and a low-doc loan. So that is point one.

Point two is that our automated underwriting system and in particular our quantitative scorecards are designed to assess this layered risk. So there will be mathematical trade-offs within that scorecard when that loan is running through automated underwriting.

I said only two points, but I will go ahead and make a third. The third has to do with risk-based pricing. So as additional risk factors are layered onto a loan, it is generally going to have a higher price. The borrower is going to pay a higher rate or higher discount points in order to have that risk layering.

SATESH PULL: Fantastic. Thank you. If you don't mind, I have a sort of slightly different question. In the recent fixed income investor presentation, you did mention that you were looking to migrate a lot of your funding from CHL to CFC. Now given the fact that you are looking at much higher financing requirements going forward, do you feel a need to review any of those financing plans at all, even if they are sort of medium-term, long-term financing plans?

ANGELO MOZILO: I think you mean to the Bank.

SATESH PULL: Yes, that's right.

ERIC SIERACKI: Well, it is -- I am trying to understand your question in the context of us migrating to the Bank. Your thought was we are going from CHL to CFC. I can give you some overview comments on our liquidity, but we're

certainly not going to have any issues funding the Company. We have a very conservative liquidity management philosophy, we have adequate diversified and reliable sources of liquidity available.

The pressure point would be short-term funding. We have got $95 billion of short-term liquidity funding sources. At June 30, $76 billion of that $95 billion was available and unused. The Bank represents another highly reliable source of liquidity. They had an additional $27 billion of unused liquidity at June 30.

In terms of contingency planning for the situation you referred to, we contemplate slower turn times, holding securities below AAA, limited market access, etc.; and we still have plenty of liquidity cushion. We have a policy of pre-funding our term debt.

And quite candidly we do not need to issue medium-term notes again in 2007 if we choose not to.

Probably the last comment I would make to comfort you is that our short-term spreads were totally unaffected at our [AB/CP] conduits. We funded our normal CP this morning and there was no friction of any kind on price, size, or term of issuance.

So, we have abundant excess capital in terms of equity and we have tremendously liquidity sources to fund ourselves through this situation. And we feel very, very comfortable about our liquidity scenario overall. Hope that's helpful.

ANGELO MOZILO: Next question.

OPERATOR: [Ronald Redfield].

RONALD REDFIELD, ANALYST: Thank you for taking the call. You retain greater MSRs than anticipated, and you explained that. Did that lead at all to increased gain on sales? Are you seeing requirements to retain greater MSRs from the securitizors? That is my first question.

UNIDENTIFIED COMPANY REPRESENTATIVE: I didn't hear the question.

ANGELO MOZILO: The question is we have increased MSRs; the cause of the MSRs is a result of a desire on our part to do that with the kind of securizations that we are doing.

RONALD REDFIELD: Or is it a requirement by the securitizors to have you hold more of the risk? Is that increasing your gain on sale, as if you would get a lower price if you didn't carry as much MSRs -- would be my first question?

KEVIN BARTLETT: Yes, let me address this. This is Kevin Bartlett. There is no requirement on the part of the securization vehicles to retain more or less excess. Most of what we did in the last year really related to our desire to invest in excess by virtue of retaining it through the securitization process, which was an option on our part.

Our views at the time -- and I think we talked about these many times before -- was that our access investment was in part due to the desire to basically not invest too much in credit risk over the last six, nine months, and more to invest in those assets that would benefit from a slowdown in the housing market. Meaning lower prepayment speeds.

So it was purely an option on a perspective -- from our perspective. In the second quarter, we retained slightly less excess as a result of the market really realizing that housing price -- the housing market was slowing down, the speeds were slowing down. As a result the spreads required by investors to buy interest-only securities decreased dramatically during the quarter. As a result towards the end of June and during June, we sold some of the excess that we would have ordinarily retained in the current market.

RONALD REDFIELD: Maybe I am ignorant here; you have $20 billion of MSRs, if -- and you already indicated like $300 million or $400 million were subprime; so the other is non subprime, Alt-A or prime. If they start going -- if the vintages start going bad, you are the first to suffer, right? You cover that before the pools get hit, the [tranches] that --?

DAVID SAMBOL: I think you had a little misnomer.

ANGELO MOZILO: Residuals (multiple speakers)

UNIDENTIFIED COMPANY REPRESENTATIVE: There are residual interests on our books which are, by and large -- there is a caveat to this, but by and large first loss positions, that would be that -- you would see those as the home equity residual interest in the [BC], subprime residual interest.

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

But the primary servicing is in the senior position, so you don't really -- you are paid to service the loans, and so there is no real credit exposure to those assets other than a slight credit exposure in the sense of increased expenses to support the increased delinquencies that we might have.

RONALD REDFIELD: What is the total amount at risk including prime?

UNIDENTIFIED COMPANY REPRESENTATIVE: Somebody's got that number, it is probably one billion-ish, right?

RONALD REDFIELD: Okay, a billion-ish is great, no problem. Can I ask a few others?

ANGELO MOZILO: No, we are limited here. And there's other people on the line if don't mind. You are welcome to call --.

RONALD REDFIELD: I think they are very pertinent for shareholders. It will be very quick.

ANGELO MOZILO: Okay.

RONALD REDFIELD: Were there any buybacks during the quarter? Do you find, Angelo, with all respect, you selling a material amount of shares into buybacks? You previously mentioned you own 10 million shares. How many shares do you currently own, not including options?

ANGELO MOZILO: I don't know the answer to that question. I own -- including options, I think around -- I think it is around 11, 12 million, something like that. The sales of the stock had nothing to do with buybacks because that 10b5-1 agreement was made well over a year ago.

RONALD REDFIELD: No, the legality is fine, but one can think that perhaps the price is being held up the buy-backs creating a demand.

ANGELO MOZILO: Yes, well, if you think like that it's -- I don't think like that. The buybacks were done because we thought it was in the best interest of shareholders. I have -- as somebody pointed out, I'm 68 years old, I own a lot of shares, and I have 10b5-1 that is in process right now. That is selling into this market when the buybacks are not holding it up.

So it is an independent issue that is not relevant to buybacks or not buybacks. It is a personal situation that I'm sell-ing into a market no matter where the price of the stock is.

RONALD REDFIELD: Okay, you mention that you guys will come out stronger than ever like you have always in the past. Have you ever had before in excess of 12 times assets to equity? Which would -- is in other words heavy lever-age?

ERIC SIERACKI: Our leverage is a result of the mix of our different businesses. Different businesses grow at dif-ferent rates. We have very high leverage in our capital markets unit. We relatively high leverage in our Bank. Histori-cally low leverage in our insurance subsidiary.

So it's going to be a dynamic organism. As the organizations grow at different speeds you're going to see our lever-age change. Our leverage within each of our business has remained relatively constant. As the mix of assets owned by those businesses changes, the overall leverage changes.

RONALD REDFIELD: Okay, thanks.

ANGELO MOZILO: Next question?

OPERATOR: [Christina Amon].

CHRISTINA AMON, ANALYST: Thank you very much. I wondered if you could comment a little bit? I know that the Countrywide Home Loan entity has been mentioned a few times on the call. I wonder if you could just give us kind of an update on the progress. I know that there had been some talk about focusing more on the Bank as a funding vehicle going forward; and just kind of wondering what that means for the future of CHL?

DAVID SAMBOL: Sure, our expectation is -- and our desire is -- that at some point for the majority of our mort-gage operations to be conducted under the Bank; and the majority of the balance sheet to therefore reside in our Federal Savings Bank.

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

We still, though, anticipate an entity, CHL, that will survive and certain activities and balance sheet will reside there. But it will be a small percentage when everything evolves as we desire, relative to what is in CHL today.

CHRISTINA AMON: Then just a quick follow-up, in terms of your plans to issue longer-dated paper out of CHL versus CFC. Any thoughts on that?

ERIC SIERACKI: There are a number of considerations as to where we will issue out of. As you know, for the first 10 years of issuance, it was CHL as issuer guaranteed by CFC. More recently, CFC has been the issuer. There are many issues attendant to the integration of the Bank and CHL that cause us to rethink that. It is entirely possible that you will see CHL as the issuer in the near-term future.

CHRISTINA AMON: Okay, great. Thank you very much.

ANGELO MOZILO: Okay, we will take one more question.

OPERATOR: [Tom Atteberry].

TOM ATTEBERRY, ANALYST: Yes, I just want to get a clarification so I have a better understanding. Could you go through sort of using your '05 and your '06 vintages and define for me prime, as you have a prime loan defined, as it relates to FICO and loan-to-value and those sorts of issues. I know you had commented that there is a wide disparity of those numbers. If you could sort of give me the high and low range so I get to get a picture of what that prime borrower -- or how you define that prime borrower -- looks like from a statistical standpoint.

JOHN MCMURRAY: Certainly. This is John. Let's turn it over to page 4 in the supplement, because that will help a little bit. But the way we define prime versus subprime is based on the program that the loan comes in under. So, there are a couple key areas that would demarcate prime from subprime.

One is the bankruptcy and foreclosure seasoning on the borrower. So if they have had a foreclosure or if they had a bankruptcy in the past, how much time has passed since that has happened. So in some cases, no matter how high the FICO might be, if one of those events was fairly recent that may preclude the borrower from getting prime in many cases.

Another detailed credit requirement is mortgage history. Under most prime programs, a borrower is allowed to have one 30-day late with an explanation in the past 12 months. If they have got more than that, that will sometimes take them out of contention for a prime loan.

The third area would be the combination of leverage, documentation, and credit background. So the more aggressive product offerings are going to tend to be in subprime rather than prime.

If we look over on the top left of page 4 in the supplement, I have got odds ratio lines drawn for the different product types. So the copper colored line represents subprime, and you can see that that ranges all the way from FICOs in the mid 400s all the way down to the lower right to FICOs in the high 700s; so a tremendous range there. Those are for first lien subprime, by the way.

The dark blue line represents prime. So for the most part, it overlaps the FICO range of subprime, although it stops a little short. Then you can see the seconds as well.

But anyhow, it is a long-winded response to say it is the program that determines whether it is prime or subprime; and the combination of guidelines along with the detailed credit requirements.

TOM ATTEBERRY: Okay, then one last thing, real short. You were talking about -- someone was asking you, your securities you were holding in the Bank went up and that was a lot of your asset growth in the last quarter. Could you give us some detail and some granularity to what those securities really are, other than just they're AAA?

KEVIN BARTLETT: Sure. This is Kevin Bartlett. Most of the securities growth is in, I would say, in securities that are backed by hybrid loans, three- and five-year and seven-year hybrid loans. Then in addition, basically the front-end portions of REMIC securities, which traditionally are more of a two-, three-year average life kind of investment.

TOM ATTEBERRY: Okay, thanks.

ANGELO MOZILO: Okay, some final comments. One to the individual who asked about my sale of stock. The decision to buy back stock is a collective decision, really emanates from the financial operations of the Company as to

Q2 2007 Countrywide Financial Corporation Earnings Conference Call - Final FD (Fair Disclosure) Wire July 24, 2007
Tuesday

what is the best return for the investment of the shareholders, invested capital for the shareholders. So it is totally unrelated to any of my issues relative to the sale of stock.

Secondly, as I said, I don't know the exact amount of shares that I have. But the shares that I have, actual stock I have, I have retained for 39 and a half years. Not sold a share of the initial stock that I got when Dave and I started this Company -- that I got, that I purchased.

The only thing that is being sold under the 10b5-1 are options with expiration dates. David, do you have a comment (multiple speakers)?

DAVID SAMBOL: Yes, what I would like to do before we terminate the call -- this is Dave Sambol -- is just maybe take a stab at putting those earnings call and our guidance and our commentary into context. And emphasize that it is our view that the market conditions that we described here today, that will certainly impact the near-term quarters, are extremely stressed conditions and from many of our perspectives quite anomalous in terms of what we see for volumes and margins and secondary market uncertainty, and at the same time a soft housing market.

But in spite of that, our guidance suggests that we will nevertheless -- we expect to generate profitability, albeit at lower levels than what we have generated historically. But if you look at the range that we are projecting and what that implies for the year, this year is still expected to be a year in which the Company generates double-digit returns on our equity.

I can tell you that the management team believes that this disruption, while certainly not a positive to our near term, will be very beneficial for the Company in the long term in terms of rationalizing and providing for what we believe is an overdue correction to the industry. And a correction that will, we believe, result in much of the overcapacity that exists in the market today working itself out. So our view of the future remains very, very bullish for those reasons.

ANGELO MOZILO: Okay, we want to thank everybody for participating. Thank you for all the shareholders who continue to support the Company. We will be talking to you at the end of the next quarter. Thank you very much.

OPERATOR: Thank you. Ladies and gentlemen, this conference will be available for replay starting at 12 PM Pacific Time today until midnight on August 7. You can access the AT&T teleconference replay service by dialing 800-475-6701 and entering the access code 877952. International callers can dial 320-365-3844, access code 877952. (OPERATOR INSTRUCTIONS)

That does conclude our conference for today. Thank you for your participation and for using AT&T executive teleconference service. You may now disconnect.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

LOAD-DATE: August 8, 2007

# EXHIBIT 3



Housing Values - MSA Level
MRAC Single Family Residence Home Price Index[1]

(1) Source: First American Real Estate Solutions. All statistics are weighted by MSA-level housing unit count.

# EXHIBIT 4

## Housing Values – Year Over Year HPI Change
### MRAC Single Family Residence Home Price Index[1]



— Year Over Year % Change

(1) Source: First American Real Estate Solutions. Index created from housing unit count weighted MSA-level HPI series.



# EXHIBIT 5

# Countrywide Directors' Dilemma

By James R. Hagerty
And Joann S. Lublin

CRITICS HAVE LONG questioned the outsize pay packages and lucrative share sales of Countrywide Financial Corp.'s chairman and chief executive, Angelo Mozilo. But members of the company's board also have above-average compensation, and three of them have sold more than $2 million of Countrywide shares apiece since mid-2006.

The directors are likely to be in the spotlight in the months ahead as the nation's biggest home-mortgage lender by loan volume struggles with rising defaults and a drooping share price. They face tricky choices in deciding how much to challenge 68-year-old Mr. Mozilo, who co-founded the company 38 years ago.

After Countrywide reported a $1.2 billion loss for the third quarter, Mr. Mozilo put his credibility on the line by forecasting late last month that the Calabasas, Calif., company will make a modest profit in the current quarter, despite continued turmoil in the markets. Countrywide's stock is down 66% so far this year.

All U.S. home-mortgage lenders have been hurt by the drop in housing prices and rise in defaults that have destroyed investors' confidence in mortgages. But Countrywide made itself more vulnerable to such a shock in several ways, say Paul J. Miller Jr., an analyst at Friedman, Billings, Ramsey & Co. and some other analysts. Mr. Miller says the company was too reliant on short-term borrowings, loosened its credit standards in 2005 and 2006 even as the housing market was turning soft, and eroded its capital base by repurchasing shares over the past year.

Countrywide directors collect fees, shares that they must hold for at least a



*Angelo Mozilo*

year, and perquisites that include health insurance and spousal travel, according to the latest proxy statement. Their total compensation ranged from $344,988 to $477,824 in 2006, according to the statement. (That excludes compensation of as much as $71,000 that some of the directors get for being on the board of Countrywide's saving bank.) The pay range is far above median total compensation for directors of the 200-largest U.S. concerns, which was $204,975 in 2006, according to the National Association of Corporate Directors.

## Countrywide's Response

Countrywide said directors review their compensation annually with the help of an independent pay consultant and look at board pay at companies deemed to be similar.

Countrywide rewards board members so well that "at some point, you cross the line between paying for services provided and a very lucrative thing where board members aren't going to challenge management," says Mark Reilly, a partner at 3C, Compensation Consulting Consortium. "I do think they have crossed the line."

Harley Snyder, Countrywide's lead director, said that the board "has been actively engaged in every significant issue facing the company" and that Countrywide has a long history of success. The board has held 31 meetings this year, not including committee sessions, he said. Mr. Snyder said the directors' shareholdings in the company keep it aligned with the interests of other shareholders.

## Is Big Pay Bad?

Generous pay for directors isn't necessarily bad, says Paul Hodgson, senior research associate at CorporateLibrary, a corporate-governance research firm. "Generally, investors would rather see a well-paid, attentive director," he says. But Corporate Library has long argued that Countrywide's board has done a poor job of designing Mr. Mozilo's pay package, guaranteeing him too much compensation regardless of performance.

Mr. Mozilo's compensation totaled about $120 million in 2006, including gains from the exercise of stock options. That was the highest among the 16 financial-services companies whose shares are included in the S&P 500-stock index, according to Corporate Library.

Mr. Mozilo has long argued that the excellent performance of the company's share price, until this year, justified the company's compensation policies.

Pearl Meyer & Partners, a New York compensation consulting firm, was the independent adviser to the board's compensation committee during the board's 2004 contract renewal

talks with Mr. Mozilo. The consultants strongly urged directors to slim his hefty contract, partly by revamping his annual bonus formula, one person familiar with those talks says. Under that formula, the CEO collected the same bonus as the prior year even when earnings-per-share growth remained flat. Directors kept the formula and decided to replace the consultancy, this person adds. In late 2006, Countrywide reached a new contract with Mr. Mozilo that it said would reduce his base salary, performance-based bonus and equity-incentive pay this year by between 48% and 62%.

Several Countrywide directors have sold large amounts of stock over the past couple of years. Jeffrey Cunningham sold 20,000 shares in early February for a total of $898,000, or about $45 each. (The stock Friday closed at $14.35 in New York Stock Exchange composite trading.)

Mr. Snyder last year sold 170,000 shares for a total of about $6.5 million.

Oscar Robertson sold a total of 72,000 shares in November 2006 and July 2007, for proceeds of $2.7 million. Robert S. Brown, a lawyer for Mr. Robertson, said he recommended the share sales as a way to avoid too much concentration on Countrywide stock in Mr. Robertson's portfolio.

Robert Donato had proceeds of $2.1 million for sales of 54,142 shares in October and December 2006. Three other outside directors—Martin Melone, Robert Parry and Keith Russell—haven't sold any shares in the past year.

Countrywide said its guidelines call for directors to own at least 10,000 common shares in the company and that all of them exceeded the minimum as of April.

## Mozilo's Sales

So far this year, three directors have resigned: Michael Dougherty, a Minneapolis investment banker who was the lead director; Kathleen Brown, an executive at Goldman Sachs, and Henry Cisneros, a former U.S. Secretary of Housing and Urban Development.

Of the remaining seven outside directors, only one—Mr. Cunningham—is under 60 years old. None of the outside directors has headed a major, publicly owned company, though, one, Mr. Parry, was CEO of the Federal Reserve Bank of San Francisco. Countrywide has hired an executive-search firm, Heidrick & Struggles International Inc., to find two new directors, and a company official said Countrywide hopes to attract at least one director who has been CEO or chief operating officer of a large public company.

## Board Veterans

One concern about the board, says Mr. Hodgson of Corporate Library, is that two of the directors, Mr. Snyder and Mr. Donato, have both been members since the early 1990s.

"If you have been to board meetings with the CEO for 14, 15, 16 years, then your ability to act entirely independently is becoming compromised," Mr. Hodgson said. "It's too cozy a relationship."

A Countrywide official said that long service on the board can provide "continuity in board leadership" and perspective on how the company dealt with past business cycles.

# EXHIBIT 6

Case 1:07-cv-00372-SLR    Document 37-9    Filed 02/13/2008    Page 2 of 10
Page 1 of 9
Countrywide's Chief Salesman and Defender - New York Times

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY

November 11, 2007

# Countrywide's Chief Salesman and Defender

By GRETCHEN MORGENSON and GERALDINE FABRIKANT

Correction Appended

AS the credit crisis sent financial markets into a tailspin in August, Countrywide Financial, the nation's biggest mortgage lender, was in dire need of cash. In a move that fueled anxiety among investors, it decided to tap an $11.5 billion credit line it held with a number of other banks.

It's not unusual, of course, for big corporations to borrow money to meet immediate needs or to clear short-term hurdles. But suddenly draining a huge portion of a credit pipeline could signal serious problems. And Countrywide wanted more than just a portion of that funding — it wanted all of it.

But before it could do so, said two people briefed on the matter, Countrywide received an urgent call. One of its subsidiaries had lent $40 billion in securities to generate cash, and the Bank of New York, which cleared trades for the unit, was phoning Countrywide, demanding more collateral. The bank was afraid of being stuck with losses.

On Aug. 15, when the Bank of New York asked for more cash, Countrywide officials initially balked. They had apparently not foreseen that with investors shunning high-risk mortgages and the credit markets frozen, drawing down its entire $11.5 billion credit line would signal that Countrywide was at the brink.

After a series of phone calls, Countrywide met the bank's demand. For Angelo R. Mozilo, the Bronx-born butcher's son who was Countrywide's chief executive and had made a fortune shaking up the staid home mortgage business, it was a humbling moment. A man long accustomed to running his own show his own way was now being forced to come up with more money because confidence in his sprawling enterprise was collapsing.

For decades, as Mr. Mozilo built Countrywide into the nation's biggest mortgage lender, his bravado had served him well. But the same traits that helped him create the dominant lender left him off balance as the growing mortgage crisis threatened to engulf Countrywide.

To this day, he says his beleaguered company did nothing wrong during the loose-lending craze that is

now unraveling nationwide with record foreclosures and mountainous losses. Instead, Mr. Mozilo considers himself and his company to be victims of financial forces beyond their control.

At a conference sponsored by the Milken Institute about two weeks ago, for example, he explained that borrowers forced lenders like Countrywide to lower their mortgage standards. The industry faced special pressure from minority advocates to help people buy homes, he said. Now, the government must help by increasing loan limits at government-sponsored enterprises like Fannie Mae and Freddie Mac, he added.

OVER the last few months, Mr. Mozilo has declined repeated interview requests. "No one, including Mr. Mozilo, could have foreseen the unprecedented combination of events that led to the problems borrowers, lenders and investors face with many of these loans today," said Rick Simon, a Countrywide spokesman. "Countrywide is proud of its role in making homeownership affordable to lower-income households and, as the largest lender to African-Americans, Hispanics and Asians, closing the gap in homeownership between whites and minorities."

Although Mr. Mozilo has built a $200 billion corporation from scratch and amassed great wealth and beautiful homes along the way, former colleagues say he still thinks he has never received the respect he deserved for creating Countrywide. Even so, he and Countrywide have many admirers.

"They built a tremendous machine over the years and slayed giants and did almost all the right things," said Sy Jacobs, a former banking analyst and founder of Jam Equity Partners, a New York investment fund. "The biggest self-inflicted wound here is they should have pulled back in '05 and '06 when you had these competitors doing all sorts of crazy things. Angelo talked about the danger but somehow went for the market share gains anyway."

For Countrywide, the quintessential proxy for the mortgage meltdown that now surrounds it, this remains one of the burning and still unanswered questions. Why did the company's chief, who routinely warned of his rivals' lax lending practices well before the mortgage market cracked, ultimately allow Countrywide to ardently embrace those practices?

"People who get themselves in trouble are good at self-hypnosis. That is why they are such good salesmen — they convince themselves about the story," Bruce C. N. Greenwald, a finance professor at Columbia Business School, said. "He was not selling houses. He was selling a dream. And he had lived in a world where there had been no defaults for so long that he didn't believe they could happen."

In 2004, the same year when interest rates hit rock bottom and Alan Greenspan extolled the virtues of the adjustable-rate mortgage, Countrywide, after almost three decades of trying, became the nation's largest home mortgage originator. In that year alone, the company generated $8.6 billion in revenue,

more than twice the amount it racked up just two years earlier.

But having spent his entire career trying to reach that mountaintop, Mr. Mozilo became unable to slow down, former colleagues and analysts say. "Angelo doesn't do reverse," said one investor who requested anonymity because he has dealings with the company.

To be sure, successful entrepreneurs are typically zealous and often inclined to charge forward in their business lives. In Mr. Mozilo's case, some analysts note, any self-regulating problems that may have accompanied those traits were held in check over the years by his co-founder and former Countrywide chairman, David S. Loeb. Mentor, sounding board and conservative yin to Mr. Mozilo's entrepreneurial yang, Mr. Loeb retired from Countrywide in 2000 and died three years later.

"With Countrywide, you could see there was a cultural change when it was David and Angelo to when it was just Angelo," said Josh Rosner, an expert on mortgage securities at Graham Fisher, an independent research firm in New York. "Before David died, he seemed to recognize the company's future was predicated on taking risks he wasn't comfortable with."

Countrywide disagrees, noting that Mr. Loeb's legacy lives on at the company. When Mr. Loeb retired, "he left an experienced risk management team to carry on his legacy," Mr. Simon said. "Many members of that team remain with Countrywide."

Central to Mr. Mozilo's post-Loeb strategy was a tactic that had taken Countrywide to the top of the mortgage industry. It was his salesman's drive — some say obsession — to constantly snare market share from rivals. Even in downturns, Mr. Mozilo used other lenders' failures to bolster Countrywide's position.

While this strategy benefited Countrywide throughout much of its history, when mortgage lending was a more plain-vanilla affair, it turned perilous during the past three years. By then, competition among mortgage bankers was so fierce that the only way to gain share was to loosen underwriting standards.

"To the extent that more than 5 percent of the market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it," said a former financial executive at Countrywide who was granted anonymity because he was concerned about legal action from the company. "Apply that principle to anyone's business and it would get you in so deep — it's the proverbial race to the bottom."

Among the fashionable new products were so-called affordability loans, like adjustable-rate mortgages (or A.R.M.'s), interest-only loans and reduced documentation mortgages. In addition to

helping Countrywide win market share, those loans generated enormous profits, both in the commissions that borrowers paid and the premiums investors paid when they bought them as pools placed in securitization trusts.

Investors were willing to pay significantly more than a loan's face value for A.R.M.'s that carried prepayment penalties, for instance, because the products locked borrowers into high-interest-rate loans with apparently predictable income streams.

For years, Countrywide specialized in straightforward fixed-rate loans. From 1999 to 2003, for example, fixed-rate loans accounted for 82 percent to 95 percent of loans originated by the company, according to corporate filings. But in 2004, its loan mix changed significantly. While A.R.M.'s accounted for 18 percent of the company's business in 2003, by the next year, they made up 49 percent of the lending pie.

Subprime loans, as a percent of total originations at Countrywide, also jumped in 2004, rising to 11 percent from 4.6 percent in 2003. These loans, including those requiring no down payments and very little documentation of borrowers' incomes or employment, were also highly lucrative to Countrywide and all those who sold them.

Countrywide advertised subprime loans as a way to "Open the door to more first-time home buyers" and said that qualified borrowers could get financing even if they provided no rental history and no down payment.

Previously, Countrywide had done modest amounts of subprime, and option A.R.M.'s, said Fred Cannon, an analyst who follows the housing industry for Keefe, Bruyette & Woods. But the company went heavily into affordability products in 2004 to satisfy both the demand from consumers and the need for higher-yielding securities from investors. Countrywide's shift from fixed-rate to variable-rate loans was more significant than that of its peers, Mr. Cannon said.

Countrywide also dived into interest-only loans, which required that borrowers paid only the interest on the loan and did not require them to pay back the principal until later in the life of the mortgage. According to National Mortgage News, Countrywide was the No. 2 originator of these loans in 2006, and kept that position through the second quarter of 2007. Wells Fargo was the top originator.

Another newfangled loan that Countrywide favored was the "pay option adjustable rate mortgage" that allowed a borrower to pay only a fraction of the interest owed and none of the principal during an introductory period. These loans lured borrowers in, but had serious consequences. If a borrower made minimum payments, for example, his mortgage would grow in size rather than fall. Another possible negative was that the borrower could eventually owe more than the home was worth.

An internal Countrywide sales document called "Pay Option A.R.M.'s Made Simple" asks what type of customer would benefit from such a loan. "Anyone who wants the lowest possible payment!" was one of the answers.

Apparently, many consumers did. In 2004, pay option A.R.M.'s accounted for 6 percent of Countrywide's originations. By 2005, that figure had climbed to 19 percent. These loans were especially lucrative. Internal company documents from March of this year show that Countrywide made gross profit margins of more than 4 percent on such loans, compared with 2 percent margins earned on loans backed by the Federal Housing Administration.

MR. MOZILO'S drive for market share had clearly paid off. In 2004, when Countrywide originated 13.1 percent of mortgage loans, it rose to the top of the lender list. Just five years earlier, Countrywide's market share was 5.8 percent.

As all of Countrywide's loan-origination pistons continued to fire, Mr. Mozilo augmented that business with other units, such as its highly profitable loan servicing business. In contrast to other lenders that farmed out ancillary services like appraisal and tax certification, Countrywide touched borrowers at every step of the home mortgage process.

Its insurance subsidiary, the Balboa Insurance Group, underwrites flood insurance and mortgage insurance. Landsafe Inc., another unit of the company, provides tax services, appraisals and other lucrative loan-processing services. Countrywide also has a bank that accepts deposits and makes loans and a broker-dealer that trades securities. Recon Trust is a Countrywide entity that provides document custody, default and lien release services in foreclosure.

Countrywide also has a unit that issues commercial paper backed by mortgages, to generate cash for more loan originations. This vehicle, called a conduit, reduced the company's reliance on Wall Street for capital.

In short, by 2005, Countrywide dominated almost all aspects of the mortgage industry. Not surprisingly, Mr. Mozilo was festooned with awards recognizing his achievements. Barron's named him as one of the world's 30 most respected chief executives in 2005. He also received a Founder's Award that year from Fordham University, his alma mater.

When accepting the award at a dinner in Manhattan before 1,000 people, Mr. Mozilo thanked his mother for encouraging him to pursue a college education even though his father wanted him to follow in his footsteps and become a butcher. According to Fordham's Web site, Mr. Mozilo also credited his professors with teaching him the importance of "sharing your good fortune with others who are less fortunate."

Case 1:07-cv-00372-SLR    Document 37-9    Filed 02/13/2008    Page 7 of 10
Countrywide's Chief Salesman and Defender - New York Times
Page 6 of 9

However much the banking business rolled headlong into risky mortgage practices, on the surface the industry has historically been marked by a preference for low-key behavior and conservative dress. In both regards, Mr. Mozilo was an outsider. He favored speaking his mind in public and was blunt about his corporate aspirations. To complement his ever-present tan, he wore flashy clothes and drove expensive cars like Rolls Royces, and often in a shade of gold.

A former Countrywide executive who worked closely with Mr. Mozilo and requested anonymity because he was not authorized to speak for the company, said the way his boss dressed had less to do with a desire to flaunt his wealth and more to do with his ideas of how to be a successful salesman.

"He was taught that first impressions are critical," this person said. "When he hired people, he would certainly assess their physical appearance as important and would assess whether or not they polished their shoes as something important. 'You are playing a game,' is how he sees it. 'Know the rules and dress accordingly.' "

And until recently, Mr. Mozilo appeared to be playing the game better than many of his competitors, such as Chase Mortgage, CitiFinancial and the IndyMac Bancorp. In late 2006, he received the American Banker's Lifetime Achievement Award at a dinner in New York. He also became a member of the Horatio Alger Association of Distinguished Americans that year.

But even as he basked in this recognition, problems were developing in Countrywide's portfolio. In December 2006, for example, company figures show that 5.02 percent of the loans in its servicing portfolio were delinquent, up from 4.11 percent in July 2006. The industrywide rate of delinquencies in late 2006 was 4.95 percent, according to the Mortgage Bankers Association. At the same time that delinquencies were rising, Mr. Mozilo accelerated his already heavy sales of Countrywide shares.

As Mr. Mozilo was selling, Countrywide used precious capital to buy back its own shares in the open market. In November 2006, the company borrowed $1.5 billion to repurchase 38.6 million shares for about $39 each. In the second quarter of 2007, it spent $900 million to buy back shares, also at higher prices than the stock's closing price of $13.83 on Friday.

Equilar, an independent compensation research firm, calculated that since Mr. Mozilo became chief executive of Countrywide in 1999, he has taken home $410 million. That includes $285 million in option gains. Restricted stock awards worth $6.65 million were excluded from the calculation because they have not been sold.

A Countrywide spokesman said that Mr. Mozilo's sales were in compliance with securities laws and company policy and were conducted according to a planned selling program — not as a result of fears about the company's future. He also said that none of Mr. Mozilo's stock sales were "based on any

material nonpublic information."

COUNTRYWIDE kept pursuing aggressive loans until summer of this year, well after the subprime mortgage meltdown got going in earnest. As recently as July, for example, Countrywide sales representatives were approved to lend $500,000 to borrowers rated C-minus, the second-riskiest grade, and with credit scores as low as 500. (The top score is 850.) As long as the loan represented no more than 70 percent of the underlying property's value, Countrywide would lend — even if the borrower had been 90 days late on a current mortgage payment twice in the last 12 months, had filed for personal bankruptcy protection or had faced foreclosure or default notices on his or her property.

Mr. Simon, the Countrywide spokesman, said the current meltdown has taught Mr. Mozilo a lesson. "With what we know in hindsight," Mr. Simon said, "he does not believe that some of the loosest guidelines and risk layering will return" to the mortgage market.

But Countrywide's drive to make loans like these has led at least one former insider to scoff at Mr. Mozilo's assertions of being forced to lend to questionable borrowers. "Countrywide said it was meeting market conditions," this former executive said. "But they were the largest mortgage originator in the country. How can you say that it is not you that is causing it, if in fact you dominate the market?"

This executive also said that Countrywide's culture of hubris hurt it as the market turned. "People used to say that Countrywide was like Jurassic Park. It is filled with dinosaurs, powerful guys living in a different era," he said. "You have this management team that has grown up within Jurassic Park. There is no one who has really worked anywhere else. They don't have an appreciation for where corporate America has gone."

Countrywide disagrees with this characterization of its corporate culture.

"Countrywide and its shareholders have benefited from the experience of a long-tenured senior management team," said Mr. Simon, the spokesman. "This team has always been receptive to new ideas and is known for encouraging entrepreneurial spirit at all levels."

Even as the mortgage market started to deteriorate earlier this year, Countrywide refused to retrench. In a May 2007 conference held by the Mortgage Bankers Association, Mr. Mozilo said he welcomed the destruction racking the industry and planned to hire employees laid off by weaker companies.

But as the subprime mortgage crisis deepened, the spotlight came to rest on Countrywide, Mr. Mozilo and his board. Nell Minow, editor of the Corporate Library, an independent research firm specializing in corporate governance, calls Countrywide's board subprime and she rates it an "F."

Case 1:07-cv-00372-SLR    Document 37-9    Filed 02/13/2008    Page 9 of 10
Page 8 of 9
Countrywide's Chief Salesman and Defender - New York Times

"We would give them a lower grade if we had one," Ms. Minow said. "They overpay their chief executive. They have the strongest possible antitakeover defenses and they don't seem to know how to manage risk."

Countrywide said it believes it has an active and effective board.

"Countrywide's board of directors has always been actively engaged in overseeing the company's senior management and business strategy," Mr. Simon said. "Countrywide has an outstanding track record for its financial performance and creation of shareholder value, and the board deserves credit for the important role it has played in these accomplishments."

Nonemployee directors at Countrywide have also been well compensated for its accomplishments. Every year, they receive cash, stock and other compensation, according to securities filings. Last year, they earned from $345,000 to $539,000 each.

Countrywide's outside directors include Robert J. Donato, president of Donato Financial Services; Jeffrey M. Cunningham, chief executive of NewsMarkets LLC, publishers of Directorship magazine; Martin R. Melone, a retired partner of Ernst & Young; and Harley W. Snyder, a consultant and private investor in real estate, and also currently a managing member of Parke & Associates LLC, a real estate development company.

The others are Robert T. Parry, retired president of the Federal Reserve Bank of San Francisco; Oscar P. Robertson, former basketball player and president of Oscar Robertson Solutions LLC; and Keith P. Russell, president of Russell Financial Inc., a strategic and financial consulting firm.

Mr. Snyder, 75, is Countrywide's lead director. Institutional shareholders who have tried to engage the Countrywide board on issues like Mr. Mozilo's pay say that Mr. Snyder, who has been a board member since 1991, prevents such dialogues from occurring. One complaint was that he does not share letters from stockholders with other members of the board.

None of the directors, including Mr. Snyder, returned phone calls seeking comment.

THREE members of Countrywide's board have resigned during the last year, including Michael E. Dougherty, chairman of the Dougherty Financial Group in Minneapolis, and Kathleen Brown, a member of one of California's most influential political families and head of West Coast municipal finance for Goldman Sachs. The most recent to depart was Henry G. Cisneros, former secretary of Housing and Urban Development, who left the board last month.

Last week, the American Federation of State, County and Municipal Employees Investment Fund

called for the resignation of Mr. Donato, Mr. Robertson and Mr. Snyder, arguing that those directors haven't protected shareholder interests at Countrywide.

Despite the fact that outsiders are questioning Countrywide's governance and that the company's finances have been bloodied by the mortgage mess, Mr. Mozilo remains unbowed. After reporting a third-quarter loss of $1.2 billion last month, he predicted that the company would return to profitability in the current period.

"Countrywide and our very capable management team have taken the steps we believe that are necessary to position Countrywide to continue our long-term track record of success," he said.

Correction: November 18, 2007

An article last Sunday about Countrywide Financial misidentified the institutional investor that has called for the resignation of three directors at the company. It is the American Federation of State, County and Municipal Employees Pension Fund, not the A.F.L.-C.I.O. Investment Fund.

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | **RSS** | First Look | Help | Contact Us | Work for Us | Site Map

Countrywide Financial Corp. – Sales Transactions from July 1, 2005 – August 29, 2007

| NAME | TRANSACTION DATE | SHARES SOLD | PRICE PER SHARE |
|---|---|---|---|
| Cisneros, Henry C. | 8/8/2005 | 22,400 | $34.8045 |
|  | 12/16/2005 | 9,672 | $35.3211 |
|  | 5/22/2006 | 15,200 | $38.2604 |
|  | 5/23/2006 | 59,132 | $38.3973 |
|  | 5/30/2007 | 5,075 | $39.50 |
| **Total** |  | **111,479** | **$4,173,776.20** |
|  |  |  |  |
| Cunningham, Jeffrey M. | 4/3/2006 | 5,000 | $36.70 |
|  | 5/1/2006 | 5,000 | $40.26 |
|  | 6/1/2006 | 5,000 | $37.95 |
|  | 7/3/2006 | 5,000 | $38.00 |
|  | 8/1/2006 | 5,000 | $35.83 |
|  | 9/1/2006 | 5,000 | $33.80 |
|  | 10/2/2006 | 5,000 | $35.14 |
|  | 11/1/2006 | 5,000 | $38.28 |
|  | 12/1/2006 | 5,000 | $39.68 |
|  | 1/3/2007 | 5,000 | $42.17 |
|  | 2/1/2007 | 5,000 | $43.88 |
|  | 2/2/2007 | 3,500 | $44.80 |
|  | 2/2/2007 | 3,700 | $44.81 |
|  | 2/2/2007 | 2,500 | $44.82 |
|  | 2/2/2007 | 300 | $44.83 |
|  | 2/2/2007 | 3,100 | $45.00 |
|  | 2/2/2007 | 1,100 | $45.04 |
|  | 2/2/2007 | 3,100 | $45.02 |
|  | 2/2/2007 | 2,700 | $45.03 |
| **Total** |  | **75,000** | **$3,006,733.00** |
|  |  |  |  |
| Dougherty, Michael E. | 11/29/2006 | 22,790 | $39.698 |
|  | 12/5/2006 | 11,396 | $41.00 |
|  | 12/15/2006 | 11,396 | $41.25 |
|  | 12/15/2006 | 22,790 | $41.6394 |
|  | 1/16/2007 | 34,186 | $41.77 |
|  | 3/16/2007 | 3,395 | $36.50 |
|  | 3/21/2007 | 8,000 | $36.50 |
|  | 4/17/2007 | 11,395 | $36.50 |
|  | 4/26/2007 | 22,790 | $39.00 |
|  | 5/8/2007 | 11,396 | $42.00 |
|  | 6/15/2007 | 11,395 | $38.1492 |
| **Total** |  | **170,929** | **$6,852,936.70** |
|  |  |  |  |
| Donato, Robert J. | 10/27/2006 | 34,142 | $38.2673 |
|  | 12/15/2006 | 20,000 | $41.7773 |
| **Total** |  | **54,142** | **$2,142,068.16** |
|  |  |  |  |
| Melone, Martin R. |  |  |  |

Countrywide Financial Corp. – Sales Transactions from July 1, 2005 – August 29, 2007

| NAME | TRANSACTION DATE | SHARES SOLD | PRICE PER SHARE |
|------|------------------|-------------|-----------------|
| Mozilo, Angelo R. | 7/6/2005 | 52,500 | $38.9752 |
| | 7/8/2005 | 52,500 | $38.71 |
| | 7/13/2005 | 52,500 | $38.5608 |
| | 7/18/2005 | 52,500 | $38.2942 |
| | 7/22/2005 | 52,500 | $37.0943 |
| | 7/28/2005 | 52,500 | $36.1322 |
| | 8/1/2005 | 52,500 | $35.7639 |
| | 8/8/2005 | 52,500 | $35.0423 |
| | 8/15/2005 | 52,500 | $35.0549 |
| | 8/19/2005 | 52,500 | $34.5987 |
| | 8/23/2005 | 52,500 | $33.9881 |
| | 8/30/2005 | 52,500 | $32.676 |
| | 9/1/2005 | 52,500 | $33.7219 |
| | 9/8/2005 | 52,500 | $33.9986 |
| | 9/13/2005 | 52,500 | $35.3065 |
| | 9/19/2005 | 52,500 | $34.4296 |
| | 9/23/2005 | 52,500 | $33.9746 |
| | 9/28/2005 | 52,500 | $33.1499 |
| | 10/3/2005 | 52,500 | $32.6834 |
| | 10/10/2005 | 52,500 | $30.956 |
| | 10/13/2005 | 52,500 | $29.6027 |
| | 10/18/2005 | 52,500 | $31.529 |
| | 10/24/2005 | 52,500 | $32.2951 |
| | 10/28/2005 | 52,500 | $31.3116 |
| | 11/1/2005 | 52,500 | $31.0405 |
| | 11/8/2005 | 52,500 | $31.9922 |
| | 11/14/2005 | 52,500 | $33.9352 |
| | 11/14/2005 | 52,500 | $33.9475 |
| | 11/18/2005 | 52,500 | $35.0625 |
| | 11/22/2005 | 52,500 | $35.6828 |
| | 11/29/2005 | 52,500 | $35.7427 |
| | 12/1/2005 | 52,500 | $34.6659 |
| | 12/8/2005 | 52,500 | $34.6345 |
| | 12/13/2005 | 52,500 | $33.8693 |
| | 12/16/2005 | 52,500 | $35.4054 |
| | 12/19/2005 | 52,500 | $35.3893 |
| | 12/29/2005 | 52,500 | $34.2085 |
| | 1/6/2006 | 52,500 | $35.583 |
| | 1/10/2006 | 52,500 | $35.2746 |
| | 1/18/2006 | 52,500 | $36.3256 |
| | 1/23/2006 | 52,500 | $34.3638 |
| | 1/27/2006 | 52,500 | $34.4986 |
| | 1/31/2006 | 52,500 | $33.4512 |
| | 2/3/2006 | 52,500 | $32.1009 |
| | 2/8/2006 | 52,500 | $32.3118 |
| | 2/16/2006 | 52,500 | $33.8107 |

Countrywide Financial Corp. – Sales Transactions from July 1, 2005 – August 29, 2007

| NAME | TRANSACTION DATE | SHARES SOLD | PRICE PER SHARE |
|------|------------------|-------------|-----------------|
|  | 2/22/2006 | 52,500 | $34.1264 |
|  | 2/28/2006 | 52,500 | $34.7482 |
|  | 3/1/2006 | 52,500 | $34.5524 |
| Mozilo cont. | 3/8/2006 | 52,500 | $34.8225 |
|  | 3/13/2006 | 52,500 | $34.8377 |
|  | 3/20/2006 | 52,500 | $36.712 |
|  | 3/24/2006 | 52,500 | $36.4866 |
|  | 3/28/2006 | 52,500 | $36.0032 |
|  | 4/3/2006 | 52,500 | $36.4021 |
|  | 4/7/2006 | 52,500 | $37.4261 |
|  | 4/10/2006 | 52,500 | $37.2652 |
|  | 4/18/2006 | 52,500 | $36.9932 |
|  | 4/24/2006 | 52,500 | $37.4158 |
|  | 4/28/2006 | 52,500 | $39.375 |
|  | 5/1/2006 | 52,500 | $40.5402 |
|  | 5/5/2006 | 52,500 | $40.6023 |
|  | 5/8/2006 | 52,500 | $42.8187 |
|  | 5/12/2006 | 52,500 | $41.4548 |
|  | 5/15/2006 | 52,500 | $41.6176 |
|  | 5/18/2006 | 52,500 | $40.4655 |
|  | 5/19/2006 | 14,793 | $39.75 |
|  | 5/22/2006 | 14,793 | $39.00 |
|  | 5/23/2006 | 14,793 | $38.26 |
|  | 5/24/2006 | 14,793 | $37.86 |
|  | 5/25/2006 | 14,792 | $37.75 |
|  | 11/1/2006 | 70,000 | $38.3425 |
|  | 11/1/2006 | 23,000 | $38.3076 |
|  | 11/6/2006 | 23,000 | $38.8426 |
|  | 11/6/2006 | 70,000 | $38.459 |
|  | 11/10/2006 | 70,000 | $38.9312 |
|  | 11/13/2006 | 70,000 | $40.1324 |
|  | 11/16/2006 | 23,000 | $40.6508 |
|  | 11/16/2006 | 25,000 | $40.6512 |
|  | 11/20/2006 | 70,000 | $40.1961 |
|  | 12/4/2006 | 70,000 | $39.9824 |
|  | 12/4/2006 | 25,000 | $39.9894 |
|  | 12/8/2006 | 70,000 | $39.9305 |
|  | 12/11/2006 | 70,000 | $40.057 |
|  | 12/15/2006 | 70,000 | $41.4566 |
|  | 12/18/2006 | 70,000 | $41.6577 |
|  | 1/4/2007 | 70,000 | $42.2193 |
|  | 1/5/2007 | 23,000 | $42.3664 |
|  | 1/8/2007 | 70,000 | $42.0548 |
|  | 1/10/2007 | 70,000 | $42.1234 |
|  | 1/11/2007 | 23,000 | $42.1793 |
|  | 1/18/2007 | 23,000 | $40.3496 |

Countrywide Financial Corp. – Sales Transactions from July 1, 2005 – August 29, 2007

| NAME | TRANSACTION DATE | SHARES SOLD | PRICE PER SHARE |
|------|------------------|-------------|-----------------|
| | 1/19/2007 | 70,000 | $41.2397 |
| | 1/22/2007 | 23,000 | $41.2712 |
| | 1/24/2007 | 70,000 | $41.6526 |
| Mozilo cont. | 1/26/2007 | 23,000 | $40.3954 |
| | 2/2/2007 | 70,000 | $44.5151 |
| | 2/5/2007 | 46,000 | $44.6077 |
| | 2/8/2007 | 70,000 | $43.4744 |
| | 2/9/2007 | 46,000 | $43.6858 |
| | 2/12/2007 | 70,000 | $41.1856 |
| | 2/13/2007 | 46,000 | $ |
| | 2/15/2007 | 70,000 | $41.8841 |
| | 2/21/2007 | 46,000 | $40.7731 |
| | 2/22/2007 | 70,000 | $40.4513 |
| | 2/28/2007 | 46,000 | $37.9111 |
| | 3/1/2007 | 70,000 | $37.0961 |
| | 3/2/2007 | 46,000 | $37.1757 |
| | 3/5/2007 | 70,000 | $35.1924 |
| | 3/6/2007 | 46,000 | $36.3168 |
| | 3/8/2007 | 70,000 | $37.4695 |
| | 3/12/2007 | 70,000 | $35.002 |
| | 3/15/2007 | 46,000 | $35.6283 |
| | 3/20/2007 | 70,000 | $35.3382 |
| | 3/23/2007 | 46,000 | $36.4047 |
| | 3/30/2007 | 46,000 | $33.8281 |
| | 4/2/2007 | 46,000 | $32.6875 |
| | 4/4/2007 | 70,000 | $33.3259 |
| | 4/11/2007 | 70,000 | $33.4635 |
| | 4/13/2007 | 46,000 | $33.6034 |
| | 4/16/2007 | 46,000 | $34.9259 |
| | 4/18/2007 | 70,000 | $37.2451 |
| | 4/20/2007 | 46,000 | $37.8355 |
| | 5/2/2007 | 70,000 | $37.5397 |
| | 5/4/5007 | 46,000 | $38.0254 |
| | 5/7/2007 | 46,000 | $38.4825 |
| | 5/8/2007 | 70,000 | $38.7839 |
| | 5/10/2007 | 70,000 | $40.677 |
| | 5/14/2007 | 70,000 | $40.2586 |
| | 5/16/2007 | 46,000 | $40.2528 |
| | 5/18/2007 | 70,000 | $41.1359 |
| | 5/21/2007 | 46,000 | $40.6417 |
| | 6/1/2007 | 70,000 | $39.0071 |
| | 6/4/2007 | 70,000 | $39.1476 |
| | 6/6/2007 | 46,000 | $39.0602 |
| | 6/8/2007 | 70,000 | $37.9537 |
| | 6/11/2007 | 70,000 | $37.6713 |
| | 6/13/2007 | 70,000 | $37.8144 |

Countrywide Financial Corp. – Sales Transactions from July 1, 2005 – August 29, 2007

| NAME | TRANSACTION DATE | SHARES SOLD | PRICE PER SHARE |
|---|---|---|---|
| | 6/14/2007 | 46,000 | $37.8313 |
| | 6/15/2007 | 46,000 | $37.9929 |
| | 6/18/2007 | 46,000 | $38.4815 |
| Mozilo cont. | 7/11/2007 | 70,000 | $35.6847 |
| | 7/12/2007 | 46,000 | $36.45 |
| | 7/13/2007 | 70,000 | $36.6439 |
| | 7/16/2007 | 70,000 | $35.8348 |
| | 7/18/2007 | 46,000 | $34.3141 |
| | 7/20/2007 | 70,000 | $34.1179 |
| | 7/23/2007 | 70,000 | $34.2157 |
| | 7/25/2007 | 46,000 | $30.5225 |
| | 7/27/2007 | 46,000 | $29.5865 |
| | 8/1/2007 | 30,000 | $28.1631 |
| | 8/7/2007 | 110,000 | $28.0606 |
| | 8/8/2007 | 92,000 | $28.7391 |
| | 8/13/2007 | 46,000 | $28.40 |
| **Total** | | **8,256,964** | |
| | | | |
| **Parry, Robert T.** | | | |
| | | | |
| **Robertson, Oscar P.** | 11/15/2005 | 120,000 | $35.4109 |
| | 5/18/2006 | 80,000 | $40.2745 |
| | 11/20/2006 | 60,000 | $39.80 |
| | 7/27/2007 | 12,000 | $29.70 |
| **Total** | | **272,000** | **$10,215,668.00** |
| | | | |
| **Russell, Keith P.** | 12/12/2005 | 10,800 | $34.3744 |
| **Total** | | **10,800** | **$371,243.52** |
| | | | |
| **Snyder, Harley W.** | 4/19/2006 | 50,000 | $38.00 |
| | 4/28/2006 | 50,000 | $40.00 |
| | 12/19/2006 | 20,000 | $40.902 |
| **Total** | | **120,000** | **$4,718,040.00** |

Countrywide Financial Corp. – David Sambol Transactions

| NAME | TRANSACTION DATE | SHARES SOLD | PRICE PER SHARE | RULE 10b5-1 ADOPTED DATE |
|---|---|---|---|---|
| Sambol, David | 7/8/2005 | 12,400 | $38.8978 | March 1, 2005 |
| | 7/15/2005 | 12,400 | $38.531 | March 1, 2005 |
| | 7/19/2005 | 12,400 | $37.4052 | March 1, 2005 |
| | 7/28/2005 | 10,000 | $36.1585 | March 1, 2005 |
| | 8/3/2005 | 10,000 | $35.3477 | March 1, 2005 |
| | 8/12/2005 | 10,000 | $35.163 | March 1, 2005 |
| | 8/15/2005 | 10,000 | $35.0745 | March 1, 2005 |
| | 8/25/2005 | 5,000 | $33.2052 | March 1, 2005 |
| | 8/30/2005 | 5,000 | $32.8154 | March 1, 2005 |
| | 9/8/2005 | 10,000 | $34.0258 | March 1, 2005 |
| | 9/14/2005 | 10,000 | $35.3022 | March 1, 2005 |
| | 9/23/2005 | 10,000 | $34.0375 | March 1, 2005 |
| | 9/26/2005 | 10,000 | $34.0448 | March 1, 2005 |
| | 10/6/2005 | 5,000 | $31.4152 | March 1, 2005 |
| | 10/10/2005 | 5,000 | $31.0912 | March 1, 2005 |
| | 10/20/2005 | 5,000 | $32.0302 | March 1, 2005 |
| | 10/25/2005 | 5,000 | $32.0242 | March 1, 2005 |
| | 10/31/2005 | 5,000 | $31.8622 | March 1, 2005 |
| | 11/10/2005 | 5,000 | $32.3522 | March 1, 2005 |
| | 11/15/2005 | 10,000 | $34.4351 | March 1, 2005 |
| | 11/21/2005 | 10,000 | $35.0226 | March 1, 2005 |
| | 11/30/2005 | 10,000 | $35.1737 | March 1, 2005 |
| | 12/13/2005 | 10,000 | $34.0351 | March 1, 2005 |
| | 12/9/2005 | 10,000 | $34.8388 | March 1, 2005 |
| | 12/22/2005 | 10,000 | $35.5961 | March 1, 2005 |
| | 12/27/2005 | 10,000 | $35.0331 | March 1, 2005 |
| | 1/5/2006 | 10,000 | $35.6342 | March 1, 2005 |
| | 1/10/2006 | 10,000 | $35.3725 | March 1, 2005 |
| | 1/19/2006 | 10,000 | $35.2656 | March 1, 2005 |
| | 1/27/2006 | 10,000 | $34.2847 | March 1, 2005 |
| | 2/2/2006 | 10,000 | $33.1349 | March 1, 2005 |
| | 2/7/2006 | 5,000 | $32.303 | March 1, 2005 |
| | 2/14/2006 | 10,000 | $33.738 | March 1, 2005 |
| | 2/22/2006 | 10,000 | $34.7091 | March 1, 2005 |
| | 4/6/2006 | 14,000 | $37.4526 | March 21, 2006 |
| | 4/11/2006 | 14,000 | $36.9777 | March 21, 2006 |
| | 4/20/2006 | 14,000 | $37.5899 | March 21, 2006 |
| | 4/26/2006 | 14,000 | $37.9639 | March 21, 2006 |
| | 5/4/2006 | 14,000 | $40.0093 | March 21, 2006 |
| | 5/12/2006 | 14,000 | $41.6571 | March 21, 2006 |
| | 5/16/2006 | 14,000 | $42.2865 | March 21, 2006 |
| | 5/25/2006 | 14,000 | $37.6641 | March 21, 2006 |
| | 6/1/2006 | 14,000 | $38.6999 | March 21, 2006 |
| | 6/7/2006 | 14,000 | $37.4077 | March 21, 2006 |
| | 6/16/2006 | 14,000 | $36.7783 | March 21, 2006 |
| | 6/21/2006 | 14,000 | $37.0728 | March 21, 2006 |

Countrywide Financial Corp. – David Sambol Transactions

| NAME | TRANSACTION DATE | SHARES SOLD | PRICE PER SHARE | RULE 10b5-1 ADOPTED DATE |
|------|------------------|-------------|-----------------|--------------------------|
|  | 6/29/2006 | 14,000 | $37.7285 | March 21, 2006 |
|  | 7/7/2006 | 14,000 | $38.2607 | March 21, 2006 |
|  | 7/19/2006 | 14,000 | $38.2781 | March 21, 2006 |
|  | 7/25/2006 | 14,000 | $38.7216 | March 21, 2006 |
|  | 8/3/2006 | 14,000 | $36.5247 | March 21, 2006 |
|  | 8/11/2006 | 10,000 | $33.1909 | March 21, 2006 |
|  | 8/17/2006 | 10,000 | $34.4648 | March 21, 2006 |
|  | 8/22/2006 | 10,000 | $33.5087 | March 21, 2006 |
|  | 8/31/2006 | 10,000 | $33.7001 | March 21, 2006 |
|  | 9/6/2006 | 10,000 | $34.4257 | March 21, 2006 |
|  | 9/12/2006 | 10,000 | $34.4835 | March 21, 2006 |
|  | 9/22/2006 | 14,000 | $35.0215 | March 21, 2006 |
|  | 9/28/2006 | 10,000 | $34.8611 | March 21, 2006 |
|  | 10/4/2006 | 14,000 | $35.5475 | March 21, 2006 |
|  | 10/12/2006 | 14,000 | $36.2957 | March 21, 2006 |
|  | 10/20/2006 | 14,000 | $35.0902 | March 21, 2006 |
|  | 10/25/2006 | 14,000 | $38.4027 | March 21, 2006 |
|  | 11/3/2006 | 14,000 | $38.0491 | March 21, 2006 |
|  | 11/9/2006 | 14,000 | $38.7999 | March 21, 2006 |
|  | 11/16/2006 | 14,000 | $40.6196 | March 21, 2006 |
|  | 11/21/2006 | 14,000 | $39.8144 | March 21, 2006 |
|  | 11/29/2006 | 14,000 | $39.8899 | March 21, 2006 |
|  | 12/7/2006 | 14,000 | $41.5377 | March 21, 2006 |
|  | 12/13/2006 | 14,000 | $40.4341 | March 21, 2006 |
|  | 12/18/2006 | 14,000 | $41.5094 | March 21, 2006 |
|  | 12/28/2006 | 14,000 | $42.8476 | March 21, 2006 |
|  | 1/5/2007 | 14,000 | $42.4167 | March 21, 2006 |
|  | 1/10/2007 | 14,000 | $42.1014 | March 21, 2006 |
|  | 1/16/2007 | 14,000 | $41.4722 | March 21, 2006 |
|  | 1/25/2007 | 14,000 | $40.7035 | March 21, 2006 |
|  | 1/31/2007 | 14,000 | $43.1951 | March 21, 2006 |
|  | 2/8/2007 | 14,000 | $43.6217 | March 21, 2006 |
|  | 2/13/2007 | 14,000 | $41.3439 | March 21, 2006 |
|  | 2/22/2007 | 14,000 | $40.3268 | March 21, 2006 |
|  | 2/27/2007 | 13,500 | $37.8604 | March 21, 2006 |
|  | 3/7/2007 | 14,000 | $37.0773 | March 21, 2006 |
|  | 3/15/2007 | 14,000 | $35.5148 | March 21, 2006 |
|  | 3/21/2007 | 14,000 | $35.9255 | March 21, 2006 |
|  | 6/6/2007 | 6,375 | $38.9915 | May 20, 2007 |
|  | 6/14/2007 | 6,375 | $37.7855 | May 20, 2007 |
|  | 6/19/2007 | 6,375 | $38.4513 | May 20, 2007 |
|  | 6/27/2007 | 4,250 | $35.9559 | May 20, 2007 |
|  | 7/3/2007 | 4,250 | $37.0188 | May 20, 2007 |
|  | 7/13/2007 | 4,250 | $36.5015 | May 20, 2007 |
|  | 7/19/2007 | 4,250 | $35.26 | May 20, 2007 |
| **Total** |  | **1,009,825** | **$37,711,725.66** |  |

58178-1