IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION DERIVATIVE LITIGATION | ) ) ) ) ) ) ) |

C.A. No. 1:07-372-SLR (MPT)

(Consolidated Action)

**DECLARATION OF THOMAS A. BECK IN SUPPORT OF DEFENDANTS ANGELO R. MOZILO, HENRY G. CISNEROS, ROBERT L. DONATO, HARLEY W. SNYDER, JEFFREY M. CUNNINGHAM, MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON, KEITH P. RUSSELL AND NOMINAL DEFENDANT COUNTRYWIDE FINANCIAL CORPORATION'S MOTION TO TRANSFER VENUE OR IN THE ALTERNATIVE STAY**

I, Thomas A. Beck, hereby declare as follows:

1.     I am a director with the law firm of Richards Layton & Finger, P.A. I make this declaration (the "Declaration") in support of Defendants Angelo R. Mozilo, Henry G. Cisneros, Robert L. Donato, Harley W. Snyder, Jeffrey M. Cunningham, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, Keith P. Russell and Nominal Defendant Countrywide Financial Corporation's Motion To Transfer Venue Or In The Alternative Stay.

2.     Exhibit A to this Declaration is a true and correct copy of the complaint filed in *In re Countrywide Financial Corp. Derivative Litigation*, Lead Case No. 07-CV-06923-MRP-(MANx).

I hereby declare under the penalty of perjury that the foregoing is true and correct.

Executed this 27th day of February, 2008.

_____
Thomas A. Beck

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2008, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

Robert D. Goldberg, Esquire
Biggs & Battaglia
921 North Orange Street
P.O. Box 1489
Wilmington, DE 19899

Edward P. Welch, Esquire
Edward B. Micheletti, Esquire
Skadden, Arps, Slate, Meagher & Flom
LLP
One Rodney Square, P.O. Box 636
Wilmington, DE 19899-0636

Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Fineman@rlf.com

RLF1-3257666-1

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
BLAIR A. NICHOLAS (Bar No. 178428)
NIKI L. MENDOZA (Bar No. 214646)
DAVID A. THORPE (Bar No. 216498)
MATTHEW P. SIBEN (Bar No. 223279)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323
blairn@blbglaw.com
nikim@blbglaw.com
davidt@blbglaw.com
matthews@blbglaw.com

GRANT & EISENHOFER
JAY W. EISENHOFER
MICHAEL J. BARRY
DIANE ZILKA
1201 N. Market Street
Chase Manhattan Centre
Wilmington, DE 19801
Tel:   (302) 622-7000
Fax:   (302) 622-7100
jeisenhofer@gelaw.com
mbarry@gelaw.com
dzilka@gelaw.com

*Co-Lead Counsel for Lead Plaintiffs Arkansas Teacher Retirement
System, Fire & Police Pension Association of Colorado,
Louisiana Municipal Police Employees' Retirement System,
Public Employees Retirement System of Mississippi, and Plaintiff
Central Laborers Pension Fund*

[additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Countrywide Financial Corp. Derivative Litigation | Lead Case No. 07-CV-06923-MRP-(MANx)<br><br>CONSOLIDATED SHAREHOLDER DERIVATIVE ACTION AND CLASS ACTION COMPLAINT FOR BREACHES OF FIDUCIARY DUTY, AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY, AND VIOLATIONS OF THE CALIFORNIA AND FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

Page

I. SHAREHOLDER DERIVATIVE AND CLASS ACTION ...................................................................1

II. NATURE AND SUMMARY OF THE ACTION ....................2

III. JURISDICTION AND VENUE ...........................................17

IV. PARTIES .............................................................................18

    A. Plaintiffs .................................................................18

    B. Nominal Defendant .................................................20

    C. Director Defendants ...............................................20

    D. Non-Director Defendants .......................................23

    E. Bank Of America Corporation ...............................25

V. FIDUCIARY DUTIES AND OBLIGATIONS OF THE INDIVIDUAL DEFENDANTS ..........................25

    A. Duties Of All Individual Defendants .....................25

    B. Countrywide's Key Board Committees Were Specifically Required To Oversee And Monitor Credit Risk, The Company's Allowance For Loan Losses, Valuations And Hedging Activities And Access To Liquidity .................................................27

        1. Audit And Ethics Committee .......................28

        2. Compensation Committee ...........................30

        3. Credit Committee .........................................32

        4. Finance Committee ......................................33

        5. Operations And Public Policy Committee ....................................................35

VI. THE INDIVIDUAL DEFENDANTS BREACHED THEIR DUTIES .....................................36

    A. Countrywide's Business ..........................................36

    B. Countrywide Shifts Its Strategy To Non-Traditional Loans, Increasing Exposure To Credit Risk And Liquidity Constraints ....................38

1.    **Countrywide Significantly Increases Origination Of Non-Traditional Loans**...................38

2.    **Countrywide's Non-Traditional Loans Posed Significantly Greater Risks Than Traditional, Conforming Loans**...................44

3.    **Individual Defendants Had A Fiduciary Duty To Monitor The Company's Origination Of These Risky Loans**...................48

C.    **Individual Defendants Allowed Countrywide To Abandon Or Ignore Loan Underwriting Standards To Pump Up Loan Volume, Capture More Market Share And Report Artificially Inflated Income Levels**...................52

D.    **Individual Defendants Allowed Countrywide To Engage In Predatory Lending Practices**...................63

E.    **Countrywide Manipulated Its Earnings By Not Taking Appropriate Allowances For Loan Losses**...................68

F.    **Countrywide Carried Assets At Arbitrary Valuations And Failed To Hedge Against Impairments Of These Assets**...................75

VII.  **THE INDIVIDUAL DEFENDANTS' MISCONDUCT AND BREACHES OF DUTY HAVE DEVASTATED COUNTRYWIDE'S BUSINESS AND FINANCIAL CONDITION**...................82

VIII.  **THE INDIVIDUAL DEFENDANTS DISSEMINATED MATERIALLY FALSE AND MISLEADING STATEMENTS TO COUNTRYWIDE'S SHAREHOLDERS**...................97

A.    **The Individual Defendants Caused Countrywide To Issue False Financial Results During The Relevant Period**...................98

B.    **The Individual Defendants' False And Misleading Conference Calls With Analysts**...................100

C.    **The Individual Defendants Caused Countrywide To File Materially False And Misleading Reports With The SEC**...................104

D.      **Throughout 2007, The Individual Defendants Misleadingly Asserted That Countrywide Was Not At Risk From Bad Loans And Was Not Suffering A Liquidity Crisis** ..................................... 109

E.      **The Individual Defendants Caused The Company's Proxy Statements To Be False And Misleading** ........................................... 113

     1.      **The 2005 Proxy Statement** .................... 114

     2.      **The 2006 Proxy Statement** .................... 115

     3.      **The 2007 Proxy Statement** .................... 119

IX.      **THE INDIVIDUAL DEFENDANTS' INSIDER SELLING** ......................................................... 121

A.      **Relevant Period Insider Sales** ........................ 121

B.      **Countrywide's Share Repurchase Program** ....................................................... 123

C.      **Defendant Mozilo Frequently Amended His Automatic Stock Sale Plan To Sell Additional Shares During The Repurchase Program Period** ........................... 125

X.      **THE CURRENT COUNTRYWIDE DIRECTORS AGREED TO SELL COUNTRYWIDE TO B OF A IN A NO-PREMIUM DEAL DESIGNED AND INTENDED TO ELIMINATE THEIR LIABILITY ON VALUABLE PENDING DERIVATIVE CLAIMS, AND AT A PRICE THAT FAILS TO RECOGNIZE THE VALUE OF THESE CLAIMS** ..................................... 133

A.      **The BofA Transaction Is Being Orchestrated By Mozilo To Avoid Personal Liability And To Further Enrich Himself At The Expense Of Countrywide Shareholders** .................................................. 138

B.      **BofA Knowingly Aided And Abetted The Countrywide Directors' Breaches Of Fiduciary Duties** ............................................. 139

C.   The Preliminary Proxy Statement  Filed
     On February 13, 2008 Confirms That
     Countrywide's Directors And BofA
     Specifically Structured The Proposed
     Deal To Eliminate The Personal Liability
     Of The Countrywide Directors On The
     Derivative Claims ................................................................. 141

XI.   CLASS ACTION ALLEGATIONS ................................................... 150

XII.  DERIVATIVE ACTION ALLEGATIONS ...................................... 152

XIII. DEMAND EXCUSED ALLEGATIONS ........................................... 153

A.   Demand Is Excused Because The Board
     Abdicated Its Fiduciary Duties .......................................... 153

B.   Demand Is Excused Because Board
     Members Face Liability For Illegal
     Insider Selling And Allowed Mozilo  And
     Others To Engage In Insider Selling ................................. 155

C.   Demand Is Excused Because The Board
     Either Knew About Or Should Have
     Inquired Into The Company's Predatory
     Lending Practices ................................................................. 161

D.   Demand Is Excused Because The Board's
     Failure To Exercise Its Duty Of Oversight
     Over Countrywide's Business Practices
     Has Exposed Countrywide To Increased
     Risks And Has Harmed Its Financial
     Condition And Prospects .................................................... 163

E.   Demand Is Excused Because The Board
     Approved Of Improper Accounting
     Practices ................................................................................ 164

F.   Demand Is Excused Because The Board
     Has Shown Its Lack Of Independence
     From Mozilo By Repeatedly Granting
     Him Outlandish Compensation Over  The
     Objection Of An Independent Adviser .............................. 166

G.   Demand Is Excused Because The Board
     Repeatedly Has Failed To Exercise
     Oversight Over Compensation Of Senior
     Executives Generally ........................................................... 170

H.   Demand Is Excused Because The Board
     Members Are Interested In Retaining
     Their Lucrative Compensation And
     Prestige As Board Members ................................................ 171

I.      **Demand Is Excused Because The Board Already Has Exhibited Antipathy Toward Investigating Or Prosecuting Corporate Wrongdoing**................................................................173

J.     **Demand Is Excused Because The Board Has Personal Financial Interests That Conflict With The Interests Of Countrywide's Public Shareholders**................................174

K.    **Demand Is Excused Because The Director Defendants' Suffer Additional Miscellaneous Conflicts And Constraints**......................175

XIV.  **RELIANCE ON DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**.........................................................176

XV.   **INAPPLICABILITY OF THE PSLRA SAFE HARBOR**.............................................................178

XVI.  **APPLICATION OF GROUP PLEADING DOCTRINE TO THE INDIVIDUAL DEFENDANTS**.......................................................178

XVII. **LOSS CAUSATION**.............................................179

**COUNT I**  Derivative Claim For Breach Of Fiduciary Duties Against All Individual Defendants...............................184

**COUNT II**  Derivative Claim For Gross Mismanagement Against All Individual Defendants......................................................186

**COUNT III**  Derivative Claim For Waste Of Corporate Assets Against All Individual Defendants......................................................186

**COUNT IV**  Derivative Claim Against Defendants Mozilo, Kurland, Garcia, Sambol, Robertson, Dougherty, Snyder, Cisneros, Donato, Cunningham, Russell And Sieracki For Insider Trading (Cal. Corp. Code § 25402)..........................187

**COUNT V**  Derivative Claim For Aiding And Abetting Breaches Of Fiduciary Duty Against The Director Defendants...........................................188

**COUNT VI**  Derivative Claim Against All Individual Defendants For Violation Of Section 10(b) Of The Securities Exchange Act And Rule 10b-5 Promulgated Thereunder.......................................188

COUNT VII  Derivative Claim Against All Individual
    Defendants For Violation Of § 20(a) Of The
    Securities Exchange Act ....................................................................191

COUNT VIII  Derivative Claim Against Defendants
    Mozilo, Cisneros, Cunningham, Dougherty,
    Garcia, Robertson, And Sambol For Violation
    Of Section 20A Of The Securities Exchange Act ...................................192

COUNT IX  Derivative Claim Against Director
    Defendants For Violation Of Section 14(a) Of
    The Securities Exchange Act And Rule 14a-9 .........................................194

COUNT X  Class Action Claim For Breach Of
    Fiduciary Duty In The BofA Transaction
    Against The Current Countrywide Directors...........................................195

COUNT XI  Class Action Claim For Breach Of
    Fiduciary Duty In The BofA Transaction
    Against The Current Countrywide Directors...........................................196

COUNT XII  Class Action Claim Against BofA For
    Aiding And Abetting Breaches Of Fiduciary
    Duties......................................................................................................197

COUNT XIII  Claim Against The Individual
    Defendants  And BofA For Constructive Trust
    And An Injunction....................................................................................198

XVIII. PRAYER FOR RELIEF .................................................................199

XIX.  JURY DEMAND.................................................................................200

# I. **SHAREHOLDER DERIVATIVE AND CLASS ACTION**

Lead Plaintiffs Arkansas Teacher Retirement System ("ATRS"), Fire & Police Pension Association of Colorado ("FPPAC"), Public Employees Retirement System of Mississippi ("MS PERS") and Louisiana Municipal Police Employees Retirement System ("LAMPERS"), and Plaintiff Central Laborers Pension Fund (collectively, "Plaintiffs") bring this action derivatively on behalf of Nominal Defendant Countrywide Financial Corporation ("Countrywide" or "CFC" or the "Company"), and on behalf of a Class of Countrywide shareholders (as defined herein), against certain Countrywide officers and members of its Board of Directors (the "Board") (collectively, the "Individual Defendants") and Bank of America Corporation ("BofA").

As detailed herein, the Individual Defendants engaged in an extensive pattern of misconduct and complete abandonment of regard for their fiduciary duties, including lack of good faith and lack of due care and oversight of Countrywide's lending practices, financial reporting, and internal controls. The Individual Defendants issued false and misleading statements and caused the Company to expend billions of dollars on stock repurchases to maintain the Company's artificially inflated stock price – to facilitate their own illegal insider selling of Countrywide stock. While the Individual Defendants created the false appearance the Company was conservatively managed and poised for long-term success, the Individual Defendants were looting the Company through massive insider sales and oversized compensation for their own benefit. Indeed, the Individual Defendants sold over *$848 million* of Countrywide stock between 2004 and January 2, 2008 (the "Relevant Period") – much of it when the Individual Defendants knew the Company was on the brink of an economic collapse resulting from the Individual Defendants' conduct.

After having looted the Company for their own personal gain and standing by as the Company's stock price collapsed due to shocking disclosures about the

Company's accounting and lending practices, the Individual Defendants now seek to extinguish the Company's ability to hold them accountable for the substantial harm inflicted on Countrywide. The Individual Defendants have essentially negotiated a sweetheart deal for themselves and Defendant BofA by selling the Company to BofA without properly valuing the Company's derivative claims against the Individual Defendants, in return for BofA agreeing to indemnify the Individual Defendants for all of their prior misconduct.

Accordingly, Plaintiffs bring this action derivatively on behalf of the Company to recoup damages resulting from the Individual Defendants' conduct, and Plaintiffs bring this action on behalf of a Class of Countrywide shareholders to enjoin the sale of the Company to BofA under the terms negotiated by the Individual Defendants to avoid liability for their wrongdoing.

The allegations of the Complaint are based on the personal knowledge of Plaintiffs as to themselves and on information and belief (including the extensive investigation of counsel and review of publicly available information) as to all other matters stated herein.

## II.     NATURE AND SUMMARY OF THE ACTION

1.     The Individual Defendants have all but destroyed Countrywide's once-valuable business. What was a strong and profitable Company, is now poised to be sold for a mere 15% of its former worth. Neither the vicissitudes of the marketplace, nor unforeseen exigencies, ought be mistaken for the precariousness of the condition the Individual Defendants created for their own personal gain. In stark violation of their fiduciary duties to the Company, the Individual Defendants caused Countrywide to originate increasingly risky, non-traditional loans to unqualified borrowers in violation of the Company's underwriting standards, while at the same time not properly setting aside reserves/allowances for inevitable loan losses that Individual Defendants knew the Company would incur, and failing to properly hedge against the likelihood of such massive loan losses, as the Individual

1  Defendants asserted the Company was doing.  The Individual Defendants caused
2  the Company to engage in this extremely risky scheme to artificially inflate short-
3  term revenues and earnings, while creating the long-term precarious condition that
4  has befallen the Company, so that the Individual Defendants could themselves reap
5  over $848 million in illegal insider trading proceeds, and other ill-gotten
6  compensation and perquisites.

7       2.     While Countrywide's share prices traded under $20 through most of
8  2003, Countrywide began to take off.  By 2004, the stock was in the mid-$20 range
9  and steadily climbing to $45 in February 2007.  However, the Company's
10  remarkable growth has been wiped-out by an even more devastating collapse.
11  Countrywide's share prices have fallen from over $40 in May 2007 to less than $5
12  in January 2008.  The United States Securities and Exchange Commission (the
13  "SEC") is investigating the Company's accounting and Chief Executive Officer
14  Angelo R. Mozilo's sales of Countrywide stock.  The Attorneys General of Illinois,
15  California and Florida are also investigating the Company's lending practices.  The
16  Company's collapse has been sudden and severe, prompting comparisons to some
17  of the worst corporate scandals of the past decade, and prompting *The New York*
18  *Times* to pose the query: Is Countrywide "Enron's Second Coming?"

19      3.     The Company's sudden collapse has been the result of a number of
20  shocking disclosures specifically concerning Countrywide.  Beginning no later
21  than July 2007, the Individual Defendants were forced to disclose that the
22  Company was facing increasing delinquency rates in its loan portfolios causing the
23  Company's allowances for loan losses to be inadequate and its hedges against such
24  losses to be ineffective.  As the Company revealed in its disclosures during the
25  period between July 2007 and January 2008, the problems could be linked

26
27
28

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

primarily to two types of loans: home equity lines of credit ("HELOCs")[1] and pay-option adjustable rate mortgages ("pay-option ARMs").[2]

4.    For example, Countrywide announced a net *loss* of $1.2 billion for the third quarter 2007 (3Q07), compared to net income of $648 million for the third quarter of 2006.  This loss was attributable to, among other things: the Company taking a loan loss provision of $934 million to offset increasing delinquencies on its HELOCs and pay-option ARMs.  In addition, the Company suffered a huge loss in 3Q07 due to the change in the fair market value of its mortgage servicing rights ("MSRs") ($1.1 billion) and retained interests ($717 million),[3] which was only partially offset by the Company's ineffective hedging activities.  The Company's 3Q07 loss resulting from declines in retained interests was primarily due to HELOCs – the Company had recorded a decline of over $1 billion in the fair value of its HELOC-related residual in the nine months ending September 30, 2007.

5.    The Company's 3Q07 results were on top of similarly poor 2Q07 results revealing HELOC and pay-option ARM delinquencies.  The Company's disclosures of credit problems in its HELOCs and pay-option ARMs, as well as the Company's huge losses in the valuations of its MSRs and retained interests, came as a surprise to investors and analysts who were covering the Company.  Indeed, some analysts questioned whether Countrywide "made serious miscalculations

---

[1]  At times, the Company referred to HELOCs as "prime home equity loans."

[2]  As defined further herein, HELOCs are second loans secured only by the difference between the value of a home and the amount due on a first mortgage. Pay-option ARMs give the borrower the "option" whether to pay down loan principal, to make the monthly interest payment, or to make a "minimum" payment that is less than the interest accruing that month.  If a borrower makes only the "minimum" payment, the difference between that amount and the monthly interest payment is added to the remaining loan principal.

[3]  The terms "retained interests" and "residual interests" are used interchangeably herein.

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

(and possibly misrepresentations) about the quality of [its] loans" and noted the Company's purported prime loans were "performing roughly in line with [a competitor's] sub-prime deals." This was a surprising comparison, given that sub-prime loans are made to inherently less creditworthy individuals and are expected to perform far worse than prime loans.

6. The Company's 2Q07 and 3Q07 financial results were not an anomaly. For 4Q07, the Company again reported a huge *loss* of $422 million, attributable to taking a loan loss provision for credit losses of $924 million and impairment of retained interests of $831 million. The loss was, again, primarily related to credit problems in the Company's HELOCs and pay-option ARMs.

7. By the end of 2007, the Company had been forced to increase its allowance for loan losses to $1.84 billion – an increase of over 700% versus the $261 million allowance for loan losses at the end of 2006.

8. Countrywide was also forced to recognize that its retained interests had been impaired (primarily because of declining valuations of its retained interests in HELOCs) by $831 million for the three month period ended December 31, 2007, as compared to impairment of $690 million for the three months ended September 30, 2007, and only $30 million for the three months ended December 31, 2006.

9. The primary cause of the Company's collapse was huge losses resulting from its pay-option ARMs and HELOCs. Defendants had caused the Company to focus on these types of loans beginning in 2004. Prior to 2004, HELOCs and pay-option ARMs were only a small fraction of the Company's loans (less than 5% of loan production). But, by 2005 these loans were approximately 28% of the Company's loan production. Defendants pushed these loans because they were, as *The New York Times* put it, "especially lucrative."

10. As the Individual Defendants knew, these non-traditional loans were inherently more risky than normal prime loans. HELOCs are only protected by a

second lien, and are likely worthless in a default because the first-lien holder oftentimes takes all of the proceeds of the sale of the collateral. Pay-option ARMs are even worse. Pay-option ARMs allow borrowers to skip payments without penalties, enabling borrowers to create larger debts that they cannot repay.

11. Not only did the Company originate these more risky loans, the Company retained interests in the most risky part of these loans. When the Company securitized its HELOCs and pay-option ARMs, the Company retained interests in the loans and took a first loss on any failure to pay. Ultimately, this would cost the Company substantially.

12. The problem, however, was not just that the Company was originating (and retaining) more risky loans – but that it was, in the words of *The Wall Street Journal*, "*giving these loans to riskier and riskier borrowers*."[4] First, the Company originated a large percentage of these risky loans to persons who could not (or would not) even document their income. According to *The Wall Street Journal*, 91% of the pay-option ARMs originated by Countrywide in 2006 "were 'low-doc' mortgages in which the borrower didn't fully document income or assets." As the Individual Defendants must have known from their years of experience in the industry, people who do not document their income are prone to falsify it. According to one industry sampling, 90% of stated income loans contain "exaggerated" income levels.

13. Second, despite the fact that the Company was originating riskier loans, the Company increasingly deviated from its own underwriting standards to originate more loans to reach Wall Street's earnings projections for the Company. The Company's underwriting polices were, according to the Company's SEC filings, "designed to produce high quality loans." Defendant Mozilo told investors that the Company's underwriting standards were disciplined, and that "maintaining

---

[4] All emphasis added unless otherwise noted.

that discipline is critically important to us." Yet, according to numerous former employees of the Company who personally witnessed these matters and who are detailed herein, underwriting policies were irrelevant when the Company needed to book a loan to report earnings. According to a former Senior Regional Vice President at Countrywide: "The fiduciary responsibility of making sure whether the loan should truly be done was not as important as getting the deal done." Indeed, according to other former CFC employees, as set forth in greater detail herein, Countrywide executives encouraged the Company to falsify appraisals to push loans through, and the Company classified loans as "prime" that clearly were not. The Individual Defendants were keenly aware of these transgressions. For instance, according to a former Executive Vice President of Process Improvement who worked at Countrywide for 17 years, Defendant Sambol and this former employee created a computer system (or "rules engine") called the Exception Processing System to monitor loans that did not comply with the Company's underwriting policies – but not for the purpose of rejecting such loans. The Exception Processing System was designed so that the Company could charge such risky borrowers additional points and fees, not reject their loan applications.

14.     Predictably, the Company's push to book loans that purportedly enabled the Company to report (false) earnings to Wall Street spiraled out of control and led to Countrywide engaging in abusive lending practices. As a result, according to *The New York Times*, "***Countrywide was willing to underwrite loans that left little disposable income for borrowers' food, clothing and other living expenses.***" The Company's incentive compensation system encouraged such loans – regardless of the inevitability that the borrower would default and the Company (and the borrower) would be severely harmed. As a result of these predatory lending practices, the Company is now under investigation by the State Attorneys General for Florida, Illinois and California.

15.     Even though the Company was extending HELOCs and pay-option

ARMs to persons who could not document their income – inherently risky types of loans – in violation of the Company's own underwriting policies and procedures, the Individual Defendants refused to increase the Company's allowance for loan losses during the Relevant Period. At the risk of oversimplifying, the allowance for loan losses is an amount of money set aside to absorb the estimated amount of probable losses in Countrywide's loan portfolio. To increase the allowance for loan losses (called a provision) would cause a dollar-for-dollar decrease in the amount of earnings Countrywide could report. Because of this earnings offset, the Individual Defendants refused to properly increase the Company's allowance for losses during the Relevant Period.

16.    From 2003 through the end of 2006, the Company's allowance for loan losses was approximately 0.3% of the total amount of the Company's loan portfolio held for investment. Countrywide's allowance for loan losses was dramatically lower than that of comparable competitors, including Washington Mutual and Wachovia Bank. The Individual Defendants maintained the allowance for loan losses at a constant rate even though the Company's loan portfolio had drastically changed from conservative, traditional loans to risky, non-traditional loans – and despite the fact that the number of delinquencies in the Company's new, non-traditional loans was growing dramatically each year.

17.    The Individual Defendants refused to increase the Company's allowance for loan losses even though they knew no later than September 2006 that 66% of borrowers elected to make less than full interest payments on the Company's pay-option ARMs. When borrowers did not pay down the interest owed on pay-option ARMs, the Company booked the additional debt owed as negative amortization (ultimately recorded as income on the Company's financial statements). As a result, ***Countrywide misleadingly reported phantom – or non-cash income – created solely from a borrower's failure to pay interest on an outstanding loan***. By year-end 2006, the Company carried $654 million of this

accumulated negative amortization, up from only $74.7 million at year-end 2005 and only $29 thousand in 2004. This alarming growth in accumulated negative amortization, created when borrowers did not pay down their pay-option ARMs, was an early warning sign of a ticking time-bomb.

18. By the end of the first quarter of 2007, accumulated negative amortization from unpaid debt on pay-option ARMs had grown to $815.8 million. Yet, still the Individual Defendants did not properly increase Countrywide's allowance for loan losses.

19. The problem was significant and known to Defendants. Defendant Mozilo publicly acknowledged the issue in 2006. He personally ordered the Company to investigate the problem; as reported by *The Wall Street Journal* in October 2007:

> Mr. Mozilo told investors in September 2006 that he was "shocked" so many people were making the minimum payment. He called a sampling of borrowers to find out why. The "general answer . . . was that the value of my home is going up at a faster rate than the negative amortization," he said. "I realized I was talking to a group . . . that had never seen in their adult life real-estate values go down."

20. As Defendant Mozilo (like the other Individual Defendants) knew, however, real estate values were then poised to substantially decline. By 2006, if not much earlier, all indicators suggested real estate values would decline as interest rates increased. Indeed, Defendant Mozilo stated in an interview with Maria Bartiromo published on March 6, 2006 that housing prices would substantially decline within the coming year and a half: "***I would expect a general decline of 5% to 10% throughout the country, some areas 20%. And in areas where you have had heavy speculation, you could have 30%.***" Despite believing that housing prices would substantially decline, and knowing the other problems with the Company's loan portfolio as detailed herein, the Individual Defendants

breached their fiduciary duties to the Company by not increasing the Company's allowance for loan losses in violation of Generally Accepted Accounting Principles ("GAAP").

21.    In addition to refusing to increase the Company's allowance for loan losses, the Individual Defendants failed to properly ascertain the reasonableness of the assumptions underlying the valuation of the Company's MSRs, retained interests and loans held for sale, and to properly hedge against likely losses in those portfolios.

22.    Indeed, according to a former First Vice President and Director of CFC in Countrywide's Capital Markets Accounting Department (as set forth in great detail herein), by 2006 it was clear that the Company's assumptions concerning the valuation of the Company's loan portfolios and the effectiveness of the Company's hedges to offset losses in those portfolios was fundamentally flawed.  According to this former employee, the Company tested the effectiveness of its hedges on a daily basis.  In 2006, as the loan portfolio he tested experienced increasing devaluation, he was instructed to retroactively alter the loans in the portfolio so as to remove "bad" loans and make it appear the Company's hedging strategies were working.  This was a clear violation of GAAP, and obviously improper.  According to this former employee, his conclusions about the ineffectiveness of the Company's hedging was reported to Countrywide's CFO, and would have been told to Defendant Mozilo.

23.    Throughout the Relevant Period, the Individual Defendants were obligated by their fiduciary duties to understand and monitor the Company's valuation of its MSRs, retained interests and loans held for sale – and to understand and monitor the Company's hedging for likely losses in those portfolios.  As a result of the Individual Defendants' failure to do so, the Company has lost over $2.6 billion.

24.    As a result of the Individual Defendants' improper conduct and failure

to perform their fiduciary duties, the Company was shut out of the credit markets and suffered a debilitating liquidity crisis. Access to capital markets was a very important part of the Company's business operations; such capital made it possible for the Company to fund the loans it originated. The Company's inability to adhere to its own underwriting standards, coupled with the Company's mounting losses from bad loans, caused the national credit rating agencies (Moody's, Standard & Poor's and Fitch) to raise significant concerns about the Company's creditworthiness. As a result, the Company's credit facilities dried up and the Company's ongoing business operations were put in jeopardy.

25. While the Company's collapse came as a shock to investors, with an 87.5% decline in the Company's stock price from $40 to $5 in less than eight months, the Individual Defendants were well aware of and responsible for all of the significant factors contributing to Countrywide's downfall. Indeed, certain of the Individual Defendants, particularly the Company's senior officers, actively endorsed and encouraged the Company's risky lending activities and resulting falsification of the Company's financial statements.

26. Moreover, throughout the Relevant Period, Countrywide and its shareholders specifically relied on the Board's numerous committees to play an active role in controlling and monitoring the very aspects of Countrywide's business that shareholders have now learned were abused for personal profit and to the Company's detriment:

(a) The Board's Credit and Audit Committees were required to assess Countrywide's exposure to credit risk, underwriting standards and the reliability of its allowances for loan losses, valuations and hedging activities. Since virtually all of Countrywide's business stemmed from the quality of the loans it originated, monitoring these functions and accounting items was essential to maintaining the Company's stability.

(b) The Board's Finance Committee was required to oversee and protect

the Company's access to liquidity – the lifeblood of a business like Countrywide. If credit and secondary markets thought that Countrywide's loans were not as safe as represented, the lifeblood would quickly dry up.

(c)     The Board's Compensation Committee was obliged to consider appropriate rewards for executives and assess whether incentives created by Countrywide's compensation system were appropriate. If mortgage brokers made more money by matching more risky loans to less capable borrowers, and executives made more money by hiding risk than confronting it, Countrywide's shareholders were sure to suffer.

27.     Instead of ensuring that Countrywide's rapid growth was tempered with acceptable business practices and honest financial reporting, the Directors of Countrywide, the gatekeepers upon whom shareholders and customers rely, allowed the Company's senior management to violate the Company's lending practices and underwriting disciplines, as well as state and federal financial reporting, disclosure and consumer lending laws.

28.     Despite the Individual Defendants' critical roles in monitoring the very issues that caused Countrywide's collapse, and the Individual Defendants' knowledge of the underlying problems and risks that ultimately materialized to the detriment of the Company and its shareholders, the Individual Defendants chose not to protect the Company by taking the difficult, but necessary, steps to right the ship – rather, the Individual Defendants chose to enrich themselves at the Company's expense.

29.     Throughout the Relevant Period, the Individual Defendants were some of the most highly paid corporate executives and directors in the country, yet the Individual Defendants sold over $848 million in Countrywide stock in illegal, insider sales (much of which at the same time the Company was repurchasing its stock on the open market). Almost all of the Individual Defendants' sales during the Relevant Period were at prices above $30 and shortly before the Director

Defendants agreed to sell the Company for only approximately $7 per share to BofA. Experts have dubbed Defendants' insider selling "extremely suspicious" and have noted that it raises "red flags."

30.     Throughout the Relevant Period and to the detriment of the Company, the Individual Defendants artificially inflated the Company's share price to facilitate their own illegal, insider sales at higher prices to enrich themselves. For instance, as a result of the Individual Defendants' push to have Countrywide originate riskier and riskier loans, the Company was able to report escalating loan volume and appear more profitable (when, in fact, had the Company properly taken allowances for loan losses and hedged against likely losses, it would have been apparent these loans were not profitable). As detailed herein, the Individual Defendants made a whole host of associated false and misleading statements, all related to deceiving investors as to the true financial condition of the Company. By doing so, ***the Individual Defendants inflated the Company's stock price in the short-term to aid their selling of their own personal stock for proceeds of hundreds of millions of dollars.***

31.     In addition, the Individual Defendants furthered their own insider selling by inflating the Company's stock price through a $2.4 billion stock repurchase program in which the Company purchased its own shares on the open market. Ostensibly, a stock repurchase plan is implemented because the company's directors believe the company's stock price is below its true value. Here, the Director Defendants caused the Company to repurchase stock while the Director Defendants sold their personal stock in massive amounts.

32.     While the stock repurchase ordered by the Company's Directors may have propped up the Company's share price for a short while, thereby enabling the Individual Defendants to profit from their own insider sales, the repurchase severely damaged the Company. Countrywide could ill-afford such a massive stock repurchase. The Company did not have $2.4 billion in cash to spend

1  (Countrywide funded the buyback with debt) without placing itself at great risk of
2  suffering a liquidity crisis, which ultimately occurred.  The Director Defendants'
3  authorization of the stock repurchase plan was an improper scheme to enrich
4  themselves at the expense of the Company, and a breach of the Director
5  Defendants' fiduciary duties.

6  33.    After the filing of this derivative action against the Countrywide
7  Board and other current and former officers and directors, Countrywide announced
8  that it had entered into a definitive agreement to be acquired by Bank of America
9  Corporation ("BofA") in an all stock deal that valued the Company at slightly over
10 $4 billion.

11 34.    The BofA deal was approved by the Board at a price that offers no
12 control premium at all.  The deal price was actually well below the market price of
13 Countrywide securities when the deal was announced.    Indeed, despite the fact
14 that Countrywide's stock was trading near an all-time low, the purchase price
15 announced was at a 7.6% discount to Countrywide's already-depressed market
16 price.   BofA's Chief Financial Officer, Joe Price, frankly stated that BofA's
17 purchase of Countrywide is for less than a third of the Company's book value (the
18 mortgage company's assets minus its liabilities) and roughly 2.9 times forecast
19 2009 earnings.  Companies like Countrywide typically sell for at least book value
20 and seven times estimated future earnings.

21 35.    In violation of their fiduciary duties to the Company, the Director
22 Defendants approved the BofA deal even though it does not properly value the
23 Company's derivative claims against the Individual Defendants.   These claims
24 against the Individual Defendants, which Plaintiffs are litigating on behalf of the
25 Company, are of substantial value to the Company.  There is no indication that the
26 Board properly valued this substantial asset in determining the adequacy of the
27 BofA proposal.  Indeed, according to the registration statement filed with the SEC
28 by BofA and Countrywide, Goldman Sachs and Sandler O'Neill – the Company's

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

financial advisors with regard to the BofA deal – did not consider the value of the Company's derivative claims against the Individual Defendants.

36. The Countrywide Board's eagerness to accept this low-ball deal is obvious: the Individual Defendants' are attempting to rid themselves of exposure to hundreds of millions (if not billions) of dollars of personal liability in this, and other, derivative claims, which seek to remedy the grave harm that they caused the Company over the past five years.

37. Should Countrywide's deal with BofA be allowed to proceed as currently announced, the Individual Defendants in this action undoubtedly will argue that as a matter of law their liability on pending derivative claims has been transferred to BofA and Plaintiffs no longer have standing to assert such claims. Indeed, the registration statement filed with the SEC by BofA and Countrywide specifically states "if the merger is consummated, plaintiffs in pending shareholder actions against certain Countrywide officers and directors may lose standing to assert derivative claims on behalf of Countrywide because the plaintiffs will no longer be stockholders of Countrywide." Moreover, the terms of the merger agreement make clear that the Defendants colluded to ensure that the Individual Defendants are not held accountable to the Company for the harm that they have caused the Company. BofA has expressly agreed to indemnify the Individual Defendants for their breaches of fiduciary duties and other transgressions against the Company, as well as any other liability arising from their roles as Directors of the Company.

38. The Director Defendants have clearly put their own interests ahead of the Company's interests in negotiating a sweetheart deal for themselves and BofA, which improperly gives away the Company at an unfair price that does not properly value the Company's claims against the Individual Defendants (which are being litigated here by Plaintiffs).

39. In addition, the terms of the BofA deal will award the Individual

Defendants further financial windfall in the form of severance and/or retirement compensation, and "change in control" payments. According to *The Los Angeles Times*, for example, Countrywide's Mozilo stands to get a pay package valued at more than $110 million as a result of the BofA deal – a particularly ironic result for the man who represents the face of the mortgage market collapse. Although Mozilo has recently agreed to forgo collecting $37.5 million, amidst public outcry and a broadening Congressional and SEC investigation into his recent pay, he still stands to pocket as much as $70 million dollars for agreeing to the deal, and this is in addition to the extinguishment of his personal liability for hundreds of millions of dollars more in connection with this action and other actions.

40.    The proposed sale of Countrywide to BofA is further flawed in that it significantly prevents additional suitors from attempting to offer a better deal for the Company – including any new acquirer that would not let the Individual Defendants off the hook. The Individual Defendants have provided BofA a right of first refusal and a $160 million termination fee if Countrywide doesn't go through with the deal with BofA. By doing this, the Individual Defendants have all but assured that no other acquirer will emerge to challenge BofA's offer.

41.    Through this shareholder derivative action, Countrywide's shareholders stand to recoup significant sums of money for the Company that Defendants unscrupulously obtained from the Company's coffers through their repeated violations of their fiduciary duties. Unless those valuable claims are carved out of the BofA transaction, and placed in a constructive trust, Defendants will – once again – reward themselves by placing their personal interests over those of Countrywide's public shareholders. By this action, therefore, the pending derivative claims should be carved out of the BofA transaction and Plaintiffs should be able to proceed to judgment for the benefit of Countrywide's present shareholders.

42.    This action seeks to make Countrywide whole by obtaining

disgorgement of the illicit trading profits of Countrywide's officers and directors who cashed out their shares before the Company's stock price collapsed, and by obtaining damages from the Board members whose abdication of duty caused so much harm to the Company that it enabled a distress sale at a grossly depressed price. As detailed herein, the Board severely damaged the Company by causing it to expend $2.4 billion on artificially inflated Countrywide stock. The Board's abandonment of its fiduciary obligations also caused, *inter alia*, the Company to become the target of government investigation and several class action and derivative lawsuits, which have caused reputational harm and significant damages. Plaintiffs also seek to remedy the harm to Countrywide caused by Individual Defendants' violations of federal securities laws, including Section 10(b) and Section 14(a) and Section 20A of the Securities Exchange Act of 1934.

## III.   <u>JURISDICTION AND VENUE</u>

43.   Counts VI-IX asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and Section 20A of the Exchange Act, 15 U.S.C. § 78t(a), and Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and the rules promulgated thereunder, including SEC Rule 14a-9, 17 C.F.R. § 240.14a-9. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States, and principles of supplemental jurisdiction in accordance with 28 U.S.C. § 1367.

44.   Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Countrywide maintained its headquarters and principal place of business in this District. Many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

45.     Countrywide is headquartered in California.  Allegations contained herein are brought derivatively on behalf of Nominal Defendant Countrywide, and Defendants' conduct was purposefully directed at California.  As such, jurisdiction over any non-resident Defendant is reasonable under these circumstances.

46.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and (d).  One or more of the Defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Countrywide, occurred in this District, and Defendants have received substantial compensation and income by doing business here and engaging in numerous activities that had an effect in this District.

47.     The claims asserted herein are not the product of any collusive conduct designed to confer jurisdiction on this Court that it otherwise would not have.

## IV.     PARTIES

### A.     Plaintiffs

48.     Plaintiff ATRS is a pension system under the laws of the State of Arkansas, established by Act 266 of 1937, to provide retirement benefits to the employees of the State of Arkansas' education community.  ATRS has total assets of approximately $11.85 billion under investment for its beneficiaries.  ATRS is a stockholder of Countrywide, currently holding 693,000 shares, has been a stockholder of Countrywide at all material times alleged in this Complaint, and will continue to be a stockholder of Countrywide through the conclusion of this litigation.  ATRS maintains its principal place of business in Pulaski County, Arkansas.

49.     Plaintiff FPPAC is a retirement system under the laws of Colorado, established pursuant to Title 31, Article 31, Part 3 of the Colorado Revised

Statutes, created to provide retirement benefits for fire station and police employees of the State of Colorado. FPPAC has total assets of approximately $3.5 billion under investment for its beneficiaries. FPPAC is a stockholder of Countrywide, currently holding 331,900 shares, has been a stockholder of Countrywide at all material times alleged in this Complaint, and will continue to be a stockholder of Countrywide through the conclusion of this litigation. FPPAC maintains its principal place of business in Arapahoe County, Colorado.

50.     Plaintiff MS PERS is a governmental defined benefit pension plan qualified under Section 401(a) of the Internal Revenue Code, established under the laws of Mississippi by the Mississippi Legislature in 1952, to provide retirement benefits to the employees of the state of Mississippi. MS PERS has total assets of approximately $21.8 billion under investment for its beneficiaries. MS PERS is a stockholder of Countrywide, currently holding approximately 360,000 shares, has been a stockholder of Countrywide at all material times alleged in this Complaint, and will continue to be a stockholder of Countrywide through the conclusion of this litigation. MS PERS maintains its principal place of business in Hinds County, Mississippi.

51.     Plaintiff LAMPERS is a retirement system under the laws of the state of State of Louisiana, established by Act 189 of 1973, enabling legislation for the purpose of investing and providing retirement allowances and other benefits for full-time municipal police officers and employees in the State of Louisiana, secretaries to chiefs of police and employees of LAMPERS. LAMPERS has total assets of approximately $1.18 billion under investment for its beneficiaries. LAMPERS is a stockholder of Countrywide, currently holding 4,900 shares, has been a stockholder of Countrywide at all material times alleged in this Complaint, and will continue to be a stockholder of Countrywide through the conclusion of this litigation. LAMPERS maintains its principal place of business in East Baton Rouge Parish, Louisiana.

52. Plaintiff Central Laborers Pension Fund is a Taft-Hartley Trust Fund headquartered in Jacksonville, Illinois. The Fund provides benefits for approximately 14,000 active and inactive vested union laborers. The Pension Fund was established in 1965 to help provide financial security to laborers during retirement. The Fund currently has more than 5,300 pensioners and beneficiaries receiving over $54 million each year in pension benefits, and is financed entirely by employer contributions negotiated through the collective bargaining process and investment income. Central Laborers is a stockholder of Countrywide, has been a stockholder of Countrywide at all material times alleged in this Complaint, and will continue to be a stockholder of Countrywide through the conclusion of this litigation.

**B.    Nominal Defendant**

53. Nominal Defendant Countrywide is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices at 4500 Park Granada, Calabasas, California 91302.  As detailed below, Countrywide is a holding company that, through its five segments – Mortgage Banking, Banking, Capital Markets, Insurance, and Global Operations – engages in mortgage lending and other finance-related operations.

**C.    Director Defendants**

54. Defendant Angelo R. Mozilo ("Mozilo") is a Countrywide director and has been since 1969.  Defendant Mozilo is a co-founder of the Company and has been Chairman of the Board of the Company since March 1999 and Chief Executive Officer of the Company since February 1998.  Defendant Mozilo was also President of the Company from March 2000 through December 2003 and served in other executive capacities since the Company's formation in March 1969.  During the Relevant Period, Defendant Mozilo sold over 12.8 million shares of Company stock for proceeds in excess of $474 million.  Defendant Mozilo resides in the County of Ventura, California.

55.     Defendant David Sambol ("Sambol") is a Countrywide director and has been since September 2007.  Defendant Sambol joined Countrywide in 1985.  Defendant Sambol served as Executive Managing Director of Business Segment Operations, leading all revenue generating functions of the Company, as well as the corporate operational and support units comprised of Administration, Marketing and Corporate Communications and Enterprise Operations and Technology.  Defendant Sambol is currently President and Chief Operating Officer ("COO") for Countrywide Financial Corporation.  Defendant Sambol also serves as Chairman and CEO of Countrywide's main subsidiary, Countrywide Home Loans, Inc.  Defendant Sambol admittedly "leads all operations of the Company" and has "oversight responsibility" for Countrywide Home Loans, as well as Countrywide Bank, Countrywide Insurance Group, Countrywide Capital Markets and Countrywide's Global Operations.  During the Relevant Period, Defendant Sambol sold over 1.4 million shares of Company stock for proceeds in excess of $54 million. Defendant Sambol resides in the County of Los Angeles, California.

56.     Defendant Jeffrey M. Cunningham ("Cunningham") is a Countrywide director and has been since 1998.  Defendant Cunningham is a member of the Credit and Operations and Public Policy Committees of the Company's Board.  During the Relevant Period, Defendant Cunningham sold 75,000 shares of Company stock for proceeds in excess of $3 million.  Defendant Cunningham resides in the County of Essex, Massachusetts.

57.     Defendant Robert J. Donato ("Donato") is a Countrywide director and has been since 1993.  Defendant Donato serves as chair of the Finance Committee and is a member of the Compensation and Corporate Governance and Nominating Committees of the Company's Board.  Defendant Donato previously served on the board of directors of Countrywide Mortgage Investments, Inc. (now IndyMac Bancorp, Inc.).  During the Relevant Period, Defendant Donato sold over 114,000

shares of Company stock for proceeds in excess of $4.3 million. Defendant Donato resides in the County of Los Angeles, California.

58.     Defendant Martin R. Melone ("Melone") is a Countrywide director and has been since 2003. Defendant Melone serves as the Chair of the Audit and Ethics Committee and is a member of the Finance Committee of the Company's Board. Defendant Melone retired as a Partner of Ernst & Young LLP in June 2003. Defendant Melone currently serves on the board of directors of Countrywide Bank, FSB. Defendant Melone resides in the County of Los Angeles, California.

59.     Defendant Robert T. Parry ("Parry") is a Countrywide director and has been since 2004. Defendant Parry is the Chair of the Operations and Public Policy Committee and is a member of the Audit and Ethics, as well as the Credit Committees of the Company's Board. Defendant Parry also currently serves on the board of directors of Countrywide Bank, FSB. Defendant Parry resides in the County of Ventura, California.

60.     Defendant Oscar P. Robertson ("Robertson") is a Countrywide director and has been since 2000. Defendant Robertson is a member of the Compensation, Finance and Operations and Public Policy Committees of the Company's Board. During the Relevant Period, Defendant Robertson sold 272,000 shares of Company stock for proceeds in excess of $10 million. Defendant Robertson resides in the County of Hamilton, Ohio.

61.     Defendant Keith P. Russell ("Russell") is a Countrywide director and has been since 2003. Defendant Russell is the Chair of the Credit Committee and a member of the Audit and Ethics, as well as, the Finance Committees of the Company's Board. Defendant Russell also currently serves on the board of directors of Countrywide Bank, FSB. During the Relevant Period, Defendant Russell sold over 10,000 shares of Company stock for proceeds in excess of $367,000. Defendant Russell resides in the County of Los Angeles, California.

62.     Defendant Harley W. Snyder ("Snyder") is a Countrywide director and has been since 1991.  Defendant Snyder serves as the Chair of the Compensation Committee and is a member of the Corporate Governance and Nominating Committee of the Company's Board.  Defendant Snyder previously served on the board of directors of Countrywide Mortgage Investments, Inc. (now IndyMac Bancorp, Inc.).  Defendant Snyder also currently serves on the board of directors of Countrywide Bank, FSB.  During the Relevant Period, Defendant Snyder sold 235,000 shares of Company stock for proceeds in excess of $7 million.  Defendant Snyder resides in the County of Porter, Indiana.

63.     Defendant Henry G. Cisneros ("Cisneros") was a Countrywide director from 2001 until resigning on October 24, 2007.  Defendant Cisneros was also a member of the Audit and Ethics, Corporate Governance and Nominating and Operations and Public Policy Committees of the Company's Board.  During the Relevant Period, Defendant Cisneros sold over 153,000 shares of Company stock for proceeds in excess of $5.6 million.  Defendant Cisneros resides in the County of Bexar County, Texas.

64.     Defendant Michael E. Dougherty ("Dougherty") was a director of Countrywide from 1998 to June 2007.  Defendant Dougherty was Chair of the Corporate Governance and Nominating Committee and served on the Compensation Committee of the Company's Board.  During the Relevant Period, Defendant Dougherty sold over 227,000 shares of Company stock for proceeds of over $9.2 million.  Defendant Dougherty resides in the County of Hennepin, Minnesota.

65.     Defendants Mozilo, Sambol, Cunningham, Donato, Melone, Parry, Robertson, Russell, Snyder, Cisneros and Dougherty are collectively referred to as the "Director Defendants."

### D.     <u>Non-Director Defendants</u>

66.     Defendant Stanford L. Kurland ("Kurland") resigned from the

position of President and Chief Operating Officer ("COO") of Countrywide Financial Corporation in September 2006. Defendant Kurland began his career with Countrywide in 1979, and served in a number of executive positions, including President of Countrywide Home Loans, Senior Managing Director of Finance, Chief Financial Officer ("CFO") and Vice President-Controller. During the Relevant Period, Defendant Kurland sold over 5.1 million shares of Company stock for proceeds in excess of $185 million. Defendant Kurland resides in the County of Los Angeles, California.

67. Defendant Carlos M. Garcia ("Garcia") joined the Company in 1984 and oversaw all corporate operations, including the e–Business Division, Finance, Administration, Human Resources, and Information Technology. Defendant Garcia has served as Chief Financial Officer ("CFO") of Countrywide and as a member of the board of directors for Countrywide Capital Markets, Inc., and as CEO of Countrywide Insurance Group, Inc. Defendant Garcia is currently Chairman of Countrywide Bank, FSB. Defendant Garcia also serves as Executive Managing Director, Chief of Banking and Insurance for Countrywide Financial Corporation and Chairman of Balboa Insurance Group, Inc. Defendant Garcia further serves as a member of the Countrywide Committee. During the Relevant Period, Defendant Garcia sold over 1.2 million shares of Company stock for proceeds in excess of $50 million. Defendant Garcia resides in the County of Los Angeles, California.

68. Defendant Eric P. Sieracki ("Sieracki") joined Countrywide in 1988 as Senior Vice President of Countrywide Asset Management Corporation and directed corporate development projects. In 1989, Sieracki was promoted to Executive Vice President of Corporate Finance in charge of finance and accounting responsibilities for Countrywide and all of its subsidiaries. Defendant Sieracki also served as Senior Vice President and Chief Financial Officer ("CFO") of Countrywide Mortgage Investments, Inc., a publicly traded affiliate of

Countrywide.  Defendant Sieracki was appointed to Managing Director in 1994, Senior Managing Director in 2002, and Executive Managing Director in 2005. Defendant Sieracki currently serves as Executive Managing Director and CFO for Countrywide and is also a voting member of the Executive Strategy Committee. Defendant Sieracki is responsible for oversight of the Company's major financial departments, including corporate accounting, treasury, financial planning, strategic planning and taxation.  During the Relevant Period, Defendant Sieracki sold over 8,000 shares of Company stock for proceeds in excess of $300,000. Defendant Sieracki resides in the County of Los Angeles, California.

69.    Defendants Kurland, Garcia and Sieracki are collectively referred to in this Complaint as the "Non-Director Defendants."

70.    The Director Defendants and Non-Director Defendants are collectively referred to in this Complaint as the "Individual Defendants."

### E.    **Bank Of America Corporation**

71.    Defendant Bank of America Corporation ("BofA") is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices at 100 North Tryon Street, Charlotte, North Carolina.  BofA is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk-management products and services.  In August 2007, BofA invested $2 billion in Countrywide, which is convertible to an approximate 16% stake.   In January 2008, BofA announced that it had entered into an agreement to acquire Countrywide in an all-stock deal valued at just over $4 billion.

## V.    **FIDUCIARY DUTIES AND OBLIGATIONS OF THE INDIVIDUAL DEFENDANTS**

### A.    **Duties Of All Individual Defendants**

72.    By reason of their positions as directors and/or officers and fiduciaries

of Countrywide, and because of their ability to control the business, corporate and financial affairs of Countrywide, each Individual Defendant owed Countrywide the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including ensuring that Countrywide operated in compliance with all applicable federal and state laws, rules and regulations. Furthermore, each Individual Defendant owed the Company and its shareholders duties of loyalty, good faith and candor, which required them to refrain from engaging in self-interested transactions with the Company, and to disclose material facts relating to their dealings with the Company.

73.     To discharge these duties, Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of Countrywide.  By virtue of these duties, Individual Defendants were required, *inter alia*, to:

- Manage, conduct, supervise, and direct the employees, businesses and affairs of Countrywide in accordance with laws, rules and regulations, and the charter and by-laws of Countrywide;

- Ensure that Countrywide did not engage in imprudent or unlawful practices and that Countrywide complied with all applicable laws and regulations and to become and remain informed as to how Countrywide was, in fact, operating;

- Remain informed as to how Countrywide was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including, but not limited to, maintaining and implementing adequate financial and operational controls;

- Supervise the preparation, filing and/or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Countrywide, and to examine and evaluate any

reports of examinations or investigations concerning the practices, products or conduct of officers of Countrywide;

- Preserve and enhance Countrywide's reputation as befits a public corporation; and

- Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

74. Furthermore, the Individual Defendants occupied positions or were associated with the Company in such a manner as to make them privy to confidential proprietary information concerning Countrywide's business and finances and present and future business prospects. Because of these positions and such access, Individual Defendants were required to take action to protect the Company upon learning the adverse facts specified herein.

**B. Countrywide's Key Board Committees Were Specifically Required To Oversee And Monitor Credit Risk, The Company's Allowance For Loan Losses, Valuations And Hedging Activities And Access To Liquidity**

75. As explained herein, Countrywide pursued a dramatic strategic shift during the Relevant Period. Countrywide's Board was specifically charged with controlling and monitoring the key functions to ensure that Countrywide's strategic shift to and reliance upon riskier mortgage lending did not destabilize the Company's business and financial condition.

76. In fact, several of the Board's committees were specifically tasked with overseeing, controlling, and monitoring Countrywide's credit risk management and assessment, allowance for loan losses, and access to the liquidity needed to keep its business functioning.

77. The chart below illustrates the membership of Countrywide's principal standing Board committees during the Relevant Period, except that Dougherty left the Board in June of 2007 and Cisneros resigned in late October of

2007. A more detailed description of the responsibilities of each specific committee are set forth below:

| Non-Employee Directors | Audit & Ethics | Compensation | Corporate Governance & Nominating | Credit | Finance | Operations & Public Policy |
|---|---|---|---|---|---|---|
| Henry G. Cisneros | Member | | Member | | | Member |
| Jeffrey M. Cunningham | | | | | | Member |
| Robert J. Donato | | Member | Member | Member | Chair | |
| Michael E. Dougherty | | Member | Chair | | | |
| Martin R. Melone* | Chair | | | | Member | |
| Robert T. Parry* | Member | | | Member | | Chair |
| Oscar P. Robertson | | Member | | | Member | Member |
| Keith P. Russell* | Member | | | Chair | Member | |
| Harley W. Snyder Lead | | Chair | Member | | | |

*Audit Committee Financial Expert  Committee Member ○  Committee Chair ⚒

| Affiliated Directors** |
|---|
| Angelo R. Mozilo |
| David Sambol |

** Affiliated Directors are not members of any Board committee.

### 1. Audit And Ethics Committee

78. The Audit and Ethics Committee is currently comprised of the following Board Members: Defendants Melone (Chair), Parry, and Russell. Defendant Cisneros was also on the Audit and Ethics Committee until his resignation.

79. Among the primary functions of the Audit and Ethics Committee is assisting the Board in overseeing (1) the integrity of the Company's financial statements and the financial and other information reporting processes of the Company; (2) the Company's internal audit function and the performance thereof, and the Company's system of internal controls; and (3) the Company's Code of Business Ethics.

80.     The Charter of the Audit and Ethics Committee contains specific areas of responsibility, including:

> 9.   *Risk Management*. The Committee shall discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures and liabilities, including the Company's risk management policies.
>
> 10.  *Risk Assessment*. The Committee shall discuss with management the Company's major risk exposures and the systems management utilizes to assess, monitor and control such exposures through the enterprise, including the Company's risk assessment policies.
>
> * * *
>
> 22.  *Internal Audit Reports*. The Committee shall review the significant reports to management prepared by the internal auditing department and management's responses.
>
> 23.  *Internal Audit Department*. At least once each year, the Committee shall review (a) the internal audit department responsibilities, budget and staffing, (b) the scope of the internal audit program and any changes thereto, (c) the risk assessment methodology proposed by the internal audit department, (d) the results of the internal audit program, and (e) any procedures for implementing accepted recommendations made by the independent auditor. Periodically, the Committee shall review the internal audit department's adherence to the audit plan.

81.     The Audit and Ethics Committee met 14 times during 2006.

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

## 2. **Compensation Committee**

82. The Compensation Committee is currently comprised of the following Board Members: Defendants Snyder (Chair), Donato and Robertson. During the relevant time, Defendants Cisneros and Dougherty were also members of the Compensation Committee.

83. The purpose of the Compensation Committee is to discharge the responsibilities of the Board relating to the compensation of the Company's directors, executives and employees. The responsibilities of the Compensation Committee include succession planning and related recommendations to the Board.

84. The Charter of the Compensation Committee contains specific areas of responsibility, including:

1. *Compensation Structure*. The Committee shall oversee and evaluate the Company's overall compensation structure, policies and programs, and assess whether these establish appropriate incentives for management and other employees.

2. *CEO and Executive Officer Compensation*. The Committee shall review and approve corporate goals and objectives relevant to the compensation of the Company's Chief Executive Officer ("CEO") and its other executive officers who are required to file reports under Section 16 of the Securities Exchange Act of 1934 (collectively, the "executive officers") in accordance with its Compensation Philosophy (the "Philosophy"), evaluate the performance of the CEO and other executive officers in light of those goals, objectives and Philosophy, and have the sole authority to determine and approve the compensation of the CEO and the other executive officers, including salaries, bonuses, stock options, other stock incentive awards and long-term cash incentive awards based on this evaluation.

In determining long-term incentive compensation of the CEO and executive officers, the Committee shall consider, among other factors, the Company's performance, the individual's performance, relative stockholder return, the value of similar incentive awards to individuals at these positions at comparable companies and the awards given to the CEO and executive officers in past years.

* * *

4. *Employment Contracts*. The Committee shall approve and implement the terms and conditions of any employment contracts or severance arrangements between the Company and any executive officer of the Company, including any amendments to said contracts or arrangements.

5. *Equity Plans*. The Committee shall oversee the administration of the Company's stock equity plans including, but not limited to, awarding stock options and restricted stock to nonemployee directors, officers and employees of the Company and its subsidiaries. The Committee shall also review and recommend that the Board approve any such plans, including any amendments to those plans, which are subject to required stockholder approval. The Committee may delegate to one or more officers designated by the Committee the authority to make grants to eligible individuals (other than any such officer) who are not executive officers, provided that the Committee shall have fixed the price (or a formula for determining the price), the maximum number to be awarded, the date of grant and reviewed and approved the award agreement associated with such options and/or restricted

stock. Any officer to whom such authority is delegated shall regularly report to the Committee the grants so made.

6.   *Non-Equity Based Benefit Plans*. The Committee shall oversee the Company's non-equity based benefit plan offerings, in particular benefit plans and perquisites made available to executives.

85.   The Compensation Committee met 29 times during 2006, six times more often than the Credit Committee and nearly three times as often as the Finance Committee. Plaintiffs believe a substantial number of the Compensation Committee's meetings consist of actions by unanimous written consent to award millions of dollars in options to Countrywide employees and management.

### 3.   Credit Committee

86.   The Credit Committee is currently comprised of the following Board Members: Defendants Russell (Chair), Snyder and Donato. During the relevant time, Defendants Parry and Robertson were also members of the Credit Committee. In addition, during the relevant time, Defendant Cunningham was a member of the Finance and Credit Committee in 2004, prior to the formation of separate Credit and Finance Committees.

87.   The Credit Committee is responsible for assisting the Board in fulfilling its oversight responsibilities relating to the credit objectives, policies, controls, procedures and activities of the Company, including the review of the Company's credit exposures, credit limits, allowance for loan losses methodology, loss mitigation and allowances for loan losses.

88.   According to its Charter, the Credit Committee:

shall review, assess and monitor the policies and activities of the Company and its subsidiaries and make recommendations to the Board, as needed, with respect to the following credit related matters:

(a) credit risk management activities, including the credit risk management strategies, policies, controls, systems and methodology of the Company;

(b) methodology of credit loss reserves and adequacy of credit reserve levels;

(c) actual and projected credit losses in all of the Company's activities and across all of its portfolios;

(d) mortgage loan reinsurance and the performance of the Company's reinsurance subsidiaries;

(e) aggregate credit limits and counterparty credit exposures;

(f) commercial real estate lending and finance activities, strategies and policies, procedures and controls, exposure limits and compensation structure; and

(g) activities and performance of the Company's credit committees.

89.     The Credit Committee met five times in 2006.

### 4.     Finance Committee

90.     The Finance Committee is currently comprised of the following Board Members: Defendants Donato (Chair), Melone and Russell.  During the relevant time, Defendants Parry and Robertson were also members of the Finance Committee.  In addition, during the relevant time, Defendant Cunningham was a member of the Finance and Credit Committee in 2004, prior to the formation of separate Credit and Finance Committees.

91.     The Finance Committee is responsible for assisting the Board in

fulfilling its oversight responsibilities relating to the financial objectives, policies, procedures and activities of the Company, including the review of the Company's capital structure, source of funds, liquidity and financial position.

92.     The Finance Committee Charter states:

> The Committee shall perform the duties and responsibilities set forth below . . .
>
> 1.  *Finance and Market Risk Activities*. The Committee shall review, assess and monitor the Company's activities and make recommendations to the Board, as needed, with respect to the following finance and market risk related matters:
>
>     (a) capital structure, liquidity, capital adequacy, reserves and related matters;
>
>     (b) long-term financing strategy and plans, including (i) projected levels of short- and long-term borrowing and credit line requirements; (ii) projected levels of equity or hybrid securities issuances; and (iii) other financing vehicles;
>
>     (c) the Company's Liquidity Policy and Finance Transactions Policy, the CFC Cash Dividend Policy, and other policies relating to the Company's liquidity management and capital structure;
>
>     (d) capital budget, including a review of consistency between the budget and the financial plans;
>
>     (e) market risk policies, including those relating to interest rate risk;
>
>     (f) the charter, policies and activities of the Company's asset liability committee ("ALCO");

(g) short- and long-term investment strategy, investment and investing policies, and investments and assets held by the Company and its significant subsidiaries, including mortgage service rights and other retained interests;

(h) mortgage loan sales and securitizations, and the Company's secondary marketing objectives, strategies, policies, procedures and controls relating to such activities.

2. *Equity Repurchases*. Review management's recommendations with respect to equity repurchases, taking into account the quantity and quality of consolidated assets, earnings, potential earnings, availability of retained earnings, projected growth rates, liquidity and capital requirements and such other matters that the Committee deems appropriate.

93. The Finance Committee met ten times in 2006.

### 5. Operations And Public Policy Committee

94. The Operations and Public Policy Committee is currently comprised of the following Board Members: Defendants Parry (Chair), Cunningham and Robertson. In addition, during the relevant time, Defendants Cisneros and Donato were members of the predecessor Community Affairs and Responsible Lending Committee.

95. The Operations and Public Policy Committee is responsible for assisting the Board in fulfilling its oversight responsibilities relating to, *inter alia*: (1) the Company's operational objectives, policies, procedures and activities including its public affairs, community affairs and public policy objectives; (2) operational risk matters; (3) reputational risk matters; and (4) matters relating to responsible lending, fair lending and the Company's community lending programs.

96.     The Operations and Public Policy Committee met five times in 2006.

97.     With respect to every improper, unlawful or uncontrolled and overly risky business practice that damaged Countrywide's value as set forth below, one or more of the Board committees described herein was directly and specifically entrusted with and responsible for control, monitoring and oversight, and failed to exercise its due care and diligence including in ensuring that Countrywide and its officers operated in compliance with all applicable federal and state law, rules and regulations, and that Countrywide and its officers refrained from engaging in unsound or illegal business practices.

## VI.     THE INDIVIDUAL DEFENDANTS BREACHED THEIR DUTIES

### A.     Countrywide's Business

98.     Countrywide is one of the largest mortgage lenders in the United States, responsible for originating and/or servicing over 18% of residential mortgages nationally.

99.     Countrywide manages its business through five divisions:  (1) Mortgage Banking, which originates, purchases, sells and services non-commercial mortgage loans nationwide; (2) Banking, which is a federally registered banking institution that takes deposits and invests in mortgage loans and home equity lines of credit ("HELOCs"), principally those issued by the Company's Mortgage Banking division but also through third party issued mortgages; (3) Capital Markets, which operates an institutional broker-dealer specializing in underwriting and trading mortgage-backed securities ("MBS"); (4) Insurance, which provides property, casualty, life, and disability insurance as well as reinsurance coverage to primary mortgage insurers; and (5) Global Operations, which licenses proprietary software to mortgage businesses abroad.

100.    The Mortgage Banking, Banking and Capital Markets divisions provided over 90% of Countrywide's pre-tax earnings for 2006, with 48% coming from the Mortgage Banking business, 32% from Banking and 13% from Capital

Markets. The operations of all three divisions are interrelated, with the loan origination process feeding the rest of the business.

101. The Company originates home loans in the Mortgage Banking division, keeps a portion of those loans on the Company's balance sheet as investments, primarily in the Banking Division, and securitizes and sells off the remainder of the mortgages or mortgage related rights and obligations to third parties, through the Capital Markets division.

102. Many of the mortgage loans that Countrywide originates are sold into the secondary mortgage market, primarily in the form of securities and to a lesser extent in the form of whole loan sales. Countrywide generally performs the ongoing servicing functions related to the residential mortgage loans that it produces. Loans that are produced through its Banking segment are generally held for investment.

103. In order to effectively run its business, Countrywide finances its operations with capital from third parties. According to Countrywide's 10-K filings during the Relevant Period, the Company's short-term financing needs arise primarily from warehousing of mortgage loans pending sale, trading activities of its broker-dealer, and providing mortgage warehouse credit to others. Long-term financing needs arise primarily from investments in mortgage loans and investments in mortgage servicing rights and interests that it retains when it securitizes mortgage loans. The Company meets its financing needs primarily through unsecured commercial paper and medium-term notes, asset-backed commercial paper, revolving lines of credit, short-term repurchase agreements, unsecured subordinated debt, junior subordinated debt, and deposit-gathering.

104. Countrywide relies substantially on the secondary mortgage market as a source of long-term capital to support its mortgage banking operations. The Company's strategy, according to SEC filings, is to ensure its ongoing access to the secondary mortgage market by consistently producing quality mortgages and

servicing those mortgages at levels that meet or exceed secondary mortgage market standards. The Company claims that it makes significant investments in personnel and technology to ensure the quality of its mortgage loan production.

105. Because of this reliance on the secondary market, the credit quality of the mortgage assets Countrywide originates is paramount to the Company's ability to securitize those assets and maintain its primary source of liquidity.

106. In addition, it was imperative that Countrywide originate loans in compliance with its underwriting policies and procedures. Countrywide provided purchasers of its mortgage loans with representations and warranties regarding the underwriting standards the Company followed in originating the loans. If a purchaser of the mortgage loans determined that Countrywide violated its representations and warranties OR a borrower defaulted during the early months of the loan, the purchaser could require Countrywide to repurchase the mortgage loan.

**B.    Countrywide Shifts Its Strategy To Non-Traditional Loans, Increasing Exposure To Credit Risk And Liquidity Constraints**

**1.    Countrywide Significantly Increases Origination Of Non-Traditional Loans**

107. Through 2003, Countrywide made primarily traditional first lien home loans to highly creditworthy individuals. These "conforming" loans are safer from a credit perspective. Conforming loans are also easily sold to Fannie Mae and Freddie Mac, government-sponsored entities that provide liquidity to the market for home mortgages.

108. Beginning in 2003 and carrying into the Relevant Period, Countrywide moved to originating more non-conforming loans. This exposed Countrywide to more risky loans, with higher default rates. Moreover, these loans could not be sold to government-sponsored entities (like Fannie Mae and Freddie Mac), but had to be sold to private institutional investors. Accordingly, Countrywide's shift in loan products made it more vulnerable to liquidity

constraints in the market for home mortgages. Countrywide's origination of non-conforming loans increased during the Relevant Period as set forth in the table below:

|  | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| **Non-conforming Loans as % of Total Loans Originated** | 24.9 | 31.7 | 39.8 | 47.2 | 45.2 |

109. At the same time, Countrywide was also pursuing a dramatic shift in strategic direction away from traditional fixed-rate home loans to borrowers with "prime" credit scores, in favor of a wide range of "non-traditional" high-risk home loans that were designed to allow people to borrow more money for home purchases than would be available under traditional fixed product lending guidelines. Mortgage brokers and other employees were compensated based on the volume of loans originated and received higher payments when selling these non-traditional loan products than they would selling standard loans. Accordingly, Countrywide's employees targeted more and more borrowers who were stretching to afford the loans – many of whom had no realistic ability to repay the loans.

110. Examples of these "non-traditional" loan products include:

- Adjustable rate mortgages ("ARMs"), which typically provide for a low "teaser" interest rate for a predetermined introductory time period, ranging between 2 to 10 years. The majority of ARMs sold to "sub-prime" borrowers were called "2/28 loans," meaning that the teaser rate lasts for only two years before "resetting" to higher rates, which are typically tied to specified benchmarks or other criteria, as dictated by the fine print in the loan documentation. As a result, borrowers' monthly obligations would often increase dramatially after the introductory period.

- Interest-only mortgages, which allow the borrower to pay only the interest accruing on the loan on a monthly basis for a predetermined time period. Thus, the loan principal balance remains constant. At the end of the initial time period, borrowers have to pay interest plus principal, and the interest may adjust depending on whether the loan is a fixed rate or ARM.

- Pay-option ARMs, which give the borrower the "option" whether to pay down loan principal, to make the monthly interest payment, or to make a "minimum" payment that is less than the interest accruing that month. If a borrower makes only the "minimum" payment, the difference between that amount and the monthly interest payment is added to the remaining loan principal. Thus, while a standard mortgage loan amortizes as principal is paid down and an "interest only" mortgage is non-amortizing, Pay-option ARMs are subject to negative amortization, *i.e.*, the principal balance increases when interest payments are "skipped."

- Stated income loans, which are based on a borrower's representations about ability to pay, with little or no documentation from the borrower to substantiate those representations. In these loans, the lender typically agrees not to inquire behind the borrower's represented income, leading many to call these products "liar loans."

- HELOCs are second loans secured only by the difference between the value of a home and the amount due on a first mortgage. Upon a default and foreclosure, the HELOC lender receives proceeds from the sale of the underlying home only after the first lien holder is paid in whole. HELOCs sit in the "first loss" position. Therefore, even a 10-20% reduction in home prices can have a dramatic effect on the

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

collateral securing HELOCs – resulting in the entire amount of the HELOC becoming unsecured.

111. Beginning in 2003, Countrywide substantially increased its production of "non-traditional" mortgages – both in absolute dollar amounts and as a percentage of the Company's total mortgage origination. The table below sets forth the Company's non-traditional mortgage originations – which loans are particularly sensitive to a drop in housing prices and/or interest rate increase:

| | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| **Adjustable-Rate Loans as % of Total Loans Originated** | 14% | 21% | 52% | 52% | 45% |
| **HELOCS as % of Total Loans Originated** | 4.6% | 4.2% | 8.5% | 9.0% | 10.2% |
| **Non-Prime Loans as % of Total Loans Originated** | 3.7% | 4.6% | 10.9% | 8.9% | 8.7% |

112. The following chart illustrates how Countrywide's origination of HELOCs, non-prime mortgages, and ARMs grew in absolute numbers and as a percentage of the Company's total mortgage origination before and during the Relevant Period:

| Mortgage Loan Production Years Ended December 31, | | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** |
| | | (in millions) | | | |
| **Total Mortgage Loans** | $251,901 | $434,864 | $363,364 | $499,301 | $468,172 |
| **HELOC (% of total)** | 11,650 (4.6%) | 18,103 (4.2%) | 30,893 (8.5%) | 44,850 (9.0%) | 47,876 (10.2%) |
| **Nonprime Mortgage (% of total)** | 9,421 (3.7%) | 19,827 (4.6%) | 39,441 (10.9%) | 44,637 (8.9%) | 40,596 (8.7%) |
| **Pay-option ARMs as a % of total** | N/A | N/A | 6% | 19% | 14% |
| **Adjustable-Rate Loans as a % of total** | 14% | 21% | 52% | 52% | 45% |

113.   Countrywide did not even offer pay-option ARMs until 2003, but soon became a leader in what *The Wall Street Journal* dubbed a "profitable and growing part of the mortgage market." According to *The Wall Street Journal*, the Company encouraged employees to sell the pay-option ARMs and made these loans to persons who did not understand what they were getting:

> In one California branch office, employees could win prizes, such as a trip to Hawaii, for selling the most option ARMs, says Cindy Lau, who worked for the company for more than six years. Only a small portion of borrowers "understood the loan and knew what they were getting themselves into," Ms. Lau adds.

114.   According to *The New York Times*, pay-option ARMs "were especially lucrative. Internal company documents from March [2007] show that Countrywide made gross profit margins of more than 4 percent on such loans, compared with 2 percent margins earned on loans backed by the Federal Housing Administration."

115.   By 2005, the Company originated $93 billion of pay-option ARMs. According to an analysis conducted by UBS AG on behalf *The Wall Street Journal*, the Company dramatically increased its production of pay-option ARMs

1  by "*giving these loans to riskier and riskier borrowers*."

2      116.  Indeed, despite the risky nature of the pay-option ARMs (as explained

3  further in Section VI.B.2), Countrywide increased its production of these loans by

4  offering them to persons who could not or would not provide documentation of

5  their income.  According to *The Wall Street Journal's* analysis of Countrywide's

6  lending, 78% of the pay-option ARMs originated by Countrywide in 2004 "were

7  'low-doc' mortgages in which the borrower didn't fully document income or

8  assets."  This number grew to 91% in 2006.  According to the Company's Form

9  10-Q filed with the SEC on November 9, 2007, by the end of 2006, 81% of the

10 pay-option ARMs held for investment by the Company were loans with low or no

11 stated income documentation.

12     117.  Countrywide also increased its origination of pay-option ARMs by

13 allowing borrowers to obtain pay-option ARMs without making substantial down

14 payments.  According to the UBS survey conducted on behalf of *The Wall Street*

15 *Journal*:

16         Countrywide also allowed borrowers to put down as little as 5% of a

17         home's price and offered "piggyback mortgages," which allow

18         borrowers to finance more than 80% of a home's value without

19         paying for private mortgage insurance.  By 2006, nearly 29% of the

20         option ARMs originated by Countrywide and packaged into mortgage

21         securities had a combined loan-to-value of 90% or more, up from just

22         15% in 2004, according to UBS.

23     118.  At the same time the Company was growing the amount of risky loans

24 it originated, the Company was increasing the amount of pay-option ARMs held by

25 the Company for investment.  Pay-option ARM loans represented 46% of the

26 Company's mortgage loans held for investment at December 31, 2006.  As set

27 forth below, the amount of pay-option ARMs held by the Company for investment

28 grew significantly during the Relevant Period (in $ millions):

| | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| Pay-option ARMs Held for Investment | N/A | 4,698 | 26,101 | 32,732 |

### 2. Countrywide's Non-Traditional Loans Posed Significantly Greater Risks Than Traditional, Conforming Loans

119.   The Company's non-traditional loans were much more risky than the Company's traditional, conforming loans.  As *The Wall Street Journal* noted in a report on Countrywide in December 2007, but which Individual Defendants knew throughout the Relevant Period, HELOCs are a "high-risk" loan because they are "potentially worthless in a default because the first-lien holder gets first dibs on the home."  Defendants knew that if home prices declined, the value of the collateral purportedly supporting Countrywide's HELOCs would disappear before the first-lien holder's collateral – leaving Countrywide with nothing to support its loans.

120.   Pay-option ARMs also posed a significant risk to the Company due to their inherent structure.   With respect to traditional mortgage products, a borrower's failure to pay at least the minimum monthly interest owed on a standard mortgage would result in the loan being deemed as delinquent and a precursor to a default.   With traditional mortgage products, the failure to pay the minimum monthly interest would clearly be a negative event from the lender's credit risk perspective and one that typically requires recording increases in allowances for loan losses or outright write-offs.

121.   With pay-option ARMs, however, Countrywide was able to turn this negative event into a "positive" event.  Specifically, when a borrower "chose" not to pay the full monthly interest on a pay-option ARM, Countrywide simply added the interest to the amount of principle outstanding on the loan.  Countrywide would then book this negative amortization as deferred interest earnings on its income statement (and in some instances increase the size of the loan asset on the balance

sheet). As a result, ***Countrywide misleadingly reported phantom – or non-cash income – created solely from a borrower's failure to pay interest on an outstanding loan***.

122. As Individual Defendants generally – and the members of the Credit and Audit Committees in particular – understood, providing borrowers this "optional payment" came with significant risk, since the option to skip a mortgage payment could be driven by necessity (inability to make even this minimal payment), which, coupled with increases to the loan balance, exacerbates the risk of default. Only if these loans were made to highly creditworthy borrowers could management and the Board reasonably have expected the deferred interest would ultimately be repaid.

123. Pay-option ARMs come with "negative amortization caps," which limit the amount of missed interest that can be rolled into the principal balance. Since a borrower who has hit the cap (typically set at 110-125% of the original loan balance) is subject to a reset interest rate coupled with required principal paydown, the likelihood of default on negative amortizing loans also increases materially as these caps are reached.[5]

124. As the Company recognized in its SEC filings, pay-option ARMs "are different than 'traditional' loans" and "such loans present additional risks." As the Individual Defendants well knew, and as the Company's SEC filings further explained: "Due to pay-option ARM loans' amortization characteristics, the loss that the Company would realize in the event of default may be higher than that realized on a 'traditional' loan that does not provide for deferral of a portion of the fully amortizing loan payment."

---

[5] Pay-option ARMs typically reset (meaning the amortization table is recast to determine the full principal and applicable interest payments) either every five years or when borrowers reach their negative amortization caps.

125. Individual Defendants have now conceded that, during the Relevant Period, the Company was extending pay-option ARMs that were far too risky. According to the Company, 89% of the pay-option ARMs it issued in 2006 would no longer pass muster under the Company's new, more-conservative lending practices.

126. As Individual Defendants further knew, the Company's loans posed additional risks because the Company was originating such a large amount of its loans without obtaining documentation of the borrower's income. Individual Defendants were keenly aware that low or no documentation loans – particularly when coupled with "non traditional" mortgages – are highly likely to contain material misrepresentations and/or fraud that will result in increased default rates. For instance, in August 2006, *The Wall Street Journal* ran an article stating:

> Banking regulators say that lenders are increasingly relying on unverified income to qualify borrowers for so-called nontraditional mortgage loans. Those products -- such as pay-option adjustable-rate mortgages and interest-only loans -- allow borrowers to defer payment of principal and sometimes interest. ***Many analysts see such a combination of nontraditional products and nontraditional underwriting processes as presenting another layer of risk*** to those who could be hurt by defaults, including consumers, shareholders in mortgage lenders and investors in securities backed by mortgage loans.
>
> "***There is more risk with a loan that is not fully documented***," says Suzanne Mistretta, senior director of residential mortgage at Fitch Ratings, because "borrowers can overestimate their income to obtain a larger loan they otherwise might not have qualified for."
>
> The vulnerability of stated-income loans to fraud is illustrated in a recent report by the Mortgage Asset Research Institute to the

Mortgage Bankers Association: after reviewing a sample of 100 stated-income loans and the accompanying IRS forms, an undisclosed lender recently discovered that *almost 60% of the stated incomes were inflated by more than 50%, while 90% of the stated amounts were exaggerated by 5% or more*.

127. In addition to originating more risky loans, Countrywide exposed itself to even greater risk in connection with these "non-traditional" loans by keeping a retained interest in loans securitized by the Company.

128. A retained interest provides an interest payment from a real estate mortgage investment conduit ("REMIC"). Retained interest holders receive interest payments from a REMIC after all required regular interest has been paid to other investors in higher priority securities tranches.

129. Typically, Countrywide maintained retained interests in the mortgage pools it securitized for non-prime mortgages and prime HELOCs. This was done as a form of credit enhancement, because Countrywide's retained interests would take the first losses if any mortgage pool underperformed, giving the securitization purchasers limited default protection. In effect, Countrywide's retained interest in these securitizations was the proverbial "canary in the coal mine." The retained interests would take the first losses from defaults, forecasting future losses to be suffered in connection with these risky loans.

130. The dramatic increase in retained interests held on Countrywide's balance sheet during the Relevant Period was another "red flag" that shareholders expected would be reviewed and monitored by the Board.

131. Thus, throughout the Relevant Period, Countrywide significantly increased its origination of non-traditional loans. These loans, while more lucrative for the Company in the short term, posed significant risks to the Company. These risks were not unforeseen, but were well known to Individual

Defendants. As set forth below, Individual Defendants had a fiduciary duty to monitor the Company's originations of these risky loans.

### 3. Individual Defendants Had A Fiduciary Duty To Monitor The Company's Origination Of These Risky Loans

132. As set forth *supra* in Section V, the Individual Defendants were obligated to monitor the Company's lending practices. Indeed, the Individual Defendants claim they knew exactly what was going on at the Company, yet they did nothing to stop the reckless lending practices or require the Company to increase its allowance for loan losses, as set forth herein. For instance, the Company's lead director Harley Snyder was quoted in *The Wall Street Journal* in November 2007 stating that the Board has been actively "engaged in every significant issue facing the company." Similarly, a Countrywide spokesman was quoted in *The New York Times* in November 2007 as stating: "Countrywide's board of directors has always been actively engaged in overseeing the company's senior management and business strategy."

133. Moreover, as set forth *infra* in Section VIII.C., the Director Defendants, along with Defendant Sieracki, each signed the Company's Form 10-K filings with the SEC containing, among other things, the Company's yearly financial statements. Because so much of Countrywide's financial exposure relates to credit risk on mortgages (regardless of whether the loans were held for investment or sold to the market with Countrywide maintaining retained interests or facing the possibility of forced repurchase) the key to properly reporting the Company's financial results was the establishment of appropriate allowances for loan losses and taking and disclosing impairment charges in a timely manner. As set forth *infra* in Section VI.E., the Company's allowance for loan losses was not appropriately established as represented in the Company's SEC filings signed by the Director Defendants and Defendant Sieracki.

134. The vast majority of Countrywide's earnings flow from the loans originated by the Mortgage Banking division. The success of the Company's strategic business model is dependent on the quality of the underlying loans issued, which in turn dictates the Company's ability to successfully sell loans it originated into secondary markets (without these loans being put back to the Company by the purchaser because the loan were originated in violation of representations and warranties). As the Individual Defendants realized, and as the Company highlighted in its SEC filings, the key to controlling and verifying the quality of its loan portfolio held for investment, as well as the loans it securitized and sold into secondary security markets, was the implementation and enforcement of appropriate underwriting standards.

135. For example, the following representation appeared in Countrywide's Form 10-K filed with the SEC on March 12, 2004, signed by each member of the Board and Defendant Sieracki (and representations to similar effect appeared in each Form 10-K during the Relevant Period):

> In addition to our pre-funding controls and procedures, *we employ an extensive post funding quality control process*. Our quality control department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in depth underwriting and appraisal review, and if necessary, a fraud investigation. We also employ a post-funding proprietary loan performance evaluation system. This system identifies fraud and poor performance of individuals and business entities associated with the origination of our loans. The combination of this system and our audit results *allows us to evaluate and measure*

> *adherence to prescribed underwriting guidelines and*
> *compliance to laws and regulations to ensure that*
> *current loan production represents acceptable credit*
> *risk, as defined by the Board of Directors.*

136. Individual Defendants' active monitoring and control over Countrywide's underwriting and credit risk assessment processes was particularly important with respect to the Company's strategic shift favoring the origination of pay-option ARMs. In theory, if borrowers are good credit risks and reasonably sophisticated, they can make their mortgage payment options as needed to manage their cash flow needs over time. However, the risk becomes very significant if, as shareholders are now learning was the case, Countrywide sold pay-option ARMs: (1) to riskier borrowers (including those who would struggle even to make the minimum monthly interest payment); (2) at greater than expected loan to value ("LTV"), *i.e.*, the ratio of the loan amount to the appraised home value; and/or (3) based on limited if any documentation of income and repayment ability.

137. Countrywide's reliance on and exposure to negative amortization on pay-option ARMs also exceeded that of its peers. Of the major mortgage lenders, Countrywide has consistently been the most or second-most reliant on non-cash interest income since the middle of 2006, with about 40% of this component of income coming from negative amortization on pay-option ARMs. Thus, even more than its peers, Countrywide reported significant income by issuing loans to borrowers who either chose not to or were unable to cover their minimum monthly interest payments.

138. This increased income boosted Earnings-Per-Share ("EPS"), served as a positive driver for Countrywide's stock price, and also helped senior management appear to meet performance bonus criteria. The possibility that increased deferred interest was an indication of a higher risk profile should have been a cause for concern and compelled active involvement by Individual

Defendants. In fact, it should have been cause to question whether performance benchmarks had been met at all. Instead, the Individual Defendants ignored this "red flag" as well, failing to inquire into the need for higher allowances for loan losses and continued to hand out exorbitant compensation packages based on what turned out to be phantom earnings.

139. Several other factors should have caused the Individual Defendants to be especially vigilant. In late September 2006, a coalition of banking regulators released extensive guidance regarding nontraditional mortgage products, entitled the "Interagency Guidance on Nontraditional Mortgage Product Risks." Among other things, the regulators were critical of the sale of low documentation or "stated-income" pay-option ARMs. A lender who does not extensively inquire into the ability of borrowers to repay these loans is more likely to sell the products to borrowers who will be unable to make the minimum interest payments (as opposed to credit worthy and sophisticated borrowers who would be more likely to skip payments for reasons other than necessity). Countrywide had disclosed that a significant portion of its pay-option ARM portfolio to that point had been issued based on low documentation or "stated income," yet there is no sign that Individual Defendants took any action to steer Countrywide away from the identified pitfall. Nor was there any discernible increase to Countrywide's allowance for loan losses.

140. Due to Individual Defendants' conscious misconduct and abdication of their fiduciary duties, which is further detailed below, Countrywide's shift to selling riskier products devolved into a reckless foray into predatory lending practices and a failure to protect Countrywide from risks it was facing. As set forth below, Countrywide maintained inadequate allowances for loan losses, thereby understating the risks inherent in its loan portfolio.

### C. Individual Defendants Allowed Countrywide To Abandon Or Ignore Loan Underwriting Standards To Pump Up Loan Volume, Capture More Market Share And Report Artificially Inflated Income Levels

141. As Countrywide was pursuing increasingly more risky loans, the Company was also abandoning its increasingly important underwriting standards.

142. Individual Defendants consistently assured the market that Countrywide managed mortgage credit risk through sound standards of origination, underwriting, and ongoing surveillance of outstanding loans. For example, Countrywide's public filings with the SEC claimed that the Company had a credit policy establishing standards for the determination of acceptable credit risks. Countrywide portrayed its underwriting process as tightly controlled and supervised and "***designed to produce high quality loans***" through a rigorous pre-loan screening procedure and post-loan auditing, appraisal, and underwriting reviews.

143. For example, Countrywide's annual reports on Form 10-K routinely boast of "proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud." The Company likewise lays claim to a "post-funding quality control process" involving a "pre-and post-funding proprietary loan performance evaluation system [that] helps to identify fraud and poor performance of individuals and business entities associated with the origination of our loans." According to the Company, the "combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance with laws and regulations."

144. Although Countrywide was building its portfolio of "non-traditional," higher risk mortgages, Mozilo urged investors to place a premium on Countrywide's superior underwriting skills. For example, when asked about the

inherent risk of originating alternative mortgage products (like sub-prime loans) during a conference call in April 2004, Mozilo responded as follows:

> Sub-prime cannot be looked at generically. There is very, very good solid sub-prime business and there is this frothy business that you [refer] to…. [Y]ou can get so deep into this marginal credit that you can have serious problems where you are taking 400 FICOs with no documentation: that is dangerous stuff. ***So [I] think it is very important that you understand the disciplines that the Company had, particularly that Countrywide has, which are very strong disciplines in the origination of sub-prime loans. And maintaining that discipline is critically important to us…. [W]hen you look at sub-prime, you have to look at it in various tranches, and we are at the high end of that tranche.***

145. In similar remarks comparing Countrywide to the rest of the industry in March 2005, Mozilo explained: "I have to separate it. The overall industry I am troubled; Countrywide I'm not, because we have remained very disciplined in our origination of subprime loans."

146. In order to further convince investors and research analysts that Countrywide's foray into riskier mortgage products would remain a relatively safe proposition, the Company publicly disclosed that it minimized credit risk by selling most of the loans it produced "***and by retaining high credit quality mortgages in our loan portfolio***." Countrywide also assured the market that it maintained its disciplined lending approach through detailed underwriting standards:

> Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the

secondary mortgage market. We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers.

*These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud controls, funds disbursement controls, training of our employees and ongoing review of their work. We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology. We also employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.*

147. While the Company consistently hyped its underwriting, Individual Defendants completely abandoned their obligations as senior officers and directors. For example:

(a) According to Confidential Witness 1 ("CW1"), an Underwriter II for Countrywide in the Jacksonville, Florida, processing center between June 2006 and April 2007, as much as 80% of the loans originated involved significant variations from the underwriting standards that necessitated a signoff by management. According to CW1, the Company was very lax when it came to underwriting guidelines. Management pressured underwriters to approve loans and this came from "up top" because management was paid based, at least in part, on the volume of loans originated. CW1's manager told CW1 to approve as many loans as possible and push loans through. According to CW1, most loans declined by

underwriters would "come back to life" when new information would "miraculously appear" – which indicated to CW1 the Company was not enforcing its underwriting standards.

(b)     According to Confidential Witness 2 ("CW2"), a Senior Underwriter in Roseville, California, from September 2002 to September 2006, Countrywide would regularly label loans as "prime" even if made to unqualified borrowers (including those who had recently gone through a bankruptcy and were still having credit problems).  According to CW2, Countrywide's lending practices got riskier in 2006 and the Company was more lax in enforcing its underwriting policies during that year.

(c)     According to Confidential Witness 3 ("CW3"), an Underwriter from Long Island, New York, between March 2000 and January 2007, Countrywide extended loans to individuals with increasing debt to income ratios.  Initially, the Company limited debt to income ratios to 38%, but this rose to 50%.  According to CW3, like CW1 and CW2, Countrywide branch managers' compensation was tied to loan origination volume and not the quality of the Company's loans.  Thus, according to CW3, branch managers pushed originators to sell more loans despite the riskiness of these loans.  As such, the Company regularly sacrificed quality for quantity.

(d)     Many branch managers (whose compensation was allegedly tied to loan origination volume) pushed originators to sell stated income or no documentation loans (including supposedly "prime" loans), which they colorfully called "liar loans," because these loans could be processed without the "burden" of paperwork.  This was confirmed by, among others, a loan processor who worked at the Company's Anchorage, Alaska branch from October 2002 to May 2006, Confidential Witness 4 ("CW4").  According to CW4, among other former employees of the Company, borrowers were oftentimes approved for loans

1    pursuant to stated incomes that were patently ridiculous (such as a cab driver who

2    claimed to earn $13,000 a month).

3        (e)    According to Confidential Witness 5 ("CW5"), a former Senior

4    Underwriter at Countrywide in Independence, OH between August 2006 and April

5    2007, the Company's "philosophy was that you didn't turn down loans."

6    According to CW5, the Company "did whatever they had to do to close loans"

7    including making exceptions to underwriting guidelines – everyone was motivated

8    to increase loan volume and "approv[e] things that should not have been

9    approved."

10       148.    According to, Brian Koss, who spent four years as a senior regional

11   vice president at Countrywide Financial where he ran 54 branches in New England

12   and upstate New York, Countrywide became a victim of "public company panic."

13   According to Koss, Countrywide was "reacting to each quarter's earnings and

14   making short term decisions.  They approached making loans like making widgets,

15   focusing on cost to produce and not risk or compliance.  Programs like 'Fast and

16   Easy' where the income and assets were stated, not verified, were open to abuse

17   and misuse.  ***The fiduciary responsibility of making sure whether the loan should

18   truly be done was not as important as getting the deal done***.  As long as people

19   had jobs and values were on the rise, life was good."

20       149.    According to Mark Zachary, a former Regional Vice President of

21   Countrywide's joint venture with KB Home, Countrywide Mortgage Ventures,

22   LLC, Countrywide blatantly ignored its underwriting policies and procedures.

23   According to Mr. Zachary, in September 2006, Mr. Zachary informed

24   Countrywide executives that there was a problem with appraisals performed on KB

25   Homes being purchased with Countrywide loans.

26       150.    According to Mr. Zachary, the appraiser, as known to Countrywide

27   executives, was being strongly encouraged to inflate appraisal values by as much

28   as 6% to allow the homeowner to "roll up" all closing costs.  According to Mr.

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

Zachary, this resulted in the homeowner being "duped" as to the value of the home. Mr. Zachary also believed this would mislead investors who provided funds for these loans because these investors were not made aware that the actual home value could actually be less than the loan amount tied to the mortgage note. According to Mr. Zachary, this inflated value put the buyer "upside down" on the home immediately after purchasing it, i.e. the borrower owed more than the home's worth. Thus, the buyer was set up to be more susceptible to defaulting on the loan. It also put the lender and secondary market end investor at risk because they were unaware of the true value of their asset.

151. Mr. Zachary brought his concerns to executives within the Countrywide/KB Homes joint venture. Mr. Zachary reported this information to Countrywide executives in Houston, the Company's Employee Relations Department and to the Company's Senior Risk Management executives.

152. According to Mr. Zachary, the Company performed an audit in January 2007 into these matters and the findings of the audit corroborate his story. According to Mr. Zachary, the findings of this audit were brought to the attention of Countrywide executives.

153. According to Mr. Zachary, the Company also regularly approved "stated income" or no-documentation loans even though the same applicant had been refused a loan under the Company's full-documentation loan program. In such instances, according to Mr. Zachary, the Company's loan officers would "assist" the applicant in switching to a no-document loan. Mr. Zachary brought this information to the attention of Countrywide Employee Relations Department and Risk Management officials in 2006 and early 2007.

154. Additional witnesses confirm and corroborate the lack of underwriting standards in connection with the no documentation loans, including Confidential Witness 6 ("CW6"), an External Home Loan Consultant at Countrywide who worked at the Company from 2000 through August 2007 and who was responsible

for originating prime loans for the residential market; Confidential Witness 7 ("CW7"), a former Senior Loan Officer that worked in the Consumer Markets division of Countrywide in the Atlanta, Georgia, branch office between 2000 and August 2005; and Confidential Witness 8 ("CW8"), a Compliance Auditor who worked at the Company between 2001 and mid-2007, in both Texas and Georgia. According to these witnesses, the no document loan process lacked independent verification of borrowers' stated income and was openly abused.

155.   Moreover, according to CW7, if a borrower didn't meet the guidelines for Countrywide's loan products, loan officers were instructed to approve the loan anyway if doing so would allow Countrywide to continue receiving borrower referrals from a particular source.

156.   The Company also masked the true riskiness of its loan originations by giving "prime loans" to persons who clearly did not qualify for prime loans. Confidential Witness 9 ("CW9") was a Compliance Auditor II in Countrywide's Capital Markets, Plano Texas facility from 2000 until October 2004. CW9's job was to audit loans that had previously been sold by Countrywide's Capital Markets department and were being returned to the Company (usually because the loans had been originated in violation of the Company's representations and warranties provided to the purchaser at the time of sale). According to CW9, many of the loans being returned to the Company were labeled "prime loans" but the borrower was clearly not qualified for a prime loan.

157.   According to CW9, the Company was making purportedly "prime loans" to borrowers who had gone through bankruptcy within the past two years, and the Company was making "prime loans" to borrowers whose stated income was clearly beyond the norm for a person in the borrowers' occupation.

158.   According to CW9, in 2004 the Company was being forced to repurchase an increasing number of loans that were already in default within 60 days after being originated. Many of these loans – in which the borrower defaulted

within 60 days of the origination – were prime loans, but the borrower was clearly a speculator. According to CW9, beginning in 2004 there was an increasing number of defaults by borrowers who were buying investment homes hoping to flip the homes for a quick profit. These borrowers, according to CW9, often clearly could not even afford the first payment on the loans unless they could put a renter in the home immediately (or flip the house at a profit).

159. According to CW9, the Company's failure to eliminate loans to speculators was just another example of how the Company was relaxing underwriting and origination procedures to facilitate increasing loan volume and reporting increasing earnings in the short-term.

160. According to CW9, the culture in the Plano office was to "make numbers." Loans coming back for repurchase showed a lack of management attention to proper procedures and adherence to qualification criteria.

161. Defendants knew Countrywide was extending loans that did not comply with the Company's underwriting policies and procedures. As set forth herein at ¶135, the Company's quality control department performed "comprehensive loan audits," employed "a post-funding proprietary loan performance evaluation system," and "evaluate[d] and measure[d] adherence to prescribed underwriting guidelines."

162. At the very least, according to Confidential Witness 10 ("CW10"), Defendant Sambol clearly knew about the Company's rampant deviations from its underwriting policies and procedures – and endorsed this conduct. CW10 was an Executive Vice President of Production Operations and later an Executive Vice President of Process Improvement. CW10 worked at Countrywide for 17 years, leaving the Company in October 2005.

163. In his role as EVP of Process Improvement in 2005, CW10 worked directly with Defendant Sambol to create a computer system (or "rules engine") that routed highly risky loans out of the normal loan approval process and to a

central underwriting group for evaluation. The system was called the Exception Processing System. According to CW10, the Exception Processing System identified loans that violated the Company's underwriting requirements. For instance, the Exception Processing System flagged loans in which the loan-to-value ratio was too high when compared with the borrower's FICO score. Flagged loan applications were routed to Countrywide's "Central Underwriting" group located in Plano, Texas (the headquarters of the Retail Lending group).

164. However, according to CW10, loans identified by the Exception Processing System as violating the Company's underwriting standards were *not* rejected. Rather, according to CW10, Defendant Sambol wanted the Company's Central Underwriting group to review such loans to evaluate whether these loans should require a higher price (up front points) or a higher interest rate in light of the violation at issue. Central Underwriting entered information into the Exception Processing System about its decisions to approve such loans and charge additional fees to the borrower.

165. Indeed, according to CW10, it was "evident" to him that one of CFC's goals was to be able to fund any loan. According to CW10, senior management didn't want to have to turn down any loan applications because it wanted to grow market share and didn't want borrowers, mortgage brokers, or other mortgage companies that sought warehouse lines of credit from CFC to take their business to competitors. As a result, according to CW10, loans that did not meet CFC's underwriting standards were approved and funded routinely. CW10 added that senior management's philosophy was that if the risks associated with a particular loan were simply "priced right," CFC should be able to fund any loan.

166. According to CW10, the data collected in the Exception Processing System was available to top company executives either online or though system-generated reports. This witness verified that Defendant Sambol had access to the Exception Processing System and could review the data in it at any time.

167. Thus, according to CW10, Countrywide originated loans that did not comply with the Company's underwriting standards, and the Company's Exception Processing System provided Defendants with hard evidence of this practice.

168. In addition to the Exception Processing System, according to CW10, the Company's Chief Risk Officer's department generated numerous other reports detailing all kinds of factors measuring the performance of Countrywide's loans, the Company's adherence to underwriting policies, and other similar issues. According to CW10, he reviewed and discussed these reports with former Chief Risk Officer John McMurray. And, according to CW10, all of the top Countrywide executives received copies of reports issued by the Chief Risk Officer's department, which came out at least monthly. Additionally, CW10 recalled that the Investor Accounting Department in the Simi Valley office, which dealt with outside purchasers of Countrywide's loans and ensuring that they were paid when the loans were paid off, did virtually nothing other than generate reports.

169. The Board generally, and the Compensation Committee in particular, created the incentives that allowed and caused these counterproductive actions. Specifically, investigations have indicated that the pay structure for a wide range of Countrywide employees, from mortgage brokers and on up the chain, was closely linked to volume and not tied to the quality of the loans originated.

170. Additionally, in contrast to Individual Defendants' claims of Countrywide's superior and more conservative approach to lending, internal documents further demonstrate that the Company was an irresponsible lender. It was not until March 16, 2007 that Countrywide eliminated "piggyback" loans[6]

---

[6] "Piggyback loans" are loans that permit borrowers to buy a house without putting down any of their own money; in essence borrowing the down payment in addition to the mortgage. Piggy-back loans only have a second lien on the lender's home, and as a result are far less likely to obtain any recovery upon a foreclosure.

from its product lists and it waited until February 23, 2007 to stop selling loans that were worth more than 95 percent of a home's appraised value and required no documentation of a borrower's income.

171. Basically, almost anybody could get a loan, even if they had very little to no chance of paying it back, because Countrywide's executives were incentivized to book purported earnings and get paid their bonuses, irrespective of the true risk such loans imposed on the Company.

172. Defendants pushed risky, non-traditional loans with onerous costs to the borrower because, so long as they were properly originated and the borrower did not default, these were more lucrative for the Company. Investors who purchased securities backed by the Company's risky, non-traditional mortgages also were willing to pay more for loans with prepayment penalties and loans that were going to reset at higher levels. Because such loans charged extra fees and interest, pools of these loans could be sold to investors for more than traditional, fixed-rate loans.

173. The Company originated non-traditional, risky loans to obtain these fees and payments to bolster the Company's short-term reported earnings – while at the same time putting the Company at grave risk in the long term.

174. As a result, the Company's commission structure rewarded sales representatives for making risky, high-cost loans, once again in contrast to the Company's stated goal of putting customers in the best loan possible and the Company's purported conservatism. According to a former sales representative, "the whole commission structure in both prime and sub-prime was designed to reward salespeople for pushing whatever programs [Countrywide] made the most money on in the secondary market." While the individual salespeople at

---

Further, because purchasers using a piggy-back loan have not personally put down any of their own money to purchase the home, such purchasers are far more likely to default.

Countrywide were worried about their personal bottom line, the Board was obligated to ensure that Countrywide did not end up originating loans that would default or that could not be sold to the secondary markets, or could be sold but would then be returned to the Company's balance sheet by virtue of contractual repurchase obligations.

### D. Individual Defendants Allowed Countrywide To Engage In Predatory Lending Practices

175.    One example of Countrywide's conscious abandonment of its underwriting standards was its increased use of deceptive lending practices to extend credit to persons who could not afford to repay the loans.

176.    Predatory lending is the practice of a lender deceptively convincing borrowers to agree to unfair and abusive loan terms including interest rates and/or fees that are unreasonably high.

177.    For years, Countrywide and its directors and officers have known the Company operates within specific statutory and regulatory parameters limiting the interest rate and other fees the Company can charge borrowers and the types of selling practices that the Company may utilize.  For instance, the Company's 2003 Form 10-K states:  "Currently, there are a number of proposed and recently enacted federal, state and local laws and regulations addressing responsible banking practices with respect to borrowers with blemished credit.  In general, these laws and regulations will impose new loan disclosure requirements, restrict or prohibit certain loan terms, fees and charges such as prepayment penalties and will increase penalties for non-compliance.  Due to our lending practices, we do not believe that the existence of, or compliance with, these laws and regulations will have a material adverse impact on our business."

178.    The Company and its directors and officers have also long been aware of the fact that predatory lending practices are a significant problem in the industry requiring Individual Defendants to monitor the Company's lending practices

closely. For instance, the Company's website contains a February 2003 presentation entitled, "The American Dream of Homeownership: From Cliché to Mission," in which Mozilo opines:

> From my perspective, there is absolutely no question that lending abuses have and are taking place relative to loans to low-income and minority borrowers. These abuses – whether they are loan flipping, the bait and switch, packing of fees, or any other unfair practice – must be addressed so that all Americans who desire to become homeowners will be treated equitably.

> There is also no doubt, in my opinion, that we've worked together to make progress in this area – exposing many of the worst predators feeding in the subprime markets. And at Countrywide, we're proud to have been the first lender to sign the Declaration of Fair Lending Principles and Practices with HUD in 1994 and the first lender to renew that Declaration in the year 2000.

> But now we are running a real risk, as the saying goes, of throwing the baby out with the bathwater. During 2001 and 2002, approximately 145 predatory lending bills were introduced by states, cities and various municipalities. Since 1999, 11 states and 12 municipalities have adopted legislation restricting lending activities deemed as predatory. And because predatory lending laws have become a cause célèbre with ambitious politicians at all levels, more are on the way.

> I don't mind the attention, nor do I question the intention. *These laws were allegedly enacted to protect borrowers from lenders who abuse unsophisticated, low-income, elderly and minority communities by charging high interest rates and fees fraudulently imposing unfair terms. These lenders deserve unwavering scrutiny and, when found guilty, an unforgiving punishment*.

179. Despite Mozilo's admonition, the Individual Defendants failed to monitor the Company's own compliance with regulatory and statutory restrictions on predatory lending, opening the Company up to substantial liability and subjecting the Company to damage to its reputation and causing the Company to make risky loans borrowers could not repay.

180. On August 26, 2007, *The New York Times* ran an expose` entitled "Inside the Countrywide Lending Spree," detailing Countrywide's abusive lending practices:

> On its way to becoming the nation's largest mortgage lender, the Countrywide Financial Corporation encouraged its sales force to court customers over the telephone with a seductive pitch that seldom varied. "I want to be sure you are getting the best loan possible," the sales representatives would say.

> But providing "the best loan possible" to customers wasn't always the bank's main goal, say some former employees. Instead, potential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force, outsize fees to company affiliates providing services on the

loans, and a roaring stock price that made Countrywide executives among the highest paid in America.

Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom no matter what it costs borrowers, according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided. One document, for instance, shows that until last September the computer system in the company's subprime unit excluded borrowers' cash reserves, which had the effect of steering them away from lower-cost loans to those that were more expensive to homeowners and more profitable to Countrywide.

181. *The New York Times* also reported in the same article that "documents from the subprime unit also show that Countrywide was willing to underwrite loans ***that left little disposable income for borrowers' food, clothing and other living expenses***."

182. The Company's computer systems and employee incentive programs caused the Company to place consumers into loans that many borrowers could not afford. As a result, it was entirely foreseeable that these borrowers would default. Accordingly, Individual Defendants should have, but did not, require the Company to establish a larger allowance for loan losses.

183. Further, Countrywide's incentive compensation system encouraged brokers and sales representatives to move borrowers into the sub-prime category, even if their financial position meant that they belonged higher up on the loan spectrum. For example, brokers who sold sub-prime loans received commissions

1  of 0.50% of the loan's value versus 0.20% on loans one step up the quality ladder,

2  known as Alternate-A loans.

3      184.  The Individual Defendants were well aware of the predatory and

4  discriminatory lending issues surrounding the Company – or they acted in bad faith

5  in remaining blind to the problem – because Countrywide's improper lending

6  practices have caused the Company to be the subject of government investigations

7  and civil lawsuits putting the Company at risk of substantial liability and

8  reputational damage.

9      185.  For instance, in December 2006 the Company agreed to compensate

10  African-American and Latino borrowers in New York as part of an agreement with

11  then-Attorney General for New York, Elliot Spitzer.

12      186.  In August 2007, the Company came under fire from Charles Schumer,

13  the United States Senator from New York and a member of the Senate Banking

14  Committee.  According to *Bloomberg*:

15          Countrywide, the biggest U.S. mortgage lender, should

16          stop paying higher commissions to brokers who steer borrowers

17          to high-cost loans that "are designed to fail," Schumer told

18          reporters in Washington today.

19          "I am calling on Countrywide, as our nation's largest

20          lender, to bury its bad business practices and reverse some of

21          the damage it has already inflicted on our housing market," the

22          New York Democrat said.

23          Schumer, a member of the Senate Banking Committee,

24          has been among the most vocal lawmakers seeking tighter

25          restrictions on mortgage brokers.  He introduced legislation in

26          May to set U.S. standards for brokers, including requiring them

27          to assess a borrower's ability to repay at a loan's highest

28          interest rate.

> "Countrywide's most lucrative brokers are those that make bad loans that are largely designed to fail the borrower," Schumer said. "The company's brokers can earn an extra 1 percent of the loan value in commission by adding a three-year prepayment penalty to loans," the senator said.

187. Currently, Countrywide is dealing with investigations of its lending practices by numerous government agencies, including the attorneys general of California, Illinois and Florida.

188. Put simply, Countrywide pushed one goal above all others – originating loans and selling them to the secondary markets as fast as possible, regardless of the quality of the loans, the suitability of the products for the borrower at issue, or the number and magnitude of "exceptions" to Countrywide's supposed underwriting standards.

189. California has been particularly hard hit by this scandal, where home prices have plummeted and defaults and foreclosures are skyrocketing, especially among underprivileged borrowers who likely should never have been offered the loans they were sold. About 28% of the unpaid principal balance of Countrywide's Servicing Portfolio as of year end 2006 was attributable to California properties.

**E.  Countrywide Manipulated Its Earnings By Not Taking Appropriate Allowances For Loan Losses**

190. During the Relevant Period, the Company materially understated its allowance for loan losses, overstated the value of its loan assets, and otherwise falsely portrayed itself as a responsible and highly disciplined lender, in knowing or reckless disregard of the true facts and circumstances of the Company's operations.

191. By understating the allowance for loan losses, the Company also

falsely inflated its reported earnings. During the Relevant Period, the Company should have been increasing its allowance for loan losses because the Company was engaging in increasingly risky lending practices (making more risky loans, without proper documentation, while interest rates were increasing and home values declining) and also retaining more risky loans on its balance sheet.

192. To increase the allowance for loan losses, the Company would have to take provisions for loan losses. Taking a provision for loan losses is an offset to earnings on a dollar-for-dollar basis.

193. As the Board understood, the Company's senior officers were compensated (in part) based upon the Company's reported earnings. Individual Defendants were aware of the risk that allowance for loan losses would be understated. Understating allowance for loan losses was an obvious way to make Countrywide *appear* to be more profitable than it really was. (The same is true with regard to delaying or avoiding write-offs of retained interests, which the Company also did as set forth herein.)

194. The allowance for loan losses was a critical metric for Countrywide's shareholders. The allowance for loan losses indicated the expected level of loss that the Company was reasonably likely to incur on loans held for investment on the Company's balance sheet. At the same time Countrywide's reliance on and exposure to non-traditional loans had increased dramatically, the Company's allowance for loan losses stayed relatively constant as a function of the total outstanding loan portfolio, as reflected in the following chart:

|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| **Allowance for Loan Losses (millions)** | $42 | $78 | $125 | $189 | $261 | $1,844 |
| **Total Loan Portfolio Held for Investment ("LPHI") (billions)** | $6.1 | $26.4 | $39.8 | $70.01 | $78.3 | $100.4 |
| **Allowance for Loan Losses as a % of Total LPHI** | 0.69 | 0.30 | 0.31 | 0.27 | 0.33 | 1.84 |
| **Adjustable-Rate Loans as % of Total Loans Originated** | 14 | 21 | 52 | 52 | 45 | Not yet available |
| **HELOCS as % of Total Loans Originated** | 4.6 | 4.2 | 8.5 | 9.0 | 10.2 | Not yet available |
| **Non-Prime Loans as % of Total Loans Originated** | 3.7 | 4.6 | 10.9 | 8.9 | 8.7 | Not yet available |

195.    Individual Defendants maintained Countrywide's allowance for loan losses at a constant percentage of the overall loan portfolio even though, as Individual Defendants knew, the Company was (i) engaging in much more risky lending practices, (ii) making loans much more likely to default and be under-collateralized upon a default, and (iii) seeing growing delinquencies and other indicators that borrowers would default as home prices declined and interest rates increased.  There was absolutely no rational basis for maintaining the Company's reserves at these historic levels in the face of the facts then-known to Individual Defendants.

196.    Indeed, Countrywide misled investors as to the risk profile of the Company's loan portfolio by maintaining a constant allowance for loan losses (as a percentage of total loans held for investment).  Individual Defendants did not materially adjust the Company's allowance for loan losses in the face of a clear need to do so.  Then, in July 2007, Countrywide increased its allowance for loan loss to 0.70% of the portfolio of loans held for investment — more than twice as large as it had been in years-end 2003-2006, but equal to the rate at the end of 2002.  Moreover, at the end of 3Q07 in September 2007, the Individual Defendants were forced to again double Countrywide's allowance for loan losses to 1.4% of the total amount of loans held for investment.

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

197. By the end of 2007, the Company had been forced to increase its allowance for loan losses to $1.84 billion – an increase of over 700% versus the $261 million allowance for loan losses at the end of 2006.

198. The need to increase the allowance for loan loss should have come as no surprise to Individual Defendants. For one thing, the Individual Defendants were made aware of the need for larger loss reserves by the growth in the Company's delinquencies in pay-option ARM loans and HELOCs, as set forth in the table below:

| | 2003 | 2004 | 2005 | 2006 | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|---|---|
| **Pay-option ARMs Delinquent 90 days or more (% of total Pay-option ARM Portfolio)** | N/A | .1 | .22 | .63 | 1.02 | 1.84 | 3.17 |
| **HELOCs Delinquent (as % of the Owned Service Portfolio)** | .73 | .79 | 1.57 | 2.93 | 2.96 | 3.7 | 4.62 |

199. In a report issued in December 2007, *Merrill Lynch economists called pay-option ARMs "ticking time bombs" that would start "ticking louder" in 2008*. Individual Defendants, however, knew the Company's pay-option ARMs were a problem far earlier because Individual Defendants knew that borrowers of the Company's pay-option ARM loans were not repaying the loans at an alarming rate.

200. During the Relevant Period, as Individual Defendants knew, many of Countrywide's borrowers were only making the minimum payments on their pay-option ARMs – i.e. these borrowers were not even paying down the interest on their pay-option ARMs. During the Relevant Period, the Company recorded massive amounts of negative amortization from these loans. The amount of the accumulated negative amortization from the Company's pay-option ARM loan portfolio held for investment indicated that the Company's pay-option ARMs were a ticking time-bomb of delinquencies waiting to happen. As soon as these

borrowers reached the pre-set negative amortization caps – which limited a borrower's ability to perpetually forgo repaying the loan – these borrowers would be delinquent and highly likely unable to repay Countrywide.

201. As set forth in the table below, the amount of accumulated negative amortization on the Company's pay-option ARMs was growing by dramatic amounts throughout the Relevant Period and, as set forth herein, ultimately contributed to the Company's current disastrous financial condition:

| | 2004 | 2005 | 2006 | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|---|
| **Accumulated Negative Amortization (from original loan balance) (in $ millions)** | 0.029 | 74.7 | 654 | 815.8 | 942 | 1,068 |

202. Indeed, as the Individual Defendants knew, ***the majority of the Company's borrowers under the pay-option ARMs were not even making full interest payments***. During the nine months ended September 30, 2006, 66% of borrowers elected to make less than full interest payments on the Company's pay-option ARMs. During the nine months ended September 30, 2007, 76% of borrowers elected to make less than full interest payments on the Company's pay-option ARMs.

203. Indeed, in 2006 Defendant Mozilo publicly acknowledged that the vast majority of borrowers under the pay-option ARMs were only making the minimum payments, and that this posed a significant problem of defaults once the housing market declined – as he knew would inevitably occur. As reported by *The Wall Street Journal* in October 2007:

> It now appears that many borrowers who moved into option ARMs were attracted by the low payments and may have been staving off other financial problems. More than 80% of borrowers who are current on these loans make only the minimum payment, according to UBS.

Mr. Mozilo told investors in September 2006 that he was "shocked" so many people were making the minimum payment. He called a sampling of borrowers to find out why. The "general answer . . . was that the value of my home is going up at a faster rate than the negative amortization," he said. "I realized I was talking to a group . . . that had never seen in their adult life real-estate values go down."

204. Proper Board oversight would have led to increasing the allowance for loan losses for loans held by the Company in its loan portfolio. Proper Board oversight would have also led to increasing the impairment charges on residual interests held by the Company for pay-option ARMs the Company securitized. Instead, the Board tacitly helped assure investors that no increase was necessary because of the high quality standards of the Company's loans. For example, the Company's Form 10-K for 2006 – signed by the Director Defendants and Defendant Sieracki – stated:

> Our allowance estimation process benefits from the extensive history and experience we have developed in our mortgage loan servicing activities. However, this process is subject to risks and uncertainties, including reliance on historical loss information that may not represent current conditions and the proper identification of factors giving rise to credit losses. For example, new products may have default rates and loss severities which differ from those products we have historically offered and upon which our estimates are based. ***We address this risk by actively monitoring the delinquency and default experience of our homogenous pools by considering current economic and market conditions.*** Based on our assessments of current conditions, we make appropriate adjustments to our historically developed assumptions when necessary to adjust historical factors to account for present conditions. ***Our senior management is***

1    *actively involved in the review and approval of our allowance for*

2    *loan losses*.

3    205.  Similarly, the Company's Form 10-K for 2006 stated:   "The

4    allowance for loan losses is our best estimate of the credit losses incurred in our

5    loan investment portfolio.   We continually assess the credit quality of our

6    portfolios of loans held for investment to identify and provide for losses incurred."

7    206.  Countrywide's allowance for loan losses was materially lower than

8    those of its competitors — suggesting to the market that the Company's portfolio

9    was less risky than those of its peers.  For example, Countrywide's allowance for

10   loan losses was between 27 and 34 basis points from 2003 through the end of

11   2006.  This was materially lower than:  (1) Washington Mutual's reported loan loss

12   reserves, which consistently ranged between 63 and 72 basis points of its loan

13   portfolio; (2) Wachovia Bank's loan loss reserves, which ranged between 80 and

14   123 basis points of its total portfolio; and (3) FirstFed Financial, which consistently

15   reserved between 100 and 170 basis points of its total loan portfolio.

16   207.  As part of their control of Company-wide credit risk assessment and

17   financial reporting (which implicates both the Credit Committee and the Audit

18   Committee, at the least), the Director Defendants were required to scrutinize

19   Countrywide's management's basis for the low allowance for loan losses.  Had

20   they done so, they would have uncovered the unreasonableness of senior

21   management's methodology and assumptions for establishing the Company's

22   allowance for loan losses.  By ignoring this blatant deviation from industry

23   standards, the Director Defendants failed in their obligation to assure the integrity

24   and reliability of the allowance for loan losses.

25   208.  The Individual Defendants also caused Countrywide to overstate the

26   value of its retained interests in loan securitizations.   When Countrywide

27   securitizes loans or sells loans to investors, the Company frequently retains a

28   residual interest in the underlying loan portfolio.  This residual interest is in the

-74-

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

"first loss" position and, therefore, functions as a barometer for the health of the entire portfolio. When the residual interest is not being paid, it is an early warning sign of problems with the underlying loans.

209. As of the end of the first quarter 2007, Countrywide carried its residual interests in HELOCs at a value of approximately $1.4 billion — a sum the Company would be forced to slash by almost $400 million by the end of the next quarter and would continue to cut in following quarters. By overstating the value of these residual interests, Countrywide concealed from shareholders that its HELOCs and similar loan products were not actually as safe as a "prime" product should be. Had the Company properly written down the value of its residual interests – this would have been an indication to the public the Company had originated these loans without applying adequate controls and underwriting standards to determine the likelihood of repayment.

**F. Countrywide Carried Assets At Arbitrary Valuations And Failed To Hedge Against Impairments Of These Assets**

210. Throughout the Relevant Period, the Company's reported earnings and balance sheet were significantly impacted by, among other things, valuations of the Company's Mortgage Servicing Rights ("MSRs"),[7] retained interests and the Company's inventory of loans held for sale.[8] Fluctuations in the valuations of

---

[7] MSRs arise from contractual agreements between the Company and investors (or their agents) in mortgage securities and mortgage loans. Under these contracts, the Company performs loan servicing functions in exchange for fees and other remuneration.

[8] Loans held for sale represent those mortgages that will ultimately be sold to a third party investor. Loans held for sale are accounted for at the lower of cost or market on an individual basis and are reported as other assets. Origination fees and direct costs are deferred until the loans are sold and are then in the determination of the gains or losses upon sale which are reported in other revenues. Valuation adjustments related to loans held for sale are reported in other assets and other

these assets, if not hedged, would directly impact the Company's earnings and balance sheet.

211.   As the Company recognized in its Form 10-K for 2006, it relied upon certain assumptions to assess the fair market value of the Company's MSRs and retained interests:

> The precise market value of MSRs and retained interests cannot be readily determined because these assets are not actively traded in stand-alone markets.  Considerable judgment is required to determine the fair values of our MSRs and retained interests, and the exercise of **such judgment can significantly impact the Company's earnings**.  Small changes in the assumptions used to estimate the value of MSRs and retained interests can have a significant effect on our estimates of value.  Similarly, relatively small changes in value of these assets can have a material effect on earnings for a particular period.  **As a result, senior financial management exercises extensive and active oversight of this process**.  The Company's Asset/Liability Committee, which is comprised of several of our senior financial executives, ultimately determines the valuation of MSRs and retained interests.

212.   As set forth in the Company's SEC filings, the Individual Defendants knew that the Company's valuations of MSRs and retained interests were of critical importance.  Moreover, throughout the Relevant Period, Defendants were on notice that the Company's assumptions underlying its valuation methodology were unreliable and unreasonable – causing massive fluctuations in the Company's

---

revenues and are not included in the allowance for credit losses or the provision for loan losses.

valuations to occur from quarter to quarter. These massive fluctuations are demonstrated graphically in ¶218.

213. The Company smoothed its earnings, and avoided reporting wild fluctuations in the value of its MSRs, retained interests and loans held for sale portfolio by employing hedges ostensibly designed to offset fluctuations in the valuations of these assets. For example, the Company's press release dated April 26, 2007 announcing 1Q2007 financial results stated with respect to MSRs and retained interests:

> The Loan Servicing sector reflects the performance of mortgage servicing rights (MSRs) and retained interests associated with Countrywide's owned servicing portfolio. ***Countrywide also manages a financial hedge within the Loan Servicing sector to mitigate negative valuation changes in MSRs and retained interests***.

214. As set forth in the Company's Form 10-K for 2006, the Company carefully monitored the effectiveness of its hedges: "The Company also formally assesses, both at the inception of the hedge and on an ongoing basis, whether the derivative instruments used are highly effective in offsetting changes in fair values or cash flows of hedged items."

215. The Company's use of hedges to offset volatility was of critical importance. Indeed, the Company's Form 10-K for 2006 states that with respect to these hedges, the Company would actively manage these risks "***on a daily basis***."

216. As the Company further explained, the value of the Company's MSRs and retained interests were effected by interest rates. Accordingly, the Company employed hedges to offset fluctuations in the valuations of these assets:

> MSRs and retained interests are generally subject to a loss in value when mortgage rates decline. ***To moderate the effect on earnings caused by a rate-driven decline in value of MSRs***

> *and retained interests, we maintain a portfolio of financial*
> *instruments*, primarily derivative contracts, which generally
> increase in value when interest rates decline. This portfolio of
> financial instruments is referred to as the "*Servicing Hedge*."

217.  The "Servicing Hedge" was no hedge – and did not effectively moderate the declines in the valuation of the Company's MSRs and retained interests.

218.  As set forth in the tables below, whereas the Company's Servicing Hedge and the change in its valuation of MSRs and retained interests should have generally canceled each other out – the Company lost approximately $2.6 billion dollars in earnings and took a $2.6 billion hit to its balance sheet from 3Q06 to 4Q07 (all numbers in $ thousands):

| MSR / RETAINED INTEREST HEDGES | 1Q05 | 2Q05 | 3Q05 | 4Q05 |
|---|---|---|---|---|
| **(Impairment)/ Recovery of MSRs** | 452,434 | (1,281,340) | 915,364 | 301,393 |
| **(Impairment)/ Recovery of Retained Interest** | 137,070 | (97,629) | (61,697) | (342,250) |
| **Servicing Hedge Gains (Losses)** | (552,292) | 1,147,158 | (837,241) | (280,703) |
| **Difference b/t Servicing Hedge and Valuation Adjustments** | 37,212 | (231,811) | 16,426 | (321,560) |

| MSR / RETAINED INTEREST HEDGES | 1Q06 | 2Q06 | 3Q06 | 4Q06 |
|---|---|---|---|---|
| **Change in FV due to Assumptions** | 978,281 | 569,002 | (1,067,320) | (47,722) |
| **(Impairment)/ Recovery of Retained Interest** | (120,654) | 51,498 | (141,857) | (73,677) |
| **Servicing Hedge Gains (Losses)** | (885,870) | (621,074) | 1,034,353 | (139,115) |
| **Difference b/t Servicing Hedge and Valuation Adjustments** | (28,243) | (574) | (174,824) | (262,514) |

| MSR / Retained Interest Hedges | 1Q07 | 2Q07 | 3Q07 | 4Q07 |
|---|---|---|---|---|
| Change in FV due to Assumptions | 179,007 | 1,327,446 | (830,932)[9] | (1,486,000) |
| (Impairment)/ Recovery of Retained Interest | (429,601) | (268,117) | (716,658) | (966,500) |
| Servicing Hedge Gains (Losses) | (113,738) | (1,373,089) | 1,183,543 | 1,975,221 |
| Difference b/t Servicing Hedge and Valuation Adjustments | (364,332) | (313,760) | (638,987) | (477,279) |

219.   In addition, the table below (all numbers in $ thousands) shows the Company's ineffective hedge on the valuation of its loans held for sale.   In the 3Q07, the Company suffered a huge loss on the value of its loans held for sale and the Company's hedges were ineffective resulting in the Company suffering a loss of nearly $800 million.

| LOAN SALE HEDGES | 1Q07 | 2Q07 | 3Q07 | 4Q07 |
|---|---|---|---|---|
| (Loss)/Gain on Sale of loans & securities | 1,234,104 | 1,493,458 | (718,620) | 425,781 |
| (Loss) due to Ineffective portion of Mortgage Loan Inventory hedges | (6,200) | (200) | (60,700) | Not disclosed |

220.   The Company accounted for its loans held for sale using hedge accounting.   The Company's Form 10-K for 2006 stated:  "A primary requirement to qualify for hedge accounting is the documented expectation and demonstration initially and on an ongoing basis that our interest rate risk management activity is highly effective.    We use standard statistical measures to determine the effectiveness of our hedging activity."

---

[9]   All amounts are taken from the individual 10-Qs.  Apparently the methodology for determining Fair Value ("FV") (due to both cash realization and assumptions) was changed retroactively in 3Q07.  This change was not disclosed.  As a result, certain amounts are calculated to arrive at proper year to date totals and do not agree to quarterly results reported in the 3Q07 10-Q.

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

221. According to Confidential Witness 11 ("CW11"), the Company's hedges did not pass muster and in 2006 he was personally instructed to falsify data (which he would not do) to make it appear the Company's hedges were effective.

222. CW11 was a First Vice President and Director of CFC in Countrywide's Capital Markets Accounting Department from 1998 to January 2007. From September 2006 through December 2006, CW11 was responsible for testing the efficacy of the Company's hedges with respect to a $5 billion portfolio in Countrywide Capital Market's portfolio.

223. According to CW11, the Company's hedges were not effective. To qualify for hedge accounting under FAS 133, CW11 had to be able to show that the hedge relationships identified by the Company were actually occurring as projected. In fact, these projected relationships were not happening. According to CW11, when viewed retrospectively, the hedges were not consistent with the projected values and therefore Countrywide's hedging was not effective. Countrywide could not demonstrate the requisite hedging relationship in order to maintain qualification for FAS 133.

224. When the test results were failing, Countrywide's Executive Vice President of Finance for Capital Markets directed CW11 to go back and change the "bucket" of assets being hedged. CW11 was ordered to retroactively remove bad loans from the portfolio. By doing so, it would ***appear*** the loan portfolio had performed better than it had, and that the hedge had operated properly to offset losses in the loan portfolio. Thus, by altering the assets being hedged, the Company could show the consistent and efficient hedge relationship required by FAS 133. According to CW11, this was contrary to the premise of FAS 133, impermissible under the accounting rules, and like being asked to change history to fabricate prior accounting records. Moreover, by altering the assets in the loan portfolio retroactively, the Company's problem bad loans could be further concealed.

225. CW11 explained that Countrywide management wanted CW11 to retroactively change the "bucket" of assets that were being hedged so that the performance of the "bucket" would match what was necessary to show an effective hedging relationship. According to CW11, Countrywide management wanted what golfers refer to as a "Mulligan" – essentially a "do-over." CW11 told his boss "I'm an accountant, I'm not in the Mulligan business."

226. CW11's findings were critical to the Company. Though CW11's findings pertained to only a small segment of the Company's hedging activities, according to CW11 this was an indictment of the Company's entire hedging operations Company-wide.

227. CW11's contention that a failure in the Company's hedging activities in one portfolio would be indicative of a systemic failure Company-wide is corroborated by the account of Confidential Witness 12 ("CW12"), a former Senior Auditor in Countrywide's Capital Markets Division in California. CW12 worked at Countrywide between August 2003 and July 2005. According to CW12, if the Company's hedging activities did not work in one portfolio than it was likely that there was a problem endemic to all of the Company's hedging activities. The reason for this, according to CW12, is that a failure to demonstrate effective hedging in one portfolio would call into question the quality of the Company's models applied to all of the portfolios because these models were all based on similar assumptions.

228. According to CW11, CW11's monthly findings from September 2006-December 2006 were reported to Countrywide's CFO CW11 also believes these findings would have been reported to Mozilo. Moreover, according to CW11, the Company's *internal* auditors purportedly conducted an internal investigation.

229. Because CW11 would not alter/falsify the Company's testing of hedging effectiveness, CW11 left the Company in January 2007 after ten years

employment.

230.   Throughout the Relevant Period, the Individual Defendants ignored clear red flags indicating the Company's valuations of MSRs, retained interests and loans held for sale were based upon improper assumptions causing the valuations to fluctuate wildly without any basis.   Further, the Individual Defendants ignored clear red flags indicating that the Company's hedges purportedly designed to offset such fluctuations (particularly negative movements in the Company's valuations) were ineffective.   As a result of Individual Defendants' failure to monitor these matters as required by their duties as directors or officers of the Company, and their knowledge or reckless disregard of such matters, the Company has been substantially harmed as set forth herein.

## VII.   THE INDIVIDUAL DEFENDANTS' MISCONDUCT AND BREACHES OF DUTY HAVE DEVASTATED COUNTRYWIDE'S BUSINESS AND FINANCIAL CONDITION

231.   Foreseeably, Individual Defendants' conduct has resulted in Countrywide suffering massive economic losses.   Because of the Company's switch to risky lending activities without proper safeguards, sufficient reserves, or effective hedges, and the improper stock repurchase program, among other things, Countrywide suffered: (i) an earnings loss of $704 million in 2007 versus having reported earnings of $2.7 billion in 2006; (ii) significant liquidity constraints effectively limiting the Company's ability to conduct business; (iii) becoming the target of ongoing numerous federal and state government investigations and various pending lawsuits; (iv) a decline in its stock price by over 85% in under 9 months; (v) significantly damaged goodwill and reputation, resulting in the Company being compared to Enron, possibly the worst corporate scandal ever to plague United States markets.

232.   During the Relevant Period, the true financial condition of the Company was concealed from the public as a result of Individual Defendants' conduct.   Individual Defendants' conduct could not perpetually conceal the

Company's true financial condition. Predictably, the Company's true financial condition was exposed after the bullish real estate market of 2002-2005 corrected.

233. As Individual Defendants knew all along, cyclical fluctuations in housing prices and interest rates affect borrowers' ability to repay loans – and such changes would inevitably cause the Company to suffer increasing losses for bad loans, with resulting devastating ramifications.

234. Indeed, Individual Defendants clearly knew by the beginning of 2006 that the housing market bubble would decline. For instance, Defendant Mozilo stated in an interview with Maria Bartiromo in February/March 2006:

> *I would expect a general decline of 5% to 10% throughout the country, some areas 20%. And in areas where you have had heavy speculation, you could have 30%.* We will see...sellers back off from the prices they have been demanding. A year or a year and half from now, you will have seen a slow deterioration of home values and *a substantial deterioration in those areas where there has been speculative excess*.

235. Individual Defendants knew throughout the Relevant Period that a decline in housing prices and an increase in interest rates could substantially impact the Company's loan portfolio – indeed, Countrywide's SEC filings made this clear – yet Individual Defendants failed to take appropriate steps to protect the Company from this foreseeable event. Indeed, Individual Defendants even failed to take appropriate precautionary measures – such as establishing adequate allowances for loan losses, hedging against likely losses, or establishing appropriate underwriting policies – despite the fact that Individual Defendants were obligated to do so and publicly stated they were doing so in Countrywide's SEC filings.

236. It was no secret that during the Relevant Period, interest rates were at historic lows. It was also no secret that interest rates were steadily increasing as

the Federal Reserve tightened cash flow to the markets.

237. In addition, it was also well known to Individual Defendants that housing prices were at all time highs in the beginning of the Relevant Period – but that many, many experts (and laypersons alike) believed these high housing prices to be unsustainable.

238. Cheap money, in the form of historically low interest rates, was fueling the increase in housing prices. As interest rates crept upwards, however, Individual Defendants knew there was a real risk that home price appreciation would significantly decline or that house prices would depreciate.

239. In fact, this is what happened. The following charts demonstrates the increasing interest rates and declining real estate prices prior to and during the Relevant Period:

Interest rates (January 2004-September 2007):



Housing prices (December 1996-December 2006):



240. Throughout the Relevant Period, as set forth *infra* at Section VIII, Individual Defendants repeatedly reaffirmed that the credit quality of the Company's loan portfolio was strong and that the Company was adequately reserved to handle the then-occurring (and inevitable) increase in interest rates and downturn in the housing market. As Individual Defendants knew or recklessly disregarded, however, this was not the case.

241. The market's trust in the Company as a disciplined lender and risk manager began to fracture on July 24, 2007, when Countrywide reported second-quarter earnings well short of consensus estimates. That day, Countrywide reported second-quarter earnings of $0.81 per share, well short of consensus analyst estimates of $0.95 per share. Countrywide's earnings shortfall was largely attributable to $417 million of impairment charges on credit-sensitive retained interests. This included $388 million of impairment charge to its retained interest in the securitization of HELOCs (which the Company misleadingly labeled "prime" home equity loans).

242. Additionally, Countrywide reported that it would take a provision for loan losses on its held for investment (HFI) portfolio of $293 million – versus having only taken a provision for loan losses of $62 million in the same quarter of 2006. This provision increased the Company's allowance for loan losses to $512 million. The increase in the provision for loan losses was driven primarily by a loan loss provision of $181 million on HELOCs.

243. This massive provision for loan losses more than doubled the Company's allowance for loan losses from its position at the end of the 2006 fiscal year.

244. Up until this time, the Company had misled investors to believe the HELOCs were prime loans and less risky and subject to greater credit testing and underwriting standards than were sub-prime loans. Thus, on these disclosures regarding allowance for loan losses, the Company's stock plunged 10% to close at $30.50 on high volume.

245. With the market focusing on sub-prime risk at Countrywide and its competitors, it now appears that Countrywide "managed" its sub-prime exposure by expanding its definition of, and risk tolerance regarding, HELOCs. Among the $468 billion in loans that Countrywide originated last year, HELOCs accounted for 10.2% of the total, while sub-prime loans were 8.7%. Following Countrywide's late-July disclosures of HELOC write-offs (as set forth below), a steady flow of analyst and news reports have suggested that Countrywide hid its true default risk exposure by lowering the standards it applied to supposed "prime" HELOCs, so that risk in the HELOC portfolio is just as risky as other lenders' sub-prime loans.

246. Three months earlier, on the morning of April 26, 2007, the Company had announced disappointing earnings. At that time, the Company attributed the shortfall to a decline of approximately $400 million in "sub-prime operations." Countrywide's stock actually closed over a dollar **_higher_** per share on that day. This market reaction suggests that shareholders had expected an even larger sub-

prime related write-down based on other companies' sub-prime woes.  Any market concerns were further allayed by the Company's assurances that further sub-prime losses had been contained.

247.   Against the backdrop of the April disclosure concerning the sub-prime shortfall, however, the July 24, 2007 disclosure — which, at least on its face, related principally to the Company's prime loan portfolio — surprised investors. The dramatic increase in the allowance for loan losses coupled with a write-down of nearly a full third of the value of the Company's retained interests in prime home equity loan securitizations, disclosed to Countrywide shareholders that the Company's prior depiction of itself as a disciplined lender and risk manager was not accurate.  This realization caused the Company's stock to decline by 10% in a single day, on unusually high volume, to close at $30.50.

248.   Additionally, on July 24 the Company's reported results included over $1.37 billion in losses resulting from the Company's "Servicing Hedge" which had a direct impact on earnings and the balance sheet.

249.   The blunt reaction of research analysts in response to the July 24, 2007 disclosure reflects their view that Countrywide had materially misled the market about the credit quality of its non-traditional loan portfolio and its supposed strength in the marketplace.  For example, an analyst for Stifel Nicolaus observed that he had previously believed that Countrywide "would outperform weaker competitors due [to] its limited (and well-managed) credit risk, strong balance sheet, and superior mortgage franchise."  The July 24th disclosures and subsequent management comments fundamentally altered the analyst's opinion: "[W]e are concerned that the 2Q07 home equity issues suggest that our sanguine views on CFC's credit exposures may be misplaced.  ***Indeed, given the magnitude of the credit problems in the bank, we think [management] made serious miscalculations (and possibly misrepresentations) about the quality of the loans added to the bank.***"

250. As Stifel Nicolaus's research observed, "CFC's home equity securitizations are performing roughly in line with [a competitor's] sub-prime deals." An analyst at Piper Jaffray seemed to agree, commenting that "Lower average and a higher percentage of low documentation loans appear to be the main drivers for the weaker credit stats on the home equity residuals."

251. Based on the Company's management's explanation of the charges, one analyst noted that it appeared that "the definition of 'prime' (or Alt-A for that matter) was loosened in the recent boom. Management referred to certain affordability programs where FICO scores went 'far below' 620 (which already is well below the bank regulator's definition of subprime, which has a 660 cutoff)." The same analyst noted that "management acknowledged that the higher combined loan to value ("CLTV") and reduced documentation higher CLTV products – classic speculator products – are accounting for a disproportionate share of credit costs."

252. These analysts were clearly complaining that Countrywide categorized as "prime" certain borrowers who should have been categorized as sub-prime, while also lowering income documentation standards below prudent levels and increasing caps on loan to value above prudent levels. As an analyst at Piper Jaffray wrote: "Lower average FICO scores and a higher percentage of low documentation loans appear to be the main drivers for the weaker credit stats on the home equity residuals," *i.e.*, the type of retained interests that Countrywide wrote down.

253. Several weeks later, on August 9, 2007, the Company filed its quarterly report for the second quarter of 2007. The filing confirmed the metrics disclosed on July 24 but, in addition, warned investors for the first time that the Company was facing liquidity funding issues. The news led to further declines in the stock price, with a price drop from $27.75 down to $18.95 over several consecutive trading days.

254.  On August 15, 2007, a Merrill Lynch analyst raised concerns that Countrywide could be forced into bankruptcy due to inability to access liquidity to fund its operations.  The next day, Countrywide drew down an $11.5 billion credit facility, said it would accelerate plans to migrate its mortgage production operations into the federally chartered bank division and said that it had "materially tightened its underwriting standards" for certain classes of loans.  The Company's stock further declined to close at $18.95 on August 16 from $24.46 just two days earlier.  As one spokesperson for a major rating agency put it, "When a company draws on its bank lines, it just basically gives off the impression that it has run out of options.  Typically these bank lines are there but not really meant to be used."

255.  With the credit markets turning against Countrywide, the rating agencies were forced to follow.  Retaining an "investment grade" rating is critical for a financial business like Countrywide.  With the markets realizing that Countrywide's financial reports had failed to account for the true credit risk of its mortgage business, the rating agencies lowered Countrywide's ratings for senior unsecured debt.  On August 2, Moody's downgraded Countrywide to A3.  On August 16, 2007, Moody's lowered Countrywide's ratings again, down to Baa3.

256.  On August 22, 2007, Bank of America ("BofA") purchased $2 billion of preferred stock in Countrywide that pays a 7.25% interest coupon and is convertible at a strike price of $18 per share.  If converted, BofA can dilute existing shareholders and acquire about 17% of the Company.  Countrywide stock closed on August 24, 2007 at $21.00.  As of October 15, 2007, Countrywide's stock price closed at $18.34, down from a high closing price of $45.03, in February 2007.

257.  Countrywide's financial condition was not the only thing hammered by Individual Defendants' affirmative misconduct and failure to protect the Company from predatory and other improper lending practices.  Countrywide's

reputation has also suffered significantly.

258.  In light of its dominant position in the mortgage industry, recent events at Countrywide have played a critical role in the widely-publicized "meltdown" that has roiled public markets, eroded confidence in the United States economy, and accelerated residential foreclosures across the country (especially among economically underprivileged, lesser-educated, and/or minority borrowers).

259.  In addition, the Individual Defendants' complete lack of oversight that should have prevented these practices has made Countrywide the focus of media criticism of the mortgage lending industry's role in causing hundreds of thousands (or millions) of Americans to lose their homes.  An October 1, 2007 op-ed in *The New York Times* compared Countrywide to the most famous corporate fraud in American history, Enron.  The article, entitled "*Enron's Second Coming?*" stated as follows:

> These days, of course, Mr. Mozilo doesn't look like such a wonderful guy, after all. Instead, he's starting to bring back memories of other people who used to be praised not just as great businessmen but as great human beings — people like Enron's Ken Lay and WorldCom's Bernie Ebbers.
>
> * * *
>
> At this point it appears that Mr. Mozilo achieved the rare feat of victimizing three distinct groups.
>
> First were the borrowers….
>
> Then there are the investors who bought those Countrywide mortgages directly or indirectly, in the form of financial instruments created by slicing and dicing claims on borrowers.
>
> * * *
>
> But Countrywide made more questionable loans than anyone else — and its post-bubble behavior does stand out. As Ms.

> Morgenson reported in yesterday's Times, Countrywide seems peculiarly unwilling to work out deals that might let borrowers hold on to their homes….
>
> * * *
>
> Last but not least, since it may be the key to the whole story, is the victimization of Countrywide's own stockholders.
>
> * * *
>
> [H]ow can it be that so soon after Enron, WorldCom and other scandals rocked the business world, we're once again hearing about executives cashing in just before their companies are revealed as less successful than advertised? The answer, of course, is that we never dealt properly with those scandals.
>
> There is one big difference this time: the number of victims — misled borrowers, homeowners whose neighborhoods are being destroyed by foreclosures, investors who thought they were buying safe assets — is even larger.

260. Even now, when Individual Defendants should be taking steps to improve the Company's public image, while the other lenders cooperate, Countrywide is being obstinate with respect to borrowers facing difficulty repaying loans. In *Countrywide Help For Borrowers Falls Short, Critics Say,* which was published on CNNMoney.com on October 12, 2007, Countrywide was singled out as being slower or less willing to assist homeowners facing foreclosure than its peers.

261. Although the Company claims it is acting to assist homeowners, Plaintiffs' investigation refutes this suggestion. In mid-October 2007, Countrywide took an unusual step that would actually *increase* the pressure on home- owners. Specifically, the Company sent an email to affiliates (like outside parties who originate or service loans) stating that going forward, once a borrower

on a HELOC is late on payment **by even one day** (without regard to the usual 30-day grace periods), the account should be frozen. Such an extreme shift in policy – especially while the Company is being criticized for forcing people into foreclosure – indicates the Individual Defendants' complete abdication of responsibility over the Company's affairs.

262. On October 26, 2007, Countrywide announced the results of its financial operations for the third quarter of 2007, and the results were dismal. Specifically, Countrywide announced a net *loss* of $1.2 billion, compared to net income of $648 million for the third quarter of 2006.

263. The Company's October 26, 2007 release included a loss of $60.7 million in the Company's hedge for loans held for sale and $718 million in the value of those loans. In addition, the release indicated the Company lost $1.1 billion on the change in fair value of the Company's MSRs and $716.7 million on the change in fair value of residual interests.

264. Following Countrywide's announcement, Friedman, Billings, Ramsey issued an analyst report commenting on the Company's terrible results – which were attributable in large part to the Company's risky HELOCs and pay-option ARMs:

> The bank took a $934 m provision in the quarter; is that enough? The higher provision, which is up from $293 m in the prior quarter, reflects expected higher future defaults and charge-offs. Reserves to the investment portfolio now stand at 140 bps, raising the question, "Is that enough given the risk of CFC's loan portfolio?" . . . ***Despite the high provision, it might not be enough as we believe CFC's loan portfolio contains significant risk as indicated by the $32 B of HELOCs and $27 B of pay-option ARMs, 41% and 33% of the investment portfolio, respectively.***

* * *

We also believe CFC made a mistake in portfolioing some of the riskier loan products, such as HELOCs associated with piggyback loans (the second lien on a 100% LTV loan) and pay-opted ARMs loans. Given the fact that **74% of CFC's investment portfolio is comprised of these riskier loan products**, it is not beyond reason that CFC will have to take larger provisions in the future on its investment portfolio so that earnings have much more downside risk then upside.

\* \* \*

CFC originated $6.4 B in HELOC loans, of which it transferred approximately $6 B to the bank portfolio due to significant pricing deterioration during the quarter. **On the $586 million of HELOCs sold during 3Q07, CFC took an 88% loss**.

\* \* \*

[The bank segment's] Pre-tax earnings were negative at $406 m, down from the prior quarter's income of $363 m. **Earnings were impacted by a $784 m provisioning expense, reflecting the increasing delinquencies on the HELOC loans and the pay-option ARM loans**.

265. Indeed, as set forth in the Company's Form 10-Q filed with the SEC, the Company's new allowance for loan losses was $1.2 billion. The Company explained:

Increased estimates of inherent losses in our portfolio of loans held for investment and increased charge-offs resulted in significant increases to credit costs during the third quarter of 2007. . . . The revised expectations relative to credit losses impacted third quarter results as follows:

• Increased provision for loan loss on our portfolio of loans held for investment of $934.3 million, compared to $38.0 million in the

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

third quarter of 2006. The increase in provision during the quarter *primarily relates to additional valuation allowances provided for the home equity and pay-option loans held in Banking Operations*.

• Impairment of credit-sensitive residuals of $689.8 million, compared to recovery of $26.4 million in the third quarter of 2006. *Third quarter 2007 impairment includes $540.6 million for prime home equity residuals* and $156.2 million for nonprime and related residuals, offset by a recovery of $7.0 million on prime residual securities.

• *Increased provision for representations and warranties in the amount of $291.5 million*, compared to $41.0 million in the third quarter of 2006. This increase relates primarily to increased expectations of future representation and warranty claims on loans sold or securitized resulting from higher levels of expected future defaults. It is our intention to defend our positions vigorously.

266. Thus, the Company has admitted that the primary causes of its credit-related problems are HELOCs and pay-option ARMs and asserted breaches of the representations and warranties made to purchasers of the Company's loans – which breaches undoubtedly are the result of the Company's purposeful disregard of underwriting standards in an effort to inflate lending volume and artificially increase reported earnings.

267. The Company further disclosed: "The increase in the provision for loan losses was primarily due to higher expectations of losses inherent in our portfolio driven by the impact of the weakening housing market and significant tightening of available credit on delinquency and default trends as well as portfolio seasoning. *The impact was most significant on prime home equity loans and Pay-option loans in the held for investment portfolio of Banking Operations.*"

268. In addition, the Company disclosed: "In the nine months ended

September 30, 2007, we recognized impairment of credit-sensitive retained interests of $1,472.1 million, including $1,061.6 million related to subordinated interests on prime home equity securitizations and $412.1 million related to nonprime and related residual interests."

269.   The Company's 10-Q also stated that "all three rating agencies have placed our ratings on some form of negative outlook."  Further, according to the filing, if the Company's credit ratings dropped any further, "our access to the public corporate debt markets could be severely limited."

270.   Investors continued to question Countrywide's liquidity throughout the next quarter.  During the 3Q07, unable to sell many of its mortgages into the secondary market, and unable to raise funds using commercial paper and intermediate term notes, Countrywide began to take increasing advantage of loans from the Federal Home Loan Bank System to keep it afloat.  At the end of September, Countrywide owed the system over $51 billion dollars, up from less than $29 billion at the end of June.  In late November, however, Countrywide again came under fire from Senator Schumer, who expressed his concern that Countrywide was abusing the Federal Home Loan Bank system.  In a November 26, 2007 letter to the Chairman of the Federal Housing Finance Board, Schumer wrote: "At a time when Countrywide's mortgage portfolio is deteriorating drastically," the system's "exposure to Countrywide poses an unreasonable risk." As Schumer succinctly explained: "Countrywide is treating the Federal Home Loan Bank system like its personal ATM."  Shares of Countrywide accelerated their decline following release of Schumer's letter.  Shares closed the day down 10%, to $8.64.

271.   The credit concerns came to a head on January 8, 2008, when the Company's stock price collapsed on widespread reports that it would soon have to file for bankruptcy protection.  The New York Stock Exchange was forced to halt trading in the stock before the Company released a statement denying that it

planned to file for bankruptcy. The price rebounded shortly before tumbling further. Analysts were troubled by a lack of information from the Company. As an analyst from Keefe, Bruyette & Woods, Inc. explained: "The last time their stock price dropped like this, the company reiterated that they had ample liquidity and capital. It's interesting that they have not made that statement today." Countrywide's shares closed down 28.4%, to $5.47.

272. Countrywide's continuing financial and other disclosures have repeatedly demonstrated that the Individual Defendants failed to perform their duties and grossly violated their fiduciary duties during the Relevant Period. The Company's unaudited financial results for 2007, released on January 29, 2008, again included huge provisions for loan losses and impairments of retained interests, primarily related to the Company's risky lending activities with HELOCs and pay-option ARMs. For instance, by the end of 2007, the Company had been forced to increase its allowance for loan losses to $1.84 billion. Countrywide was also forced to recognize its residual interests bad been impaired (primarily because of declining valuations of its retained interests in HELOCs) by $831 million for the three month period ended December 31, 2007, as compared to impairment of $690 million for the three months ended September 30, 2007 and $30 million for the three months ended December 31, 2006.

273. Countrywide's lending activities and related conduct during this time has led to government investigations, civil suits, and further damage to the Company's reputation. The SEC is reportedly investigating insider trading at the Company, and Mozilo revealed in late October that his trades were specifically under investigation. On December 13, 2007, press reports revealed that the Illinois Attorney General's Office was investigating Countrywide's lending and loan origination practices. Similarly, on December 14, reports revealed that the California Attorney General's Office had launched a similar investigation. Additionally, *The New York Times* reported on January 8, 2008 that court records

indicated that Countrywide had fabricated documents related to the bankruptcy case of a homeowner targeted for foreclosure. This incident was in addition to an investigation launched in October 2007 by the United States Trustee examining Countrywide's conduct in foreclosure proceedings.

274. Lead Plaintiffs filed this action initially in October 2007, seeking, among things, to hold Individual Defendants liable for the breaches of their fiduciary duties, to recover the damages to the Company, and to disgorge the Individual Defendants' illegal insider trading proceeds. Rather than answer for their improper conduct, Individual Defendants further breached their fiduciary duties when they agreed to sell the Company to Bank of America without properly valuing the Company's substantial claims against the Individual Defendants being prosecuted derivatively by, among others, Lead Plaintiffs. Individual Defendants engineered this sweetheart deal to Bank of America out of their own self-interest to avoid liability for their actions.

## VIII. THE INDIVIDUAL DEFENDANTS DISSEMINATED MATERIALLY FALSE AND MISLEADING STATEMENTS TO COUNTRYWIDE'S SHAREHOLDERS

275. As a result of the Individual Defendants' disregard for their fiduciary duty obligations to Countrywide and its shareholders, they caused the Company to issue materially false and misleading statements concerning, among things, Countrywide's lending practices, financial results, and liquidity, throughout the Relevant Period. These materially false and misleading representations failed to disclose the following facts, as alleged herein:

> (i) Individual Defendants disregarded publicly stated underwriting and loan-origination practices to artificially inflate reported income, earnings and loan volume;

> (ii) the Company made a substantial amount of loans without requiring documentation confirming the credit-worthiness of borrowers;

(iii)   the Company lacked the requisite internal controls to determine appropriate allowances for loan losses;

(iv)   the Company understated reserves and allowances for loan losses which did not properly reflect the risk facing the Company for the purpose of artificially inflating the Company's reported income and earnings;

(v)   the Company improperly mischaracterized high-risk, low-documentation loans as prime loans as opposed to sub-prime loans;

(vi)   the Company engaged in predatory lending practices;

(vii)   the Company's purported financial success was the result of aggressively and improperly originating risky loans, without regard to its stated underwriting and origination policies, and without taking adequate reserves to reflect the risks associated with such loans; and

(viii)   the Company did not properly value and failed to disclose the ineffectiveness of its hedging with respect to loans held for sale, MSRs and retained interests.

A.   **The Individual Defendants Caused Countrywide To Issue False Financial Results During The Relevant Period**

276.   After each quarterly reporting period during the Relevant Period, the Individual Defendants caused the Company to publicly report overstated income and earnings per diluted share that failed to properly take allowances for loan losses for the Company's risk-laden loan portfolio. In each instance, the Company attributed its positive financial results to management's exceptional performance and the Company's well-crafted loan origination and underwriting policies. For instance, on April 21, 2004, the Individual Defendants caused the Company to

1    issue an earnings press release for 1Q04 stating:

2               "Outstanding operational and financial results characterized the
3               first quarter of 2004," said Angelo R. Mozilo, Chairman and
4               Chief Executive Officer. This performance, in light of rapidly
5               shifting environmental conditions, illustrates the strength and
6               flexibility of our business model and risk management
7               strategies, as the Company delivered impressive results.

8          277. Moreover, the Company repeatedly hyped its business model as
9    capable of delivering results despite a market downturn. For example, on
10   October 20, 2004, the Company issued a press release announcing 3Q04 financial
11   results, stating: "Countrywide's financial results for the quarter – highlighted by
12   diluted earnings per share of $0.94 – once again demonstrate the strength and
13   resilience of our business model."

14         278. Similarly, on April 27, 2006, the Individual Defendants caused
15   Countrywide to issue financial results for 1Q06, stating:

16              Countrywide opened the year by delivering strong operational
17              and financial performance for its shareholders . . . . Overall, in
18              this    challenging    environment,    Countrywide's    results
19              demonstrate the effectiveness of our time-tested business
20              model, our focus on mortgage lending and the continued
21              diversification of our earnings base.

22         279. And, throughout the Relevant Period, the Individual Defendants
23   repeatedly assured investors in quarterly earnings announcements that the
24   Company's loan portfolio contained quality loans likely to be repaid. For instance,
25   on October 27, 2005, the Individual Defendants caused Countrywide to announce
26   financial results for 3Q05 stating:

27              "Countrywide delivered strong results for the third quarter. . . .
28              As we begin the fourth quarter, we are well positioned with a

$77 billion mortgage loan pipeline, a $171 billion balance sheet *and a high quality credit profile in our loan portfolio*."

280. The earnings releases in ¶¶276-279 were materially false and misleading for the reasons stated in Section VI. For instance, the statement that Countrywide possessed "a high quality credit profile" in its loan portfolio was particularly false and misleading because during the Relevant Period Countrywide utilized a low-documentation loan origination process that skirted the publicly stated underwriting standards of the Company for screening loan applicants. Moreover, Countrywide's predatory lending practices placed non-qualifying borrowers into risky and abusive loans that often left the borrower with little additional income for living expenses.

**B. The Individual Defendants' False And Misleading Conference Calls With Analysts**

281. In addition to issuing materially false and misleading earnings releases, throughout the Relevant Period, the Individual Defendants repeatedly hosted conference calls for analysts and shareholders during which the Company's management similarly asserted that the Company was better than its competitors at managing the risks associated with lending. For instance, on April 21, 2004, Mozilo reassured investors Countrywide was properly monitoring its risks:

It depends on your ability to manage it. And we have successfully managed this product for years. And so I think using what our competitors do as a barometer will put you down the wrong path. *We are a very different focused company that understands this product very well, how to originate it, how to manage it, how to underwrite, how to service it.*

\* \* \*

Sub-prime cannot be looked at generically. There is very, very good solid sub-prime business and there is this frothy business that you relate to. . . . *[I]t is very important that you understand the disciplines that the Company had, particularly that Countrywide has, which are very strong disciplines in the origination of sub-prime loans. And maintaining that discipline is critically important to us.* I don't think, when you look at sub-prime, you have to look at it in various tranches, and we are at the high end of that tranche.

282. Further, during the same conference call, the Individual Defendants reassured investors the Company's risky loans were similar to traditional, prime loans that the Company had historically originated:

ED GROSHANS, Prudential Securities, Analyst: You also mentioned putting most of the HELOCs into the bank. I was under the understanding that the bank is mostly prime or better type or product. And does Countrywide's current production of HELOCs fit those standards?

ANGELO MOZILO: Absolutely. It is well over 720 FICO average on HELOCs that we are originating.

283. Similarly, during a July 22, 2004 conference call, Defendant Mozilo deflected concerns over ARM originations:

GAREESH PAKU, RCG Analyst: And the couple of questions I have are, one, it came up on the last call, basically what's the impact of all of this ARM origination? I'm a little new to the idea of ARM origination and sale. Can you talk about how that's different from fixed rate mortgage, origination-

ANGELO MOZILO: . . . [W]e don't see any difference in the, in the servicing of those [ARM] loans. We don't see any difference in the, currently in the delinquency or foreclosure on those loans, again, partially due to the fact that you've increased values that sort of mitigates and sort of does mitigate the servicing problems. But you got to remember that these ARMs – most of these ARMs are not pure ARMs. They are 3-year fixed, 5-year fixed, 7-year fixed, they're hybrid ARMs. So, for – at least for the time being, these really have to be viewed as fixed rate loans until, you know, until the time elapses where they become fixed and go to ARMs. Then we would be dealing with pure ARMs. The pure ARM portion of the ARM business being done is still relatively small.

284.  Similarly, during an April 26, 2005 conference call, the Individual Defendants again defended Countrywide's ARM origination practices:

ANGELO MOZILO: **On the pay option ARMs itself. It is a very good product. And it fits the needs of many homebuyers,** and these are again high cycle because of the complexity of that product. And -- but we are continuing to originated it and we will -- we have no restrictions on the amount, the dollar amount or the number of loans that we will do in that area. ***It's a time-tested product, by the way we'll say we have had that product for years***. ***And if you originate it properly, it's very profitable***. It is a good product for both us, the lender, and for the mortgage broker. It is a lot of flexibility based upon with eight days month in terms of how much cash there are available to make the payments. ***So, it's a very good product and it is time tested.***

285.   Likewise, during a May 24, 2005 conference call Defendant Sambol remarked that credit risks associated with ARMs were mitigated:

> DAVID SAMBOL: ***These risks are mitigated or addressed in part by the different underwriting criteria which are applied to these loans relative to those used for traditional fixed-rate agency product such as maybe higher credit scores or lower loan to value ratios***, and also importantly, the paradigm in the mortgage market today and with Countrywide in particular, is that the increased risk is priced for in a very granular way. And as I mentioned the secondary markets have become increasingly sophisticated and proficient. They are pricing different credit risks, which in turn flows down into the pricing that is offered to consumers.

286.   The Individual Defendants' statements during conference calls with analysts in ¶¶281-285 were materially false and misleading for the reasons stated in Section VI.  For instance, the statements that pay-option ARMS were "good products" that had been "time tested" and that any risks were "mitigated . . . by underwriting criteria" were particularly false and misleading because the Individual Defendants were aware that negative amortization associated with the portfolio of pay-option ARM loans radically increased during the Relevant Period – meaning borrowers were not even paying the minimum interest payments on their mortgages – and the risk materially increased that these loans would reset at an accelerated rate and borrowers would default.  Despite this, the Individual Defendants failed to appropriately increase the loss reserves for these loans in order to inflate earnings at Countrywide in violation of GAAP and to mask the liquidity crisis Countrywide faced.  Moreover, the pay-option ARM loans were new products that the Individual Defendants forced Countrywide to originate in order to increase loan volumes.  Indeed, despite the risk of borrower default

through lax underwriting standards and predatory practices, Countrywide provided these loans to many non-qualifying borrowers who would default when the interest rate on their pay-option ARM loans adjusted upward.

**C. The Individual Defendants Caused Countrywide To File Materially False And Misleading Reports With The SEC**

287. Countrywide's SEC Form 10-Q and 10-K filings similarly reported that the Company was committed to managing credit risk, which was false. For instance, the Company's 1Q04 Form 10-Q stated the Company managed credit risk by selling risky loans to remove the risk from the Company's balance sheet:

> We also face credit risk, primarily related to our residential mortgage production activities. Credit risk is the potential for financial loss resulting from the failure of a mortgagor or an institution to honor its contractual obligations to us. We manage mortgage credit risk principally by securitizing substantially all mortgage loans that we produce, and ***by only retaining high credit quality mortgages in our loan portfolio***.

288. Similarly, the Form 10-K for the fiscal year ending December 31, 2004, filed March 15, 2005, and signed by Defendants Mozilo, Kurland, Cisneros, Cunningham, Donato, Dougherty, Melone, Parry, Russel, Robertson and Snyder, misleadingly reported:

Credit Risk Management

> ***We actively manage credit risk to maintain credit losses within levels that achieve our profitability and return on capital objectives while meeting our expectations for consistent financial performance***.
>
> Our Credit Committee, which is comprised of our Chief Credit Officer and other senior executives, has primary responsibility for setting strategies to achieve our credit risk goals and objectives. Those

goals and objectives are documented in our Credit Policy.

Mortgage Credit Risk

Overview

*In our mortgage lending activities, we manage our credit risk through credit policy, underwriting, quality control and surveillance activities* as well as through use of credit enhancements, especially nonrecourse and limited recourse securitizations. We also employ proactive collection and loss mitigation efforts.

Loan Quality

*Our Credit Policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.*

*Borrower quality includes consideration of the borrower's credit and capacity to pay.* We assess credit and capacity to pay through the use of credit scores, application of a mortgage scorecard, and manual or automated underwriting of additional credit characteristics.

*Collateral quality includes consideration of property value, condition and marketability and is determined through physical inspections and the use of manual and automated valuation models*.

*Underwriting guidelines facilitate the uniform application of underwriting standards to all borrowers regardless of race, religion or ethnic background*. Uniformity in underwriting also provides a means for measuring and managing credit risk. This allows us, as well as government sponsored entities ("GSEs"), private investors, and the secondary markets in general, to assess risk, which provides us with more flexibility in the sale of loans.

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

* * *

*Our loan origination standards and procedures are designed to produce high quality loans.* These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of their work. We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology.

289.   Much like the Company's Form 10-K for 2004, the Company filed its Form 10-K for the fiscal year ending December 31, 2005, on March 1, 2006.  The 2005 Form 10-K was signed by Defendants Mozilo, Kurland, Sieracki, Cisneros, Cunningham, Donato, Dougherty, Melone, Parry, Russel, Robertson and Snyder.

290.   Much like the Company's Form 10-K for 2005, the Company filed its the Form 10-K for the fiscal year ending December 31, 2006, on March 1, 2007.  It was signed by Defendants Mozilo, Sieracki, Cisneros, Cunningham, Donato, Dougherty, Melone, Parry, Russel, Robertson and Snyder.

291.   Throughout the Relevant Period, the Company issued financial statements that were materially misstated and not presented in accordance with GAAP.  Defendants Mozilo and Sieracki repeatedly signed sworn certifications regarding Countrywide's financial statements and the adequacy of the Company's internal controls, which were materially misleading as these sworn certifications failed to reveal the Individual Defendants' knowledge of Countrywide's violations of GAAP.  These certifications were substantially, if not actually, identical. Examples of such certifications are attached hereto as Exhibit 1.

292.   Throughout the Class Period, Countrywide's SEC filings repeatedly trumpeted the Company's risky lending products as "high quality" without disclosing the true risks associated with the products as known to the Individual

Defendants. For example, the Form 10-Q for the quarter ending September 30, 2005, filed November 8, 2005, and signed by Defendants Sieracki and Kurland, reported:

Loan Production

*Our pay-option loan portfolio has very high initial loan quality*, with original average credit rating (expressed in terms of FICO scores) of 720 and original loan-to-value and combined loan-to-values of 74% and 78%, respectively. *We only originate pay-option loans to borrowers who can qualify at the loan's fully-indexed interest rates*.

293. Similarly, the Form 10-Q for the quarter ending March 31, 2006, filed May 9, 2006, and signed by Defendants Sieracki and Kurland, reported:

Loan Production

Pay-option loans differ from "traditional" monthly-amortizing loans by providing borrowers with the option to make fully amortizing, interest-only, or "negative-amortizing" payments. We view these loans as a profitable product that does not create disproportionate credit risk. *Our pay-option loan portfolio has very high initial loan quality*, with original average FICO scores (a measure of credit rating) of 721 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively. *We only originate pay-option loans to borrowers who can qualify at the loan's fully indexed interest rates.*

294. The Individual Defendants caused Countrywide to make similar representations throughout the Relevant Period, including in the Company's Form 10-Q for the quarter ending June 30, 2006, filed August 7, 2006, and signed by Defendants Sieracki and Kurland.

295. The Form 10-Q for the quarter ending March 31, 2007, filed May 9, 2007, and signed by Defendants Sieracki and Kurland, misleadingly stated:

We manage the credit risk relating to pay-option ARM loans through a variety of methods, including active borrower communications both before and after funding, through our underwriting standards and through the purchase of mortgage insurance. Our underwriting standards conform to those required to make the pay-option ARM loans salable into the secondary market at the date of funding, including a requirement that the borrower meet secondary market debt-service ratio tests based on the borrower making the fully amortizing loan payment and assuming the loan's interest rate is fully indexed. (A fully indexed note rate equals the sum of the current index rate plus the margin applicable to the loan.)

296. Further, the Form 10-Q for the quarter ending June 30, 2007, filed August 9, 2007, and signed by Defendants Sieracki and Kurland, reported:

We supplement our credit risk management practices relating to pay-option ARM loans through a variety of methods, including active borrower communications both before and after funding, through our underwriting standards and through the purchase of mortgage insurance. Our underwriting standards conform to those required to make the pay-option ARM loans salable into the secondary market at the date of funding, including a requirement that the borrower meet secondary market debt-service ratio tests based on the borrower making the fully amortizing loan payment and assuming the loan's interest rate is fully indexed. (A fully indexed note rate equals the sum of the current index rate plus the margin applicable to the loan.)

297. The SEC filings at ¶¶287-296 were materially false and misleading for the reasons stated in Section VI. For instance, the financial statements that the

Individual Defendants caused Countrywide to issue were particularly false and misleading because they failed to disclose the true risks associated with Countrywide's loan portfolio. Indeed, the Individual Defendants refused to appropriately increase the allowance for loan losses, despite knowing that the quality of the loans in the portfolio deteriorated significantly, as evidenced by the rise in negative amortization associated with the pay-option ARM for loans throughout the Relevant Period. Moreover, the financial statements failed to disclose that the derivative hedging for loans held for sale and MSRs did not serve as an effective hedge and failed to properly mitigate losses, as publicly stated.

### D. Throughout 2007, The Individual Defendants Misleadingly Asserted That Countrywide Was Not At Risk From Bad Loans And Was Not Suffering A Liquidity Crisis

298. Even toward the end of the Relevant Period, the Individual Defendants continued to falsely and/or misleadingly state that Countrywide was abiding by its strict underwriting and origination procedures and was therefore well prepared to deal with the impending day of reckoning that would result in an industry wide shake out of irresponsible lenders.

299. For example, during an interview on March 13, 2007, Mozilo misleadingly told the marketplace that the Company's exposure to risky loans was not significant because the Company only originated 7% of loans that were sub-prime:

> MOZILO:     Well, I think you have to keep things in perspective. You know, there's an old saying that you don't know who's swimming naked until the tide goes out, and obviously, the tide's gone out. *And the one's that you see exposed at the moment would be the New Centuries, the NovaStars, and the Accredited Home Loans*, and, those are monoline companies, subprime companies, that did well in the

housing boom, in the bubble, but once the tide went out, you can see what's happened. *I think it's a mistake to apply what's happening to them to the more diversified financial services companies such as Countrywide*, Wells Fargo and others. Certainly, a percentage of our business is subprime. We had 7 percent of our business underindexing that…

BARTIROMO:     Seven percent?  Angelo, so you've got seven percent of originations coming from the subprime area?

MOZILO:          That's correct.  *And about .2 percent of our assets are in subprime. So I think it's very important that this be kept in perspective*. So, for us, what our concern is, Maria, is not so much for Countrywide because we'll be fine. In fact, *this will be great for Countrywide at the end of the day because all the irrational competitors will be gone*. So, you have to look over this valley you know to the horizon and it looks very positive for us

300.   Shortly after appearing on CNBC to be interviewed by Bartiromo, on March 22, 2007, Mozilo appeared on the popular television show Mad Money, hosted by Jim Cramer.  Mozilo, once again, was very positive regarding the Company's prospects.  He misleadingly assured investors watching the show that Countrywide was essentially a prime lender, and subprime only represented 7-9% of the Company's business.  He again differentiated Countrywide from sub-prime lenders, asserting their business model was fundamentally flawed in a way Countrywide was not.

301.   Further, on a conference call held on April 26, 2007, Mozilo focused investors' attention on the Company's growing pipeline of "prime" loans, noting

that Countrywide was poised to capitalize on the implosion of irresponsible lenders that had populated the industry in the last five years:

> ANGELO MOZILO: Let me just take the first part. On the prime, what is happening in the prime I think should be obvious to most observers, is that you have got—you have had tremendous consolidation, a lot of people just going out of business who are just not participating any longer. You have acquisitions taking place of companies contributing to the rapid consolidation, more rapidly than I have ever seen and steeper than I have ever seen.
>
> As a result, you have less competition and as Dave pointed out, rational competition. So when you have that, one is your margins are going to improve. There is no question that there are many players who have entered the business over the last five years that had to some degree or another irresponsible behavior, conducted themselves irresponsibly, and that impacted everybody, Gresham's Law.
>
> But right now, you can see our pipeline increase dramatically, prime business. Margins increased and that appears at least to me at the moment to be a trend and one that we can see for the next several years. So that is our view of what is happening, and that continues, that trend, towards higher quality loans at better margins.

302. On the same conference call, Countrywide's COO, Defendant Sambol stated Countrywide's prime business would continue to grow despite industry problems:

> DAVID SAMBOL: Yes. Just to elaborate first on the prime side, Ken, the first quarter was characterized by very strong

volumes and stable pricing margins.

And as it relates to top-line pricing margins, there was the absence of competitive worsening in pricing. So the outlook is very good for our prime business and prime margins.

303. On August 23, 2007, Mozilo was again interviewed on CNBC by Maria Bartiromo. During the interview, Mozilo misleadingly assured the public and investors the Company was not at risk of suffering a bankruptcy. Indeed, Mozilo blasted the Merrill Lynch analyst who had accurately release an analyst report indicating Countrywide would face liquidity constraints:

Well, first of all let me comment couple things. One is the, just the irresponsible behavior on part of that analyst from Merrill Lynch to, yell fire in a very crowded theater in environment where you had panic already setting in the overall markets unrelated to Countrywide. *Was totally irresponsible and baseless.* And it, affected the lives of 61,000 people here at Countrywide our employees and more importantly or as important our depositors. Our depositors, primarily senior citizens, stood on-line frightened to death that Countrywide would go bankrupt and lose their money. *Has no basis whatsoever*. Strong bank, well overcapitalized accessed to fed window.

\* \* \*

I can tell you *there is no more chance for bankruptcy today for Countrywide than it was six months ago, two years ago, when the stock was $45 a share*. [We] are a very solid company.

304. Moreover, during the same interview, Mozilo again reassured investors that Countrywide was different than other lenders being hit by the decline in the real estate market:

> BARTIROMO: Sure. So what is the future, then, for Countrywide? Tell me how you see this debacle playing out?
>
> Mr. MOZILO: ***Well, I think it's great. First of all, it's made us stronger. It's made us stronger. . . . Countrywide's future is going to be great. You know, it's always been great.*** We've been, you know, we're one of the best performing share stocks and stocks in the New York Stock Exchange for the last 40 years. You know, better than Berkshire Hathaway, and I love Warren, but that it makes me proud to have, you know, people that we beat. Microsoft. We're better than Dell. We're better than all of those to our shareholders. We want to continue doing that. That's who we work for. ***So I think down the line this is going to be a better company, a more profitable company, and a company that's a great investment for shareholders as we continue down the line because the market ultimately will come to us***.

305. The Individual Defendants' statements during the interviews and conference calls in ¶¶299-304 were false and misleading for the reasons stated in Section VI.

**E.     The Individual Defendants
         Caused The Company's Proxy
         Statements To Be False And Misleading**

306. Individual Defendants also made materially false and misleading statements in the Company's proxy statements for the annual shareholders meetings in 2005 through 2007, and omitted material information from those proxy

1   statements in seeking shareholder votes.

2   **1.   The 2005 Proxy Statement**

3   307.   In the Company's Proxy Statement filed with the SEC on April 29,

4   2005 ("2005 Proxy"), Individual Defendants sought a vote in favor of the re-

5   election of defendants Mozilo, Kurland, Robertson and Russell.  (Kurland resigned

6   from the Company in September 2006).   Individual Defendants also sought

7   approval of the Company's Annual Incentive Plan as amended and restated.  The

8   2005 Proxy stated that the Annual Incentive Plan's purposes were, among other

9   things, to promote profitability of the Company, to provide officers with an

10  opportunity to receive incentive compensation based on profitability, and to attract

11  and retain talented executives.   Defendants Kurland, Sambol and Garcia were

12  among the executive officers who were to participate in the plan in fiscal year

13  ended December 31, 2005.   The 2005 Proxy stated that the Compensation

14  Committee awarded participants under the plan based on, among other things, the

15  extent to which the performance goals had been achieved.  According to the 2005

16  Proxy, earlier that year, the Compensation Committee approved, subject to

17  stockholder approval, an amendment and restatement of the plan that expanded the

18  types of performance criteria that could be used as goals under the plan.   The 2005

19  Proxy sought approval of the plan as amended and restated to establish

20  performance goals based on one or more of a number of performance criteria,

21  including gross and/or net revenue, gross and/or net income, operating income,

22  share price, earnings per share, EBIT and EBITDA.

23  308.   The 2005 Proxy omitted to state the material fact that Individual

24  Defendants would achieve the performance criteria set forth in the Annual

25  Incentive Plan by manipulating the Company's reported financial results and by

26  making undisclosed fundamental changes to the Company's business model that

27  relied on riskier products to boost reported figures in order to inflate its stock price

28  and drive its short-term performance, as described above.

309.   Had shareholders known that these material facts, they would not have voted to approve the Annual Incentive Plan and would not have voted to re-elect Mozilo, Robertson and Russell, who remain on the Board to this day and who continue to serve on Board Committees despite their breaches of fiduciary duties detailed above.

## 2.   The 2006 Proxy Statement

310.   In the Company's Proxy Statement filed with the SEC on April 28, 2006 ("2006 Proxy"), Individual Defendants sought a vote in favor of the re-election of defendants Cunningham, Melone and Parry.   Individual Defendants also sought approval of the Company's 2006 Equity Incentive Plan (the "EIP"), which the Board had approved earlier that year, subject to stockholder approval. The 2006 Proxy stated that the EIP's purposes were, among other things, to promote the Company's long-term financial success, to attract, retain and reward persons who could contribute to such success, and to further align the participants' interests with those of the Company's stockholders.   The 2006 Proxy stated that the Compensation Committee had full authority to administer the EIP, and that the Compensation Committee could, under the EIP, grant non-qualified and incentive stock options, stock appreciation rights, stock awards and cash incentive awards. The 2006 Proxy explained that compensation awards in excess of $1 million would be tax deductible to the Company to the extent they qualified as "performance-based compensation" under section 162(m) of the Internal Revenue Code, based on performance measures for awards under the EIP, as selected by the Compensation Committee.   The 2006 Proxy listed such performance measures as earnings, financial return ratios, net income, stock price, improvement of financial ratings, and achievement of income statement, balance sheet and/or strategic business objectives.

311.   Once again, Individual Defendants failed to disclose in the 2006 Proxy that the weaknesses in the Company's internal controls created the

1    opportunity to skew the Company's performance results and measures which

2    Individual Defendants manipulated by causing Countrywide to engage in

3    extremely risky lending businesses and by inflating reported financial results, as

4    described in detail above.  The 2006 Proxy also falsely stated that awards by the

5    Compensation Committee under the EIP would be given to persons who

6    contributed to Countrywide's success when, in fact, Mozilo, Sambol and the Non-

7    Defendant Directors – candidates for awards under the EIP – ruined Countrywide's

8    operations and business prospects, and acted in ways that were antithetical to,

9    rather than aligned with, the interests of the Company's stockholders.  The 2006

10   Proxy statement also omitted to state the material fact that the Compensation

11   Committee members were wholly unqualified to issue such awards as they were

12   the cause of exorbitant, unjustifiable compensation packages to Mozilo and others

13   that rewarded such insiders for false financial results, extremely risky business

14   practices and insider selling.

15         312.  In the 2006 Proxy, the Board also encouraged shareholders to vote

16   against a shareholder proposal submitted by the American Federation of State,

17   County and Municipal Employees ("AFSCME") that urged the Board to adopt a

18   policy permitting shareholders to have the opportunity, at the annual meeting, to

19   vote on an advisory resolution to be proposed by Countrywide's management to

20   approve the report of the Compensation Committee set forth in the proxy

21   statement.   The proposal sought to give Countrywide shareholders sufficient

22   influence over pay practices by establishing an annual referendum process.   In

23   support of the proposal, the shareholder proponent noted, among other things, that

24   "performance criteria submitted for stockholder approval to allow a company to

25   deduct compensation in excess of $1 million are also broad and do not constrain

26   compensation committees in setting performance targets for particular executives.

27   Withholding votes from compensation committee members who are standing for

28   reelection is a blunt instrument for registering dissatisfaction with the way in

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

which the committee has administered the compensation plans and policies in the previous year."

313.  Not surprisingly, the Board recommended a vote against the proposal. In support of that position, the Board stated that the "Compensation Committee has a process for establishing executive compensation that is based on performance in alignment with stockholder value creation and which responsibly achieves the purpose of hiring and retaining the best executives in order to maintain the Company's competitiveness."  The Board further stated that the Compensation Committee "believes that the Company's compensation policies and programs effectively serve the interests of the stockholders and the Company" and that "these policies motivate executives to contribute to our overall future success, thereby enhancing the value of the Company for the benefit of all shareholders." The Board also stated that it "always exercises great care and discipline in determining and disclosing executive compensation."  With respect to Mozilo's compensation, the Board stated:

> An assessment of our Chief Executive Officer compensation in light of the Company's performance supports the Board's belief that it has implemented pay for performance. From the fiscal year ended February 28, 2001 through Fiscal 2005, the Company's net earnings expanded at a compound annual growth rate of approximately 48%, from approximately $374 million to $2.5 billion. In the same period, total assets grew by a compound annual growth rate of 52% from $23 billion to $175.1 billion and earnings per diluted share increased by a compound annual growth rate of 40%, from $0.79 per diluted share to $4.11 per diluted share. In addition to these achievements, over the five-year period from December 29, 2000 through December 30, 2005, our stockholders would have received an 188% total return.

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

These are all strong demonstrations that the work of the Compensation Committee has been in the stockholders' best interests.

314. On June 13, 2006, the Company filed additional materials to its Schedule 14A to further shore up the Board's position that shareholders vote against AFSCME's proposal. In the additional materials, Countrywide stated: "Countrywide's Board of Directors has adopted an effective and responsible pay-for-performance system, in which the interests of shareholders and management are aligned. . . . The Company is continually focused on ensuring that such alignment exists." The additional statement also cited metrics that Individual Defendants claimed underscored Countrywide's "outstanding" performance from 1996 through 2005, including appreciation in net earnings, market capitalization, stock price and return to shareholders, and stated that "we will continue to focus on developing and executing strategies that deliver returns that meet the expectations of our shareholders."

315. The Board's statements in the 2006 Proxy and supplemental materials to the 2006 Proxy against the shareholder proposal seeking to give shareholders a say in executive pay were materially false and misleading. The Compensation Committee, in fact, had neither a legitimate nor responsible process for compensating Countrywide's senior executives. Rather, the Board, and the Compensation Committee, sought to further the selfish interests of Individual Defendants and enable them to steal from the Company through insider selling and, in the case of Mozilo, by manipulation of his Rule 10b5-1 plan. The 2006 Proxy failed to disclose that the compensation packages that the Board gave to Mozilo and other senior executives year after year were out of proportion to actual performance, the true results of which were hidden by Individual Defendants and only recently came to light. Further, the 2006 Proxy's discussion of Mozilo's compensation relative to Countrywide's performance was materially misleading because Mozilo and other top Countrywide officers caused the Company's

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

performance to gravely deteriorate and its net earnings, asset growth rate and stockholder returns all to be artificially inflated, as described in detail above. In addition, the statement that the Board "always" exercises "great care and discipline" in determining and disclosing executive compensation was materially false and misleading because, as set forth herein, the Board was completely derelict in its duties to shareholders to ensure proper controls were in place, and instead rewarded senior officers for running Countrywide into the ground and profiting from such malfeasance before the true value of the Company became known by the Company's other shareholders. Moreover, Individual Defendants manipulated and falsified the very metrics they cited to underscore Countrywide's "outstanding" performance.

316. Had shareholders known these material facts, they would have voted in favor of the shareholder proposal seeking to give shareholders a say in executive compensation, not have approved the EIP and not have re-elected Cunningham, Melone and Parry to the Board.

### 3. The 2007 Proxy Statement

317. In the Company's Proxy Statement filed with the SEC on April 27, 2007 ("2007 Proxy"), Individual Defendants sought a vote in favor of the re-election of Defendants Cisneros, Donato and Synder. (Cisneros would later resign from the Board in October 2007). In the 2007 Proxy, Individual Defendants also sought to encourage shareholders to vote against a shareholder proposal, similar to the one submitted for vote at the 2006 annual meeting. The proposal urged the Board to adopt a policy that Countrywide stockholders be given the opportunity at each annual meeting of stockholders to vote on an advisory resolution, to be proposed by Company's management, to ratify the compensation of the named executive officers set forth in the proxy statement's Summary Compensation Table and the accompanying narrative disclosure of material factors provided to understand the table. As did the shareholder proposal in the 2006 Proxy, this

proposal sought to involve Countrywide shareholders in the Company's compensation practices.

318.   Once again, Individual Defendants encouraged shareholders to vote against the shareholder proposal challenging the Board's entrenched compensation practices.  In addition to asserting that the practices sought by the proposal, if implemented, might render Countrywide unable to recruit and retain talented personnel, Individual Defendants stated:

> In light of the complexity and challenges of the financial services industry, intellectual capital is critical to the success of the Company. The Company's short-and long-term prospects are dependent upon the quality and motivation of our executive team and we believe our executive compensation policies and programs are effective at achieving the Company's goals in these areas. As evidence of this, our policies and programs have contributed to attracting and retaining an executive management team that has been with the Company for an average tenure of 22 years and has delivered outstanding financial results through many different business cycles. From the fiscal year ended February 28, 1997 through Fiscal 2006, the Company's net earnings expanded at a compound annual growth rate of approximately 26%, from approximately $257 million to $2.7 billion. In the same period, total assets grew by a compound annual growth rate of 39% from $7.7 billion to $199.9 billion and earnings per diluted share increased by a compound annual growth rate of 22%, from $0.61 per diluted share to $4.30 per diluted share. In addition to these achievements, over the 10-year period from December 31, 1996 through December 29, 2006, our stockholders would have received a 563% total return. Such extraordinary results, especially in light of a transitioning business environment, are all strong demonstrations of

the alignment of our pay-for-performance system with our stockholder's best interests.

The Board and the Compensation Committee strive to enhance the Company's executive compensation policies and programs in light of changing industry and market forces to ensure that we provide appropriate incentives to our executives to continue to deliver such financial results for our stockholders. In this regard, in 2007 we enhanced our pay-for-performance compensation system to further strengthen the relationship between pay and performance. These enhancements are outlined more fully under the heading "Compensation Discussion and Analysis." We believe our compensation policies and practices result from a disciplined and thorough process for determining executive compensation as outlined in our "Compensation Discussion and Analysis."

319.   The foregoing statements were materially false and misleading and omitted material facts.  The 2007 Proxy also failed to state that the Compensation Committee failed to prevent Individual Defendants from selling shares at inflated prices based on material inside information.

320.   Had Countrywide's shareholders known the material facts misrepresented in and omitted from the 2007 Proxy, they would not have voted to re-elect Cisneros, Donato and Synder to the Board and would have voted in favor of the shareholder proposal.

## IX.   THE INDIVIDUAL DEFENDANTS' INSIDER SELLING

### A.   Relevant Period Insider Sales

321.   Knowing that the inevitable day of reckoning was coming, certain of the Individual Defendants made themselves absurdly rich.  Between 2004 and the end of 2007, the Individual Defendants sold nearly $850 million of their stock at

prices artificially inflated by the Individual Defendants' false and misleading statements and the Company's stock repurchase program, led by CEO Angelo R. Mozilo (who sold over $474 million); former President and COO Stanford L. Kurland (who sold over $191 million); current COO David Sambol (who sold over $69 million); and Managing Director of Banking and Insurance, Carlos M. Garcia (who sold over $64 million).    Appendix A contains a detailed listing of the Individual Defendants' stock sales during the Relevant Period.    Individual Defendants' stock sales during the Relevant Period were unusual and suspicious and were far greater than their sales before the Relevant Period.

322.    The chart below summarizes the sale of significant amounts of Countrywide common stock by the Company's directors:

| Defendant | Date Of Sales | Shares Sold | Proceeds |
|---|---|---|---|
| Mozilo | 5/5/04 – 10/12/07 | 12,874,835 | $474,491,038.25 |
| Kurland | 1/7/04 – 10/9/06 | 5,160,975 | $191,738,379.34 |
| Sambol | 1/2/04 – 7/19/07 | 1,617,400 | $69,878,744.13 |
| Garcia | 3/12/04 – 6/21/07 | 1,368,011 | $64,264,344.81 |
| Robertson | 11/15/05-7/27/07 | 272,000 | $10,215,668.00 |
| Dougherty | 11/29/04-6/15/07 | 227,905 | $9,191,552.73 |
| Snyder | 9/21/04-12/19/06 | 206,400 | $7,960,864.30 |
| Cisneros | 11/29/04-5/30/07 | 153,475 | $5,637,373.36 |
| Donato | 12/29/04-12/15/06 | 114,142 | $4,345,868.00 |
| Cunningham | 4/3/06 – 2/2/07 | 75,000 | $3,006,700.00 |
| Russell | 12/12/05 | 10,800 | $371,243.62 |
| Sieracki | 2/2/04 | 88,143 | $7,496,562.15 |
| **TOTALS** | | **22,169,086** | **$848,598,338.75** |

323.  At the time of the stock sales set forth above, the Individual Defendants possessed knowledge of the Company's irresponsible lending practices, including the need to increase allowances for loan losses and the impairment of retained interests in loan securitizations during the Relevant Period. Despite knowledge of adverse, material non-public information, the Individual Defendants sold Countrywide common stock on the basis of such information during the Relevant Period.

**B.    Countrywide's Share Repurchase Program**

324.  In October 2006, Countrywide's Board of Directors authorized a share repurchase program of up to $2.5 billion, signaling to the market that the Board believed Countrywide's shares to be underpriced.  The market reaction to this announcement was swift.  From November 2006 to February 2007, Countrywide's share price rose over $6.50 per share to arrive at an all-time high of $45.03 per share on February 2, 2007.  While publicly proclaiming Countrywide shares a bargain, however, senior officers and directors were aggressively liquidating their stock holdings.

325.  In the fourth quarter of 2006 alone, the Company spent $1.5 billion repurchasing 38,639,876 shares with an average price of $38.83 per share.  At the same time, Company officers and directors sold over 1.2 million shares of Countrywide stock, to correspond with the repurchase program and increased share price, for profits of approximately $52 million, as detailed in the chart below.

| Defendant | Date Of Sales | Shares Sold | Proceeds |
|-----------|---------------|-------------|----------|
| Mozilo | 11/1/06 -12/18/06 | 841,999 | $33,575,809.81 |
| Sambol | 10/4/06 -12/28/06 | 168,000 | $6,632,446.40 |
| Garcia | 10/26/06 -12/28/06 | 75,000 | $3,042,126 |
| Robertson | 11/20/06 | 60,000 | $2,388,000 |
| Dougherty | 11/29/06-12/15/06 | 68,372 | $2,791,000.35 |
| Snyder | 12/19/06 | 20,000 | $818,040 |
| Donato | 10/27/06-12/15/06 | 54,142 | $2,142,068.16 |
| Cunningham | 11/1/06 – 12/1/06 | 10,000 | $389,800 |
| **TOTALS** | | **1,297,513** | **$51,779,290.72** |

326.  Then, in the second quarter of 2007, the Company spent an additional $900 million to repurchase 21,503,512 shares at an average price of $40.37 per share.  At the same time, Company officers and directors sold approximately 2.5 million shares of Countrywide stock for profits of approximately $96 million while the Company repurchased shares, as detailed in the chart below.

| Defendant | Date Of Sales | Shares Sold | Proceeds |
|-----------|---------------|-------------|----------|
| Mozilo | 3/1/07 – 6/19/07 | 2,274,000 | $84,985,729.40 |
| Sambol | 3/7/07 – 6/27/07 | 65,375 | $2,406,639.39 |
| Dougherty | 3/16/07 - 6/15/07 | 91,161 | $3,542,551.50 |
| Garcia | 4/26/07 – 6/21/07 | 52,500 | $2,090,438.25 |
| Cisneros | 5/22/07-5/30/07 | 79,407 | $3,052,529.72 |
| **TOTALS** | | **2,562,443** | **$96,077,888.26** |

327.  In effect, the Company was supporting the stock price while allowing insiders to sell at inflated prices.  Ultimately, in connection with the share repurchase program, the Company repurchased 60,143,388 shares of its common

stock for $2.4 billion funded by issuing debt securities.

**C.    Defendant Mozilo Frequently Amended His
        Automatic Stock Sale Plan To Sell Additional
        Shares During The Repurchase Program Period**

328.   While the Company repurchased $2.4 billion worth of stock between November 2006 and June 2007, Defendant Mozilo frequently revised his supposedly "passive" Rule 10b5-1 stock sale plan to sell additional shares each month during the buyback periods, as detailed in the above charts.

329.   Rule 10b5-1 stock sale plans were created to allow corporate insiders to sell stock based on predetermined triggers, like specified dates or prices, without any direct involvement.  Recent academic studies have argued that executives are manipulating such plans, which have been described as "Mozilo plans" due to his extensive use of them.  As a senior compensation analyst for the Corporate Library told the *Los Angeles Business Journal*, "[t]his Mozilo clause is clearly a loophole in the entire trading system…  it's obviously a way for executives like him to enrich themselves, and it's highly convenient that most of his transactions tend to coincide with a negative earnings release.

330.   On September 29, 2007, *The Los Angeles Times* published an article titled:  "CEO sold as stock dropped; Countrywide's Mozilo made changes to trading plan that raise red flags, experts say.  Firm says sales followed policy." The article quoted noted experts finding the sales very suspicious:

> Although trading plans usually protect executives against allegations that they traded on inside information, experts say Mozilo may have weakened his defense by making changes in a relatively short period of time.
>
> "***This raises a slew of red flags***," said Andrew Stoltmann, a Chicago-based securities lawyer. "Anytime you have revisions or modified plans. . . ***it is extremely suspicious.***"

*    *    *

Thom F. Carroll, a financial planner with the Baltimore wealth management firm Carroll, Frank & Plotkin, said revising such a plan puts an executive "on a slippery slope."

"There are circumstances where the plans could be amended, but you better have a good reason because *it's defeating the basis of the rule*," Carroll said. "*If a guy is changing his plan around, I would think that would send up a red flag.* I wouldn't allow my clients to do it."

331. Starting in September 2004, Mozilo had a Rule 10b5-1 trading plan that lasted through May 2006. During this time period, Mozilo would sell 52,500 shares once a week. The timing and increments were consistent throughout the life of the plan. This amounted to sales of about 200,000 to 250,000 shares per month.

332. On October 27, 2006, just as the Board was approving the massive share repurchase described above, Defendant Mozilo amended his automatic stock sale plan, which had expired in May 2006, to allow him to sell 350,000 shares per month.

333. Six weeks later, on December 12, 2006, Defendant Mozilo initiated a second automatic stock sale plan to allow him to sell an additional 115,000 shares per month. One month later, on January 12, 2007, Countrywide reported that foreclosures from the previous month soared 48% over that of 2005.

334. Less than two months later, on February 2, 2007, Defendant Mozilo amended his second automatic stock sales plan to allow him to sell 230,000 shares per month. On this same date, shares of Countrywide hit an all-time high of $45.03 per share. Starting in February 2007, between both of Defendant Mozilo's plans, he could sell 580,000 shares of stock per month. Countrywide's stock price remained well above $30 per share until July 26, 2007—the day before investors caught the first true glimmer of Individual Defendants' misconduct.

335. The following diagram, published in "Mozilo's stock trades questioned," *The Los Angeles Times*, Oct. 12, 2007, illustrates Mozilo's repeated amendments of his supposedly "passive" stock sales program just before the collapse of Countrywide's stock price:



336. The Board, and the Compensation Committee in particular, is required to oversee, administer and monitor the compensation of senior executives. Rather than control the compensation that Countrywide conferred on Mozilo, the Board provided Mozilo with compensation packages that were wholly out of proportion and scale with those of other CEOs. In addition, even while Mozilo was repeatedly amending his Rule 10b5-1 stock sale plans in order to manipulate this supposedly "passive" sales program, the Board took no steps to protect the Company and shareholders from Mozilo's actions or to ensure that shareholders received access to the same material information on which Mozilo was trading.

337. Although the Board has kept its collective head entrenched firmly in the sand, according to published reports, North Carolina's State Treasurer, Richard Moore ("Moore"), wrote the Board in September 2007 to urge them to investigate reports of questionable loan practices and Mozilo's trading practices. Consistent with its prior refusal to act for shareholders, according to the report, the Board promptly refused Moore's request, effectively declaring their intention not to investigate any of the questionable (and potentially criminal) practices infecting Countrywide.

338. One month after writing to the Board, Moore contacted the SEC with his concerns. As revealed in *The New York Times* (in an October 11, 2007 story):

> The Securities and Exchange Commission has been asked to investigate stock sales made by Angelo R. Mozilo, chief executive of the mortgage lender Countrywide Financial, in the months before its shares plummeted amid the deepening mortgage crisis.
>
> In an Oct. 8 letter to the S.E.C. chairman, Christopher Cox, the state treasurer of North Carolina, Richard H. Moore, questioned changes Mr. Mozilo made to his arranged stock selling program, adjustments that allowed him to increase significantly his sales of Countrywide shares.
>
> After starting a [10b5-1] plan in October 2006, Mr. Mozilo twice raised the number of shares that could be sold: once in December 2006, when Countrywide stock was $40.50, and again in February, when it hit a high of $45.03. He has had gains of $132 million since starting the October 2006 plan and expects to sell his remaining shares by the end of the week, a move that will generate millions more.

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

"As an investor and a Countrywide shareholder, I was shocked to learn that C.E.O. Angelo Mozilo apparently manipulated his trading plans to cash in, just as the subprime crisis was heating up and Countrywide's fortunes were cooling off," Mr. Moore wrote. "The timing of these sales and the changes to the trading plans raise serious questions about whether this is a mere coincidence."

\* \* \*

Late Friday, Countrywide said that Mr. Mozilo would sell almost all of his remaining shares this week before his October 2006 selling program expires at the end of the month.

As a result, each day this week he has exercised roughly 140,000 options with a strike price of $9.94 and sold the stock at prevailing market prices. Given that the stock has been trading around $19 this week — it closed yesterday at $18.80 — Mr. Mozilo has generated gains of roughly $4 million in the last three days.

The options that Mr. Mozilo is exercising do not expire until 2011. But in a statement last Friday, Mr. Mozilo said that his trading plan, intended to diversify his holdings, forced him to sell.

"The upcoming sales are driven by rules within the 10b5-1 plan that were established long ago," he said, "and should in no way be viewed as any indication of my future outlook for Countrywide."

Regulatory filings show that Mr. Mozilo has about 500,000 shares remaining and 280,000 options. A year or so

ago, he held 1.2 million Countrywide shares and 2.5 million options.

339. Moreover, besides lining his own pockets before the Countrywide ship crashed, it appears Mozilo made sure to enrich his senior staff by telling them about the timing of his sales. There was rampant insider trading which coincided with Mozilo's changes to his Rule 10b5-1 plan and/or the announcement of Countrywide's stock buyback program. The suspicious timing of these transactions raises serious doubts about the legality of these sales.

340. As illustrated in the following chart, insider sales more than doubled in November 2006 compared to October 2006 and stayed at an elevated level in December 2006 and January 2007, spiking in February 2007 after Mozilo amended his Rule 10b5-1 plan. For example, the week after Mozilo changed his Rule 10b5-1 plan in February 2007, all of Countrywide's insiders (Form 4 filers) sold 1,139,222 shares of the Company's stock – 675,986 share of which were sold from February 2, 2007 through February 9, 2007 (the week after the Mozilo's change). This compares with only 636,686 shares sold in all of January 2007, the month prior, 629,147 shares sold in December 2006 and 749,655 shares in November 2006. Insiders sold more the week of February 2 through February 9 than they had sold during either of the two preceding months. Moreover, the total sales for February 2007 were almost double the average of the preceding three months:



341. The Board's refusal to investigate the issues raised in Attorney General Moore's letter evidences that making a pre-suit demand on the Board asking them to consider the same issues brought to their attention one month ago

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

1    would be futile. Countrywide's Board is simply not interested in investigating
2    Mozilo or his cohorts for their misuse of Countrywide's information for his
3    personal gain.

4         342.    Because the Board ignored these issues, the Company is currently
5    being injured because the SEC is being forced to act. As reported in *The Wall*
6    *Street Journal* on October 18, 2007:

7                The Securities and Exchange Commission has opened an
8           informal investigation into stock sales by Countrywide
9           Financial Corp.'s chief executive officer, according to people
10          familiar with the matter, deepening problems at the nation's
11          largest mortgage lender.

12               At least one area of inquiry, these people say, involves
13          stock sales by founder and Chief Executive Officer Angelo
14          Mozilo through prearranged executive sales plans.

15               These plans, known as "10b5-1" plans, were designed to
16          allow senior executives to sell shares at regular intervals
17          automatically. If executives pledge they don't have insider
18          information at the time the plans are established, they can be
19          used as a defense against insider-trading charges. Earlier this
20          year, however, the SEC started to examine these plans
21          following an academic study that said insiders were setting
22          them up just ahead of big stock drops. The findings suggest
23          some plans may have been abused.

24
25
26
27
28

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

## X. THE CURRENT COUNTRYWIDE DIRECTORS AGREED TO SELL COUNTRYWIDE TO B OF A IN A NO-PREMIUM DEAL DESIGNED AND INTENDED TO ELIMINATE THEIR LIABILITY ON VALUABLE PENDING DERIVATIVE CLAIMS, AND AT A PRICE THAT FAILS TO RECOGNIZE THE VALUE OF THESE CLAIMS

343. Against this backdrop – and the virtual certainty of substantial personal liability – the Current Countrywide Directors structured a deal that attempts not only to eliminate the threat of liability for the derivative claims but will net them millions in change-in-control premiums. Specifically, on January 11, 2008, Countrywide announced that it had entered into a definitive agreement (the "Agreement") with BofA pursuant to which BofA would purchase Countrywide in an all stock transaction worth about $4 billion (hereafter, the "BofA Transaction"). Under the announced terms of the BofA Transaction, Countrywide stockholders are to receive 0.1822 of a share of BofA shares or every Countrywide share they own. The BofA Transaction is expected to close in the 3rd Quarter 2008.

344. The BofA Transaction offers **no premium** to Countrywide shareholders and locks up the deal by providing BofA with a right of first refusal in the event of a competing proposal. Indeed, by receiving only 0.1882 shares of BoA for every share they own, Countrywide shareholders are receiving approximately $7.16 per share, based upon BofA's January 10, 2008 closing price of $39.30. The day prior to the announcement of the BofA Transaction, on January 10, 2007, Countrywide shares closed at $7.75. Thus, when it was announced that the BofA Transaction valued Countrywide at $7.16 per share, a 7.6 percent discount to its Thursday closing price, the market reaction was swift and severe, with Countrywide shares falling $1.18, or 15.2 percent, to $6.57.

345. Just one month earlier, Countrywide shares were trading at over $12, and a year prior they traded at over $42 per share. The price announced in the BofA deal, which amounts to just .31 times Countrywide's tangible book value, is lower than anyone reasonably expected. David Stepherson, Senior Portfolio

Manager at Hardesty Capital Management, stated that "[i]n our business, we're always trying to buy things that are really cheap. I can tell you with great certainty that Bank of America is getting these assets on the cheap. This thing is trading at a point-three times book value. So basically, they're buying a dollar's worth of assets for thirty cents." Moreover, Gary Gordon, an analyst at Portales Partners LP stated, "If people think this is a good deal, they are just wrong." Noting that the purchase price does not reflect the true value of Countrywide's mortgage servicing rights, and therefore as much as $10 billion below book value, Mr. Gordon also stated, "[BofA is] getting the loan origination business for free."

346. Not surprisingly, many stock analysts and industry experts have questioned the Countrywide – BofA deal on account of the bargain-basement price being paid for Countrywide. For example, CNNMoney correspondent Susan Lisovicz reported that the Wall Street traders she spoke with on the day the deal was announced indicated that it was not only the "deal of the century" but the "steal of century" because BofA was purchasing the nation's top mortgage lender in a "desperation deal" where the stock price was at or near its bottom.

347. Ken Horowitz, an analyst at Citigroup, characterized it as a "very distressed price."

348. Alistair Barr, writing in the January 11, 2008 edition of Marketwatch.com, characterized BofA's purchase price of Countrywide as "very attractive," "distressed," and a "bargain," noting that several analysts agreed.

349. According to Wachovia Capital Markets, LLC analyst Jim Shanahan "the purchase price of roughly $4B is well below the most recently reported equity capital base of $15B." Thus, he wrote, BofA's purchase of Countrywide "Looks like a steal for BofA," noting that "[i]t seems hard to believe that a Company that was issuing trust preferred securities to buy back its own stock six months ago would potentially be willing to sell out now far below those levels and at currently depressed valuation multiples." "If BofA does acquire [Countrywide], the deal

price will likely set the floor in the near-term for the valuation of other names in the group, in our opinion." Even if Countrywide could "muster $10/share from BofA (an approximate 25% premium from today's closing price)," Wachovia concluded, "it would be trading at roughly a 60% discount to reported book value."

350. Paul Miller, an analyst with Friedman, Billings, Ramsey & Co., promptly slashed his price target for Countrywide to $7.00, on the belief that the purchase price in the BoA Transaction had a built-in "discount of 10-12%."

351. Analyst Bruce Foerster, president of South Beach Capital Markets characterized the deal as "an opportunity for BofA to pick up a business on the cheap."

352. UBS research analysts – who prior to the deal being announced had an $11 price target on Countrywide shares – similarly commented that the $7.16 valuation represents a "sizeable discount" to Countrywide's reported 3rd Quarter book value of $23.

353. According to an article in Forbes, regardless of any consensus among analysts, "the market appears to be giving it a thumbs down" as Countrywide shares "backed down sharply," nearly 17%, on news of the deal.

354. A significant shareholder of Countrywide Financial, SRM Global Fund, recently issued a statement opposing the terms of the acquisition: "We strongly believe that the terms of the proposed merger with Bank of America are contrary to the interests of the Company's shareholders." In a letter to the Company's Board dated February 13, 2008, SRM Global asserts:

> We are extremely concerned that the value to be received by shareholders based upon the proposed terms of the merger represents less than half of the book value of the Company as of the end of the fourth quarter 2007. We also believe that the Company's acceptance of the proposed terms of the merger and the Board's approval of those terms are inconsistent with management's disclosures concerning its

financial position and business prospects during the third and fourth quarters of 2007.

In our view, and particularly in light of the Company's previous public disclosures, the Board has failed to fulfill its duty to act in the best interests of all of its shareholders in approving a transaction with Bank of America . . . .

355. Such a dramatically low price was accepted by the Countrywide Board of Directors for obvious personal motives: it is an attempt to extinguish the significant personal liability of the Directors in pending derivative litigation, where the Directors themselves are charged with liability to Countrywide for hundreds of millions, if not billions, of dollars.

356. Several Directors, moreover, not only have significant incentives to extinguish their personal liability by accepting any price, no matter how low, for a sale of control of Countrywide, but also stand to make millions of dollars more to the detriment of Countrywide shareholders on account of lucrative severance packages that are promised by any change in control deal. Defendant Mozilo, for example, stands to make over $110 million on account of the BofA deal, according to *The Los Angeles Times*. Thus, the potential change to Mozilo's personal fortune is staggering – instead of being potentially liable for hundreds of millions of dollars for looting Countrywide while at the helm, he stands to make millions for selling Countrywide shareholders further down the river. While Mozilo recently announced his intention to forego approximately $37.5 million of his $110 million payout, this token gesture does nothing to account for his massive personal liability for breaching his fiduciary duties and violating securities laws, nor does it soften the blow of his potential receipt of approximately $70 million in severance and retirement-related payments.

357. The BofA Transaction dramatically undervalues Countrywide's shares, not only because the price is too low given Countrywide's financial picture

and the market for Countrywide shares, but also because it fails to take into consideration a relatively new, but substantial asset of Countrywide: its derivative claims. These claims, which are potentially worth hundreds of millions, or even billions, of dollars, are being disregarded because the Countrywide Board wants to see those claims disappear quietly and quickly.

358. By the terms of the Agreement with BofA, no provision is made for the substantial derivative liability of the Countrywide Board, and no reserves or other financial accounts are established to ensure that Countrywide shareholders retain the ability to recoup the massive amounts Countrywide recently lost because of Individual Defendants' breaches of fiduciary duties and securities law violations. Instead, the Agreement provides Individual Defendants with a substantial benefit (and motive): it agrees to defend and indemnify past and present directors and officers for their breaches of fiduciary duties, including providing advancements of costs and expenses for any such litigation, for a period of six years. Given the massive liability facing the Individual Defendants, this undoubtedly played a role in inducing their approval.

359. For its part, in addition to getting a below-market-price deal, BofA was able to extract several deal protection devices from the Countrywide Board of Directors. Pursuant to the Agreement, Countrywide Directors agreed to not solicit proposals relating to other business combinations ("No Shop Provisions"), and to not entertain any discussions or provide any information in connection with any proposals relating to other business combinations ("No Talk Provisions"). Further, the Agreement provides that the Countrywide Directors will submit the BofA Transaction to shareholders for approval (whether or not the Countrywide Board recommends approval or not), and that if the Board fails to recommend approval of the BofA Transaction, and rejection of any competing offers, that such action would trigger the payment of a termination fee from Countrywide to BofA in the amount of $160 million.

360.   While the termination fee of $160 million included in the Agreement does not suggest an aggressively-high or punitive deal protection device in relation to the deal value ($4 billion) alone, such a high (4%) fee must be considered in the context of this particular deal.  Here, according to preliminary published reports, the deal was accomplished in one month or less. Thus, the $160 million bears no rational relationship to the actual costs and expenses borne by BofA in conducting that amount of due diligence and analysis.  In addition, the $160 million fee must also be considered in light of the substantial discount already written into the deal in favor of BofA, which has agreed to pay just thirty cents for every dollar of Countrywide assets.   Thus, in context, even a 4% termination fee is excessive. But, again, none of this mattered much to Countrywide's Board when BofA dangled the possibility of extinguishing their massive liabilities to Countrywide and Countrywide's public shareholders.

**A.    The BofA Transaction Is Being Orchestrated By Mozilo To Avoid Personal Liability And To Further Enrich Himself At The Expense Of Countrywide Shareholders**

361.   According to preliminary reports of the BofA Transaction, Mozilo himself called BofA CEO Ken Lewis in early December 2007 and offered a deal so sweet that it was swept up after just a month of due diligence, despite all the obvious risks to BofA in the collapsing mortgage lender market.

362.   Mozilo's self-interests in the BofA Transaction are clear.  Not only will he be entitled to a whopping severance-related payday if the BofA Transaction is consummated, but if the deal is not consummated, he gets nothing but hundreds of millions of dollars in personal liability for profiting at the expense of Countrywide and its public shareholders.

363.   The primary reason why the price being paid to Countrywide shareholders under the proposed BofA Transaction is grossly insufficient is the same reason why Countrywide's Directors are so keen on accepting the BofA

Transaction in the first place – namely, the presence of several derivative actions pending against Countrywide's past and present officer and directors for their malfeasance.

364. BofA is also an obvious beneficiary, as most analysts and pundits agree that it is getting the nation's largest mortgage lender at a bargain basement price. In contrast, Countrywide's shareholders are left holding the bag – the same bag already looted by Mozilo and the other Individual Defendants.

365. According to a report on Bloomberg, BofA Chief Executive Ken Lewis stated that Mozilo will stay until the sale is completed, but not thereafter, as "I would guess [Mozilo] would want to go have some fun." Moreover, Mozilo will have tens of millions of dollars more in his already sizeable bank account – an account that was largely funded at the expense of Countrywide shareholders.

366. As set forth in greater detail above, Mozilo has already collected over $450 million from pay and stock option gains from 2002 to 2007. Mozilo's stock sales are now the subject of an SEC investigation.

367. CEO and Founder of San Francisco-based Compensation Design Group, Frank Glassner, succinctly questioned the massive payout to Mozilo if the BofA Transaction were to go through: "The boards of both companies are well within their right to question these arrangements," because the "circumstances are flat-out egregious." It is like "paying the captain of the Titanic buckets of money for sinking the ship."

**B.  BofA Knowingly Aided And Abetted The Countrywide Directors' Breaches Of Fiduciary Duties**

368. Defendant BofA has knowingly aided and abetted the breaches of fiduciary duty committed by the current Countrywide Directors to the detriment of Countrywide's public shareholders. Indeed, the proposed merger could not take place without the active participation of BofA, which was already a 16% stakeholder in Countrywide, and thus keenly aware of Countrywide's mounting

legal problems, as well as the massive liabilities facing the Individual Defendants.
Furthermore, BofA and its principals are the intended beneficiaries of the wrongs
complained of and would be unjustly enriched if the merger is consummated.

369. With full knowledge of the legal problems facing the Individual
Defendants, BofA induced Countrywide's current directors to agree to sell the
Company for inadequate consideration by structuring a transaction that would
eliminate the Countrywide directors' personal liability on the pending derivative
claims. Specifically, Section 6.7 of the Agreement and Plan of Merger by and
among Countrywide Financial Corporation, Bank of America Corporation, and
Red Oak Merger Corporation, Dated as of January 11, 2008 (and filed as Exhibit
2.1 to the Form 8-K filed by Countrywide on January 17, 2008), would require
BofA to indemnify each of the Individual Defendants for any liability that they
may incur on the pending derivative claims. Individual Defendants and BofA will
contend that the merger transfers standing to prosecute the derivative claims to
BofA. The indemnification provision in the merger agreement would, in essence,
eliminate any potential liability by the Individual Defendants because it would
eliminate the possibility that the derivative claims would be pursued by BofA
following completion of the merger. By specifically agreeing to indemnify the
Countrywide directors on the derivative claims and thus eliminating any personal
liability those defendants may have on the derivative claims if the merger is
completed, BofA provided the Countrywide directors with an inducement to agree
to sell the Company for inadequate consideration. By doing so, BofA intentionally
and successfully sought to induce the Countrywide directors to elevate their own
personal interests over the interests of Countrywide and its public shareholders
and, thus, to breach their duty of loyalty to the Company and its shareholders.

370. By this suit, Plaintiffs seek to stop this gross profiteering at the
expense of Countrywide and its shareholders, and demand that there be a carve-out
of one of Countrywide's most valuable assets – its derivative claims – from the

BofA Transaction, by way of an assignment of those claims to Countrywide shareholders prior to any deal being consummated.

**C. The Preliminary Proxy Statement Filed On February 13, 2008 Confirms That Countrywide's Directors And BofA Specifically Structured The Proposed Deal To Eliminate The Personal Liability Of The Individual Defendants On The Derivative Claims**

371. On February 13, 2008, Bank of America Corporation filed a Form S-4 Registration/Proxy statement concerning the proposed merger between Countrywide and Red Oak Merger Corporation, a subsidiary of Bank of America, which was announced on January 11, 2008 (the "Draft Proxy").

372. Although purporting to disclose the process leading to the merger agreement with Countrywide and the reasons for the Countrywide Board's acceptance of the merger agreement with Bank of America, the Draft Proxy actually confirms that the Countrywide Directors and BofA specifically structured the transaction to eliminate the potential liability of the Individual Defendants on the derivative claims. Specifically, the Draft Proxy makes clear that BofA and the Countrywide Directors calculated the exchange ratio based on a valuation of Countrywide *that specifically excludes the value of the derivative claims*, failed to provide any information regarding the derivative claims to the investment bankers hired by Countrywide to provide "fairness opinions" justifying the exchange ratio, and have attempted to deliberately mislead the Countrywide shareholders regarding the impact that any proposed acquisition by BofA would have on the derivative claims.

373. According to the Draft Proxy, Countrywide and BofA supposedly had been engaged in discussions regarding a possible transaction between the companies since November of 2007. Draft Proxy at 24 ("Beginning in mid-November 2007, with the preliminary approval of the Countrywide board of directors, Countrywide and Bank of America agreed that it would be worthwhile to

engage in discussions regarding a potential transaction, and the parties entered into a confidentiality agreement.") At that time, Countrywide's stock already had fallen significantly from a high in May 2007 of over $41, but was trading around $13.00 per share. However, BofA and the Countrywide Directors did not agree on a specific exchange ratio pursuant to which BofA would acquire Countrywide's outstanding stock until January 9, 2008, Draft Proxy at 25 ("During discussions on January 8 and 9, 2008, Bank of America and Countrywide agreed to an all-stock transaction with a 0.1822 exchange ratio, among other significant terms.")

374. The exchange ratio agreed to by Countrywide's Directors and BofA (0.1822 shares of BofA for each share of Countrywide stock) implied a value of Countrywide's stock of $7.06 per share. Draft Proxy at 33. Although represented in the Draft Proxy as representing a premium to the closing price of the stock on January 9, 2008 (the date of the valuation), the truth of the matter is that the implied share price represented 7.6% discount to the closing price of Countrywide stock the day before the announcement of the proposed deal. Regardless, however, the simple fact is that the valuation of Countrywide that supposedly justifies the proposed sale to BofA at the designated exchange ratio is based on a value of Countrywide *after* the collapse of the Company's stock price following disclosure of the Individual Defendants' fraud and breaches of fiduciary duties. Yet, it is the Individual Defendants' misconduct that, in fact, caused the collapse of the Company's stock price in the first place. If the Individual Defendants' misconduct caused significant harm to the Company, which is precisely what Plaintiffs allege here, these claims constitute a significant asset belonging to the Company that was, by definition, excluded from the valuation of Countrywide that supposedly justifies the deal with BofA.

375. In valuing Countrywide, however, BofA and the Countrywide Directors structured a process that prevented the value of the derivative claims from even being considered as an asset of the Company. To explain, the

Countrywide's Directors retained the services of Goldman, Sachs & Co. ("Goldman Sachs") and Sandler O'Neill & Partners L.P ("Sandler") to provide "fairness opinions" justifying the proposed sale of the Company to BofA. Although Countrywide's own lawyers on the BofA deal have publicly acknowledged that a "fairness opinion" is worth about as much as psychiatric advice from Charlie Brown's nemesis Lucy,[10] the opinions of Goldman Sachs and Sandler here appear to be the product of the maxim "garbage in, garbage out." This is because in providing valuation analyses of Countrywide, Goldman Sachs and Sandler each expressly relied upon the Countrywide Directors to provide them with access to all information material to valuing the Company. Yet conspicuously absent from the items or factors considered by either Goldman Sachs or Sandler is any consideration of the value of the derivative claims or any analysis of the derivative claims at all.

376. The Draft Proxy reports that Goldman Sachs considered the following items in providing its analysis of the "fairness" of the proposed BofA deal:

> In connection with rendering the opinion described above and performing its related financial analyses, Goldman Sachs reviewed, among other things:
>
> • the merger agreement;
>
> • annual reports to stockholders and annual reports on Form 10-K of Countrywide and Bank of America for the five years ended December 31, 2006;

---

[10] *SLM Corporation v. J.S. Flowers II L.P.*, Del. Ch. No. 3279-VCS (hearing on Oct. 22, 2007), quoting Marc C. Wolinsky, Esq., of Wachtel Lipton Rosen & Katz:

THE COURT: A fairness opinion is just a fairness opinion.
MR. WOLINSKY: A fairness opinion, you know – it's the Lucy sitting in the box: "Fairness Opinions, 5 cents."

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

- certain interim reports to stockholders and Quarterly Reports on Form 10-Q of Countrywide and Bank of America;
- certain other communications from Countrywide and Bank of America to their respective stockholders;
- certain publicly available research analyst reports for Countrywide and Bank of America; and
- certain internal financial analyses and forecasts regarding Countrywide prepared by its management, including certain projected cash flows, including from equity issuances, and certain analyses of Countrywide's sources of liquidity and its capital adequacy.

Draft Proxy at 27.

377. Similarly, the Draft Proxy reports that Sandler reviewed and considered the following in connection with the preparation of its "fairness" analysis:

In connection with rendering its January 10, 2008 opinion, Sandler O'Neill reviewed and considered, among other things:

- the merger agreement;
- certain publicly available financial statements and other historical financial information of Countrywide that Sandler O'Neill deemed relevant;
- certain publicly available financial statements and other historical financial information of Bank of America that Sandler O'Neill deemed relevant;
- consensus earnings per share estimates for Countrywide for the years ending December 31, 2007 and 2008 as published by Institutional Brokerage Estimate Systems ("IBES") and reviewed with management of Countrywide;

- internal financial projections for Countrywide for the years ending December 31, 2007 through 2012 as prepared by and discussed with senior management of Countrywide;

- consensus earnings per share estimates for Bank of America for the years ending December 31, 2007 and 2008 and an estimated long-term growth rate as published by IBES and reviewed with senior management of Bank of America;

- the pro forma financial impact of the merger on Bank of America based on assumptions relating to transaction expenses, purchase accounting adjustments and cost savings as determined by the senior management of Bank of America;

- the publicly reported historical price and trading activity for Countrywide's and Bank of America's common stock, including a comparison of certain financial and stock market information for Countrywide and Bank of America with similar publicly available information for certain other companies the securities of which are publicly traded;

- the financial terms of certain recent business combinations in the financial services industry, to the extent publicly available;

- the current market environment generally and the banking environment in particular; and

- such other information, financial studies, analyses and investigations and financial, economic and market criteria as Sandler O'Neill considered relevant.

Draft Proxy at 31.

378. Conspicuously absent from these lists of items considered by either Goldman Sachs or Sandler is any information, whatsoever, regarding the derivative claims. Indeed, nowhere in the Draft Proxy is it even suggested that Goldman

1    Sachs or Sandler were provided with a copy of the operative derivative complaints,

2    with any documents detailing the extensive insider sales of the Individual

3    Defendants, with any documents detailing the Individual Defendants' deviation

4    from the Company's publicly disclosed lending policies and practices, or with any

5    information at all that would have been necessary for an evaluation of the value of

6    the derivative claims as an assert of the Company.

7        379.   Instead, the ***only*** disclosure in the Draft Proxy that touches upon the

8    merits of the derivative claims is the following recitation by the Countrywide

9    Directors that they "believe" the claims are "without merit":

10       The various complaints in these actions allege, among other things,

11       that Countrywide's directors breached their fiduciary duties of care,

12       good faith, candor and loyalty by entering into the merger agreement.

13       More specifically, they allege, among other things, that

14       Countrywide's directors (i) failed to maximize Countrywide's sale

15       price by rapidly approving the merger agreement in an unfavorable

16       economic environment, (ii) did not consider the value to Countrywide

17       of pending derivative claims against its directors, (iii) obtained

18       indemnification in connection with the merger agreement allegedly to

19       protect themselves from, among other things, liability in pending

20       securities and derivative lawsuits, (iv) approved the merger agreement

21       allegedly to receive large severance payments, (v) granted Bank of

22       America the right to match any acquisition offer in connection with

23       Bank of America's August 2007 investment in Countrywide, (vi)

24       agreed to pay Bank of America a $160 million termination fee in

25       certain circumstances, (vii) did not consider the allegedly unique

26       benefits Bank of America would receive from acquiring Countrywide,

27       (viii) failed to solicit other offers before contracting with Bank of

28       America, and (ix) did not disclose all material information about the

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

proposed acquisition to Countrywide's stockholders. The complaints allege that Bank of America aided and abetted these breaches of fiduciary duty. The plaintiffs seek, among other things, class action status, a court order enjoining or rescinding the consummation of the merger or various of its terms, the payment of attorneys' fees and expenses, and damages in unspecified amounts. ***Countrywide believes that these actions are without merit and intends to defend them vigorously.***

Draft Proxy at 40-41.

380. Regardless of what the Countrywide Directors "believe" regarding the merits of the derivative claims, by preventing both Goldman Sachs and Sandler from considering any materials relevant to the facts underlying the derivative claims the Countrywide Directors effectively precluded Goldman Sachs and Sandler from making an independent analysis as to the value of this potentially valuable asset, thus rendering the "fairness opinions" that the Countrywide Directors have offered as justification for the exceptionally low exchange ratio fundamentally flawed and incomplete.

381. Indeed, a careful review of the Draft Proxy reveals that BofA and the Countrywide Directors specifically excluded consideration or analysis of the value of the derivative claims because they structured a deal that they hope will eliminate any potential liability that the Individual Defendants may face on the derivative claims, and have attempted to mislead shareholders in the Draft Proxy regarding the impact that the BofA transaction may have on the defendants' liability.

382. The ***only*** disclosures in the Draft Proxy that discloses the impact that the consummation of a sale of Countrywide to BofA may have on the derivative claims is the potential impact on the "standing" of Countrywide shareholders to pursue such claims. Specifically, the Draft Proxy states:

If the merger is consummated, plaintiffs in pending shareholder actions against certain Countrywide officers and directors may lose standing to assert derivative claims on behalf of Countrywide because the plaintiffs will no longer be stockholders of Countrywide. (Draft Proxy at 5)

In addition, if the merger is consummated, plaintiffs in pending shareholder actions against certain Countrywide officers and directors may lose standing to assert derivative claims on behalf of Countrywide because the plaintiffs will no longer be stockholders of Countrywide. See "The Merger — Litigation Relating to the Merger" on page 41. (Draft Proxy at 18)

As Countrywide has previously disclosed in its filings with the SEC, Countrywide, certain of its subsidiaries, and certain of its directors and officers, among others, are also named as defendants in certain putative class actions and shareholder derivative actions asserting claims unrelated to the proposed merger. Upon consummation of the merger, the plaintiffs in the pending shareholder derivative actions may lose standing to assert derivative claims on behalf of Countrywide because they will no longer be stockholders of Countrywide. (Draft Proxy at 42)

*Shareholder Derivative Claims.* If the merger is consummated, plaintiffs in pending shareholder actions against certain Countrywide officers and directors may lose standing to assert derivative claims on behalf of Countrywide because the plaintiffs will no longer be stockholders of Countrywide. See "Litigation Relating to the Merger" on page 41. (Draft Proxy at 47)

383. These disclosures are fundamentally misleading and incomplete because the true problem with the BofA deal is not that the individual Plaintiff

shareholders who are prosecuting these derivative claims may lose standing to assert the claims if the sale to BofA is completed, but that the consideration offered to Countrywide's shareholders in the proposed transaction is artificially low because BofA and the Countrywide Directors have attempted to structure a transaction that they hope will not just deprive Lead Plaintiffs of "standing" to prosecute the claims, but to eliminate the Individual Defendants' liability on these claims entirely.

384. Specifically, as discussed above, Section 6.7 of the Agreement and Plan of Merger would require BofA to indemnify the Countrywide Directors for any liability that they may have arising from their service as directors on Countrywide's Board. Thus, the proposed sale to BofA is not simply designed to deprive Lead Plaintiffs from prosecuting the derivative claims, but it is specifically designed to **eliminate** the potential liability of the Individual Defendants on these claims. Nowhere in the Draft Proxy is the intended impact of Section 6.7 of the Merger Agreement on the derivative claims disclosed to Countrywide's shareholders.

385. Instead, the Draft Proxy simply discloses the following:

*Protection of Countrywide Directors and Officers Against Claims.* Bank of America has agreed to cause the surviving corporation in the merger to indemnify and hold harmless each present and former director and officer of Countrywide from liability for matters arising at or prior to the completion of the merger to the fullest extent provided by applicable law. Bank of America also has agreed that it will maintain in place existing indemnification and exculpation rights in favor of Countrywide directors, officers and employees for six years after the merger and that it will maintain Countrywide's current policy of directors' and officers' liability insurance coverage, or an equivalent replacement policy for the benefit of Countrywide directors

and officers, for six years following completion of the merger, except that Bank of America is not required to incur annual premium expense greater than 250% of Countrywide's current annual directors' and officers' liability insurance premium.

Draft Proxy at 46.

386. This disclosure, however, is fundamentally incomplete and misleading because it fails to inform shareholders that the indemnification provision in the Merger Agreement had a material impact on the valuation of Countrywide and in the calculation of the exchange ratio. Specifically, by excluding the value of the derivative claims from the value of Countrywide, BofA and the Countrywide Directors were able to structure an exchange ratio that provides Countrywide's shareholders with inadequate consideration in the proposed deal. And by preventing Goldman Sachs and Sandler from having any opportunity to consider the value of the derivative claims in calculating the reasonable value of Countrywide, BofA and the Countrywide Directors deliberately structured a transaction that, if consummated, may enable BofA to acquire Countrywide at an artificially low price in exchange for the Individual Defendants herein from being held personally responsible for the damage they have caused the Company.

## XI. CLASS ACTION ALLEGATIONS

387. Plaintiffs bring this action derivatively on behalf of Countrywide and as a Class Action pursuant to Federal Rule of Civil Procedure Rule 23, individually and on behalf of all other current holders of Countrywide's common stock (except defendants herein and any persons, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from defendants' wrongful actions, as more fully described herein (the "Class").

388. This action is properly maintainable as a class action for the following reasons:

a.     The Class is so numerous that joinder of all members is impractical. As of January 11, 2007, and at all relevant times herein, Countrywide had outstanding over 578 million shares of its common stock, held by individuals and entities too numerous to bring separate actions.  It is reasonable to assume that holders of the Countrywide common stock are geographically dispersed throughout the United States.

b.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, inter alia,

▪ whether the current Countrywide Directors breached their fiduciary duties and other common law duties by putting their own financial interests ahead of the interests of Countrywide shareholders;

▪     whether the current Countrywide Directors breached their fiduciary duties by failing to engage in any good faith negotiation with BofA, and failing to perform any due diligence to become fully informed of the terms of BofA's proposal;

▪     whether the current Countrywide Directors breached their fiduciary duties by ignoring or undervaluing one of Countrywide's most valuable assets – its derivative claims – and accepting a unfairly-priced deal to protect themselves at the expense of the Company and its shareholders;

▪     whether the current Countrywide Directors breached their fiduciary duties by agreeing to improper deal protection provisions with BoA, while at the same time seeking to advance the majority of the Countrywide Directors' own personal interests over those of Countrywide and its shareholders; and

▪     whether BofA has aided and abetted the current Countrywide Directors' breaches of their fiduciary duties.

c.     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs are members

of the Class, and Plaintiffs' claims are typical of the claims of the other members of the Class. Accordingly, Plaintiffs are adequate representatives and will adequately protect the interests of the Class.

d. Plaintiffs anticipate that there will be no difficulty in the management of this litigation as a class action.

e. The current Countrywide Directors have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

f. Plaintiffs have suffered damages and will continue to suffer additional damages as a result of the acts and conduct of the current Countrywide Directors alleged herein, including but not limited to (a) damages representing the negative market reaction to the BoA Transaction, (b) the loss of hundreds of millions, if not billions, of dollars in shareholder value, which would be derived from shareholder derivative litigation already pending against the Individual Defendants, and (c) damages representing any fees and costs resulting from the defensive measures the current Countrywide Directors permitted in the BoA Transaction, the payment of which would lower the per share consideration received by the shareholders.

g. The prosecution of separate actions would create the risk of:

▪ inconsistent or varying adjudications which would establish incompatible standards of conduct for the Defendants, and/or

▪ adjudications which would as a practical matter be dispositive of the interests of other members of the Class.

## XII. DERIVATIVE ACTION ALLEGATIONS

389. Plaintiffs bring this action derivatively on behalf of and for the benefit of Countrywide to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of the breaches of fiduciary duty and other legal violations alleged herein. Countrywide is named as a nominal defendant solely in a derivative capacity.

390. Plaintiffs are shareholders of Countrywide common stock and will adequately and fairly represent the interests of the Company and its shareholders in this litigation. Plaintiffs intend to retain shares in Countrywide throughout the duration of this litigation.

391. Plaintiffs were shareholders of Countrywide at the time of the transactions or any part thereof.

392. The wrongful acts complained of herein subject, and will persist in subjecting, the Company to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

393. The wrongful actions complained of herein were unlawfully concealed from Countrywide shareholders.

## XIII. DEMAND EXCUSED ALLEGATIONS

### A. Demand Is Excused Because The Board Abdicated Its Fiduciary Duties

394. Plaintiffs did not make a demand on the Countrywide Board prior to instituting this action regarding the claims because the wrongful acts complained of herein evidence a pattern of conduct showing a wholesale abandonment of their fiduciary duties, including lack of due care and oversight. Those acts include:

(a) allowing Countrywide insiders and a majority of the Board to unload shares before news of the Company's financial woes became known to its public investors;

(b) allowing Countrywide to markedly shift its lending practices to volatile and sub-prime loans without adequately reserving for the inevitable risks that would befall Countrywide when interest rates finally increased and the heady days of the real estate market ended;

(c) allowing for woefully inadequate controls over the Company's policies and practices with respect to underwriting and credit risk exposure which created the opportunity for Board members and Company's insiders to sell

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

hundreds of millions of dollars worth of Countrywide stock at inflated prices;

(d)     allowing Countrywide's financial statements to be artificially inflated;

(e)     permitting Mozilo to implement and then change the terms of his 10b5-1 plan, which allowed him to unload more than $300 million in Countrywide's stock since June 2006;

(f)     taking steps to keep the price of Countrywide's stock inflated by initiating a share repurchase program which forced Countrywide to buy back shares from Mozilo, a majority of the Board and other Company insiders at inflated prices; and

(g)     the outlandish compensation packages that the Board gave to Mozilo and other senior executives year after year that were out of proportion to actual performance.

395.    These acts, and the other improper acts set forth herein, which demonstrate a pattern of misconduct, were not, nor could they have been, the product of a valid or good faith exercise of business judgment.

396.    Whenever a director is entrusted to make a decision about a corporate transaction in which that director has a financial interest, the entire fairness doctrine is triggered.  The doctrine carries a presumption that the transaction was accomplished to favor the interests of the director over the corporation, and the director carries the burden of demonstrating that the transaction was actually entirely fair to the corporation.  Given that presumption and burden-shifting, the business judgment rule is rebutted, and demand is not required.

397.    As detailed above, the Board members were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board's various committees, or they completely abdicated their responsibility to oversee the Company's operations and let management run roughshod over the Company for their personal gain and causing the Company to engage in illegal lending practices and improper conduct that rendered the Company's public

disclosures misleading, destroying, in their wake, much of Countrywide's shareholder value. The Director Defendants' conduct lacked any legitimate business purpose and was not a product of a valid exercise of business judgment. As such, demand should be excused as futile.

398. The entire fairness doctrine applies here and there is not a majority of disinterested and independent directors on Countrywide's Board to appropriately consider a demand as all of Countrywide's ten directors have disabling interests or conflicts. As such, demand should be excused.

### B. Demand Is Excused Because Board Members Face Liability For Illegal Insider Selling And Allowed Mozilo And Others To Engage In Insider Selling

399. Demand on the Board is excused because, as set forth above and as is detailed in this section, the members of the Board engaged in insider selling. In addition, as set forth above, the Company's management engaged in insider selling, which the Board knew about or allowed them to engage in.

400. Not only did the Board engage in and approve of illegal insider selling, the Board specifically authorized the Company's stock repurchase program to maintain the price of the Company's stock at artificially inflated levels while they were selling stock.

401. The stock repurchase program was implemented just as news of the meltdown in the sub-prime market began to surface, despite Defendants' knowledge that the Company had engaged in risky lending practices and was not adequately reserved to accommodate these risky loans, and as such the Company's stock price was already artificially inflated. The repurchase program, accordingly, caused Countrywide to buy back stock at inflated prices from Mozilo, Sambol, and other insiders, as well as a majority of other Board members.

402. Ostensibly, a stock repurchase plan is implemented because the company's directors believe the company's stock price is *below* its true value.

Here, the Director Defendants authorized a stock repurchase by the Company – but they themselves did not believe the stock price was undervalued but, to the contrary, knew it was artificially inflated. Indeed, if the Defendants believed the stock was undervalued they would not have sold so many of their personal holdings in such suspicious amounts.

403. With respect to Mozilo's 10b5-1 plan, the Board allowed Mozilo to set up the plan when they knew (and he knew), or were derelict in their duties in not knowing, the Company's true financial condition and the imminent decline in the value of Countrywide's stock that would follow when the truth behind Countrywide's business model came to light. Indeed, the Board allowed Mozilo to change the terms of his Rule 10b5-1 plan (without any consequence) in rapid succession while the proverbial ship was sinking, thereby enabling him to sell significant amounts of shares at prices that he and other insiders caused to be artificially inflated by their own fraudulent conduct, at the same time the Company was buying stock from him as part of its buyback program, using debt that it could ill-afford given its undisclosed liquidity crisis.

404. The Board failed and continues to fail to investigate Mozilo's changes to his Rule 10b5-1 plan despite wide media attention claiming that Mozilo abused such plans by changing them at will when they are supposed to fix limits on the amount and timing of stock sales by insiders.

405. Current or former directors engaged in substantial insider selling. Specifically,

      a. Defendant Dougherty, who resigned from the Board in March 2007 as negative news about Countrywide's financial condition began to circulate, had served during the Relevant Period on the Board's Governance and Compensation Committees. The Compensation Committee was responsible for recommending compensation policies to the Board for director, executive and employee compensation

packages. In terms of Dougherty's sales of Countrywide's stock, his Rule 10b5-1 plan was adopted a mere four months before his departure, on November 17, 2006. Dougherty had no sales for at least two years prior to implementation of the plan. Through this plan, Dougherty sold 227,905 shares from November 29, 2006 through June 15, 2007, garnering proceeds of over $9 million. All of Dougherty's insider sales were at prices far in excess of the Company's current stock price.

b. Defendant Robertson, who during the Relevant Period served on the Board's Credit, Operations, Strategic Planning, Compensation, Finance, Community Affairs and Public Policy Committees, sold 60,000 shares on November 20, 2006 for proceeds of $2.4 million. This sale represented nearly two-thirds of his holdings of Countrywide stock. All of Robertson's insider sales were at prices far in excess of the Company's current stock price.

c. Defendant Cunningham, who in 2005 and 2006 served on the Board's Compensation, Technology, Finance, Credit and Operations Committees, set up a Rule 10b5-1 plan which was adopted on March 31, 2006 pursuant to which he sold 5,000 shares per month at the beginning of each month. Cunningham sold shares pursuant to that plan consistently until February 2007, when he sold 5,000 shares pursuant to his 10b5-1 plan on February 1, 2007 and then sold an additional 20,000 shares on February 2, 2007 outside his plan. This sudden and dramatic off increase in sale is very suspicious and well-timed. All of Cunningham's insider sales were at prices far in excess of the Company's current stock price.

d. Defendant Snyder, who during the Relevant Period served on the Board's Compensation, Technology Committees, sold 20,000 shares

on December 16, 2006 after the Board approved the Company's stock repurchase program and during the time period when Mozilo was selling his shares. Snyder received over $800,000 in proceeds from that trade. All of Snyder's insider sales were at prices far in excess of the Company's current stock price.

e. Defendant Cisneros, who during the Relevant Period served on the Board's Audit and Operations and Public Policy Committees, sold 15,200 shares on May 22, 2006 and 59,132 shares on May 23, 2006, for total proceeds of over $3 million. Those share sales represented over 75% of his holdings at the time. In addition, Cisneros sold 5,075 shares on May 30, 2007, netting him more than $200,000. All of Cisneros's insider sales were at prices far in excess of the Company's current stock price.

f. Defendant Donato, who during the Relevant Period served on the Board's Audit, Finance, Community Affairs, and Responsible Lending,, Compensation and Governance Committees, sold 34,142 shares on October 27, 2006, right when the buyback was announced and an additional 20,000 shares on December 15, 2006 for proceeds of over $2.1 million. Prior to his October 27, 2006 sale, Donato's last sale was December 29, 2004, nearly two years ago. All of Donato's insider sales were at prices far in excess of the Company's current stock price.

406. Nearly all of the Director Defendants engaged in highly suspicious insider trading and are liable for violating their fiduciary duties, and California and federal securities laws. All the Director Defendants failed to exercise any oversight whatsoever over Mozilo, Kurland, Garcia and Sambol with respect to their massive sales. Accordingly, a clear majority of the Board is unable to consider a demand to investigate Plaintiffs' allegations that the Defendants

engaged in illegal insider selling of Company stock, committed other wrongdoing in violation of their fiduciary duties, and artificially inflated the Company's stock price for their own personal gain. The Director Defendants cannot investigate allegations of Defendants' wrongdoing in a disinterested and independent manner.

407.   Moreover, demand is excused because the Board knew or failed to exercise its duties with respect to rampant insider trading by numerous corporate insiders who are responsible for Countrywide's financial problems.  The timing of the insiders' sales (which often coincided with Mozilo's changes to his 10b5-1 plan and/or the announcement of Countrywide's stock buyback program) raises serious doubts about the legality of the sales.

408.   For example, the week after Mozilo changed his 10b5-1 plan in February 2007, all of Countrywide's insiders (Form 4 filers) sold 1,139,222 shares of the Company's stock, 675,986 share of which were sold from February 2, 2007 through February 9, 2007 (the week after the Mozilo's change).  This compares with only 636,686 shares sold in all of January 2007, the month prior, 629,147 shares sold in December 2006 and 749,655 shares in November 2006.  Insiders sold more the week of February 2 through February 9 than they sold during either of the two preceding months.  Moreover, the total sales for February 2007 were almost double the average of the preceding three months.

409.   Numerous Countrywide insiders (along with Mozilo and Sambol) collectively sold nearly $800 million in the Company's shares since 2004.

410.   Defendant Kurland was the most senior executive at the Company, after Mozilo, prior to his unexplained departure from the Company in September 2006.  Prior to leaving Countrywide, Kurland sold all of his holdings during the Summer and early Fall of 2006 – only months before the truth about Countrywide's true financial situation became known.  From September 12 to September 15, 2006, Kurland sold 3,776,349 shares for total proceeds of over $130 million.  Prior to this he had a 10b5-1 plan through which he sold approximately

10,000 to 13,000 shares of Countrywide per week from June 8, 2006 through September 12, 2006.

411. From September 25, 2006 through June 21, 2007, Defendant Garcia, Executive Managing Director, Banking & Insurance, sold 716,625 shares for proceeds of over $28 million. Of this amount, he sold 230,000 shares for over $9 million in proceeds pursuant to a 10b5-1 plan set up on October 26, 2006, coinciding with the announcement of Countrywide's stock buyback program. Additionally, 486,625 shares, which were sold for $19 million, were sold pursuant to open sales (296,868 shares sold on September 25, 2006 for over $10 million in proceeds and 189,757 shares sold on February 2, 2007 for over $8.5 million in proceeds), and which were at the same time that Mozilo amended his 10b5-1 plan.

412. Marshall Gates, Senior Managing Director/CAO, sold 45,000 shares from November 2006 through December 2006 for proceeds of over $1.8 million.

413. Andrew Gissing III, Executive Managing Director, sold 11,092 shares for proceeds of nearly $500,000 between February 13 and May 7, 2007.

414. Ranjit M. Kripalani, Executive Managing Director, Capital Markets, sold 63,876 shares between October 30, 2006 and May 8, 2007.

415. Anne McCallion, Senior Managing Director, Chief Finance Operations, sold 71,608 shares from September 2006 through February 5, 2007 for proceeds of over $2.8 million. Of this amount, 21,608 shares were sold on February 2 and 5, 2007.

416. Laura Millema, Senior Managing Director, Chief Accounting Officer, sold 24,000 shares on February 2, 2007 for proceeds of over $1 million.

417. Sandor E. Samuel, Executive Managing Director/Chief Legal Officer, sold 122,836 shares for proceeds of nearly $5 million. Of the shares sold, 83,336 shares were sold pursuant to a 10b5-1 plan; however, after a 10b5-1 sale on October 25, 2007 of 25,044 shares, Samuels sold an additional 39,500 shares on

October 27, 2006, for proceeds of over $1.5 million – coinciding with Countrywide's announcement of its share buyback program.

418. James Schakett, Executive Managing Director, COO of Countrywide Home Loans, sold 32,565 shares on December 29, 2006, for proceeds of nearly $1.4 million.

419. Jeffrey Speakes, Senior Managing Director/Chief Economist, sold 52,500 shares on February 2, 2007, for proceeds of over $2.3 million.

420. The Defendant Directors' refusal to investigate the suspicious insider selling by these officers of the Company was a violation of their fiduciary duties, rendering them not disinterested and incapable of conducting a thorough investigation into Plaintiffs' allegations.

### C. Demand Is Excused Because The Board Either Knew About Or Should Have Inquired Into The Company's Predatory Lending Practices

421. As discussed above, Countrywide is required to comply with statutory and regulatory limits on interest rates and other fees it can charge customers and the selling methods that it may employ. These federal, state and local laws are designed to prevent deceptive lending practices that cause consumers with bad credit to enter into erroneous and usurious loans. Countrywide's predatory lending practices, described above, have caused the Company to be the subject of government investigations and lawsuits which have placed the Company at risk of substantial liability.

422. According to the Company's 2006 and 2007 proxy statements, Director Defendants Russell (Chair), Cunningham, Robertson and Parry served on the Board's Credit Committee at various times during the Relevant Period. According to Countrywide's 2007 Proxy, the Credit Committee "assists the Board of Directors in fulfilling its oversight responsibilities relating to the credit objectives, policies, controls, procedures and activities of the Company, including

the review of the Company's credit exposures, credit limits, loss reserve methodology, loss mitigation and loss reserve positions."

423. As detailed above, the Company's credit policies, procedures and controls – over which these defendants had responsibility – were so woefully inadequate that they allowed for predatory lending practices. By virtue of their position on the Credit Committee, these Director Defendants either knew about the predatory lending practices or they abdicated all oversight over the credit policies and practices at Countrywide, which created an environment in which the Company's senior management could conduct illegal lending practices.

424. According to the Company's 2006 and 2007 proxy statements, Director Defendants Donato (Chair), Melone, Parry, Robertson and Russell served at various times during the Relevant Period on the Board's Finance Committee. According to Countrywide's 2007 Proxy, the "purpose of the Finance Committee is to assist the Board of Directors in fulfilling its oversight responsibilities relating to the financial objectives, policies, procedures and activities of the Company, including the review of the Company's capital structure, source of funds, liquidity and financial position." By virtue of their positions on the Finance Committee, these Director Defendants either knew about the Company's predatory lending practices or exercised no oversight over the financial policies, practices and procedures that senior executives, including Mozilo and Sambol employed, as a result of which management caused the Company to violate lending laws.

425. Therefore, a majority of the Board are either directly responsible for the Company's predatory lending practices or were derelict in carrying out the express oversight duties with which they were charged as members of the Board's Credit Committee and Finance Committee.

### D. Demand Is Excused Because The Board's Failure To Exercise Its Duty Of Oversight Over Countrywide's Business Practices Has Exposed Countrywide To Increased Risks And Has Harmed Its Financial Condition And Prospects

426. The Board created an environment in which management was given *carte blanche* to change the Company's business strategy to extremely risky lending practices. Individual Defendants did so without addressing the attendant risks inherent in the change to non-traditional lending products. These acts led to Countrywide suffering substantial economic losses and being denied access to the secondary market for mortgage backed securities.

427. The Board allowed senior management to shift the Company's focus away from its core business involving safer, prime loans to non-traditional, risky loans without properly reserving for the increased risks resulting from the shift to this highly risky lending business.

428. The Board's lack of good faith and oversight exposed the Company to other increased risks, including: a lack of access to capital markets; ratings downgrades for its mortgage backed securities; investigations by the SEC and other governmental authorities; exposure to lawsuits; and irreparable damage to the Company's reputation. Their care and oversight was so lacking that senior management was able to freely engage in securities fraud, including fraudulent conduct that rendered false the Company's disclosures about its business practices and its risk exposure.

429. Several Director Defendants have completely abdicated their responsibilities by leaving the Company when they realized the truth would soon be revealed.

430. Four members of the Board have left within the last year before the true situation at Countrywide became known. For example, on October 18, 2007 – shortly before the Company issued its horrid financial results for the third quarter of 2007 on October 26, 2007 – Defendant Cisneros resigned from the Board of

Directors. Former director Kathleen Brown, a Goldman Sachs Senior Executive, resigned from the Board in March 2007. (Goldman Sachs is reported to have profited handsomely from shorting mortgage securities in the first half of 2007.) Edward Heller, a retired partner of law firm Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank"), left in June 2006. Heller was in a position to know what Countrywide was facing given that Fried Frank has provided legal services to Countrywide, including tax work and other legal opinions.

431. Senior executives also left under the Board's watch. For example, Kurland left in September 2006 and cashed out completely, reaping huge gains from insider trades. And, in April 2007, James Furash, the Chief Executive Officer of Countrywide Bank, the division he helped start in 2001, left the Company without any explanation. According to an April 12, 2007 news article on *Bloomberg News*, Countrywide built up Furash's unit – assets swelled to more than $80 billion from $75 million six years ago – by diverting mortgages to the bank rather than selling them off to investors. The purported strategy was to cut Countrywide's cost of funding new loans, and the monthly payments from homeowners generated a more predictable stream of income than gains from loan sales. However, that growth had declined in recent months as U.S. home sales slowed, and Countrywide was forced to take out more insurance on mortgages to protect against a rise in defaults.

432. In light of the Board's complete failure of oversight over senior management (including Defendants Mozilo, Kurland, Garcia and Sambol) and their conduct during the Relevant Period, the Director Defendants are incapable of responding adequately to a demand, and demand on them is therefore excused.

## E. Demand Is Excused Because The Board Approved Of Improper Accounting Practices

433. According to the Company's 2006 and 2007 proxy statements, Director Defendants Melone (Chair), Cisneros, Donato, Russell and Parry served

on the Board's Audit and Ethics Committee at various times during the Relevant Period. According to Countrywide's most recent proxy, the primary functions of the Audit and Ethics Committee include assisting the Board in overseeing the integrity of the financial and other information reporting processes of the Company and the Company's system of internal controls.

434. As members of Countrywide's Audit and Ethics Committee, Defendants Melone, Cisneros, Donato, Russell and Parry were responsible for ensuring that Countrywide's internal controls were adequate and that the Company's quarterly and annual financial statements were accurate.

435. However, Countrywide's internal controls were deficient, and its financial statements were inaccurate. The Audit Committee was directly responsible for approving the Company's materially false and misleading financial statements.

436. Accordingly, there is significant doubt that these Director Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing and loyalty, as well as other violations of law.

437. These Director Defendants' complete dereliction of their duties of oversight over the Company's systems and internal controls created the lax environment that enabled Mozilo and Sambol to operate Countrywide for their own personal gain until they ultimately drove it to absolute ruin – but not before they secretly and illegally took for themselves as much profit as possible from the Company.

438. Accordingly, Defendant Directors Melone, Cisneros, Donato, Russell and Parry are incapable of responding adequately to a demand, and demand on them is therefore excused.

**F.    Demand Is Excused Because The Board
Has Shown Its Lack Of Independence
From Mozilo By Repeatedly Granting
Him Outlandish Compensation Over
The Objection Of An Independent Adviser**

439.    According to the Company's 2006 and 2007 proxy statements, four directors (Snyder, Cunningham, Donato and Robertson) served at various times during the Relevant Period on the Board's Compensation Committee. They directly participated in the grants to Mozilo and Sambol of enormous compensation packages which enabled Mozilo and Sambol to engage in massive insider selling.

440.    The Compensation Committee was directly responsible for administering and managing the Company's executive compensation program and its stock option plans.  Its members during the Relevant Period therefore approved, ratified, and were otherwise responsible for Mozilo's and Sambol's compensation year after year that both defendants used, in part, to effectuate illegal insider sales.

441.    As members of the Compensation Committee during the Relevant Period who were responsible for approving the Countrywide stock option grants, Director Defendants Snyder, Cunningham, Donato and Robertson knew, or recklessly disregarded, that they were approving Mozilo's compensation in a manner that was not a valid exercise of business judgment.  Accordingly, there is significant doubt that these Director Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing and loyalty.

442.    Mozilo has received, and continues to receive, millions of dollars in salary, bonuses and other types of compensation:

| Year | Salary | Total Compensation |
|---|---|---|
| 2003 | $ 2,266,667 | $ 23,925,939 |
| 2004 | $ 2,466,667 | $ 23,242,098 |
| 2005 | $ 2,666,667 | $ 22,950,342 |
| 2006 | $ 2,866,667 | $ 48,133,155 |
| Total | $10,266,668 | $118,251,534 |

443.   According to the Compensation Committee's Charter, "In determining long-term incentive compensation of the CEO and executive officers, the Committee shall consider, among other factors, the Company's performance, the individual's performance, relative stockholder return, the value of similar incentive awards to the individuals at these positions at comparable companies and the awards given to the CEO and executive officers in past years." However, Mozilo's compensation when compared to the benchmarks in the Compensation Committee's charter shows that the committee simply failed to consider any of the purported benchmarks when setting his compensation.

444.   In addressing Mozilo's compensation for 2006, Countrywide's 2007 Proxy reveals that Mozilo received a compensation package valued at $48.1 million. Additionally, Mozilo realized $72.2 million through the exercise of stock options last year. Mozilo's package included salary of $2.9 million, incentive-plan payments of $20.5 million, stock awards of $1.1 million and option awards valued at $23 million. The Company also paid $15,481 of country club fees for Mozilo and $30,196 for tax-and-investment advice, among other benefits.

445.   According to an article published in *The Wall Street Journal* titled "Countrywide Directors' Dilemma," the Company's Directors approved Mozilo's 2004 pay package over the objection of the Company's hired independent adviser. Rather than heed the advice of the consulting firm hired for this purpose – and who

ostensibly the Directors believed to be qualified at the time of hiring – the Directors fired the consulting firm and gave Mr. Mozilo the excessive pay package he wanted:

> Pearl Meyer & Partners, a New York compensation consulting firm, was the independent adviser to the board's compensation committee during the board's 2004 contract-renewal talks with Mr. Mozilo. ***The consultants urged directors to slim his hefty contract***, ***partly by revamping his annual bonus formula***, one person familiar with those talks says. Under that formula, the CEO collected the same bonus as the prior year even when earnings-per-share growth remained flat. ***Directors kept the formula and decided to replace the consultancy, this person adds***.

446. According to a *Forbes* special report on CEO compensation, Mozilo ranked 7th in total compensation in 2006 when compared to all CEOs, well ahead of the CEOs of larger financial firms such as Bank of America, JPMorgan Chase, and Lehman Brothers.

447. Additionally, Mozilo, who was due to retire as CEO at the end of 2006, agreed in October to remain in that post through 2009. In return for his continued employment, the Board promised Mozilo a retirement "reimbursement" that would pay Mozilo $10 million over the next three years (an arrangement that compensation experts say may be the first of its kind). Of that amount, $5 million is guaranteed while the rest is supposedly contingent on the Company's shareholder return ranking at the median or above those in the Standard & Poor's Financial Services Index.

448. However, in order to continue payments to Mozilo irrespective of the Company's performance, the contract eliminated a formula that calculated Mozilo's incentive award by using EPS growth. Because of this change in Mozilo's employment contract, Mozilo could still earn the maximum incentive of

$10 million, even if Countrywide's profits were to fall sharply in 2007, as the new contract does not require earnings growth.

449. At each turn, the Board has gone out of its way to ensure that Mozilo would be excessively compensated. The recent elimination of EPS growth as a benchmark for Mozilo's compensation is a prime example of the Board's willingness to elevate Mozilo's compensation over the best interests of the Company.

450. For example, in early to mid part of this decade, when historically low interests rates helped Countrywide steer unqualified borrowers into risky loans, Countrywide's EPS grew rapidly. Between year ended December 31, 2004 and 2006, EPS increased from $3.90 to $4.42, respectively, an increase of 13%. During this time Mozilo's compensation was tied to Countrywide's EPS growth. *See* http://pages.stern.nyu.edu/~adamodar/New_Home_Page/articles/buybacksnot goodnews.html ("Mozilo's bonus is based solely on earnings per share. Mr. Mozilo has received bonuses worth $56.7 million in the past three years."). Given the new climate of decreasing EPS numbers, the Board has opted to eliminate EPS growth as a metric for compensating Mozilo.

451. In fact, in 2006, and again in 2007, The Corporate Library, one of the nation's leading corporate governance watchdog firms, gave Countrywide an "F" grade for its compensation practices, the lowest possible mark.

452. In 2006, the Board's willingness to pay Mozilo far more than his counterparts embroiled the Company in disputes with major shareholders. A June 9, 2006, press release by the American Federation of State, County and Municipal Employees (AFSCME) Pension Plan stated:

> Alarmed at the excessive compensation package being paid to
> Countrywide Financial CEO and Chairman Angelo Mozilo, a
> group of shareholders led by the American Federation of State,
> County and Municipal Employees (AFSCME) Pension Plan are

planning to challenge Countrywide's Board of Directors to give them a say on Mozilo's runaway executive pay.

* * *

"Mozilo is making a Godzilla-size pay package equal to six percent of Countrywide's net income," said AFSCME President Gerald W. McEntee. "It is time that shareholders are given a say on whether this type of compensation is in anyone's best interests but Mr. Mozilo's."

453. Given the excessiveness of Mozilo's compensation package, the Compensation Committee has demonstrated it will not act against the interests of Mozilo and is simply unwilling (or unable) to abide by the terms of its charter and they have demonstrated that demand on them would be futile.

**G. Demand Is Excused Because The Board Repeatedly Has Failed To Exercise Oversight Over Compensation Of Senior Executives Generally**

454. In Countrywide's 2007 Proxy, the Board of Directors strongly encouraged a "no" vote on a shareholder proposal that urged Countrywide's Board of Directors to adopt a policy that would give shareholders an annual advisory vote on executive compensation. The outlying excuses included, among others, that the Board was in the best position to make compensation decisions, the Compensation Committee has access to the best information on compensation practices and has a thorough process in place to determine appropriate executive pay and that Countrywide already has mechanisms in place to facilitate shareholder input at the Board level.

455. This position is impossible to reconcile with the rampant insider selling at Countrywide and Mozilo's blatant illegal profiting through his manipulation of the Rule 10b5-1 Plan, timed to take advantage of Countrywide's share price inflation caused by the share buy-back program (that he and the other

Defendants approved) and the misinformation that he and other insiders disseminated to the market about Countrywide's lending practices and controls.

456.   The Board similarly encouraged a "no" vote on a shareholder proposal submitted for the 2006 annual shareholder meeting that likewise sought more involvement of shareholders by involving them in a yearly review of senior executives' compensation.

457.   The Board abdicated its duty to revoke the Compensation Committee's authority to set executive compensation when it became clear that the Committee was not actually exercising that authority.  The Board had the duty to take back its authority to set executive compensation when the Committee failed to appropriately fulfill that duty.  Their failure to do so is an abdication which negates application of the business judgment rule and excuses demand.

458.   Additionally, the Board acquiesced to giving excessive compensation to insiders' family members.  For example, since June 1, 2005, the Company has employed Mozilo's son as a Branch Manager for approximately $296,709 in base salary and bonus, and since 1984, Mozilo's son-in-law has been employed as Director, Fixed Income Products, for approximately $437,965 in base salary and bonus.

459.   For these reasons, the Board is unable to adequately respond to a demand and, therefore, demand on the Director Defendants would be futile.

**H.    Demand Is Excused Because The Board
Members Are Interested In Retaining Their
Lucrative Compensation And Prestige As Board Members**

460.   Demand is also excused because, in addition to Mozilo's and Sambol's extraordinary compensation as officers of Countrywide that the Board essentially gave away to them, each Board member received his own enormously lucrative compensation and other emoluments that render him incapable of considering the transactions challenged herein.  Demand on the directors other than

Mozilo is futile because Mozilo dominated the Board, controlled the selection process for Board membership, and ensured that his fellow Board members were paid excessively so they would look the other way at the wrongdoing occurring at Countrywide.

461. According to an article published in *The Wall Street Journal* titled "Countrywide Directors' Dilemma," the Company's Directors receive excessive pay calling into question the Directors' ability to independently assess claims against management:

> Critics have long questioned the outsize pay packages and lucrative share sales of Countrywide Financial Corp.'s chairman and chief executive, Angelo Mozilo. But outside members of the company's board also have above-average compensation, and three of them have sold more than $2 million of Countrywide shares apiece since mid-2006.
>
> *       *       *
>
> ***Countrywide rewards board members so well that "at some point, you cross the line between paying for services provided and a very lucrative thing where board members aren't going to challenge management***," says Mark Reilly, a partner at 3C, Compensation Consulting Consortium. "***I do think they have crossed the line***."

462. According to the Company's 2007 Proxy Statement, each director received "on an annual basis, shares of restricted stock with an aggregate value equal to $220,000, based on the fair market value of our Common Stock on the date of grant." Directors also had the right to participate in the Company's group health plans and receive reimbursement for spousal travel. They had the right to designate charitable contributions of up to $1 million "ratably over five years" and to have the Company match contributions of up to $5,000 a year.

463. Additionally, each member of Countrywide's Compensation Committee, as it was comprised in 2006, earned over $400,000 in total compensation in that year. The table below, which was filed with the Company's 2007 Proxy Statement, summarizes the compensation paid by the Company to non-employee directors for the Company's fiscal year 2006 (excludes all footnotes):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Henry G. Cisneros | 84,250 | 222,754 | — | 51,962 | 358,966 |
| Jeffrey M. Cunningham | 84,250 | 222,754 | 342 | 61,962 | 369,308 |
| Robert J. Donato | 92,500 | 278,352 | 845 | 53,158 | 424,855 |
| Martin R. Melone | 99,000 | 274,368 | — | 54,219 | 427,587 |
| Robert T. Parry | 154,250 | 330,355 | — | 54,219 | 538,824 |
| Oscar P. Robertson | 84,250 | 278,352 | 302 | 44,219 | 407,123 |
| Keith P. Russell | 163,500 | 269,579 | — | 59,191 | 492,270 |
| Harley W. Snyder | 97,500 | 278,352 | 402 | 66,524 | 442,778 |

## I. Demand Is Excused Because The Board Already Has Exhibited Antipathy Toward Investigating Or Prosecuting Corporate Wrongdoing

464. As described above, the Board has failed to investigate Mozilo's changes to his 10b5-1 plan despite wide media coverage about abuses of those plans and his plan in particular.

465. Demand on the Board would also be futile because the Board has been made aware of – and has refused to investigate – Mozilo's trading practices as well as Countrywide's questionable loan practices.

466. As noted above, North Carolina's State Treasurer, Richard Moore ("Moore"), wrote to Countrywide's Board in September 2007 asking the Board to

1  investigate reports of questionable loan practices and Mozilo's trading practices.
2  The Board refused this request without explanation, forcing Moore to request that
3  the SEC take action, which it has agreed to do, as reported by *The New York Times*
4  on October 11, 2007 and in *The Wall Street Journal* on October 17, 2007.

5  467.  The Board's response to Moore's letter is not the first instance where
6  the Company has resisted providing investors with information concerning
7  Mozilo's compensation. The Board has also rebuked efforts by other Countrywide
8  shareholders to encourage investigation of and more transparency with respect to
9  compensation of senior management.  For example, in October 2006, the Company
10  refused to allow LAMPERS to inspect Countrywide's books and records to
11  investigate the possibility that stock option grants over the past seven years to
12  Company executives, including Mozilo, Kurland and Sambol, may have been
13  manipulated by backdating and "spring loading" options.  On October 2, 2007,
14  Vice Chancellor Noble issued an Order finding that LAMPERS made an adequate
15  showing of a credible basis to infer possible corporate misconduct and ordered
16  Countrywide to comply with LAMPERS's demand to inspect certain documents
17  that relate to such suspicious grants of executive stock options. *See LAMPERS v.*
18  *Countrywide Fin. Corp.*, No. 2608-VCN, slip. op. at 38 (Del. Ch. Oct. 2, 2007).
19  Countrywide has yet to turn over the documents.

20  468.  The Director Defendants' repeated resistance to investigating patent
21  misconduct at Countrywide demonstrates that a demand on them to take action
22  with respect to the conduct challenged herein would be futile.

23  **J.  Demand Is Excused Because The Board**
    **Has Personal Financial Interests That**
24  **Conflict With The Interests Of**
    **Countrywide's Public Shareholders**
25
26  469.  As set forth in greater detail above, the Director Defendants cannot
27  fairly consider demand because they have personal financial interests at stake, not
28  just in this litigation, but also in relation to the BofA Transaction.  If the BofA

Transaction is consummated, the Board effectively negotiated for itself an extremely broad "defense and indemnity" provision, which would effectively transfer their personal financial liability to BofA and insulate the Board from liability for their misconduct alleged herein. In exchange for such a provision, the Directors Defendants sold Countrywide's public shareholders down the river by accepting a discounted, fire-sale price.

470. Because the Director Defendants have personal financial interests at stake in this litigation and in the BofA Transaction, there exists more than reasonable doubt about their ability to fairly and impartially consider demand.

471. Defendant Sambol is additionally conflicted and incapable of impartially considering demand as he will further inequitably gain as a result of the BofA Transactions. BofA has effectively purchased Defendant Sambol's vote on the BofA Transaction by promising him he will lead the combined consumer mortgage business once BofA completes its proposed purchase of Countrywide. As a result, Sambol stands to gain significant remuneration as a result of the completion of the BofA Transaction and he cannot exercise fair and impartial judgment concerning Plaintiffs' allegations.

### K. Demand Is Excused Because The Director Defendants' Suffer Additional Miscellaneous Conflicts And Constraints

472. The Board cannot independently investigate Plaintiffs' claims because certain members of the Board have already, and improperly, jumped to the conclusion that the Company's senior management (including Mozilo) has done no wrong. For instance, in an October 18, 2007 resignation letter to Defendants Mozilo and Snyder, Defendant Cisneros declared his unwavering admiration for the Company's Board, its founder and its Lead Director: "Please know of my immense admiration for Countrywide as a company, of my appreciation for its workforce, and of my respect for the members of the Board and for you as its

leader for so many years." Moreover, the BofA deal provides indemnity agreements requiring that the Individual Defendants are held harmless for their conduct.

473. The Board cannot independently investigate Plaintiffs' claims because Mozilo and the other Board members put Sambol, a long-time loyal associate of Mozilo who also engaged in illegal insider trading, on the Board in September 2007 to insulate Defendants from being subjected to a full and proper scrutiny which would otherwise have occurred had the Board appropriately appointed new independent, outside directors to investigate management's wrongdoing.

474. The Board members sit on committees that oversee the very conduct that is challenged. As such, these Board members either knew and approved of management's wrongdoing, or so abdicated their oversight responsibilities as to render demand unnecessary.

## XIV. RELIANCE ON DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

475. As a result of the misconduct alleged herein (Individual Defendants' misstatements and omissions), the market for Countrywide securities was artificially inflated. Under such circumstances, the presumptions of reliance available under the "fraud-on-the-market" theory and *Affiliated Ute* apply.

476. Throughout the Relevant Period, Countrywide justifiably expected the Individual Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in the Company's offering documents for the sale of the Company's securities. The Defendants were under a fiduciary duty to make such disclosures. Countrywide would not have repurchased its securities at artificially inflated prices if the Individual Defendants had disclosed all material information then known to them, as detailed herein. Thus, reliance by Countrywide should be presumed with respect to the Individual Defendants' omissions of material information as established under the *Affiliated*

*Ute* presumption of reliance.

477. The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

(a) Countrywide's stock met the requirements for listing and was listed on the New York Stock Exchange;

(b) As a regulated issuer, Countrywide filed periodic public reports with the SEC;

(c) Countrywide's securities volume was substantial during the Relevant Period;

(d) Countrywide was followed by various analysts employed by major Wall Street brokerage firms, who wrote reports which were distributed to the sales force and certain customers of the brokerage firms and which were available to various automated data retrieval services; and

(e) The market price of Countrywide securities reacted efficiently to new information entering the market.

478. The foregoing facts clearly indicate the existence of an efficient market for trading of Countrywide securities and support application of the fraud-on-the-market theory.

479. Countrywide relied on the integrity of the market price for the repurchase of its securities and is entitled to a presumption of reliance with respect to the Individual Defendants' misstatements and omissions alleged in this Complaint.

480. Had Countrywide known of the material adverse information not disclosed by the defendants, or been aware of the truth behind the defendants' material misstatements, Countrywide would not have engaged in the stock re-purchase program detailed herein to purchase Countrywide stock at artificially

inflated prices.

## XV.   INAPPLICABILITY OF THE PSLRA SAFE HARBOR

481.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  First, the safe harbor provided by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") does not apply to false or misleading statements that are contained in financial statements which purport to have been prepared in accordance with GAAP.  Second, the statements complained of were not forward-looking statements nor were they identified as forward-looking statements when made.   Rather, the false or misleading statements complained of in this Complaint concerned historical and/or current facts and conditions existing at the time the statements were made.

482.   To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false or misleading forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Countrywide or of an Individual Defendant who knew that the statement was materially false or misleading when made.

## XVI.   APPLICATION OF GROUP PLEADING DOCTRINE TO THE INDIVIDUAL DEFENDANTS

483.   The Individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications concerning Countrywide that are complained of herein and

were aware of, or recklessly disregarded, the misstatements contained therein and the omissions therefrom, and were aware of their materially false and misleading nature. Because of their positions with Countrywide, each of the Individual Defendants had access to adverse undisclosed information about Countrywide's business prospects and financial condition and performance as particularized herein, and knew (or recklessly disregarded) that these adverse facts rendered the statements complained of herein materially false and misleading.

484. The Individual Defendants, because of their positions of control and authority as officers and controlling persons of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period. Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports, releases and statements detailed herein and is therefore primarily liable for the representations contained therein.

## XVII. **LOSS CAUSATION**

485. Throughout the Relevant Period, as detailed above, the price of Countrywide's common stock was artificially inflated as a direct result of Individual Defendants' material misrepresentations and omissions regarding the Company. Indeed, during the Relevant Period, Countrywide's common stock reached a high of approximately $45 per share in February 2007. The true value of the Company's stock during the Relevant Period, as evidenced by the price by which Defendants are willing to sell the Company after the truth concerning the Company's true financial condition was revealed, was far less than its peak price of $45 per share.

486. Individual Defendants concealed the true financial condition of the Company, its true underwriting procedures, and material risks to the Company's liquidity. As a result, Individual Defendants materially misrepresented the creditworthiness of Countrywide and its future prospects and ability to fund its operations. As the true financial condition of the Company was revealed, and the risks associated with the Company's true creditworthiness materialized, including those relevant to evaluation of the Company's potential to suffer a liquidity crisis and possible bankruptcy, the Company's stock price declined dramatically causing harm to the Company.

487. Similarly, throughout the Relevant Period, Individual Defendants concealed the true reasons for their own sales of Countrywide stock. As a result, Individual Defendants materially misrepresented their own true, subjective valuations of the Company's stock price. As investors came to doubt the veracity of Individual Defendants' representations concerning the bases for their stock sales – and by doing so investors questioned the integrity of the Company's management and directors – the price of Countrywide shares declined and the Company was injured.

488. When the truth about Countrywide was revealed to the market, as is set forth in Section VII titled "Defendants' misconduct and Breaches of Duty Have Devastated Countrywide's Business and Financial Condition", the inflation that had been caused by Individual Defendants' material misrepresentations and omissions was eliminated from the price of Countrywide's common stock causing significant damage to Countrywide. Countrywide's common stock price consistently reacted to information in the marketplace, including, but not limited to, the following:

- On July 24, 2007, Countrywide reported a $417 million impairment charge on loans that it could not sell, and lowered earnings guidance. Countrywide's stocked declined from a close of $33.88 per share on July 23,

2007 to close at $30.34 per share on July 24, 2007, with an intra-day low of $29.50.

- On August 3, 2007, after announcing that Countrywide had access to nearly $50 billion in short-term funding, investors remained concerned about liquidity and internal controls with respect to lending practices and the stock declined over 6%, to close at $25 per share, with an intra-day low of $24.73 per share, after closing at $26.77 per share the day before.

- On August 9, 2007, Countrywide filed its Form 10-Q for 2Q07, announcing an $11.5 billion draw down on its credit lines, which raised liquidity concerns. Countrywide's stocked declined from a close of $28.51 per share on August 9, 2007 to close at $27.71 per share on August 10, 2007, with an intra-day low of $24.76.

- On August 15, 2007, Kenneth Bruce, a Merrill Lynch analyst in San Francisco, stated in a research note that "[e]ffective insolvency" would result if creditors force Countrywide to sell assets at depressed prices or investors lose confidence in its ability to raise cash and that shareholders shouldn't "understate the importance of liquidity . . . . If liquidations occur in a weak market, then it is possible for CFC to go bankrupt." Countrywide was downgraded to "sell" from "buy" in the note. Countrywide stock then declined $3.17 to $21.29 per share, a 13% drop. In reaction to this news, Countrywide's stock price continued to decline the next day to close at $18.95 per share, with an intra-day low of $15 per share.

- On August 23, 2007, Defendant Mozilo sparked further investor concern over Countrywide's liquidity and operational health when he warned that the current housing slump may lead to a recession. Countrywide common stock declined on this news, dropping from a close of $22.02 per share on August 23, 2007, to close at $21 per share the next day, with an intra-day low of $20.7 per share.

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

- On August 26, 2007, *The New York Times* published an article detailing Countrywide's abusive lending practices stating that "documents from the subprime unit also show that Countrywide was willing to underwrite loans that left little disposable income for borrowers' food, clothing and other living expenses." After closing on Friday, August 24, 2007, at $21.00 per share, the common stock declined $1.00 to close at $20.00 per share on August 27, 2007, with an intra-day low of $19.53 per share.

- On September 5, 2007, Countrywide announced layoffs of 900 employees in its mortgage production division. The job cuts came on the heels of disclosed drops in lending volumes and rising defaults, creating further concern with regard the Company's operational viability. The stock declined from $19.81 per share on September 4, 2007, to close at $18.81 per share on September 5, 2007. In the subsequent days, the common stock continued to decline, closing at $16.62 per share on September 12, 2007.

- On October 17, 2007, Bloomberg reported that the SEC had begun an informal investigation into the insider sales of Defendant Mozilo. On October 18, 2007, the stock closed at $16.51 per share, $.84 below the previous day closing price.

- On October 23, 2007, Countrywide announced that it would begin to contact borrowers and offer refinancing and/or interest rate modifications on $16 billion in loans with rates set to adjust upward by the end of 2008. In reaction to the rising risk of defaults associated with the Company's loan portfolio, the common stock declined from $15.05 per share on October 23, 2007, to close at $13.83 per share on October 24, 2007, with an intra-day low of $13.47 per share.

- On November 9, 2007, Countrywide filed its Form 10-Q for 3Q07 late in the day, and Defendants warned that a credit downgrade could have dire effects on Countrywide's business, stating that "all three rating agencies have

placed our ratings on some form of negative outlook." Further, according to the filing, if the Company's credit ratings dropped any further, "our access to the public corporate debt markets could be severely limited." The next Monday, the stock closed down $.64 lower than Friday, at $13.19 per share, with an intra-day low of $13.05 per share.

- On November 20, 2007, rumors surfaced that Countrywide may seek bankruptcy protection due to liquidity concerns. Countrywide issued statement declaring it had ample capital, access to cash and was well-positioned to benefit from the financial turmoil rocking the mortgage sector. The stock declined from a closing price of $10.57 per share on November 19, 2007, to $10.28 per share on November 20, 2007, with an intra-day low of $8.21 per share.

- On December 13 and 14, 2007, press reports revealed that both the Illinois Attorney General's Office and the California Attorney General's Office were investigating Countrywide's lending and loan origination practices. Countrywide's stock closed at $9.80 per share on December 14, 2007, compared to a closing price of $10.53 per share on December 12, 2007.

- On January 8, 2008, the bankruptcy rumors resurfaced, based on liquidity concerns. The New York Stock Exchange was forced to halt trading in the stock before the Company released a statement denying that it planned to file for bankruptcy. Countrywide shares declined more than 28% to close at $5.47 per share.

- On January 9, 2008, shares of Countrywide slipped again after Defendants reported higher home loan delinquency and foreclosure rates in December. The stock closed at $5.12 per share.

489. The declines in Countrywide's stock price following these and other revelations, and the resulting damages suffered, are directly attributable to the market's reaction to the disclosure of information that had previously been

misrepresented or concealed by Individual Defendants, and to the market's adjustment of the Company's stock price to reflect the newly emerging truth about Countrywide's condition. Had Countrywide known of the material adverse information not disclosed by Individual Defendants named herein, or been aware of the truth behind the Individual Defendants' material misstatements, it would not have repurchased common stock at artificially inflated prices.

## COUNT I

### Derivative Claim For Breach Of
### Fiduciary Duties Against All Individual Defendants

490. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

491. Each of the Individual Defendants owed and owes a fiduciary duty to Countrywide and its stockholders. By reason of their fiduciary relationships, Individual Defendants all owed and owe Countrywide the highest obligation of good faith, fair dealing, loyalty and due care and diligence in the management and administration of the affairs of the Company, as well as in the financial accounting, auditing and reporting of the Company. Moreover, Individual Defendants owed and owe the duty of full and candid disclosure of all material facts thereto.

492. Individual Defendants have been responsible for the gross and reckless mismanagement of Countrywide. Individual Defendants abdicated their corporate responsibilities by mismanaging the Company in at least the following ways:

(a) allowing Countrywide insiders and a majority of the Board to unload shares before news of the Company's financial woes became known to its public investors;

(b) allowing Countrywide to markedly shift its lending practices to volatile sub-prime loans without adequately reserving for the inevitable risks that would befall Countrywide when interest rates increased and the real estate market

slowed;

(c)     allowing for woefully inadequate controls over the Company's policies and practices with respect to underwriting and credit risk exposure which created the opportunity for Board members and Company's insiders to sell more hundreds of millions of dollars worth of Countrywide stock at inflated prices;

(d)     allowing Countrywide's financial statements to be artificially inflated through a host of accounting shenanigans;

(e)     permitting Mozilo to implement and then twice change the terms of his 10b5-1 plan which allowed him to unload more than $300 million in Countrywide's stock;

(f)     taking steps to keep the price of Countrywide's stock artificially inflated by initiating a share repurchase program which forced Countrywide to buy back shares from Mozilo, a majority of the Board and other Company insiders at inflated prices;  and

(g)     the outlandish compensation packages that the Board gave to Mozilo and other senior executives year after year that were out of proportion to actual performance.

493.     All Individual Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

494.     Individual Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Company.

495.     By reason of the foregoing, Individual Defendants have breached their fiduciary obligations to Countrywide and its shareholders.

496.     Countrywide and its shareholders have been injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiffs, as shareholders and representatives of Countrywide, seek damages and other relief for the Company as hereinafter set

Case 2:07-cv-06923-MRP-MAN Document 241 Filed 02/27/2008 Page 195 of 208

forth.

497. Plaintiffs on behalf of Countrywide have no adequate remedy at law.

## COUNT II

### Derivative Claim For Gross
### Mismanagement Against All Individual Defendants

498. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

499. By their actions alleged herein, Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and businesses of Countrywide in a manner consistent with the operations of a publicly held corporation.

500. As a direct and proximate result of Individual Defendants' gross mismanagement and breaches of duty alleged herein, Countrywide has suffered substantial monetary damages, as well a further and even greater damage in the future, including damage to Countrywide's reputation and good will. Individual Defendants are liable to the Company as a result of the misconduct alleged herein.

501. Plaintiffs on behalf of Countrywide have no adequate remedy at law.

## COUNT III

### Derivative Claim For Waste Of
### Corporate Assets Against All Individual Defendants

502. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

503. As a result of the improper conduct described herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Countrywide to waste valuable corporate assets by: awarding excessive compensation to senior executives; conducting a share repurchase plan whose purpose was to allow executives to liquidate holdings and not to benefit the

Company or its public shareholders; and incurring potentially millions of dollars of legal liability and legal costs to defend Individual Defendants' unlawful actions.

504.   As a direct and proximate result of Individual Defendants' waste of corporate assets, the Individual Defendants are liable to the Company.

505.   Plaintiffs on behalf of Countrywide have no adequate remedy at law.

### COUNT IV

**Derivative Claim Against
Defendants Mozilo, Kurland, Garcia,
Sambol, Robertson, Dougherty, Snyder,
Cisneros, Donato, Cunningham, Russell And
Sieracki For Insider Trading (Cal. Corp. Code § 25402)**

506.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

507.   Defendants Mozilo, Kurland, Garcia, Sambol, Robertson, Dougherty, Snyder, Cisneros, Donato, Cunningham, Russell and Sieracki (the "Inside Trading Defendants"), by reason of their relationship with the Company as officers and directors of the Company, had access, directly or indirectly, to material information about the Company not generally available to the public.

508.   The Inside Trading Defendants knowingly used material information about the Company, not generally available to the public, to facilitate the sale of Countrywide securities in the State of California for their own personal gain in a manner not available to the public.

509.   The Inside Trading Defendants knowingly used their positions at the Company to avail themselves of non-public information to facilitate the improper sale of Countrywide securities in the State of California for their own personal gain in a manner not available to the public.

510.   The Inside Trading Defendants sold Countrywide securities with actual knowledge that the value of these securities was inflated as a result of their actions, in violation of § 25402 of the California Corporations Code.

511.   The Inside Trading Defendants are liable to the Company pursuant to

§ 25402.5 of the California Corporations Code.

## COUNT V

### Derivative Claim For Aiding
### And Abetting Breaches Of Fiduciary
### Duty Against The Director Defendants

512. Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

513. By reason of their positions as fiduciaries of the Corporation, defendants owed duties of due care, undivided loyalty, good faith, and truthful disclosure. These Defendants violated and breached these duties.

514. By virtue of their role in abdicating their duties of monitoring, oversight and management of the affairs of the Company, as alleged herein, the Director Defendants were able to, and in fact did, render aid and assistance to the Inside Trading Defendants in their breaches of fiduciary duty. The Director Defendants did so knowing, or but for their gross negligence would have known, of the fiduciary breaches by the Inside Trading Defendants.

515. As a direct and proximate result of the Director Defendants' aiding and abetting the Inside Trading Defendants' breaches of fiduciary duty, the Corporation has sustained, and will continue to sustain, substantial harm.

516. The Director Defendants are liable to the Corporation as a result of the acts alleged herein.

## COUNT VI

### Derivative Claim Against All Individual
### Defendants For Violation Of Section 10(b) Of The
### Securities Exchange Act And Rule 10b-5 Promulgated Thereunder

517. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

518. Throughout the Relevant Period, Individual Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous

1course of conduct designed to artificially inflate the price of the Company's
2common stock and enable Inside Trading Defendants to profit by selling hundreds
3of millions of dollars of the Company's common stock at artificially inflated
4prices.

5519. Individual Defendants employed devices, schemes, and artifices to
6defraud while in possession of material, adverse non-public information, and
7engaged in acts, practices, and a course of conduct that included the making of, or
8participation in the making of, untrue and/or misleading statements of material
9facts and/or omitting to state material facts necessary in order to make the
10statements made about Countrywide not misleading. Individual Defendants also
11participated in a fraudulent scheme and artifice to defraud that included looting of
12the Company by, among other things, causing the Company to purchase
13Countrywide shares on the open market at artificially inflated prices to maintain
14the share price at a time when Inside Trading Defendants were selling
15Countrywide shares.

16520. Individual Defendants, as senior executive officers and directors of
17the Company, are liable as direct participants in the wrongs complained of herein.
18Through their positions of control and authority as officers and directors of the
19Company, each of the Individual Defendants was able to and did control the
20conduct complained of herein.

21521. Individual Defendants acted with scienter throughout the Relevant
22Period in that they either had actual knowledge of the misrepresentations and/or
23omissions of material facts set forth herein, or acted with reckless disregard for the
24truth by failing to ascertain and disclose the true facts, even though such facts were
25available to them. Individual Defendants were among the senior management and
26the directors of the Company, and were therefore directly responsible for the false
27and misleading statements and/or omissions disseminated to the public through
28press releases, news reports, and SEC filings.

522. Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Countrywide. Individual Defendants caused Countrywide to purchase at least $2.4 billion in shares of Countrywide stock at prices Individual Defendants knew to be artificially inflated as a result of Individual Defendants' false and misleading statements concerning Countrywide's business and financial statements. Moreover, Individual Defendants caused Countrywide to purchase the Countrywide shares at these artificially inflated prices knowing that Company's repurchase plan would further maintain the artificial inflation at a time that the Inside Selling Defendants were themselves profiting by selling Countrywide shares on the basis of material, non-public inside information.

523. As described herein, Individual Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon the marketplace for purchasers of Countrywide securities during the Class Period. Throughout the Class Period, Individual Defendants had a duty to disclose new information that came to their attention, which rendered their prior statements to the market materially false and misleading.

524. Individual Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

525. Countrywide purchased shares on the open market relying directly or indirectly on Individual Defendants' false and misleading statements and/or upon the integrity of the market price for Countrywide securities. But for Individual Defendants' fraud, Countrywide would not have purchased the securities at artificially inflated prices.

526. The market price for Countrywide's securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by Individual Defendants, as described above.

527. By virtue of the foregoing, Individual Defendants have violated §

10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and caused Countrywide to sustain damages, as alleged herein.

528. Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

## COUNT VII

### Derivative Claim Against All Individual Defendants
### For Violation Of § 20(a) Of The Securities Exchange Act

529. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

530. The Individual Defendants acted as controlling persons of Countrywide within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as alleged herein. By virtue of their positions as officers and/or directors of Countrywide, their high-level positions, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that are alleged to be materially false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged to be materially misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

531. In particular, each of the Individual Defendants had direct involvement or intimate knowledge of the day-to-day operations of the Company during the Relevant Period. Therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

532.   By reason of such wrongful conduct, the Individual Defendants are liable pursuant to § 20(a) of the 1934 Act.  As a direct and proximate result of the wrongful conduct, Countrywide suffered damages in connection with its repurchase of the Company's stock during the Relevant Period.

## COUNT VIII

**Derivative Claim Against Defendants
Mozilo, Cisneros, Cunningham, Dougherty,
Garcia, Robertson, And Sambol For Violation
Of Section 20A Of The Securities Exchange Act**

533.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

534.   Defendants, by reason of their relationship with the Company as officers and directors of the Company, had access, directly or indirectly, to material information about the Company not available to the public.

535.   Defendants knowingly traded on this material, non-public information about the Company.

536.   Defendants sold Countrywide securities with actual knowledge that the value of these securities was inflated as a result of Individual Defendants' false and misleading statements and other fraudulent activities detailed herein.

537.   As part of Countrywide's publicly disclosed share repurchase program, the Company purchased 38,641,941 shares of its common stock in November 2006, at an average price of $38.82 per share, and then purchased an additional 21,507,817 shares of common stock in May 2007, at an average price of $40.39 per share.  As such, Countrywide was as a contemporaneous purchaser of Company securities, pursuant to Section 20A of the Exchange Act, when the Individual Defendants sold Countrywide securities, as set forth in the chart below.

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

| Defendant | Date Of Sales | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Cisneros | 5/30/2007 | 5,075 | $39.5 | $200,462.50 |
| Cunningham | 11/1/2006 | 5,000 | $38.28 | $191,400.00 |
| Dougherty | 11/29/2006 | 22,790 | $39.7 | $904,717.42 |
| Dougherty | 5/8/2007 | 11,396 | $42 | $478,632.00 |
| Dougherty | 5/15/2007 | 22,790 | $39.87 | $908,564.37 |
| Garcia | 11/8/2006 | 2,500 | $38.49 | $96,233.00 |
| Garcia | 11/14/2006 | 12,500 | $40.17 | $502,080.00 |
| Garcia | 11/22/2006 | 2,500 | $40.26 | $100,653.00 |
| Garcia | 11/30/2006 | 2,500 | $39.7 | $99,254.00 |
| Garcia | 5/3/2007 | 2,500 | $37.85 | $94,625.00 |
| Garcia | 5/8/2007 | 12,500 | $40.06 | $500,723.75 |
| Garcia | 5/18/2007 | 12,500 | $41.18 | $514,712.50 |
| Garcia | 5/24/2007 | 12,500 | $40.35 | $504,360.00 |
| Garcia | 5/29/2007 | 2,500 | $39.44 | $98,610.00 |
| Mozilo | 11/1/2006 | 70,000 | $38.34 | $2,683,975.00 |
| Mozilo | 11/1/2006 | 23,000 | $38.31 | $881,074.80 |
| Mozilo | 11/6/2006 | 70,000 | $38.46 | $2,692,130.00 |
| Mozilo | 11/6/2006 | 23,000 | $38.84 | $893,379.80 |
| Mozilo | 11/10/2006 | 70,000 | $38.93 | $2,725,184.00 |
| Mozilo | 11/13/2006 | 70,000 | $40.13 | $2,809,268.00 |
| Mozilo | 11/16/2006 | 25,000 | $40.65 | $1,016,280.00 |
| Mozilo | 11/16/2006 | 23,000 | $40.65 | $934,968.40 |
| Mozilo | 11/20/2006 | 70,000 | $40.2 | $2,813,727.00 |
| Mozilo | 11/21/2006 | 25,000 | $39.79 | $994,782.50 |
| Mozilo | 11/21/2006 | 22,999 | $39.79 | $915,146.31 |
| Mozilo | 5/2/2007 | 70,000 | $37.54 | $2,627,779.00 |
| Mozilo | 5/4/2007 | 46,000 | $38.03 | $1,749,168.40 |
| Mozilo | 5/7/2007 | 46,000 | $38.48 | $1,770,195.00 |
| Mozilo | 5/8/2007 | 70,000 | $38.78 | $2,714,873.00 |
| Mozilo | 5/10/2007 | 70,000 | $40.68 | $2,847,390.00 |
| Mozilo | 5/14/2007 | 70,000 | $40.26 | $2,818,102.00 |
| Mozilo | 5/16/2007 | 46,000 | $40.25 | $1,851,628.80 |
| Mozilo | 5/18/2007 | 70,000 | $41.14 | $2,879,513.00 |
| Mozilo | 5/21/2007 | 46,000 | $40.64 | $1,869,518.20 |
| Robertson | 11/20/2006 | 60,000 | $39.8 | $2,388,000.00 |
| Sambol | 11/3/2006 | 14,000 | $38.05 | $532,687.40 |
| Sambol | 11/9/2006 | 14,000 | $38.8 | $543,198.60 |
| Sambol | 11/16/2006 | 14,000 | $40.62 | $568,674.40 |
| Sambol | 11/21/2006 | 14,000 | $39.81 | $557,401.60 |
| Sambol | 11/29/2006 | 14,000 | $39.89 | $558,458.60 |

538.   As a contemporaneous purchaser, Countrywide was damaged by the actions of the Individual Defendants, as alleged herein.

## COUNT IX

### Derivative Claim Against Director Defendants For
### Violation Of Section 14(a) Of The Securities Exchange Act And Rule 14a-9

539.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

540.   On April 29, 2005, Director Defendants issued a proxy statement to solicit votes to, among other things, re-elect Defendants Mozilo, Kurland, Robertson and Russell to the Board, and to approve the Company's Annual Incentive Plan as amended and restated to expand the types of performance goals employees must achieve under that plan.

541.   On April 28, 2006, Director Defendants issued a proxy statement to solicit votes to, among other things, re-elect Defendants Cunningham, Melone and Parry to the Board and approve the adoption of the Company's 2006 Equity Incentive Plan, and to discourage shareholders from voting in favor of a shareholder proposal that urged the Board to adopt a policy that shareholders be given an opportunity to annually approve the report of the Compensation Committee.

542.   On April 27, 2007, Director Defendants issued a proxy statement to solicit votes to, among other things, re-elect Defendants Cisneros, Donato and Synder to the Board, and to discourage shareholders from voting in favor of a shareholder proposal that urged the Board to adopt a policy that shareholders be given an opportunity to have a say annually in the compensation of named executive officers.

543.   In seeking shareholder approval of the Annual Incentive Plan and the Equity Incentive Plan, Director Defendants provided misleading information about Countrywide's financial results and performance metrics.  Defendants also failed to disclose that: (i) the Company's controls over financial reporting, compensation and lending policies were deficient; and (ii) the metrics of the Company's results

of operations were skewed and misleading due to Defendants' undisclosed decision to steer Countrywide's focus to highly risky financial products.

544.   In encouraging shareholders to vote against the stockholder proposals in the 2006 Proxy and 2007 Proxy that would result in greater shareholder involvement in executive compensation, Defendants failed to disclose that:  (i) the Company's controls over financial reporting, compensation and lending policies were at best deficient if not non-existent; and (ii) the metrics used to determine performance-based compensation were misleading because Defendants did not also disclose that such results were achieved only because of Defendants' undisclosed decision to change Countrywide's business model to one dependent on highly risky financial products.

545.   The Board's material misstatements in, and failure to include material facts in the 2005 Proxy, the 2006 Proxy and the 2007 Proxy rendered them materially misleading, in violation of Section 14(a) of the exchange Act and Rule 14a-9 promulgated thereunder.

546.   As a result thereof, the re-election of Defendants to the Board was improper.

547.   Countrywide was also harmed by the amount of compensation it paid pursuant to the Annual Incentive Plan approved in 2005 and the Equity Incentive Plan approved in 2006.

## COUNT X

### Class Action Claim For Breach Of Fiduciary Duty In The BofA Transaction Against The Current Countrywide Directors

548.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

549.   The current Countrywide Directors, as Countrywide directors, owe the Class the utmost fiduciary duties of due care, good faith, and loyalty.

550. The current Countrywide Directors have failed to fulfill their fiduciary duties in the sale of control of Countrywide.

551. The current Countrywide Directors also breached their fiduciary duty by favoring their own interests and those of the other Individual Defendants over those of the Countrywide shareholders. They caused the Company to enter into the BofA Transaction in order to perpetuate their own personal interests, because the BoA Transaction indemnifies the Individual Defendants from personal liability arising from their participation in the illegal conduct which is at issue in the numerous derivative cases pending against the Individual Defendants.

552. Plaintiffs and the Class have been harmed by these breaches of fiduciary duty, as this transaction is their only chance to capture a control premium. The individual defendants have squandered that chance.

553. Plaintiffs and the Class have no adequate remedy at law.

## COUNT XI

### Class Action Claim For Breach Of Fiduciary Duty In The BofA Transaction Against The Current Countrywide Directors

554. Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

555. The current Countrywide Directors owe the Class the utmost fiduciary duties of due care, good faith, and loyalty.

556. The current Countrywide Directors are bound by their fiduciary duties to the Class to provide the Class with all information material to the Class members' decision on whether to vote to accept the BofA Transaction or not.

557. The current Countrywide Directors have breached those fiduciary duties by failing to disclose the processes, terms and negotiations with other potential bidders for the Company. The current Countrywide Directors have not disclosed who approached who, who participated in the negotiation of the deal, any other, unnamed potential acquirors, the terms of the offer, nor does it disclose

what, if any, measures the individual defendants took to evaluate that offer. These are all material facts which the Class must have in order to cast a fully informed vote on the BofA Transaction.

558. Plaintiffs and the Class have no adequate remedy at law.

## COUNT XII

### Class Action Claim Against BofA
### For Aiding And Abetting Breaches Of Fiduciary Duties

559. Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

560. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

561. The current Countrywide Directors owe the Class the fiduciary duties of care, good faith and unflinching loyalty. That the current Countrywide Directors owe the Class these fiduciary duties is well known to BofA.

562. As is detailed in the preceding paragraphs, the current Countrywide Directors have breached their fiduciary duties to the Class.

563. BofA aided and abetted the current Countrywide Directors' breaches of fiduciary duty. BofA actively and knowingly induced the current Countrywide Directors, and each of them, to breach his fiduciary duties by, foisting upon them a substantially undervalued deal that promised no benefits to Countrywide shareholders, while at the same time securing substantial benefits to BofA and to Countrywide Directors named as Defendants herein, including (but not limited to) the potential extinguishment of their personal liability to Countrywide and its public shareholders for breaches of their fiduciary duties in connection with the pending derivative claims.

564. The Class has been harmed by BofA's aiding and abetting the current Countrywide Directors' breaches of fiduciary duty.

565. Plaintiffs and the Class have no adequate remedy at law.

# COUNT XIII

### Claim Against The Individual Defendants And
### BofA For Constructive Trust And An Injunction

566. Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

567. As set forth in greater detail above, the current Countrywide Directors and BofA entered into and approved the Agreement, whereby BofA intends to merge with Countrywide in an all-stock transaction valued at around $4 billion.

568. The Agreement makes no mention of the derivative claims presently pending on behalf of Countrywide, and fails to account for or make provisions for, this valuable asset of Countrywide, which potentially will return to Countrywide hundreds of millions of dollars wrongfully taken from the Company by insiders through unlawful stock sales and other breaches of fiduciary duties. Rather, the agreement contains indemnification for officers and directors.

569. On account of such Agreement, there exist an imminent threat to the standing of stockholders to continue to pursue the derivative claims on behalf of Countrywide, and upon information and belief, the Individual Defendants are keenly aware and will argue that the BofA Agreement may serve to extinguish the derivative and class action claims against them.

570. To protect and preserve the shareholder derivative claims, and to protect this substantial asset of Countrywide, equity and good conscience requires that the court recognize a constructive trust over the derivative claims, or at least over the Individual Defendants' ill-gotten gains, for the benefit of Countrywide's shareholders and that the derivative claims be assigned to Countrywide shareholders. Absent this relief, equity requires an injunction against the vote and the BofA transaction.

571. There is no adequate remedy at law.

# XVIII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

1.  Determining that this action is a proper derivative action maintainable under law and demand is excused;

2.  Disgorgement of all illegally obtained proceeds and ill-gotten gains, including the proceeds of insider sales made in violation of federal and state securities law and bonus and other compensation obtained as a result of the Individual Defendants' wrongdoing, including Countrywide's issuance of false and misleading financial results and conversion to risky lending practices;

3.  Against each Individual Defendant for restitution and/or damages in favor of Plaintiffs, on behalf of Countrywide and its public shareholders, including restitution of the amount of compensation paid by Countrywide pursuant to the Annual Incentive Plan approved by Countrywide shareholders in 2005 and the Equity Incentive Plan approved by Countrywide shareholders in 2006;

4.  Canceling the votes to re-elect Defendants in connection with the annual shareholder meetings in 2005, 2006 and 2007, and ordering Defendants to disgorge to the Company all compensation they received for service on the Board following these invalid elections;

5.  Rescinding the Annual Incentive Plan approved by Countrywide's shareholders in 2005;

6.  Rescinding the Equity Incentive Plan approved by Countrywide's shareholders in 2006;

7.  Recognizing a constructive trust over the derivative claims, or at a minimum over the Individual Defendants' illegally–obtained proceeds, for the benefit of Countrywide shareholders;

8.  Absent a constructive trust and assigning the derivative claims to Countrywide shareholders, enjoining the proposed Countrywide – Bank

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

1  of America merger, and any shareholder vote regarding the same, until such time

2  that the derivative claims pending in this action are fully and finally resolved;

3      9.      Assigning the derivative claims to Countrywide

4  shareholders;

5      10.     Awarding Plaintiffs the costs and disbursements of the

6  action, including reasonable allowance of fees for Plaintiffs attorneys, experts and

7  accountants; and

8      11.     Granting Plaintiffs such other and further relief as the

9  Court deems just and proper.

## XIX.      JURY DEMAND

Plaintiff demands a trial by jury on all applicable issues.

Dated: February 15, 2008      Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP


By: */s/ Blair A. Nicholas*

BLAIR A. NICHOLAS (Bar No. 178428)
NIKI L. MENDOZA (Bar No. 214646)
DAVID A. THORPE (Bar No. 216498)
MATTHEW P. SIBEN (Bar No. 223279)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (212) 793-0323


GRANT & EISENHOFER P.A.
JAY W. EISENHOFER
MICHAEL J. BARRY
DIANE ZILKA
1201 N. Market Street
Chase Manhattan Centre
Wilmington, DE 19801
Tel:   (302) 622-7000
Fax:   (302) 622-7100

*Co-Lead Counsel for Lead Plaintiffs
Arkansas Teacher Retirement System, Fire
& Police Pension Association of Colorado,
Louisiana Municipal Police Employees'*

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)

*Retirement System, and Public Employees Retirement System of Mississippi*

MARIAN P. ROSNER
ROBERT C. FINKEL
E. ELIZABETH FERGUSON
WOLF POPPER LLP
845 Third Avenue
New York, New York 10022
Tel: (212) 759-4600
Fax: (212) 486-2093

*Counsel for Public Employees Retirement System of Mississippi*

CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS COMPLAINT
Lead Case No. 07-CV-06923-MRP-(MANx)