IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION DERIVATIVE LITIGATION | C.A. No. 07-372 SLR (MPT)<br><br>(Consolidated Action) |

**DEFENDANTS ANGELO R. MOZILO, HENRY G. CISNEROS, ROBERT L. DONATO, HARLEY W. SNYDER, JEFFREY M. CUNNINGHAM, MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON, KEITH P. RUSSELL AND NOMINAL DEFENDANT COUNTRYWIDE FINANCIAL CORPORATION'S OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS**

OF COUNSEL:

Brian E. Pastuszenski
Stuart M. Glass
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
(617) 570-1000

Dated: February 27, 2008

Thomas A. Beck (#2086)
beck@rlf.com
Steven Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19801
(302) 651-7700

*Attorneys for Defendants Angelo R. Mozilo, Henry G. Cisneros, Robert L. Donato, Harley W. Snyder, Jeffrey M. Cunningham, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, Keith P. Russell, and Nominal Defendant Countrywide Financial Corporation*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................1

NATURE AND STAGE OF THE PROCEEDING.......................................3

SUMMARY OF ARGUMENT .....................................................................5

STATEMENT OF FACTS ............................................................................7

    I.    COUNTRYWIDE AND ITS BOARD OF DIRECTORS......................7

    II.    COUNTRYWIDE'S STOCK REPURCHASE PROGRAM .................9

    III.    THE CONSOLIDATED, AMENDED, AND SUPPLEMENTAL
        VERIFIED COMPLAINT ...................................................................9

ARGUMENT ...............................................................................................11

    I.    THE FAILURE TO MAKE PRE-SUIT DEMAND REQUIRES
        DISMISSAL OF THE COMPLAINT .................................................11

        A.    The Decision Whether to Initiate Litigation on Behalf
               of the Company Belongs to Countrywide's
               Board of Directors..............................................................11

        B.    Shareholders Bear a Heavy Burden to Show Demand
               is Excused .............................................................................12

        C.    Plaintiffs Have Not Alleged the Required Particularized
               Facts Establishing Demand Futility ......................................14

               1.    Countrywide's Directors are Independent ......................14

               2.    Countrywide's Directors are Disinterested .....................15

               3.    Countrywide's Stock Repurchase Program Was
                     an Otherwise Valid Exercise of Business Judgment........26

    II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF
        FIDUCIARY DUTY.............................................................................29

    III.    PLAINTIFFS' FAILURE TO ADEQUATELY ALLEGE
        STANDING REQUIRES DISMISSAL ...............................................31

CONCLUSION.............................................................................................33

i

# TABLE OF AUTHORITIES

CASES

*Acme Propane, Inc. v. Tenexco, Inc.,*
   844 F.2d 1317 (7th Cir. 1988) ......................................................................19

*Anspach v. City of Philadelphia Dept. of Public Health,*
   503 F.3d 256 (3d Cir. 2007)........................................................................17

*Aronson v. Lewis,*
   473 A.2d 805 (Del. 1984) ................................................................ *passim*

*Ash v. McCall,*
   No. Civ. A. 17132, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000) .............................28

*Beam v. Stewart,*
   845 A.2d 1040 (Del. 2004) ....................................................................13, 15

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007)........................................................................29, 30

*Benak v. Alliance Capital Mgmt. L.P.,*
   435 F.3d 396 (3d Cir. 2006)........................................................................17

*Blasband v. Rales,*
   971 F.2d 1034 (3d Cir. 1992)........................................................................15

*Brehm v. Eisner,*
   746 A.2d 244 (Del. 2000) ................................................................ *passim*

*Carmody v. Toll Bros., Inc.,*
   723 A.2d 1180 (Del. Ch. 1998)........................................................................15

*Cecena v. Allstate Ins. Co.,*
   No. C. 05-3178JF, 2007 WL 134245 (N.D. Cal. Jan. 16, 2007) .............................17

*Chaffin v. GNI Group, Inc.,*
   No. Civ. A. 16211-NC, 1999 WL 721569 (Del. Ch. Sept. 3, 1999).........................30

*City of Pittsburgh v. West Penn Power Co.,*
   147 F.3d 256 (3d Cir. 1998)........................................................................29

*County of Santa Clara v. Astra USA, Inc.,*
   No. C. 05-03740, 2006 WL 1344572 (N.D. Cal. May 17, 2006) .............................17

*D.E. & J Ltd. P'ship v. Conaway,*
   284 F. Supp. 2d 719 (E.D. Mich. 2003)................................................................17

ii

*Emerald Partners v. Berlin*,
  Civ. A. No. 9700, 1994 WL 48993 (Del. Ch. Feb. 4, 1994)......................................................7

*Fellner v. Tri-Union Seafoods, L.L.C.*,
  No. Civ. A. 06CV0688, 2007 WL 87633 (D.N.J. Jan. 9, 2007)................................................17

*Fishbaum v. Liz Claiborne, Inc.*,
  No. 98-9396, 1999 WL 568023 (2d Cir. July 27, 1999)...........................................................26

*Freedman v. Countrywide Financial Corp.*,
  Case No. 3464-VCN (Del. Ch., filed Jan. 14, 2008) ...............................................................29

*Gagliardi v. TriFoods Int'l, Inc.*,
  683 A.2d 1049 (Del. Ch. 1996)................................................................................................28

*Grimes v. Donald*,
  673 A.2d 1207 (Del. 1996) .............................................................................11, 12, 14, 15

*Grobow v. Perot*,
  539 A.2d 180 (Del. 1988) ......................................................................................12, 13, 27

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003).........................................................................6, 24, 25, 31

*Harris v. Carter*,
  582 A.2d 222 (Del. Ch. 1990).................................................................................................7

*Highland Legacy Ltd. v. Singer*,
  No. Civ. A. 1566-N, 2006 WL 741939 (Del. Ch. Mar. 17, 2006)............................................27

*In re Adams Golf Inc., Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004).....................................................................................................19

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999).....................................................................................................25

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)...................................................................................................30

*In re Coca-Cola Enterprises, Inc.*,
  C.A. No. 1927-CC, 2007 WL 3122370 (Del. Ch. Oct. 17, 2007) .............................................30

*In re Computer Scis. Corp. Deriv. Litig.*,
  No. CV 06-05288 MRP, 2007 WL 1321715 (C.D. Cal. Mar. 26, 2007).......................... 6, 31-32

*In re Computer Scis. Corp. Deriv. Litig.*,
  244 F.R.D. 580 (C.D. Cal. 2007).............................................................................................13

iii

*In re Donald J. Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir. 1993)..................................................................................19

*In re Fuqua Indus., Inc. S'holders Litig.*,
  No. Civ. A. 11974, 1997 WL 257460 (Del. Ch. May 13, 1997) ...............................7

*In re Merck & Co, Inc., Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005)..............................................................................23

*In re Merck & Co. Sec., Deriv. & ERISA Litig.*,
  493 F.3d 393 (3d Cir. 2007)........................................................................15, 27

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  289 F. Supp. 2d 416 (S.D.N.Y. 2003)..................................................................17

*In re NAHC, Inc. Sec. Litig.*,
  306 F. 3d 1314 (3d Cir. 2002).............................................................................9

*In re Sagent Tech., Inc. Deriv. Litig.*,
  278 F. Supp. 2d 1079 (N.D. Cal. 2003) ...........................................................6, 31

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ............................................................................27

*In re Turretto*,
  255 B.R. 884 (Bankr. N.D. Cal. 2000) ...............................................................17

*In re VeriSign, Inc. Deriv. Litig.*,
  No. C. 06-4165 PJH, 2007 WL 2705221 (N.D. Cal. Sept. 14, 2007).......................32

*Jacobs v. Yang*,
  No. Civ. A. 206-N, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004)..............................14

*Kahn v. Roberts*,
  C.A. No. 12324, 1995 WL 745056 (Del. Ch. Dec. 6, 1995) .............................16, 30

*Kahn v. Roberts*,
  679 A.2d 460 (Del. 1996) .........................................................................6, 27, 31

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991) .......................................................................6, 11, 12-13

*Kanter v. Barella*,
  489 F.3d 170 (3d Cir. 2007)........................................................................14, 15, 31

*Kohls v. Duthie*,
  791 A.2d 772 (Del. Ch. 2000).............................................................................15

iv

*Levine v. Smith,*
  591 A.2d 194 (Del. 1991) ..................................................................................11, 13, 28

*Lewis v. Anderson,*
  477 A.2d 1040 (Del. 1984) .............................................................................................4

*Lewis v. Graves,*
  701 F.2d 245 (2d Cir. 1983)........................................................................................15

*Lewis v. Vogelstein,*
  699 A.2d 327 (Del. Ch. 1997)................................................................................27, 28

*Lewis v. Ward,*
  852 A.2d 896 (Del. 2004) ..............................................................................................4

*Limantour v. Cray,*
  432 F. Supp. 2d 1129 (W.D. Wash. 2006)..................................................................26

*Malpiede v. Townson,*
  780 A.2d 1075 (Del. 2001) ..........................................................................................30

*Marron ex. rel. Stewart & Stevenson Servs., Inc. v. Ream,*
  No. Civ. A. H-06-1394, 2006 WL 2734267 (S.D. Tex. May 5, 2006).........................32

*Morse v. Lower Merion Sch. Dist.,*
  132 F.3d 902 (3d Cir. 1997).......................................................................................29

*Polk v. Good,*
  507 A.2d 531 (Del. 1986) ............................................................................................27

*Rales v. Blasband,*
  634 A.2d 927 (Del. 1993) .....................................................................................*passim*

*Rattner v. Bidzos,*
  No. Civ. A. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003)............................24-25

*Rosenberg v. Oolie,*
  Civ. A. No. 11,134, 1989 WL 122084 (Del. Ch. Oct. 16, 1989) ................................24

*Rothenberg v. Santa Fe Pac. Corp.,*
  No. Civ. A. 11749, 1995 WL 523599 (Del. Ch. Sept. 5, 1995)..................................14

*Seminaris v. Landa,*
  662 A.2d 1350 (Del. Ch. 1995)...................................................................................15

*Spiegel v. Buntrock,*
  571 A.2d 767 (Del. 1990) .......................................................................................11, 12

v

*Stroud v. Grace*,
606 A.2d 75 (Del. 1992) ................................................................................16, 30

*Tripp v. IndyMac Bancorp, Inc.*,
Case No. CV07-1635, 2007 U.S. Dist. LEXIS 95445 (C.D. Cal. Nov. 29, 2007) ...................23

*White v. Panic*,
783 A.2d 543 (Del. 2001) .........................................................................................27

*Wietschner v. Monterey Pasta Co.*,
294 F. Supp. 2d 1102 (N.D. Cal. 2003) .......................................................................26

**STATUTES**

8 DEL. C. § 102(b)(7) ...............................................................................................30

8 DEL. C. § 141(a) ...................................................................................................11

8 DEL. C. § 141(d) ...................................................................................................15

8 DEL. C. § 160 .......................................................................................................31

8 DEL. C. § 160(a) ...................................................................................................26

12 U.S.C. § 1451 .....................................................................................................18

**OTHER AUTHORITIES**

FED. R. CIV. P. 9(b) ..............................................................................................29-30

FED. R. CIV. P. 10(b) ............................................................................................10-11

FED. R. CIV. P. 12(b)(6) ............................................................................................29

FED. R. CIV. P. 23.1 ..........................................................................................6, 12, 31

FED R. EVID. 201 ..............................................................................................9, 17, 23

T. Farber and W. Walton, CORP. COMMS. HANDBOOK § 4:18 ...........................................27

## PRELIMINARY STATEMENT

This is a shareholder derivative suit ostensibly brought on behalf of nominal defendant Countrywide Financial Corporation ("Countrywide," or the "Company") against certain current and former members of Countrywide's Board of Directors, including Angelo R. Mozilo, Henry G. Cisneros, Jeffrey M. Cunningham, Robert L. Donato, Harley W. Snyder, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, and Keith P. Russell (together with Countrywide, "Defendants").[1] Defendants respectfully submit this opening brief in support of their motion to dismiss the Consolidated, Amended, and Supplemental Verified Complaint ("the Complaint") with prejudice. This consolidated action should be dismissed principally because plaintiffs failed to make demand on the Board of Directors before filing this litigation and thereby deprived the Board of the opportunity to consider whether the prosecution of this litigation would be in Countrywide's or its shareholders best interests, as required by Delaware substantive law.

This case is a moving target. When the initial complaint was filed in June 2007, it focused exclusively on disclosures in the Company's 2006 and 2007 proxy statements regarding the compensation of Countrywide's Chief Executive Officer. Now, eight months and three complaints later, plaintiffs no longer challenge Countrywide's proxy disclosures or its Chief Executive Officer's compensation. Rather, plaintiffs abandoned those allegations and now argue something entirely different: that it was a breach of fiduciary duty for the Board to approve the repurchase of Countrywide common stock in November 2006 and May 2007.

Although plaintiffs' theories have changed, one thing remains the same: this ostensible shareholder derivative action must be dismissed because, in addition to other grounds for dismissal, plaintiffs never made demand on Countrywide's Board of Directors before filing this

---

[1] Former Countrywide directors Michael E. Dougherty and Kathleen Brown also are defendants in this action, and have submitted a separate motion to dismiss.

lawsuit. Countrywide is a Delaware corporation. As such, Delaware law governs the demand requirement. Making pre-suit demand before commencing a shareholder derivative lawsuit is a bedrock principle of Delaware corporate governance law. Delaware law presumes that a company's board of directors is in the best position to judge whether litigation on behalf of the Company would benefit the corporation and its shareholders and should be pursued. Here, however, plaintiffs chose not to make demand before suing and instead have usurped the Countrywide Board's decision-making power without satisfying the heavy burden they bear to show that demand should be excused. Under Delaware law, demand is excused only where the plaintiff alleges particularized facts creating a reasonable doubt as to whether (a) a majority of the board is disinterested and capable of objectively considering a demand or (b) the transaction at issue is the product of the board's reasonable business judgment. Plaintiffs here have not met that strict standard.

Here, the Countrywide Board of Directors made a business judgment to approve a stock buyback program—a corporate finance technique that Delaware law expressly authorizes and that public companies routinely utilize. Not only have plaintiffs not pled the requisite particularized facts showing a lack of disinterestedness on the part of a majority of the Board or conduct that is not the product of reasonable business judgment, but plaintiffs' argument why demand should be excused fundamentally makes no sense.

In a nutshell, plaintiffs allege that in November 2006 Countrywide's Board of Directors was somehow aware of information concerning the future direction of the housing market that was not equally available to the investing public. Building on this factually unsupported premise, plaintiffs then allege—again without any factual support whatsoever—that sales of stock by certain members of the Countrywide Board that occurred in or after November 2006

2

were made on the basis of this information. The problem with this allegation, however, is that information about the housing market during the relevant period was publicly available from a variety of sources, including government agencies. In addition, during the relevant period, Countrywide itself publicly disclosed the information it had concerning the housing market, including the fact that the rate of appreciation in the housing market was declining and the impact that the softening of the housing market was having on the Company's mortgage operations. The marketplace was aware of this information, and set the value of Countrywide's common stock accordingly. In fact, its common stock traded in the $30-$40/share range from November 2006 through the end of July 2007. Beginning in July 2007, however, along with the rest of the mortgage industry, Countrywide's stock began to fall, and it continued to fall to its present price of approximately $6/share. Plaintiffs do not allege a single fact indicating that the Board of Directors in November 2006 or at any other time knew that the Company's stock was worth substantially less than its market price, or that the Board had foreseen that more than ten months later the stock would fall to $6 per share when the market did not. In short, the Complaint contains no facts to suggest anything other than that the Company's stock repurchase program was a valid exercise of business judgment.

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff IBEW filed this lawsuit on June 12, 2007, on the eve of Countrywide's annual shareholders meeting, making allegations about the amount of compensation paid to the Company's Chief Executive Officer and certain disclosures in the Company's 2006 and 2007 proxy statements concerning executive compensation. *See* D.I. 3. Despite claiming in its complaint that it sought to enjoin the 2007 annual meeting, plaintiff IBEW never pursued any such relief and, in fact, did not serve the complaint on Defendants until several days *after* the

3

annual meeting had occurred. Plaintiff also did not seek any monetary damages other than attorneys' fees. Despite asserting solely derivative claims ostensibly on behalf of Countrywide, plaintiff filed the lawsuit without first making demand on Countrywide's Board of Directors and without pleading specific facts demonstrating that demand would be futile.

On September 14, 2007, plaintiff IBEW filed an amended complaint, which was substantially similar to the prior complaint but also for the first time made allegations concerning the stock repurchase transactions and stock sales by certain of the Defendants. *See* D.I. 8. On November 6, 2007, plaintiff's counsel filed a copycat action in this Court on behalf of plaintiff Blumberg. *See Blumberg v. Mozilo*, 07-717 (D. Del.). The parties stipulated and the Court ordered that Defendants would have 60 days to respond to a consolidated amended complaint once filed. *See* D.I. 9 (ordered Nov. 13, 2007).

On January 11, 2008, Bank of America Corporation announced that it had entered into a definitive agreement to acquire all of the outstanding shares of Countrywide stock. Just four days later, likely fearing that they would cease to have standing under Delaware law to prosecute this upon consummation of the proposed merger,[2] plaintiffs moved for partial summary judgment—before the cases were consolidated, before filing a consolidated complaint, and completely ignoring the schedule that had been agreed to by the parties and ordered by the Court. *See* D.I. 18-20. The Court denied plaintiffs' summary judgment motion as premature, noting that "it has not yet determined if subject matter jurisdiction exists over the claims at issue, mindful of Defendants' stated intention to move to dismiss . . . on the grounds that plaintiffs did not make demand on the Countrywide Board of Directors prior to filing these cases." *See* D.I. 35.

---

[2] *See Lewis v. Ward*, 852 A.2d 896 (Del. 2004); *Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984).

On February 13, 2008, plaintiffs filed the Consolidated, Amended, and Supplemental Verified Complaint, which is the subject of this motion. *See* D.I. 37. In the Complaint, plaintiffs abandoned any challenges to the 2006 and 2007 proxy statements and the compensation paid to Countrywide's CEO.[3] Instead, plaintiffs assert a single state law claim (jurisdiction is based on diversity of citizenship) for breach of fiduciary duty, based exclusively on Countrywide's stock repurchase program in November 2006 and May 2007 and certain sales of Countrywide stock by some of the Defendants.[4]

## SUMMARY OF ARGUMENT

The Complaint must be dismissed with prejudice, in its entirety, for the following reasons:

1.    Contrary to the requirements of Delaware law, plaintiffs failed to make pre-suit demand on Countrywide's Board of Directors, and have not pled particularized facts that show demand should be excused as futile. This is not merely a technical pleading requirement. Rather, the requirement that plaintiffs plead particularized facts demonstrating circumstances that would excuse making demand is a rule of substantive law, designed to protect a board of directors' fundamental prerogative under Delaware law to manage the internal affairs of the corporation. It is well-settled that the decision to bring litigation on a corporation's behalf belongs to its directors, and plaintiffs allege no facts—much less the particularized facts required

---

[3] The Complaint contains one stray reference in its demand allegations to "misrepresentations and omissions in proxy statements," but Defendants assume this is an oversight since plaintiffs have dropped all of their proxy claims. Compl. ¶ 13. In any event, this out-of-place reference is vague and factually unsupported, and clearly fails to satisfy the particularity requirements of *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).

[4] In addition to their motion to dismiss, Defendants also have filed a motion to transfer this case to the United States District Court for the Central District of California or stay, based on the presence in California of another, much broader consolidated shareholder derivative action that contains the very same claim asserted here by plaintiffs—breach of fiduciary duty in connection with the stock repurchase program, as well as additional claims not found in this action. *See In re Countrywide Fin. Corp. Deriv. Litig.*, Case No. 07-CV-06923-MRP (C.D. Cal.).

5

by Delaware law—that would justify departing from this basic tenet of corporate governance. *See* FED. R. CIV. P. 23.1; *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991); *Aronson v. Lewis*, 473 A.2d 805, 811-12 (Del. 1984).

2.    The failure to make demand is dispositive of this action, and the Court need proceed no further.    Nonetheless, this action is subject to dismissal for the separate and independent reason that plaintiffs have not stated a claim for breach of fiduciary duty under Delaware law. Nothing in the Complaint suggests that Countrywide's directors knew of—or traded on—any information that was not disclosed or otherwise available to the public. Absent such allegations, the law presumes that Defendants' stock sales were in good faith, and that Countrywide's stock repurchase program was a valid exercise of business judgment, aimed at promoting the best interests of the company. Moreover, any alleged violation of the individual defendants' duty of care is barred by the express provisions of Countrywide's Certificate of Incorporation.    Likewise, even assuming plaintiffs had identified facts that Countrywide somehow knew which the investing public did not (which they have not), the defendants had no duty of disclosure under Delaware law in connection with the stock repurchase program because shareholder action was neither sought nor required. *See Kahn v. Roberts*, 679 A.2d 460, 468 (Del. 1996); *Guttman v. Huang*, 823 A.2d 492, 502-05 (Del. Ch. 2003).

3.    Plaintiffs have failed to adequately allege their standing to maintain this action, because they do not specify when they became Countrywide shareholders. *See* FED. R. CIV. P. 23.1; *In re Computer Scis. Corp. Deriv. Litig.*, No. CV 06-05288 MRP, 2007 WL 1321715, at *15 (C.D. Cal. Mar. 26, 2007); *In re Sagent Tech., Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1096 (N.D. Cal. 2003). Under Delaware law, plaintiffs do not have standing to bring this action unless

6

they owned Countrywide stock continuously from the time of the alleged wrongs through the date of filing of the litigation.

## STATEMENT OF FACTS

### I.    Countrywide and its Board of Directors

Countrywide is a Delaware corporation headquartered in California. It is primarily engaged in mortgage lending and other real estate finance-related businesses. *See* Compl. ¶ 6. The individual defendants are eleven current and former members of Countrywide's Board of Directors. At the time of the relevant complaint for purposes of analyzing demand futility,[5] Countrywide's Board consisted of nine directors (defendants Mozilo, Cisneros, Cunningham, Donato, Melone, Parry, Robertson, Russell, and Snyder). Defendant Brown left the Board in March 2007, and defendant Dougherty's term expired in June 2007. *See* Compl. ¶ 7.[6] The directors bring extensive business experience to the Countrywide Board and are well-qualified to make business judgments in Countrywide's best interests—including decisions on whether to pursue litigation on behalf of the Company:

---

[5] For purposes of the demand requirement, the Court analyzes the Board as of the date the first complaint is filed, unless the complaint is later amended to include new claims that were "not already validly in litigation." *In re Fuqua Indus., Inc. Shareholders Litig.*, 1997 WL 257460 at *13 (Del. Ch. May 13, 1997); *Harris v. Carter*, 582 A.2d 222, 230 (Del. Ch. 1990). Here, plaintiff added the stock repurchase program allegations for the first time in the September 14, 2007 amended complaint, so that is the relevant date for analyzing demand futility. *See* D.I. 8. Regardless of the date used, however, plaintiffs have failed to allege facts demonstrating demand futility regarding *any* directors, at *any* time.

[6] Plaintiffs did not name Countrywide director David Sambol as a defendant, but nonetheless state that they will "seek relief against him" "to the extent that he participated with the directors in committing the acts alleged herein or aided and abetted those acts." *Id.* Plaintiffs admit, however, that Mr. Sambol (who is not alleged to have joined the Board until the end of September 2007) "did not . . . authorize the Company's repurchase of its stock," and they fail to allege any facts connecting him to the issues in the case. *Id.* In any event, courts have "no power to enter an order against a nonparty." *Emerald Partners v. Berlin*, Civ. A. No. 9700, 1994 WL 48993, at *3 (Del. Ch. Feb. 4, 1994).

- <u>Angelo R. Mozilo</u> is Countrywide's Chairman and Chief Executive Officer, and co-founded the company almost forty years ago. Over that time, he has also served as Countrywide's President and in a variety of other executive positions.

- <u>Henry G. Cisneros</u> is the Chairman of CityView America, a joint venture to build affordable homes in metropolitan areas. Previously, he was founder and Chairman of American CityVista, a joint venture with KB Home, and President, Chief Operating Officer and a director of Univision Communications, Inc., a Spanish language television network.

- <u>Jeffrey W. Cunningham</u> is the Chairman and CEO of NewsMarkets LLC, and the founder and Chairman of an investment firm. Previously, he was publisher of Forbes Magazine, president of CMGI, Inc., managing director of an international finance company, and head of sales and marketing at Business Week Magazine.

- <u>Robert J. Donato</u> is the President of Donato Financial Services. Previously, he was an Executive Vice President at UBS Financial Services, President of Freedom Advisors, Inc., and held executive positions at PaineWebber.

- <u>Martin R. Melone</u> is a retired partner of Ernst & Young, where he worked for over 28 years and was responsible for global clients in a wide range of industries.

- <u>Robert T. Parry</u> is the retired President and CEO of the Federal Reserve Bank of San Francisco, a position he held for 18 years.

- <u>Oscar P. Robertson</u> is the President and CEO of several businesses, including a holding company, a manufacturer of specialty chemicals, and a document management provider. He is also a general partner in a media publications firm.

- <u>Keith P. Russell</u> is President and CEO of a strategic and financial consulting firm. Previously, he was Chairman of Mellon West, Vice-Chairman and Chief Risk Officer of Mellon Financial Corporation, and President and Chief Operating Officer of Glendale Federal Bank.

- <u>Harley W. Snyder</u> is President of two real estate development companies and has served as managing partner of many other real estate-related businesses.

8

*See* Declaration of Steven J. Fineman ("Fineman Decl.") Exs. 1, 2 at 5-9 (2006, 2007 Proxy Statements).[7]  Only defendant Mozilo holds a management position at the Company.  The other Defendants are neither Company officers nor employees, and are considered independent directors under the policies of both Countrywide and the New York Stock Exchange.  *See* Fineman Decl. Ex. 2 at 11 (2007 Proxy Statement).

## II.    Countrywide's Stock Repurchase Program

In October 2006, Countrywide announced that as part of a plan to optimize use of the Company's capital, the Board of Directors had "authorized a share repurchase program of up to $2.5 billion.  In connection with this program, the Company intends to repurchase $1 billion to $2 billion of its common stock in the fourth quarter financed through the issuance of high equity-content debt securities."  *See* Fineman Decl. Ex. 24 at 2 (Form 8-K).  At the time the Company authorized the stock repurchase program in November 2006, it had close to *$200 billion* in total assets (Fineman Decl. Ex. 25) and its stock was trading in the $38-40 range (Fineman Decl. Ex. 36).  According to the Complaint, Countrywide's stock repurchase program was executed in two parts, one repurchase in November 2006 and a second in May 2007 for a total expenditure of approximately $2.4 billion.  *See* Compl. ¶¶ 26-28.  At the time the stock repurchases were completed in May 2007, the Company had in excess of *$210 billion* in total assets (Fineman Decl. Ex. 32) and its stock was trading in the $38-41 range (Fineman Decl. Ex. 37).

## III.    The Consolidated, Amended, and Supplemental Verified Complaint

Plaintiffs filed the Complaint ostensibly on behalf of Countrywide without first making demand on Countrywide's Board of Directors as required by governing Delaware law.  Compl.

---

[7] This Court may take judicial notice of Countrywide's filings with the U.S. Securities and Exchange Commission.  *See, e.g.,* FED R. EVID. 201; *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (taking judicial notice of SEC filings on Rule 12(b)(6) motion).

9

¶¶ 3, 9. The gravamen of the Complaint is that Defendants breached their fiduciary duties by causing the Company to repurchase stock in November 2006 and May 2007 while supposedly aware of material non-public information about the future direction of the housing market, and while they themselves sold shares of Company stock. *Id.* ¶ 4.

Relying almost exclusively on graphs and data from an investor presentation Countrywide gave on *July 24, 2007* (*see* Compl. Exs. 1-4), plaintiffs claim that Defendants knew and failed to disclose in *November 2006* that (1) there was a "correlation" between the rate of home price appreciation and the likelihood of delinquencies, *i.e.*, "the more slowly that home prices appreciate, the greater are the chances of delinquency in mortgage loan payments"; (2) starting in the fourth quarter of 2005, "there began a sudden, long-term decline in the rate of home price appreciation, which signaled to Countrywide's Board that mortgage delinquencies were poised to rise"; and (3) given this negative impact on its lending business, the Defendants knew that Countrywide's stock was inflated above its true value. *Id.* ¶¶ 14-23.

According to plaintiffs, the "correct course of action" was for the Board "to disclose the material adverse changes in the housing market." *Id.* ¶ 26. Plaintiffs then allege that in authorizing the stock repurchase program, Defendants "caused Countrywide to pay substantially more for its stock than its value." *Id.* ¶¶ 26-28. Plaintiffs also claim that the stock repurchase had the effect of increasing the market price of Countrywide stock, benefitting those directors who sold stock during the relevant period. *Id.* ¶ 26. Plaintiffs, however, do not seek recovery of any trading profits, but "only for the [alleged] harm to Countrywide from the stock repurchases, leaving for others the recovery of [any such] profits." *Id.* ¶ 34.[8]

---

[8] The Complaint does not identify any specific "counts" or "causes of action" that plaintiffs are asserting. It therefore fails to satisfy even the most basic requirements of Federal Rule of Civil Procedure 10(b), which requires that "[e]ach claim founded upon a separate transaction or

10

**ARGUMENT**

I.    **THE FAILURE TO MAKE PRE-SUIT DEMAND REQUIRES DISMISSAL OF THE COMPLAINT.**

A.    **The Decision Whether to Initiate Litigation on Behalf of the Company Belongs to Countrywide's Board of Directors.**

A bedrock principle of Delaware corporate governance law is that "directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson*, 473 A.2d at 811; 8 Del. C. § 141(a). Because "[t]he decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation. . . . such decisions are part of the responsibility of the board of directors." *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990). In other words, "the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors." *Kamen*, 500 U.S. at 101.[9]

Delaware law thus requires that any shareholder seeking to bring derivative litigation on a company's behalf must first make demand on that company's board of directors. *See Aronson*, 473 A.2d at 811-12. The demand requirement "exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits." *Id.* As the Delaware Supreme Court has explained:

> The demand requirement serves a salutary purpose. First, by requiring exhaustion of intracorporate remedies, the demand requirement invokes a species of alternative dispute resolution procedure which might avoid litigation altogether. Second, if litigation is beneficial, the corporation can control the proceedings.

---

occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth."

[9] *See also Grimes v. Donald*, 673 A.2d 1207, 1215 (Del. 1996) ("it is the corporation, acting through its board of directors, which must make the decision whether or not to assert the claim"); *Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991) ("the directors of a corporation and not its shareholders manage the business and affairs of the corporation, and accordingly, the directors are responsible for deciding whether to engage in derivative litigation").

11

*Grimes*, 673 A.2d at 1216. The demand requirement is not merely a technical pleading hurdle. Rather, it "is a rule of substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." *Aronson*, 473 A.2d at 809. Rooted in "the allocation of governing powers within the corporation," the demand requirement aims "to protect the directors' prerogative to take over the litigation or to oppose it." *Kamen*, 500 U.S. at 101. Any other rule would permit shareholders unilaterally to undermine the Board's authority and usurp legal claims belonging to the corporation.

**B.    Shareholders Bear a Heavy Burden to Show Demand is Excused.**

Plaintiffs deliberately chose not to make demand on Countrywide's Board of Directors. *See* Compl. ¶ 9. That ends the issue, and the case, unless plaintiffs can demonstrate that "demand is excused because the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993). The Delaware courts, however, have narrowly defined the circumstances where demand may be excused. This is because, under the Business Judgment Rule, the board is entitled to a presumption that it will assess whether litigation should be brought on behalf of the corporation "on an informed basis, in good faith and in the honest belief that the action taken [will be] in the best interests of the company." *Aronson*, 473 A.2d at 812. To excuse demand, then, the burden squarely falls on plaintiffs. *See Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988).

To protect a board's right to determine whether to pursue claims on behalf of the company, both the Federal Rules of Civil Procedure and Delaware law require derivative plaintiffs to plead "with particularity" the factual circumstances that makes demand unnecessary. *See* FED. R. CIV. P. 23.1; *Spiegel*, 571 A.2d at 773. Because Countrywide is a Delaware corporation, Delaware law governs the substantive question of whether a plaintiff is excused

from making demand. *Kamen*, 500 U.S. at 108-09 (courts must apply the demand excusal exception "as it is defined by the law of the State of incorporation"). Under Delaware law, the test for demand futility turns on whether plaintiff's underlying claim challenges a specific board decision or transaction. *See Aronson*, 473 A.2d at 814-15; *Rales*, 634 A.2d at 934. Here, because the Complaint challenges a specific decision made by half or more of the Board of Directors at the time the suit was filed—the decision to authorize the stock repurchase program—the *Aronson* test applies. *See id.*

Under *Aronson*, demand is excused only when, "under the *particularized facts* alleged, a reasonable doubt is created that [a majority of]: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. This inquiry is of a "highly factual nature," and "must be decided by the trial court on a case-by-case basis." *Grobow*, 539 A.2d at 186.

In attempting to satisfy this test, plaintiffs face heightened—indeed, "stringent," "onerous," and "exacting"—pleading requirements. *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000); *In re Computer Scis. Corp. Deriv. Litig.*, 244 F.R.D. 580, 585-86, 591 (C.D. Cal. 2007). Mere notice pleading is insufficient; the complaint "must set forth . . . particularized factual statements," not empty rhetoric or conclusions. *Brehm*, 746 A.2d at 254; *see also Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991). Only "well-pleaded allegations of fact must be accepted as true; conclus[o]ry allegations of fact or law not supported by allegations of specific fact may not be taken as true." *Grobow*, 539 A.2d at 187; *Levine*, 591 A.2d at 207. Likewise, inferences that do not "logically flow from particularized facts . . . . [or] are not objectively reasonable cannot be drawn in the plaintiff's favor." *Beam v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004).

13

Given these strict requirements, demand will only be excused in "rare" cases. *Rothenberg v. Santa Fe Pac. Corp.*, No. Civ. A. 11749, 1995 WL 523599, at *7 (Del. Ch. Sept. 5, 1995). The heavy burden that Delaware law imposes on plaintiffs who contend demand should be excused as futile acts as "a screening mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms." *Grimes*, 673 A.2d at 1217. Plaintiffs are not allowed "to cause the corporation to expend money and resources in discovery and trial in the stockholder's quixotic pursuit of a purported corporate claim based solely on conclusions, opinions or speculation." *Brehm*, 746 A.2d at 255.

**C.    Plaintiffs Have Not Alleged The Required Particularized Facts Establishing Demand Futility.**

In this case, plaintiffs' demand allegations are boilerplate and generic, and fail to establish demand futility under *Aronson*. Plaintiffs have not alleged the requisite particularized facts—or any facts for that matter—demonstrating the interest or non-independence of *any* of the nine Countrywide directors at the time this case was filed, much less the required majority. Plaintiffs also have not alleged any facts, let alone particularized facts, showing that the stock repurchase program was not the product of a valid exercise of business judgment.[10]

**1.    Countrywide's Directors are Independent.**

Without any factual support, plaintiffs assert that a majority of the Board "lacked independence." Compl. ¶ 10. To excuse demand, however, plaintiffs must allege "*particularized facts*" showing the directors were "beholden" to an interested party, or "so under [another's] influence that their discretion would be sterilized." *Aronson*, 473 A.2d at 814-16; *Rales*, 634 A.2d at 936; *Kanter v. Barella*, 489 F.3d 170, 178 (3d Cir. 2007). Here, plaintiffs

---

[10]    *See Jacobs v. Yang*, No. Civ. A. 206-N, 2004 WL 1728521, at *3 (Del. Ch. Aug. 2, 2004) (demand not excused where interested directors did not comprise a majority of the board).

allege absolutely no facts at all. There are no allegations of domination, economic control, or anything else to suggest that the directors lack independence. Plaintiffs' entire independence argument consists literally of two conclusory words—"lacked independence." This "allegation does not provide particularized facts from which one may reasonably infer improper influence." *Beam*, 845 A.2d at 1053.[11]

### 2. Countrywide's Directors are Disinterested.

The directors are not "interested" for demand purposes simply because they are named as defendants in this case. It is well-established that "the mere threat of personal liability in the derivative action does not render a director interested." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995). Plaintiffs "may not bootstrap allegations of futility" just by pleading that "the directors participated in the challenged transaction or that they would be reluctant to sue themselves." *Blasband v. Rales*, 971 F.2d 1034, 1049 (3d Cir. 1992). *Accord Aronson*, 473 A.2d at 815-18; *Kanter*, 489 F.3d at 180. Were this not the case, plaintiffs "could readily circumvent the demand requirement merely by naming as defendants all members of the . . . board," which "would eviscerate Rule 23.1." *Lewis v. Graves*, 701 F.2d 245, 249 (2d Cir. 1983); *Grimes*, 673 A.2d at 1216 n.8. Instead, to show disqualifying interest, plaintiffs must plead particularized facts that demonstrate a "*substantial likelihood*" of director liability. *Rales*, 634 A.2d at 936; *In re Merck & Co. Sec., Deriv. & ERISA Litig.*, 493 F.3d 393, 402 (3d Cir. 2007); *Kohls v. Duthie*, 791 A.2d 772, 779 (Del. Ch. 2000) (emphasis added). Here, there is no likelihood of liability, substantial or otherwise, for breach of fiduciary duty or insider trading.

---

[11] Plaintiffs' claim that Countrywide's directors "sought to entrench themselves" by "maintaining a staggered or classified board" gets them nowhere. Staggered boards are explicitly permitted by Delaware law, and are not a sign of entrenchment or impropriety. *See* 8 Del. C. § 141(d); *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1186 (Del. Ch. 1998).

15

First, plaintiffs spend several paragraphs of the Complaint (¶¶ 14-25) suggesting what Countrywide should have disclosed about the housing market at the time of the stock repurchase program. Countrywide, however, had no state law duty to disclose any information in connection with authorizing the stock repurchase program. Under Delaware law, the Board's fiduciary duty of disclosure only applies "*when it seeks shareholder action.*" *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) (emphasis added). When the Board is not seeking shareholder action, there is "no distinctive state law duty to disclose material developments with respect to the company's business." *Kahn v. Roberts*, C.A. No. 12324, 1995 WL 745056, at *8-9 (Del. Ch. Dec. 6, 1995). As *Kahn* held, "[i]n the absence of required shareholder action, Delaware law simply has no application to boards' or directors' disclosures or omissions." *Id.* at *9. Here, shareholder approval for the stock repurchase program was not required, and none was sought. *See* Fineman Decl. Ex. 24 (Form 8-K). Because under *Stroud* and *Kahn* the Countrywide Board did not have a state law duty of disclosure with respect to the stock repurchase program, there can be no likelihood of liability for non-disclosure.

Second, even if Defendants had a duty to disclose, plaintiffs' assertion that the ongoing decline in home price appreciation was somehow "inside information" at Countrywide is non-sensical. *See* Compl. ¶ 26 ("[t]he correct course of action for [Defendants] . . . was to disclose the material adverse changes in the housing market"). To the contrary, the information that plaintiffs assert should have been disclosed was unquestionably *public information*. Home price data is published regularly by government agencies, private companies, and the media, and is freely and readily available to the public. *See, e.g.*, Fineman Decl. Exs. 3-20. Contrary to what the Complaint implies, at the time of Countrywide's stock repurchases in November 2006 and May 2007, it was public knowledge that the housing market was softening.

For instance, the following information (of which this Court can take judicial notice)[12]

was publicly available during the period relevant to this suit:

- Every month, the well-known rating and analysis firm Standard & Poor's releases the "S&P/Case-Shiller Home Price Index," which is widely considered "the leading measure of U.S. home prices."

  o As early as August 2006, this index showed "a continuing deceleration in average home prices," with "year-over-year gains shrinking." Fineman Decl. Ex. 3 (S&P report, Aug. 29, 2006).

  o In October 2006, the index showed more "erosion" in home price gains, which had fallen to their lowest level in nearly a decade. According to the index's chief economist, "[h]ome price gains definitely appear to be wearing away," as there had been steady declines "[f]or two years running." Fineman Decl. Ex. 5 (S&P report, Oct. 31, 2006).

  o Month after month, the index made it clear the negative trend was continuing, with headlines like "Cooling Home Prices Evident," "Home Prices Continue to Soften," "Wide Spread Home Price Declines Prevail," "Home Prices Flat or Declining," and "Persistent Declining Returns." Fineman Decl. Exs. 4, 6-9, 11 (S&P reports, Sept. 26, 2006, Nov. 28, 2006, Dec. 26, 2006, Jan. 30, 2007, Feb. 27, 2007, Apr. 24, 2007).

  o In March 2007, the index showed "home price composites plummeting into negative terrain." Fineman Decl. Ex. 10 (S&P report, Mar. 27, 2007).

---

[12] Under Federal Rule of Evidence 201, this Court may take judicial notice of public documents, government reports, and news articles when introduced by a party to show that the information contained in them was publicly available. *See, e.g., Anspach v. City of Philadelphia, Dept. of Public Health*, 503 F.3d 256, 273 n.11 (3d Cir. 2007) ("[c]ourts ruling on Rule 12(b)(6) motions may take judicial notice of public records"); *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (approving judicial notice of "newspaper articles . . . . to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true"); *County of Santa Clara v. Astra USA, Inc.*, No. C. 05-03740, 2006 WL 1344572, at *2 (N.D. Cal. May 17, 2006) (taking judicial notice of "various government [documents] . . . and news articles from *The Wall Street Journal*"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (judicial notice of market hardships, crashes); *D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003) (taking judicial notice of "well-publicized stock prices and market trends"); *Fellner v. Tri-Union Seafoods, L.L.C.*, No. Civ. A. 06-688, 2007 WL 87633, at *1-2 (D.N.J. Jan. 9, 2007) (taking judicial notice of publicly available government reports). Courts may also take judicial notice of the condition of the housing market. *See Cecena v. Allstate Ins. Co.*, No. C. 05-3178SF, 2007 WL 134245, at *6 (N.D. Cal. Jan. 16, 2007) ("the Court takes judicial notice of [the] housing rental market in general"); *In re Turretto*, 255 B.R. 884, 892 (Bankr. N.D. Cal. 2000) ("[t]he Court takes judicial notice of the extremely tight and expensive rental housing market").

- o  In April 2007, Standard & Poor's noted that "the deceleration and declines in home prices are showing no signs of turnaround." Fineman Decl. Ex. 11 (S&P report, Apr. 24, 2007).

- The Office of Federal Housing Enterprise Oversight, a federal government agency, publishes a quarterly report entitled the "OFHEO House Price Index," along with a detailed statistical report.

  - o  In September 2006, the OFHEO report noted a "sharp decline" in the rate of home price appreciation. It was the "largest deceleration in three decades," and the worst decline in the entire history of the OFHEO index. According to the report, this data was "a strong indication that the housing market is cooling in a very significant way." Fineman Decl. Ex. 12 (OFHEO report, Sept. 5, 2006).

  - o  In November 2006, the report was titled "House Price Appreciation Slows Further," and noted that "the rate of increase continued to slow and some areas experienced actual price declines." Fineman Decl. Ex. 13 (OFHEO report, Nov. 30, 2006).

  - o  In March 2007, the index showed that the "general trend of deceleration" was persisting. Fineman Decl. Ex. 14 (OFHEO report, Mar. 1, 2007).

  - o  In May 2007, the report noted that "[t]he rate of home price appreciation in the U.S. remained slow. . . . at the lowest rate in 10 years." Fineman Decl. Ex. 15 (OFHEO report, May 31, 2007).

- Every quarter, Freddie Mac (a for-profit business established by an Act of Congress to help ensure the availability of capital to residential mortgage lenders, *see* 12 U.S.C. §§ 1451 *et. seq.*) releases its "Conventional Mortgage Home Price Index."

  - o  In September 2006, this index reflected a significant "slowdown in house-price appreciation," and warned that "the slowdown in the housing market could become more abrupt over the next year." Fineman Decl. Ex. 16 (Freddie Mac report, Sept. 6, 2006).

  - o  In March 2007, the Freddie Mac index further showed "a substantial slowdown in home-value appreciation, and a drop in values in some markets." Fineman Decl. Ex. 17 (Freddie Mac report, Mar. 5, 2007).

- The U.S. Census Bureau, the Federal Housing Finance Board, and the National Association of Realtors also regularly published average and median sales prices for new and existing homes. *See* Fineman Decl. Exs. 18-20.

- The weakening housing market also was frequently discussed in the media during the period relevant to this lawsuit. Articles such as "Home-Price Rises Slow the Most in Over 30 Years," "Homes Post Price Drop for August," "New-Home Prices Fall Sharply," "When It Comes to House Prices, The Bloom Is Off the Cactus," and

"House Prices Slide as Property Glut Grows," "New Signs of Cooling in Housing," and "Realtors Expect Home Prices to Show First Annual Decline," all appeared in the *New York Times* and *Wall Street Journal* between September 2006 and April 2007. Fineman Decl. Ex. 21.

In short, the slow-down during the relevant period in the housing market was widely publicized throughout 2006 and 2007. This was not information peculiarly in the possession or control of Countrywide, but rather was well-known and in the public domain. The unequivocally public nature of the very information that plaintiffs claim Countrywide knew at the time of the stock repurchase transaction undermines plaintiffs' demand futility argument.

Third, although Countrywide "was not duty-bound to disclose general industry-wide trends easily discernible from information already available in the public domain," *In re Adams Golf Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004); *accord Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1323-24 (7th Cir. 1988); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 377 (3d Cir. 1993) ("the reasonable investor should have known of the economic downturn"), Countrywide itself repeatedly disclosed the information it had about the softening housing market and its effect on the Company's mortgage lending operations and the Company's expectations for the future. Repeatedly both before and after the Board authorized the stock repurchase program in November 2006, the Company stated in its public disclosures that home price appreciation was slowing, that loan originations were declining, and that payment delinquencies were rising.

For example, between August 2006 and May 2007, Countrywide made the following disclosures in its public filings with the SEC:

- August 9, 2006: "Countrywide's mortgage loan production volume was down 19 percent as compared to July 2005. The decline in purchase activity was consistent with our overall funding volume, *as the pace of home sales has slowed*. Fineman Decl. Ex. 22 (Form 8-K).

19

- September 14, 2006: August 2006 portfolio delinquency was 4.15%, compared to 3.68% in August 2005. Fineman Decl. Ex. 23 (Form 8-K).

- October 24, 2006: "We anticipate the fourth quarter of 2006 will be characterized by a *continued slowdown* in purchase volume beyond typical seasonality[13] . . . We also continue to expect that *margins will remain under pressure* and that pricing will remain competitive as the mortgage market consolidates." Fineman Decl. Ex. 24 (Form 8-K).

- October 24, 2006: "The *year-over-year increase in delinquencies and foreclosures* are primarily the result of portfolio seasoning, product mix and *changing economic and housing conditions*." Fineman Decl. Ex. 24 (Form 8-K).

- November 7, 2006: "The amount of total U.S. mortgage originations nationally declined 25% when compared to the third quarter of 2005; our mortgage loan production declined 22%. . . . Our total loan production volume decreased during the third quarter primarily due to the impact of the *slowing housing market* for purchase mortgages and higher interest rates on refinance mortgage loans." Fineman Decl. Ex. 25 (Form 10-Q).

- November 7, 2006: "*The U.S. housing market is undergoing a significant contraction* and both mortgage origination volumes and growth in total mortgage indebtedness is *likely to decline*." Fineman Decl. Ex. 25 (Form 10-Q).

- January 30, 2007: "Looking ahead to 2007, the industry will likely see *continued pressure on margins* as mortgage origination volumes decline and industry capacity is rationalized. We are also preparing for *increased borrower delinquencies and continued credit deterioration*." Fineman Decl. Ex. 26 (Form 8-K).

- January 30, 2007: "Management's outlook for 2007 contemplates that *current difficult market conditions will continue*. The Company believes the industry will experience *continued pressure on volumes, margins and housing prices, as well as increased defaults and foreclosures*. As a result, 2007 is anticipated to be a challenging year for the Company." Fineman Decl. Ex. 26 (Form 8-K).

- February 9, 2007: "Factors which could cause actual results to differ . . . [include] competitive and general economic conditions in each of our business segments such as *slower or negative home price appreciation. . .*." Fineman Decl. Ex. 27 (Form 8-K).

---

[13] As Countrywide disclosed in its SEC filings, Countrywide historically derived most of its revenues by securitizing and selling the mortgage loans that it made to institutional purchasers in the secondary market. This continued until late summer 2007 when the global capital markets experienced an unprecedented disruption leading to liquidity challenges for many businesses, including businesses in the mortgage industry. *See* Fineman Decl. Ex. 34 (Form 10-Q).

- March 1, 2007: "*[W]orsening economic conditions* increase the risk that our borrowers will not be able to repay our portfolio loans, and *worsening real estate market conditions* increase the risk that the value of the properties securing our loans will be insufficient to repay amounts owing to us in the event our borrowers default on the loans." Fineman Decl. Ex. 28 (Form 10-K).

- March 1, 2007: "*[I]ncreasing defaults and foreclosures*, along with *a slowdown in home price appreciation (or price depreciation in some markets)* and worsening economic conditions *may result in higher credit losses* in the future." Fineman Decl. Ex. 28 (Form 10-K).

- March 1, 2007: "*With the current contraction in the U.S. housing market* and *the resulting slowdown in price appreciation (or price depreciation in some markets)*, along with worsening economic conditions, *the credit losses we experience may increase* in the future. Fineman Decl. Ex. 28 (Form 10-K).

- March 12, 2007: "Aggressive industry underwriting guidelines and *lower home price appreciation* have resulted in *increasing delinquencies and defaults*." Fineman Decl. Ex. 29 (Form 8-K).

- April 12, 2007: March 2007 portfolio delinquency was 4.29%, compared to 3.68% in March 2006. Fineman Decl. Ex. 30 (Form 8-K).

- April 26, 2007: "Management believes that *considerable risks remain in the mortgage marketplace*, including but not limited to *potential further deterioration in the housing market that could impact origination volume and future credit costs*." Fineman Decl. Ex. 31 (Form 8-K).

- April 26, 2007: "The *year-over-year increase in total delinquencies and foreclosures is generally the result of softening housing market conditions*." Fineman Decl. Ex. 31 (Form 8-K).

- April 26, 2007: "*[T]urbulent mortgage market conditions had an adverse impact* on the Company's first quarter." Fineman Decl. Ex. 31 (Form 8-K).

- May 9, 2007: "*[T]he U.S. housing market is undergoing a significant contraction* and lenders and investors are tightening their credit standards. Therefore both mortgage origination volumes and growth in total mortgage indebtedness is *likely to slow* in the short-term." Fineman Decl. Ex. 32 (Form 10-Q).

- May 9, 2007: "*With the current contraction in the U.S. housing market and the resulting slowdown in price appreciation (or price depreciation in some markets)*, along with worsening economic conditions, *the credit losses we experience may increase* in the future. In 2007, we have observed a marked decline in credit performance." Fineman Decl. Ex. 32 (Form 10-Q).

(All emphases added.)

21

In addition to the disclosures that Countrywide made in the SEC filings noted above, each month during the relevant period Countrywide published detailed financial and operational statistics for a rolling 13-month period. These monthly reports included information regarding Countrywide's total loan originations and the level of delinquencies in its loan portfolio as compared to prior periods. Each of these reports thus reflected the effect that the decline in the home price appreciation was having on Countrywide's operations. *See, e.g.,* Fineman Decl. Exs. 22, 23, 27, 29, 30. Among other things, these reports showed loan delinquencies increasing from 4.15% in August 2006, to 4.50% in September 2006, to 4.57% in November 2006, to 5.02% in December 2006. *See* Fineman Decl. Ex. 27. In addition, as early as July 2006, Angelo Mozilo, Countrywide's CEO, had stated publicly that home prices were "down," and that he had "never seen a soft landing [for the housing market] in 53 years." Fineman Decl. Ex. 35 (*Wall Street Journal*, Aug. 8, 2006).

In short, there is no merit to plaintiffs' argument that demand should be excused because Defendants authorized Countrywide to repurchase its shares at prices that Defendants allegedly knew were higher than what Countrywide stock was then worth. Plaintiffs have not alleged any facts, let alone the requisite particularized facts, suggesting that Countrywide knew any information about the housing market that the public did not know and that Countrywide did not itself disclose.[14] Knowing the same information about the housing market conditions that Countrywide had, the stock market valued Countrywide shares at around $40/share at the time the Board authorized the stock buyback program in November 2006. Indeed, knowing the same information about the housing market that the Board did, the market still valued Countrywide

---

[14] Instead, plaintiffs' Complaint refers to information contained in a July 24, 2007 Countrywide presentation to investors (Compl. ¶ 16, Ex. 2) and there is nothing in the Complaint to show that at any earlier date Countrywide knew and failed to disclose the information.

stock at roughly the same $40/share price ten months later, at the beginning of July 2007. *See* Fineman Decl. Ex. 38 (stock price data).[15]

It is true that Countrywide's stock price has declined sharply since mid-August 2007. Rather than suggest that Defendants somehow knew in November 2006 that this decline would occur almost ten months later, the only inference that reasonably can be drawn from the allegations in the Complaint is that events beyond Countrywide's control or foreknowledge have caused its stock price to decline. This inference is further supported by the fact that the share prices of Countrywide's competitors have also dropped significantly during the same period.[16] As such, the words of the district court in *Tripp v. IndyMac Bancorp, Inc.*, Case No. CV 07-1635, 2007 U.S. Dist. LEXIS 95445, at *9-11 (C.D. Cal. Nov. 29, 2007), are especially apt here. Rejecting allegations that the precipitous drop in this mortgage lender's share price was caused by misstatements allegedly made by the lender concerning its financial condition, the district court observed that "an even stronger inference is that Defendants were simply unable to shield themselves as effectively as they anticipated from *the drastic change in the housing and mortgage markets.*" *See also* Fineman Decl. Ex. 34 (noting impact on Company's operations from unprecedented "disruptions in the U.S. mortgage market and the global capital markets, both of which [Countrywide] historically relied upon to finance [its] mortgage production").

<u>Finally</u>, to the extent plaintiffs contend that demand should be excused because the directors who sold face a substantial likelihood of liability relating to their trading, plaintiffs do not seek disgorgement of any trading proceeds. Instead, plaintiffs explicitly state that they "seek to recover only for the harm to Countrywide from the stock repurchases, leaving for others the

---

[15] The Court can take judicial notice of Countrywide's stock price information. *See, e.g., In re Merck & Co., Inc., Sec. Litig.*, 432 F.3d 261, 264 n.3 (3d Cir. 2005); FED. R. EVID. 201.

[16] *See* Fineman Decl. Ex. 38 ("Countrywide Financial Corporation Daily Closing Price & Value of the Standard & Poor's Supercomposite Thrifts and Mortgage Finance Index, 11/06-2/08).

23

recovery of the profits made by the individual defendants from their insider sales." Compl. ¶ 34. In any event, even if plaintiffs had chosen to pursue such a claim, the Complaint does not come remotely close to satisfying the strict test for demand futility.

Under Delaware law, there is no "common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information." *Guttman*, 823 A.2d at 502. Stock sales alone are not sufficient to call into question a director's disinterest. If they were, shareholders would be able to usurp the corporation's claim in virtually every case. *See id.* Rather, courts focus on whether "plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability" for insider trading. *Id.* Thus, to establish interest, "it must be shown that *each sale* by *each individual defendant* was entered into and completed *on the basis of, and because of,* adverse material non-public information." *Rattner v. Bidzos*, No. Civ. A. 19700, 2003 WL 22284323, at *11 (Del. Ch. Sept. 30, 2003) (emphasis added). In other words, plaintiffs must allege *specific facts* supporting two inferences: (1) the directors had *knowledge of* material non-public information, and (2) they "*consciously acted to exploit* such superior knowledge" by trading on it. *Guttman*, 823 A.2d at 502-05.[17] No such facts can be found anywhere in the Complaint here.

As detailed above, the Complaint fails to allege any facts showing "that these [] directors possessed information . . . that was materially different than existed in the marketplace at the time they traded." *Id.* The softening conditions of the housing market was widely known, public information, and Countrywide throughout the relevant period had disclosed both the information

---

[17] *See also id.* ("insider trading claims depend importantly on proof that the selling defendants acted with scienter"); *Rosenberg v. Oolie*, Civ. A. No. 11,134, 1989 WL 122084, at *3 (Del. Ch. Oct. 16, 1989) (insider trading requires showing that defendant "*use[d] his knowledge* to make a profit for himself") (emphasis in original); *Rattner*, 2003 WL 222843423, at *11 (same).

about market conditions that it had and the impact of those conditions on Countrywide's business operations. *See supra*, at 16-22. The Complaint's failure to allege any facts indicating that Defendants had knowledge of "non-public" information "is fatal to the plaintiffs' effort to show demand excusal." *Guttman*, 823 A.2d at 502-05.

Likewise, plaintiffs have alleged no facts, let alone particularized facts, that suggest any of the stock sales during the relevant period were "consciously" done to "exploit" whatever information they did have. As such, the Complaint "fails to allege any facts with particularity that would permit . . . a reasonable inference that the challenged sales were executed *upon the basis and because of* non-public information." *Rattner*, 2003 WL 22284323, at *12 (emphasis added). To excuse demand, courts require allegations regarding the specific timing of each sale, each defendant's prior trading patterns, the percentage of holdings sold by each defendant, and the relationship of each director's sales to permitted trading periods, options vesting periods, or the expiration of restrictions on marketability. *See Guttman*, 823 A.2d at 498, 503-04; *Rattner*, 2003 WL 22284323, at *10-12. Here, such facts are entirely absent, and thus there is no way to tell if the challenged stock sales were "unusual" or "suspicious" in any way. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999).

In fact, plaintiffs make no effort at all to analyze each trade individually. Rather, in one boilerplate paragraph, they simply allege three years' worth of stock sales data—including many sales that *pre-date* the approval of the stock repurchase program in November 2006 and are thus obviously irrelevant. *See* Compl. ¶ 31. For instance, plaintiffs challenge sales by Messrs. Cunningham, Robertson, Russell, and Snyder dating back to late 2005 and early 2006, long before the stock repurchases at issue. *See id.* Plaintiffs also challenge sales by Mozilo and Cisneros dating back to the summer of 2005, well over a year before the stock repurchase

25

program began and even before the Complaint claims the rate of home price appreciation began to slow. *See id.* ¶¶ 17, 31. These sales are irrelevant to this suit.

Moreover, many of the challenged stock sales were made pursuant to automatic trading plans established under SEC Rule 10b5-1. A Rule 10b5-1 plan "allows corporate insiders to set a schedule by which to sell shares" automatically at pre-determined times, and can "raise an inference that the sales were pre-scheduled and not suspicious." *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003); *see also Fishbaum v. Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023, at *4 (2d Cir. July 27, 1999); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1150-51 n.9 (W.D. Wash. 2006). Here, several Countrywide directors sold shares pursuant to Rule 10b5-1 plans, which further dilutes any inference of inappropriate conduct that plaintiffs seek this Court to draw. *See, e.g.,* Fineman Decl. Exs. 39-42 (selected Form 4s for Mozilo, Cunningham, Dougherty, Snyder).[18]

### 3.    Countrywide's Stock Repurchase Program Was an Otherwise Valid Exercise of Business Judgment.

Moving to the second prong of the *Aronson* test, plaintiffs allege that—even if the Board was disinterested and independent—Countrywide's stock repurchase program was not a valid exercise of business judgment because it constituted waste. *See* Compl. ¶¶ 12-13. This argument is without merit, and does not excuse plaintiffs' failure to make demand.

Stock repurchase programs are common, appropriate, and expressly authorized by Delaware law. *See* 8 Del. C. § 160(a) ("[e]very corporation may purchase, redeem, receive, take or otherwise acquire . . . its own shares"). Not only are they authorized, but "[c]orporate stock

---

[18] Because plaintiffs implicitly acknowledge that Countrywide repurchased its shares from third parties and not from the Board members, Defendants did not receive a personal financial benefit from the transaction that would raise a question about their disinterestedness. *See Rales*, 634 A.2d at 936.

repurchases . . . have become a common occurrence." T. Farber and W. Walton, CORP. COMMS. HANDBOOK § 4:18. Moreover, such transactions are presumptively protected by the Business Judgment Rule, as most business decisions by a board of directors are. *See Kahn v. Roberts*, 679 A.2d at 468; *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986).

As such, when assessing plaintiffs' argument that demand should be excused, the Court "must *presume* that the Board had a legitimate business purpose when it repurchased [Countrywide] stock," *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999) (emphasis added), and that the directors "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company," *Aronson*, 473 A.2d at 812. This is a "powerful presumption," and plaintiffs face a "heavy burden" to overcome it. *White v. Panic*, 783 A.2d 543, 551 (Del. 2001). Indeed, courts warn that the second prong of *Aronson* should be triggered only in "extreme cases" where "the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Highland Legacy Ltd. v. Singer*, No. Civ. A. 1566-N, 2006 WL 741939, at *7 (Del. Ch. Mar. 17, 2006); *In re Merck & Co.*, 493 F.3d at 403. The Complaint here contains no facts whatsoever that raise the prospect of rationally "inexplicable" judgment and "bad faith" in connection with approving what has become a common corporate finance technique.

Similarly, the doctrine of waste is "confined to *unconscionable* cases where directors *irrationally squander* or *give away* corporate assets." *Brehm*, 746 A.2d at 263 (emphasis added). Waste is "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Id.*; *Grobow*, 539 A.2d at 189. Plaintiffs must allege facts showing "a transfer of corporate assets that serves *no corporate purpose*, or for which *no consideration at all* is received." *Brehm*, 746 A.2d at 263;

27

*Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997) (emphasis added). If there was *any* consideration, and the Board made a good faith judgment that the transaction was justified, then "there should be no finding of waste." *Id.*

Plaintiffs here, however, have alleged no particularized facts that would support a claim for waste. Although the Board authorized repurchase of shares at prices that are higher than the price at which Countrywide shares trade today, hindsight second-guessing of otherwise reasonable business decisions is not a basis for avoiding making demand on a board. As the Delaware Chancery Court observed in *Ash v. McCall*, No. Civ. A. 17132, 2000 WL 1370341, at *10 (Del. Ch. Sept. 15, 2000):

> [T]his Court has stated on several occasions that mere allegations that directors made a poor decision—absent some showing of self-dealing or suspect motivation—does not state a cause of action, much less meet the standard for excusing demand under the second prong of *Aronson.*

Though plaintiffs "may disagree with the Board's judgment as to how this matter should have been handled," "mere disagreement cannot serve as grounds for imposing liability based on alleged breaches of fiduciary duty and waste." *Brehm*, 746 A.2d at 266. Because Countrywide's stock repurchase program was "a lawful transaction, within the corporation's powers, [and] authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes," it is not waste, "no matter how foolish the investment may appear in retrospect." *Gagliardi v. TriFoods Int'l, Inc*, 683 A.2d 1049, 1052 (Del. Ch. 1996).[19]

Finally, having failed to satisfy either prong of the *Aronson* test, plaintiffs make the remarkable observation that shareholders have "good reason" to forego demand, because if they make demand and it is refused, their challenge must focus on "the board's decision not to bring

---

[19] *See also Levine*, 591 A.2d at 207 ("If a board's decision can be attributed to any rational business purpose, a court will not substitute its judgment for that of a board").

the lawsuit" instead of "the underlying transaction." Compl. ¶ 9. Whether or not plaintiffs would prefer not to make demand, however, the fact is that Delaware law requires demand.[20]

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY.

Plaintiffs' failure to allege particularized facts demonstrating a basis for excusing demand is dispositive, requiring dismissal of this case in its entirety. That said, dismissal is required as well for the separate and independent reason that the Complaint fails to state a claim for breach of fiduciary duty. *See* FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). This "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.* at 1964. Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. *Accord Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997); *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 n.13 (3d Cir. 1998) (court need not credit "bald assertions," "legal conclusions," or "unwarranted inferences"). Moreover, because plaintiffs here allege that several directors sold their shares while aware of allegedly material, non-public information, plaintiffs are alleging fraud. Because their allegations sound in fraud, plaintiffs are required to plead the supporting facts "with

---

[20] Making matters worse, plaintiffs' counsel has a clear conflict of interest. In this derivative case, counsel is asserting a breach of duty claim on Countrywide's behalf; at the same time, counsel has filed a class action in Delaware Chancery Court asserting breach of duty claims *against* Countrywide, in connection with the proposed Bank of America acquisition. *See Freedman v. Countrywide Fin. Corp.*, Case No. 3464-VCN (Del. Ch., filed Jan. 14, 2008). This conflict is not just hypothetical—it directly affects the substantive issues in both cases. Here, counsel contends that Countrywide's stock price was inflated at the time of the stock repurchase program ($38-40), and that its true value was substantially less than that price (Compl. ¶ 4); in *Freedman*, counsel argues that Bank of America's acquisition price ($7.16) is too low, and uses the stock repurchase program as one of several metrics suggesting Countrywide's value is much higher. *Compare* Compl. ¶¶ 26-36 *with Freedman* Compl. ¶ 21.

particularity." FED. R. CIV. P. 9(b); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417-18 (3d Cir. 1997). Plaintiffs have not adequately alleged breach of fiduciary duty, regardless of whether their allegations are reviewed under *Twombly* or under Rule 9(b).

First, to the extent plaintiffs are asserting a claim for breach of the duty of care, any such claim would be barred by the express provisions of Countrywide's Certificate of Incorporation. As permitted by Delaware General Corporation Law § 102(b)(7), Countrywide's Certificate of Incorporation contains a provision eliminating the personal liability of directors for breaches of the duty of care, including claims for "gross negligence." *See* 8 Del. C. § 102(b)(7); Fineman Decl. Ex. 43 at 4; *Malpiede v. Townson*, 780 A.2d 1075, 1094-95 (Del. 2001). Likewise, Defendants did not have any state law duty of disclosure in connection with the stock repurchase program because shareholder action was neither sought nor required. *See supra*, at 16; *Stroud*, 606 A.2d at 84; *Kahn*, 1995 WL 745056, at *8-9.

Second, plaintiffs' factual allegations do not support a claim for breach of the duty of loyalty. To state a duty of loyalty claim, plaintiffs must allege facts showing that the defendants "either (1) stood on both sides of the transaction and dictated its terms in a self-dealing way, or (2) received in the transaction a personal benefit that was not enjoyed by the shareholders generally." *In re Coca-Cola Enters., Inc.*, C.A. No. 1927-CC, 2007 WL 3122370, at *4 (Del. Ch. Oct. 17, 2007); *Chaffin v. GNI Group, Inc.*, No. Civ. A. 16211-NC, 1999 WL 721569, at *5 (Del. Ch. Sept. 3, 1999). No such facts are alleged here. The Company did not enter into the stock purchase transactions with the directors (*see* Compl. ¶¶ 26-29), and to the extent the Complaint alleges that the repurchase program "helped to keep the [stock] price up," any impact on the share price (even if true) would have "devolve[d] upon the corporation or all stockholders

30

generally." Compl. ¶¶ 26-27; *Aronson*, 473 A.2d at 812.[21] Likewise, it is well-settled that stock sales between directors and marketplace buyers do not constitute self-dealing for purposes of assessing whether demand should be excused. *See Guttman*, 823 A.2d at 502.

Finally, no facts are alleged that would support a waste claim. Stock repurchase programs are expressly authorized by Delaware law. *See* 8 DEL. C. § 160; *Kahn*, 679 A.2d at 468. Here, the Company repurchased Countrywide shares at their fair market value, and the Complaint alleges no facts suggesting that no rational person would have repurchased Countrywide shares at that price at that time. *Brehm*, 746 A.2d at 263.

## III. PLAINTIFFS' FAILURE TO ADEQUATELY ALLEGE STANDING REQUIRES DISMISSAL.

The Complaint should be dismissed for the additional reason that it fails to adequately allege plaintiffs' standing to bring this lawsuit. Under Federal Rule of Civil Procedure 23.1, plaintiffs must allege with particularity that they were Countrywide shareholders "at the time of the transaction complained of." FED. R. CIV. P. 23.1; *see also Kanter*, 489 F.3d at 176 n.5. Courts have interpreted this to require plaintiffs to allege *when* they bought company shares. *See, e.g., Sagent Tech.*, 278 F. Supp. 2d at 1096 (to properly plead standing, the complaint "must indicate *when* plaintiffs bought stock"). Plaintiffs make no such allegation in the Complaint. Instead, plaintiffs generically allege that they "were stockholders at the time of the wrongs alleged herein, and have been such continuously since then." Compl. ¶ 5. That is not enough.

Courts routinely reject non-specific allegations of stock ownership like those asserted here. In *Computer Scis. Corp.*, the court held that vague allegations that each plaintiff was a

---

[21] In any event, the allegation that the transaction was effected in November 2006 to "keep the [stock] price up" makes no sense. Compl. ¶ 26. At the time the repurchase transactions were approved, Countrywide's stock price was not going down. To the contrary, it had been steadily rising and stayed in the same range for months afterwards. *See* Fineman Decl. Ex. 36, 38 (stock price data).

shareholder "at all times relevant" or "during the relevant period" were "insufficient to allege contemporaneous ownership during the period in which the questioned transactions occurred." 2007 WL 1321715, at *15. In *Marron ex rel. Stewart & Stevenson Servs., Inc. v. Ream*, No. Civ. A. H-06-1394, 2006 WL 2734267, at *4 (S.D. Tex. May 5, 2006), the court dismissed on standing grounds because plaintiff had only alleged that he was a shareholder "at all relevant times." In *In re VeriSign, Inc. Deriv. Litig.*, No. C 06-4165 PJH, 2007 WL 2705221, at *24-25 (N.D. Cal. Sept. 14, 2007), the court refused to accept the allegation that plaintiffs "owned VeriSign stock during the Relevant Period . . . and continue to own the Company's common stock," ruling instead that "plaintiffs must unambiguously indicate . . . the dates they purchased VeriSign stock." Here, plaintiffs' failure to allege when they became Countrywide shareholders is another ground for dismissal of the Complaint.

32

## CONCLUSION

Defendants respectfully request that the Consolidated, Amended, and Supplemental Verified Complaint be dismissed with prejudice for failure to make demand on the Countrywide Board of Directors and for the other reasons addressed above. Fundamentally, the Complaint fails to allege the particularized facts required by Delaware substantive law that call into question either the disinterestedness of the directors or the good faith business judgment of the Board in approving the repurchase of the Company's stock. As such, demand should have been made, and this action should be dismissed.

Thomas A. Beck (#2086)
beck@rlf.com
Steven Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19801
(302) 651-7700

OF COUNSEL:

Brian E. Pastuszenski
Stuart M. Glass
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
(617) 570-1000

*Attorneys for Defendants Angelo R. Mozilo, Henry G. Cisneros, Robert L. Donato, Harley W. Snyder, Jeffrey M. Cunningham, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, Keith P. Russell, and Nominal Defendant Countrywide Financial Corporation*

Dated: February 27, 2008

33

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2008, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

Robert D. Goldberg, Esquire
Biggs & Battaglia
921 North Orange Street
P.O. Box 1489
Wilmington, DE 19899

Edward P. Welch, Esquire
Edward B. Micheletti, Esquire
Skadden, Arps, Slate, Meagher & Flom
LLP
One Rodney Square, P.O. Box 636
Wilmington, DE 19899-0636



Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Fineman@rlf.com

RLF1-3257666-1