IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION DERIVATIVE LITIGATION | ) ) ) ) ) ) |

C.A. No. 07-372-SLR (MPT)

(Consolidated Action)

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS AND TO TRANSFER VENUE
OR IN THE ALTERNATIVE STAY**

ROBERT D. GOLDBERG (#631)
921 North Orange Street
Wilmington, DE 19899
Tel: (302) 655-9677
Fax: (302) 655-7924
goldberg@batlaw.com

*Attorneys for plaintiffs*

*Of Counsel:*
Barrack, Rodos & Bacine
Alexander Arnold Gershon
Regina M. Calcaterra
Gloria Kui
1350 Broadway, Suite 1001
New York, New York 10018
(212) 688-0782

Barrack, Rodos & Bacine
Daniel E. Bacine
William J. Ban
3300 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-0600

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING .................................................................. 1

SUMMARY OF ARGUMENT .......................................................................................... 4

STATEMENT OF FACTS ............................................................................................... 4

   1.    The Parties ........................................................................................................ 4

ARGUMENT ................................................................................................................. 9

   I.     Plaintiffs Have Adequately Alleged Standing to Bring Suit ..................................... 9
   II.    Pre-suit Demand Is Excused .................................................................................. 10
   III.   The Consolidated Complaint States a Claim For Relief Under Delaware Law ... 15

     A.   THE BASIS OF LIABILITY ........................................................................... 15

     B.   THE MEASURE OF RELIEF ........................................................................... 18

   IV.   DEFENDANTS' MOTION TO TRANSFER VENUE UNDER 28 U.S.C. §1404(a) SHOULD BE DENIED ........................................................................................ 19

     A.   THE PROPONENT OF A MOTION TO TRANSFER HAS THE BURDEN ................ 19

     B.   THE CALIFORNIA DERIVATIVE ACTION IS INFERIOR TO PLAINTIFFS' CASE .......... 20

     C.   CONVENIENCE AND FAIRNESS WEIGH IN FAVOR OF KEEPING THIS ACTION IN THE DISTRICT OF DELAWARE ........................................................................ 20

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*American Trade Partners, L.P. v. A-1 Intern. Importing Enterprises, Ltd.*, 755 F.Supp. 1292

    (E.D.Pa. 1990)..................................................................................................................26

*Applebaum v. Avaya, Inc.*, 812 A.2d 880 (Del. Supr. 2002)..................................................16, 20

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984).......................................................................12, 13

*Ash v. McCall*, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000) ....................................................27

*Automotive Technologies Int'l, Inc. v. American Honda Motor Co., Inc.*, 2006 WL 3783477 (D.

    Del. 2006) .................................................................................................................25

*Bayly Mfg. Co. v. Koracorp Industries, Inc.*, 298 F.Supp. 600 (D. Colo 1969) ..........................28

*Blasband v. Rales*, 971 F.2d 1034 (3d Cir. 1992)................................................................11, 27

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ............................................................................12

*Chrysogelos v. London*, 1992 WL 58516 (Del. Ch. Mar. 25, 1992)......................................12, 17

*Desimone v. Barrows* , 924 A.2d 908 (Del. Ch. 2007) ..............................................................11

*Dollar Discount Stores of America, Inc. v. Petrusha*, 2001 WL 881725 (E.D. Pa. Apr. 25, 2001)

    ..................................................................................................................................26

*EEOC v. Univ. of Pa.*, 850 F.2d 969 (3d Cir. 1988) ..................................................................26

*Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215 (2d Cir. 1978) ................................................26

*General Elec. Co. by Levit v. Cathcart*, 980 F.2d 927 (3d 1992) ................................................30

*Guth v. Loft, Inc.*, 5 A.2d 503 (Del. Supr. 1939) ......................................................................18

*Guttman v. Huang*, 823 A.2d 492 (Del.Ch. 2003)...............................................................passim

*Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990) ......................................................................14

*Hewlett v. Davis*, 844 F.2d 109 (3d Cir. 1988) ........................................................................28

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) ......................................................29

*In re Amendt*, 2006 U.S. App. LEXIS 3944 (3d Cir. Feb. 16, 2006)............................................23

*In re General Motors Class E Stock Buyout Litigation*, 790 F.Supp. 77 (D. Del. 1992) ............14

*In re Oracle Corp. Derivative Litig.*, 867 A.2d 904 (Del.Ch. 2004) .................................3, 15, 29

*In re Primedia, Inc.*, 910 A.2d 248 (Del. Ch. 2006)............................................................18, 22

*In re Sagent Tech. Inc., Deriv. Litig.*, 278 F. Supp. 2d. 1079 (N.D. Cal. 2003) ..........................10

*In re Verisign*, 2007 U.S. Dist. LEXIS 72341 (N.D. Cal. 2007) ...................................................11

*In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. Supr. 2006) ......................................20, 21

*Jumara v. State Farm Insurance Company*, 55 F.3d 873 (3d Cir. 1995) ..............................23, 25

*Kahn v. Tremont Corp.*, 1996 WL 145452 (Del. Ch. Mar. 21, 1996) .........................................16

*Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90,111 S.Ct. 1711 (1991) ........................11

*Kanter v. Barella*, 489 F.3d 170 (3d Cir. 2007)..........................................................................10

*Leboyer v. Greenspan*, 2007 WL 4287646 (C.D. Cal. Jun. 13, 2007)...................................13, 28

*Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984)......................................................................10, 27

*Malone v. Brincat*, 722 A.2d 5 (Del. 1998) ................................................................................16

*Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007) ....................17

*Norte & Co. v. Huffines*, 288 F.Supp. 855 (S.D.N.Y. 1968) ........................................................17

*Norte & Co. v. Huffines*, 304 F.Supp. 1096 (S.D.N.Y. 1968), *new trial denied*, 288 F.Supp. 855

    (S.D.N.Y. 1968) *aff'd in part, remanded in part*, 416 F.2d 1189 (2d Cir. 1969), *cert. denied*,

    397 U.S. 989 (1970)...............................................................................................................19

*O'Neill v. Maytag*, 339 F.2d 764 (2d Cir. 1964) .........................................................................18

*Prince v. Palmer*, 148 Fed.Appx. 249 (6th Cir. July 13, 2005) ....................................................28

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) .............................................................................13

*Rattner v. Bidzos*, 2003 WL 22284323 (Del.Ch. Oct. 7, 2003) ....................................................3

*See Corwin v. Silverman*, 1999 WL 499456 (Del. Ch. June 30, 1999) .......................................27

*Siegman v. Tri-Star Pictures, Inc.*, 1989 WL 48746 (Del. Ch. May 5 (revised May 30), 1989).12

*Strassburger v. Earley*, 752 A.2d 557 (Del. Ch. 2000) ...............................................................22

*Thorpe v. Cerbco, Inc.*, 676 A.2d 436 (Del. Supr. 1996).......................................................18, 22

*Van Dusen v. Barrack*, 376 U.S. 612 (1964) ...............................................................................28

*Victor v. Manning*, 128 F.2d 415 (3d Cir. 1942) ........................................................................28

*Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) ..................................................................19

*Zelenkofske Axelrod Consulting v. Stevenson*, 1999 WL 592399 (E.D.Pa. Aug. 5, 1999)..........26

## Regulations

17 C.F.R. §240.10b5-1(c) ...............................................................................................................3

## Rules

Federal Rule Of Civil Procedure 23.1....................................................................................9, 10

## Treatises

15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*

§3853 (2d ed. 2004) ................................................................................................................21

## Other Authorities

Hillary A. Sale, *Delaware's Good Faith*, 89 CORNELL L. REV. 456 (2004)................................17

United States House of Representatives, Committee on Oversight and Government Reform,

Memorandum (March 6, 2008).................................................................................................7

## NATURE AND STAGE OF THE PROCEEDING

Defendants have filed three pretty good briefs with a total of 80 pages – except that these briefs challenge the complaint that the defendants **wish** that the plaintiffs had filed, not the actual complaint.[1]

This is a consolidated stockholders' derivative action on behalf of Countrywide Financial Corporation, a Delaware corporation ("Countrywide" or the "Company"), against its directors. It alleges one cause of action, for breach of the duty of loyalty. Specifically, at a time when the board of directors caused Countrywide to repurchase more than 60 million shares of its own stock, or 9.75% of the total outstanding, at nearly $40 per share, costing Countrywide $2,372,152,000, in cash, a majority of the board sold their own shares of Countrywide stock to realize proceeds of approximately $373 million. At the time of the repurchases the board of directors was in possession of facts concerning material adverse changes in Countrywide's business and assets. Countrywide itself had assembled those facts. These facts were not in the possession of the public. When these facts became public, the value of Countrywide's stock fell to less than $20 per share. In at least the previous 15 years, Countrywide had never repurchased any of its stock. Jurisdiction is based on diversity. The claim is based on Delaware law.

Plaintiff IBEW commenced its action on June 12, 2007 on the basis of federal question jurisdiction, supplemental jurisdiction, and diversity. Plaintiff IBEW e-filed an amended complaint on September 14, 2007. D.I. 8. Plaintiff Blumberg commenced his action on November 6, 2007, also on the basis of federal question jurisdiction, supplemental jurisdiction, and diversity. The amended IBEW complaint and the Blumberg complaint were substantially identical. The Blumberg complaint added two individual defendants, i.e., Kathleen Brown, who was a Countrywide director

---

[1] The Complaint is the Consolidated, Amended, Supplemental Complaint that the plaintiffs e-filed on February 13, 2008. D.I. 37. It is sometimes referred to herein as the "Consolidated Complaint."

1

during 2006 until March 29, 2007, and David Sambol, who became a Countrywide director on September 26, 2007. It also added allegations concerning Countrywide's issuance of convertible preferred stock on August 22, 2007.

On January 14, 2008 the Plaintiffs filed a motion for partial summary judgment on the claim that the individual defendants, as officers and directors of Countrywide breached their fiduciary duty of loyalty to Countrywide. The defendants filed a motion to stay all proceedings on January 18, 2008. In a telephone conference held on January 24, 2008, this Court denied plaintiffs' motion for partial summary judgment as premature, with leave to re-file if and when appropriate.

By orders entered January 31, 2008, the court consolidated these cases (D.I. 33), appointed lead and liaison counsel and provided for the Consolidated Complaint (D.I. 34), and denied plaintiffs' motion for summary judgment, set a briefing schedule, and provided for discovery. D.I.. 35. In addition to the claim concerning Countrywide's repurchase of its own stock, there were claims that the directors distributed proxy statements for the 2006 and 2007 annual meetings of stockholders seeking the re-election of directors of a staggered board. These proxy statements were materially false or misleading in that they materially understated the compensation of the CEO, defendant Angelo R. Mozilo. It was also alleged that the compensation committee of the board of directors granted stock options to CEO Mozilo that were inconsistent with his employment contract and that it paid him compensation that was grossly excessive.

The Consolidated Complaint eliminates every claim except the repurchase claim, in order to present a straightforward case to recover for the directors' breach of their fiduciary duty of loyalty under Delaware law. The eliminated claims raise intricate questions arising under the new 2006 regulations of the United States Securities & Exchange Commission ("SEC") concerning proxy

2

statements. They raise complex questions of the California law of contract construction and interpretation. They present esoteric issues of fact as to the proper application of a new accounting rule requiring expert testimony on, *inter alia*, established principles of financial economic theory. And what is more, the amount in controversy on the eliminated claims, though substantial, is a small fraction of the amount in controversy on the repurchase claim.

The amount in controversy on the eliminated claims is approximately $150 million. On the repurchase claim, applying a rescissory measure of recovery, the amount could exceed $3 billion. Complaint ¶¶1, 34-36.

What the Complaint does not allege, but what the defendants wish it did and argue against, is a claim that directors sold their Countrywide stock on the basis of material, inside, adverse information. Whether under state law, *see In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 954 (Del.Ch. 2004), *affd. mem.*, 872 A.2d 960 (Del. April 14, 2005) (mad "ravings of conspiracy theorists"); *Rattner v. Bidzos*, 2003 WL 22284323 (Del.Ch. Oct. 7, 2003); *Guttman v. Huang*, 823 A.2d 492 (Del.Ch. 2003), or federal law, in order to urge an affirmative defense based on a prearranged plan to sell stock under 17 C.F.R. §240.10b5-1(c).

Nor does the Complaint allege that the directors made false or misleading statements and omitted material facts under the federal securities laws (rendering useless the defense under 17 C.F.R. §240.10b5-1) or that they violated their fiduciary duty of disclosure under Delaware law, although the defendants wish it did and base much of their argument upon such imaginary claims. See Mozilo brief at 16-26, 29-30; Dougherty and Brown brief at 13, 16, 21.

## SUMMARY OF ARGUMENT

1.     Pre-suit demand on the board of directors is excused because the directors caused the Company to repurchase nearly 10 percent of its outstanding common stock at times when they, individually, sold their own Company stock.  At the same time, they were in possession of facts about material adverse changes in the Company's business.

2.     The directors breached their duty of loyalty to Countrywide. This was a breach of that duty in the classic sense, in that the directors preferred their own adverse self-interest to the interest of Countrywide.

3.     The Defendants fail to establish a transfer from the District of Delaware to the Central District of California or a stay would serve the interests of justice.

## STATEMENT OF FACTS

**1.     The Parties**

The plaintiffs have been stockholders of Countrywide at all relevant times. Complaint ¶5. Plaintiff IBEW is a pension fund. Plaintiff Blumberg is an individual stockholder of the Company. He has been a stockholder since May 5, 2004 and continuously to date. See Declaration of Adam Blumberg, dated March 25, 2008, and submitted herewith.

The Company is incorporated in the State of Delaware. The Company's stock is listed on the New York Stock Exchange. As of September 30, 2006, shortly before the repurchases began, Countrywide reported in its unaudited financial statement on SEC Form 10-Q that it had 616,748,918 shares of common stock outstanding. Complaint ¶28. Through its subsidiaries, Countrywide is engaged in mortgage lending and other real estate finance related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities, and insurance underwriting. Complaint ¶6.

4

The individual defendants are current or former members of the Company's board of directors. Eleven individual defendants, i.e., all but David Sambol, were directors on November 9, 2006, when they caused Countrywide to repurchase 38 million of its shares. Complaint ¶¶7, 26. When IBEW filed its complaint on June 12, 2007, the board consisted of defendants Mozilo, Cisneros, Donato, Snyder, Cunningham, Melone, Parry, Robertson, Russell, and Dougherty. On November 6, 2008 (Blumberg complaint filed), the board consisted of defendants Mozilo, Donato, Snyder, Cunningham, Melone, Parry, Robertson, Russell, and Sambol.

As a mortgage lender on single family homes, Countrywide has carefully studied the risk of delinquencies on loan repayments, which can lead to defaults. It has found that for all kinds of loans, serious delinquency rates rise the more slowly that home prices appreciate. And when home prices do not just rise more slowly, but actually decline, the chance of mortgage delinquency skyrockets. These are facts of cardinal importance to a mortgage lender. Complaint ¶¶14-16.

Countrywide actually has quantified these facts and prepared graphs to show the correlation. Complaint ¶15. An example of such graphs are shown as Exhibit 1 to the Complaint. A color print of those graphs was filed on January 15, 2008. D.I. 21. They show the same correlation for all kinds of loans, i.e., first mortgages, second mortgages, prime loans and sub-prime loans. They also show that, even when home prices are appreciating, the risk of mortgage delinquency rises if the *rate* of appreciation declines. Complaint ¶16.

By the fourth quarter of the year 2005 there suddenly began a long-term decline in the rate of home price appreciation. Since 1992, there had been an increase in that rate, but in 2005 it reversed. Complaint ¶¶17-21, Exhibits 3, 4; *see also* the color prints of those exhibits at D.I. 21. By November 2006, the rate of home price appreciation had declined since 2005 from more than 12 percent (Complaint Exh. 4), to less than 4 percent. By May 2007 home prices had begun negative

appreciation, i.e., they were falling. Complaint ¶22. By then, mortgage delinquencies had already

risen. Complaint ¶22. It was not, as the Mozilo brief at 10 says, that the directors were "aware of

material non-public information about the **future direction** of the housing market." (boldness

added). By that time, Countrywide was already in crisis.

The individual defendants who were on Countrywide's board of directors and David Sambol,

who was then a senior officer, had possession of the facts concerning home price movements and

their effect on mortgage delinquencies, for they were "actively engaged in every significant issue

facing the company." Complaint ¶24. Countrywide's directors have paid themselves "far above the

median range," (Complaint ¶24), and they have justified this because they have "always been

actively engaged in overseeing the Company's senior management and business strategy." Complaint

¶25.

The Complaint does not allege how long a period it took to plan the repurchase because that

fact was not public. But the Declaration of Susan E. Bow, ¶4, D.I. 43, recites that the repurchase in

November 2006 "was the result of more than one year of planning and analysis ... and involved

various presentations to and discussions with the Board of Directors." This suggests that the board

had sufficient opportunity between late 2005 and November 2006 to review the repurchase in the

context of the steady and precipitous deterioration of Countrywide's mortgage portfolio and to plan

their sales of their own Countrywide stock.

The Mozilo brief at 9 refers to a Countrywide announcement in October 2006 that the stock

repurchase program was to proceed. The brief refers to Fineman Declaration, D.I. 48, Exhibit 24,

which is from an SEC Form 8-K that says that the share repurchase program had been previously

announced. It declines to give the date of that previous announcement, or the place. So, the market

was conditioned with knowledge of the repurchase. On November 9, 2006, the individual

defendants, acting as Countrywide's board of directors, caused Countrywide to repurchase 38,639,876 shares for $1,508,596,000, or $39.04 per share (Complaint ¶26.) And then, in May 2007, Countrywide's board of directors caused it to repurchase 21,503,512 shares of its common stock for $863,556,000, or $40.16 per share. At the time of the May 2007 repurchase, home prices nationally were in year-over-year decline for the first time in 30 years. Countrywide's total expenditure to repurchase its stock, in November 2006 and May 2007 was $2,372,152,000. (Complaint ¶27.)

During the period of decline in the rate of appreciation of home prices, beginning with the planning of the repurchase, a majority of the directors sold thousands of their own shares of Countrywide stock for many millions of dollars. (Complaint ¶¶30-31, Exhibit 7.) They were defendants Mozilo, Dougherty, Snyder, Robertson, Cunningham, Donato, Cisneros, Russell, and Sambol. The Complaint is silent as to sales by defendants Melone, Parry, and Brown, but they have not denied that they or their family members made sales.

Countrywide's repurchase of 38 million shares in November 2006 and 21 million shares in May 2007 helped to keep the price up, to the benefit of the directors who were in the process of selling their own Countrywide stock. Complaint ¶¶26, 27; United States House of Representatives, Committee on Oversight and Government Reform, Memorandum at 15 and 22 (March 6, 2008) (finding that these two repurchase caused an increase in the price of Countrywide stock to the benefit of CEO Mozilo), attached as Exhibit 1, Gershon Declaration, submitted herewith. In these two repurchases, Countrywide bought more than 60 million of its own shares, nearly 10 percent of the total outstanding. Complaint ¶28.

The Mozilo brief, at 9, makes the lame assertion that at the time of the repurchases, Countrywide had total assets of *$200 billion* (italics in that brief), implying that $2.4 billion out of $200 billion is *de minimus*. But the proper measure for this highly leveraged company is

stockholders' equity of approximately $15 billion or market capitalization of approximately $24 billion. See Fineman Declaration, Exhibits 25, 32, and 37, cited in the Mozilo brief at 9.

It might be true, as the defendants suggest, that some public Delaware companies routinely repurchase their own stock under DGCL §160, Mozilo brief at 2, Dougherty brief at 20, but Countrywide is not one of them. Countrywide's financial statements reflect that, at least since March 1, 1991, it had never redeemed or repurchased any of its common stock until November 9, 2006. Complaint ¶29.

Defendants also fail to demonstrate adequate grounds in their motion to transfer the present action to the United States District Court for the Central District of California, and the court should deny their motion. Moreover, the plaintiffs in this action are first to file compared to the California Derivative Action. The California Derivative Action's 200-page complaint also contain defects and is filled with extraneous allegations, including ones regarding deficiencies in the proxy statements that will not survive a motion to dismiss. (CDC Complaint ¶¶ 539-547). Plaintiffs will suffer great prejudice if this action is transferred and consolidated into a case in which the California plaintiffs will lose in, or at least, cause great delay for obtaining relief. Nor have defendants shown grounds for a stay.

## ARGUMENT

### I.    Plaintiffs Have Adequately Alleged Standing to Bring Suit

Federal Rule Of Civil Procedure 23.1 requires that plaintiffs "allege that the plaintiff was a shareholder . . . at the time of the transaction complained of[.]" Here Plaintiffs did just that. ¶ 5. Defendants contend that more detailed pleading is required of plaintiffs. They are mistaken, but even if the Court should determine in their favor, such a determination is not fatal to plaintiffs' case because, as set forth in the Blumberg Decl, submitted herewith, Plaintiff Blumberg has continuously held stock in Countrywide since May 5, 2004 and thus has standing to prosecute the claims set forth in the Consolidated Complaint.

Defendants' contention that plaintiffs have failed to meet the requirements of Rule 23.1 finds no support in controlling case law. The only decision from this circuit cited in support of their contention, *Kanter v. Barella*, 489 F.3d 170 (3d Cir. 2007), stands for the uncontroversial position that in order to file a derivative shareholder action pursuant to Rule 23.1, "the plaintiff must allege ownership of shares, or subsequent ownership by operation of law, at the time of the challenged transaction." *Id. at* 176 n.5.[2] Plaintiffs did so in the Consolidated Complaint and Plaintiff Blumberg has verified and confirmed his continuous ownership in the Blumberg Decl. Defendants' reliance on *Lewis v. Anderson*, 477 A.2d 1040, 1049-50 (Del. 1984), is entirely misplaced as *Lewis* stands for the position that "a plaintiff who ceases to be a shareholder . . . loses standing to continue a derivative suit." Here, as is alleged in the Consolidated Complaint and confirmed in the Blumberg Decl, Plaintiff Blumberg is a continuous stockholder in Countrywide. ¶ 5. Defendants' reliance on both *Desimone v. Barrows* , 924 A.2d 908 (Del. Ch.

---

[2] Notably, while the Third Circuit Court of Appeals cited *In re Sagent Tech. Inc., Deriv. Litig.*, 278 F. Supp. 2d. 1079 (N.D. Cal. 2003) for other purposes in its *Kanter* opinion, the Court did not adopt the *Sagent* Court's position on pleading of ownership. *See Kanter* at 475.

2007) and *In re Verisign*, 2007 U.S. Dist. LEXIS 72341 (N.D. Cal. 2007) is similarly misplaced as both cases address instances in which the plaintiffs were clearly not stockholders at the time of the challenged transactions. Here again, the Blumberg Decl. renders these cases inapplicable.

## II.    Pre-suit Demand Is Excused

In this stockholders' derivative action in federal court, Rule 23.1 of the Federal Rules of Civil Procedure provides the pleading standards for the pre-suit demand allegations, and state law governs the substance of the requirement to make demand. Fed.R.Civ.P. 23.1; *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 98-99, 111 S.Ct. 1711 (1991); *Blasband v. Rales*, 971 F.2d 1034, 1047 (3d Cir. 1992). The state's law that applies is the state of incorporation, which is Delaware in the case at bar. *Id.* at 1047.

The Delaware rule excuses demand if there is a reasonable doubt that the directors are disinterested or that their act is protected by the business judgment rule. Directors are not disinterested if they derive a personal financial benefit from the transaction that they approved. If the complaint alleges that a majority of the board is interested then the inquiry ceases, for then futility of demand has been established by any standard. *Aronson v. Lewis*, 473 A.2d 805, 812-15 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000) the Delaware Supreme Court reaffirmed the rule and held that the standard of review was plenary, not abuse of discretion.

The showing required by the Delaware rule to excuse demand is "a *reasonable doubt ...* that the board was disinterested." *Siegman v. Tri-Star Pictures, Inc.*, 1989 WL 48746 at *11 (Del. Ch. May 5 (revised May 30), 1989) (italics in original). The interest of the directors need not be an adjudicated fact in this "limited procedural context." *Id.* The Delaware rule determines reasonable doubt based on the allegations of the complaint, *id.*, "when viewed as a whole." *Chrysogelos v. London*, 1992 WL 58516 at *8 (Del. Ch. Mar. 25, 1992).

Although some parties argue that a stockholder bears a heavy burden to show demand futility, and that the test is stringent, onerous and exacting (Mozilo brief at 12-13), such characterizations are overstated. The purpose of the Delaware rule concerning exceptions to presuit demand is to balance the interests of directors and stockholders. It is not to allow directors to appropriate corporate assets and leave no redress to the hapless stockholders. *Brehm v. Eisner*, 746 A.2d at 255 (it creates a "balanced environment"). As the Delaware Supreme Court has, at least twice, held:

> Derivative suits have been used most frequently as a means of redressing harm to a corporation allegedly resulting from misconduct by its directors. As we observed in *Aronson*:
>
> > [A] stockholder is not powerless to challenge director action which results in harm to the corporation. The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid and unfaithful management.
>
> 473 A.2d at 811. In such instances, stockholders often do not make a demand on the board of directors, and instead file suit claiming that demand is excused.

Thus held the Delaware Supreme Court in *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993).

What is stringent about the demand exception under Delaware law is the requirement of particularized pleading, as it is under federal pleading standards. What is not stringent is that a pleader need only allege reasonable doubt, not prove the case. The procedural posture is, of course, a motion directed to a pleading.

Finally, although demand is a threshold issue, *Aronson v. Lewis*, 473 A.2d at 811, it is not a matter of standing. *See* D.I. 23, the second bullet paragraph on page 2, calling demand an issue of standing. As the court held in *LeBoyer v. Greenspan*, 2007 WL 4287646 at *2 - *3 (C.D. Ca. Jun. 13, 2007) standing ordinarily refers to whether a plaintiff has a redressable injury, but the demand rule, by contrast, is a substantive matter that concerns the allocation of corporate control and

exhaustion of intracorporate remedies. Supporting the *Le Boyer* analysis is this court's holding that stockholders should be cautious about making demand, for "[o]nce a demand is made ..., the challenge under Delaware law must be not to the underlying transaction, but to the board's decision not to bring the lawsuit." *In re General Motors Class E Stock Buyout Litigation*, 790 F.Supp. 77, 81 (D. Del. 1992), *citing*, *RCM Securities Fund, Inc. v. Stanton*, 928 F.2d 1318, 1328 (2d Cir. 1991) (a "good reason not to make a demand"). If demand were a matter of standing, Delaware law could provide neither an exception for futility nor a difference in the nature of the cause of action if demand were made.

The Complaint makes particularized allegations that a majority of the board is interested in Countrywide's repurchase of its stock. First, a majority of the members of the Countrywide board sold their own shares. Every sale that they reported on SEC Form 4s is listed on Complaint Exh. 7. These sales were made during the planning of the repurchases for more than a year, i.e., since before November 2005 (Bow Decl. ¶4), and from November 2006 through and after May 2007.[3]

Second, the Complaint alleges that the Countrywide board was very well informed about all the parts of Countrywide's business, basing those allegations on public statements that were made to the financial press in an effort to justify the extraordinarily high compensation that the board members paid to themselves. (Complaint ¶¶ 23-25, Exhs. 5 and 6.) The Complaint particularizes

---

[3]     Defendants also contend, based entirely on an incorrect reading of *Harris v. Carter*, 582 A.2d 222, 230 (Del. Ch. 1990), that demand futility should be considered in light of the make up of Countrywide's Board at the time the Amended Complaint was filed in this action. In reaching its decision, the *Harris* Court acknowledged that "[t]he authority on this narrow question is scant indeed." *Id. at 230*. Moreover, the *Harris* Court conceded that in the "vast number of cases . . . the board that approved the challenged transaction is typically composed of the same individuals as the board that would decide whether to institute suit." *Id.* That is certainly true here where all of the Director Defendants save Defendants Sambol and Brown were members of the Board both when the Verified Complaint was filed on June 12, 2007. Defendant Sambol, who was named as a Defendant in the Complaint filed by Plaintiff Blumberg on November 6, 2007, joined the board on September 26, 2007. Indeed, the *Harris* Court appears to have limited the reach of its opinion to apply only "after a ***disinterested board takes control*** of the corporation." *Id.* at 231. Thus, because the modest changes to the Board between the filing of the Verified Complaint on June 12, 2007 and the Amended Complaint on September 14, 2007 did not shift control of the corporation to a disinterested board, *Harris* is inapplicable. The two dates to determine if demand is excused are June 12 and November 6, 2007

what facts were available to the Company. These facts included not only the rates of increases in the price of homes (Complaint Exhs. 3 and 4), but also the significance of those rates. Complaint Exh. 1. The significance of Exhibits 1, 3 and 4 is explained in the first three pages of Complaint Exhibit 2. Even a quick look at these three exhibits reveals that, in November 2006, the rate of increase in home prices had dramatically declined and that the risk of default by Countrywide's customers had dramatically increased. And the problem was not limited to subprime loans. It affected every mortgage loan that Countrywide had made.

Third, having reported no repurchase for more than 15 years, the board took this action at the worst possible time, right after the most serious break in home prices in the living memory of most people.

Defendants argue that the Complaint does not allege that they are financially interested. They assert a hodge podge of reasons all addressed to the complaint that they wish that the plaintiffs had filed. For example, the Mozilo brief, at 15, says that merely naming a director as a defendant does not excuse demand. The Complaint, however, does not allege such a basis for excusing demand.

All defendants argue that the sales of their own shares of Countrywide stock does not make them interested, relying upon such cases as *Guttman v. Huang*, 823 A.2d 492 (Del.Ch. 2003); *Rattner v. Bidzos*, 2003 WL 22284323 (Del.Ch. Sept. 30, 2003); and *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904 (Del.Ch. 2004). Those cases are inapplicable to the facts at bar because they involve directors who sold their own shares, but did not make the companies repurchase shares. In *Guttman*, 823 A.2d at 502, the court placed decisive importance on the absence of a corporate repurchase. It held that when the purchase and sale is a face-to-face transaction between the company and a director, the director is interested. The court declined to extend such a concept to a pure insider

13

trading case. At bar, the directors sold what they made the Company repurchase. These were not face-to-face transactions, perhaps, but the economic effect was the same.

Similarly, it is irrelevant whether the directors sold unusually large amounts of stock during the period or acted with scienter on the basis of inside information. In *Guttman v. Huang*, the court held that if the directors and the company are on opposite sides of the transaction, then subjective good faith is irrelevant, and the only defense is fairness to the company, which the directors must prove. Nor does it matter whether facts were disclosed to the stockholders.

The defendants argue that they made full and fair disclosure of the facts. Again, this Complaint does not allege that the directors breached their fiduciary duty of disclosure under Delaware law. *See Malone v. Brincat*, 722 A.2d 5 (Del. 1998). The Complaint at ¶26, does allege that the directors should have disclosed the facts in the fourth quarter of 2006, when the housing market had already behaved in a way that materially damaged Countrywide's business, but the point of that allegation is to show that the market price did not reflect the diminished value of Countrywide's stock. *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 890 (Del. Supr. 2002) (market price only equals value when market is "well informed"). The market price may not reflect a stock's fair value if the market is manipulated. *Kahn v. Tremont Corp.*, 1996 WL 145452 at *9 (Del.Ch. Mar. 21, 1996). A "free and open market" is necessary to "make the market a fair reflection of the judgment of the buying and selling public." *Norte & Co. v. Huffines,* 288 F.Supp. 855, 859 (S.D.N.Y. 1968) (citing *Application of Marcus*, 79 N.Y.S.2d 76, 78 (1st Dept. 1948), *app. dism.*, 99 N.Y.S.2d 849 (1st Dept. 1950), *aff'd.*, 103 N.E.2d 338 (N.Y. 1951)). For "[w]hat can we reason, but from what we know?" *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 175 (2d Cir. 2007) (quoting ALEXANDER POPE, AN ESSAY ON MAN)).

The defendants have tried to disassemble the connected facts of the corporate repurchases, their own sales, and their possession of non-public information. By itself, each one of these facts might not excuse demand. But the facts cannot be taken in isolation. Rather, they must be "viewed as a whole." *Chrysogelos v. London*, 1992 WL 58516 at *8.

The defendants have placed in the record a vast amount of material in an effort to show that the market was well informed about conditions in the housing market in general, and as to Countrywide in particular. It consists of 450 pages, many of which are parts of much larger filings by Countrywide with the SEC. There are also reports from non-parties to this action.

Plaintiffs have two responses to this. First, this is not a case alleging that the defendants traded on inside information. Instead, this is the case that the court distinguished in *Guttman v. Huang*. Second, in all the hundreds of pages that defendants put in the record (and which were buried in thousands of filed pages) there are six pages that are conspicuously absent. They are Exhibits 1, 3, and 4 to the Complaint and the first three pages of Exhibit 2 to the Complaint. Those Exhibit 2 pages explain the significance of Exhibits 1, 3, and 4. Without those six pages, the 450 submitted pages are worthless.

## III.    The Consolidated Complaint States a Claim For Relief Under Delaware Law

### A.    THE BASIS OF LIABILITY

Delaware law has long imposed upon corporate officers and directors a fiduciary duty of loyalty not to use their positions to further their private interests and not to do anything that would work injury to the corporation. *Thorpe v. Cerbco, Inc.*, 676 A.2d 436, 445 (Del. Supr. 1996); *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. Supr. 1939). Causing the company to pay too much to repurchase or redeem its own stock is a violation of the duty of loyalty. In *In re Primedia, Inc.*, 910 A.2d 248, 261-62 (Del. Ch. 2006), controlling persons caused the company to call its preferred stock for

redemption long before redemption was mandatory and at redemption prices that materially exceeded the market price. The controlling persons held substantial amounts of the preferred stock. The court held that "[t]he theoretical grounds for damages here are straightforward." In *O'Neill v. Maytag*, 339 F.2d 764, 767 (2d Cir. 1964), the directors forced the Company to acquire shares of its own stock worth $11,115,000 in exchange for consideration worth $12,906,400. Those acquired shares constituted 21 percent of the outstanding shares and posed a threat to the directors' control. The court observed that the directors had in effect used $1,800,000 of the company's assets "to purchase a more favorable control position for themselves." *Id.* at 767. The court held that the allegations in support of the effort to recover the $1,800,000 "obviously state a claim under state law." *Id.*

Similarly, directors violate their fiduciary duty when they cause a company to issue shares of its stock to acquire assets worth less than the issued shares. Thus, in *Norte & Co. v. Huffines*, 304 F.Supp. 1096 (S.D.N.Y. 1968), *new trial denied*, 288 F.Supp. 855 (S.D.N.Y. 1968), *aff'd in part, remanded in part*, 416 F.2d 1189 (2d Cir. 1969), *cert. denied*, 397 U.S. 989 (1970), directors forced a corporation to issue shares worth $2,992,940 more than the assets it acquired. The fiduciaries held 77 percent of the assets and received 77 percent of the stock. The court, applying Ohio law, held that the directors were liable to the corporation for the full amount and not just the 77 percent that they received.

The instant claim for breach of the duty of loyalty does not contain a requirement to show fraud or scienter. The Delaware Supreme Court observed the existence of such a claim arising from "a non-fraudulent transaction." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). In *Guttman v. Huang*, the court held that when a director sells her own stock to the corporation,

> that director is interested because she is on the other side of the transaction from the corporation and faces liability if the entire fairness standard applies, regardless of her subjective good faith, so

long as she cannot prove that the transaction was fair to the
corporation.

An article by Hillary A. Sale, *Delaware's Good Faith*, 89 CORNELL L. REV. 456, 460, 489-93 (2004)

argues that the Delaware concept of good faith should apply a scienter standard. Delaware courts do

apply a scienter standard to a stockholder's derivative action for pure insider trading, unsullied by

contemporaneous corporate repurchases, *Guttman v. Huang,* 823 A.2d at 505, but the case at bar is

not that.

The prices at which Countrywide repurchased, and the directors sold, the stock were the

market prices on the dates of repurchase and sale. But, as we have shown, those prices did not

reflect the value of the stock. Market price only equals value when the market is "well-informed."

*Applebaum v. Avaya, Inc,* 812 A.2d at 890. It is irrelevant whether the market is disinformed by

fraud because fraud is not an element of the claim at bar, and the effect on the market is the same.

At bar, when the directors caused Countrywide to repurchase its own stock, they themselves

were selling their own Countrywide stock. When Countrywide sustained out-of-pocket losses on its

repurchases, the directors reaped in-pocket gains on their sales. This misalliance of corporate

repurchases and directorial sales was "disloyalty in the classic sense," *i.e.*, the directors preferred

their own adverse self interest to the interest of Countrywide. *In re Walt Disney Co. Deriv. Litig.*,

906 A.2d 27, 66 (Del. Supr. 2006). Moreover, this misalliance of repurchases and sales that the

directors effected was not "in the good faith belief that ... [their] actions ... [were] in the

corporation's best interest." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. Supr. 2006) (footnote omitted).

To cause Countrywide to buy what defendants chose to sell is the polar opposite of "actions required

by a true faithfulness and devotion to the interests of the corporation and its shareholders." *In re

Walt Disney Co. Deriv. Litig.*, 906 A.2d at 67.

### B.    THE MEASURE OF RELIEF

The measure of relief against officers and directors for breach of the duty of loyalty must meet the standard that "a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct." *Thorpe v. Cerbco, Inc.*, 676 A.2d at 445. Moreover, the "damages flowing from that breach are to be liberally calculated." *Id.* at 444. Delaware public policy seeks to remove all temptation for fiduciaries to breach their duty of loyalty. To that end, when fiduciaries breach their duty of loyalty, Delaware law "loosen[s] normally stringent requirements of causation and damages." *In re Primedia Inc. Deriv Litig.*, 910 A.2d at 262 (citing *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)).

By this Complaint, plaintiffs seek to recover only for the harm to Countrywide, leaving for another day, and in California if plaintiffs there can, the recovery of the profits made by the individual defendants. On the facts at bar, the measure of recovery for breach of the fiduciary duty of loyalty, where the fiduciary has made a profit, is rescissory damages, *i.e.*, the difference between the price that Countrywide paid for its stock and the value of its stock on the date of judgment. *Strassburger v. Earley*, 752 A.2d 557, 579-82 (Del. Ch. 2000). The directors caused Countrywide to repurchase 60,143,388 shares of its stock for $2,372,152,000. In the ten trading days ending April 3, 2008, the market price of Countrywide stock has been in the $6 per share range. Taking $6.50 per share as the value on the date of judgment, which is approximately the price of the Bank of America all stock acquisition, rescissory damages would be $1,981,219,978, calculated by taking the original cost, $2,372,152,000, less $390,932,022, calculated by taking $6.50 per share times 60,143,388 shares. But if the price of Countrywide stock recovers, there should be a floor of $1,289,571,016. This is the difference between the repurchase price of the shares and the $18 conversion price of the preferred stock, times 60,143,388 shares.

The 20,000 shares of convertible preferred stock issued on August 22, 2007, pay a dividend of $145 million per year. The common stock that the directors caused Countrywide to repurchase paid a dividend of $0.60 per share per year, or $36,086,032.80 annually. The dividend difference is $108,913,967.20. Countrywide cannot redeem the preferred stock until August 22, 2017. The present value of the dividend difference for 10 years at an annual interest rate 7 % per annum is approximately $765 million. To make Countrywide whole, it should recover the dividend difference, as well.

## IV.    DEFENDANTS' MOTION TO TRANSFER VENUE UNDER 28 U.S.C. §1404(a) SHOULD BE DENIED

### A.    THE PROPONENT OF A MOTION TO TRANSFER HAS THE BURDEN

The burden of establishing the inconvenience of the forum rests with the proponent of transfer. *In re Amendt*, 2006 U.S. App. LEXIS 3944 at *7 (3d Cir. Feb. 16, 2006), and that the case would be better off transferred to another district. To decide a transfer motion, the court must assess a number of private and public interest factors in addition to those enumerated in §1404(a). *Jumara v. State Farm Insurance Company*, 55 F.3d 873, 879 (3d Cir. 1995). Specifically, the private interests have included: (1) the plaintiff's forum preference as manifested in the original choice; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties as indicated by their relative physical and financial conditions; (5) the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of books and records. *Amendt*, at *8, citing *Jumara*, at 879-80. The public interests have included: (1) the enforceability of the judgment; (2) practical considerations that could expedite or simplify trial; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in

deciding local controversies at home; (5) the public policies of the fora; and (6) in a diversity case, the familiarity of the two courts with state law. *Id.*

### B.    THE CALIFORNIA DERIVATIVE ACTION IS INFERIOR TO PLAINTIFFS' CASE

There are several shareholder derivative cases pending in the United States District Court for the Central District of California, all filed subsequent to the case at bar. The California cases have been consolidated before Judge Mariana Pfaelzer. The docket number for the lead case is 07-cv-06923 (MRP)-(MANx), and the caption is *In re Countrywide Financial Corp. Derivative Litig.* They will be referred hereinafter as the "California Derivation Action".

### C.    CONVENIENCE AND FAIRNESS WEIGH IN FAVOR OF KEEPING THIS ACTION IN THE DISTRICT OF DELAWARE

#### a)    Convenience of Parties and Witnesses

Convenience of the parties and witnesses is not relevant here. This case should never proceed to trial. The facts in the record show that a renewed motion for summary judgment is appropriate in this case. The voluminous record reveals that the directors were on the opposite side to the Company when they made it repurchase its stock. The directors have raised no issue as to their possession of facts. Bow Decl. at ¶4. There is no issue of fact to require a trial. The defendants barely mention Exhibits 1-4 of the Complaint, which suggests that the defendants had knowledge of the condition of the Company. This is evidenced in the Declaration of Susan E. Bow, ¶4: "The decision by the Countrywide Board of Directors in November 2006 to approve repurchase of shares of the Company's common stock was the result of more than one year of planning and analysis by the Treasury Finance area within Countrywide and involved various presentations to and discussions with the Board of Directors." The documents gathered from

discovery and the depositions will either establish our case or show that the directors did not deserve their compensation packages.

### b)    The Location of Relevant Documents and Access to Proof

Consideration of the location of books and records is "limited to the extent that the files could not be produced in the alternative forum." *Jumara*, 55 F.3d at 879. Where documents can be produced in the alternative forum the location of these documents is irrelevant to the venue analysis. In fact, in the age of electronic discovery, documents can be sent to and from any forum. *See, e.g.*, *Automotive Technologies Int'l, Inc. v. American Honda Motor Co., Inc.*, 2006 WL 3783477 *2 (D. Del. 2006); *see also* 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* §3853 (2d ed. 2004) ("Many records are easily transported and their location is entitled a little weight, and this is particularly true with the development of xerography and the easy availability of copies.").

### c)    The Public Interests To Be Considered

Transferring this case to California at this time is not practical. Since there are other motions pending in this court, remaining in this forum will make resolutions of these motions easier and more expeditious. *See, e.g.*, *Dollar Discount Stores of America, Inc. v. Petrusha*, 2001 WL 881725 (E.D. Pa. Apr. 25, 2001). Transferring this case, one that is so close to beginning discovery, will cause undue delay in the proceedings. *See, e.g.*, *American Trade Partners, L.P. v. A-1 Intern. Importing Enterprises, Ltd.*, 755 F.Supp. 1292, 1304-05 (E.D.Pa. 1990) (convenience of witnesses pales in comparison to the prejudice a transfer would cause for the plaintiff).

The case at bar was the first to be filed in the string of derivative actions against the directors of Countrywide. *See Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215 (2d Cir. 1978)

(first filed suit should have priority). "In all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it." *EEOC v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988). "[D]isregard of the first-filed rule … will rarely be found where the first action was filed in a logical place." *Zelenkofske Axelrod Consulting v. Stevenson*, 1999 WL 592399, at *3 (E.D.Pa. Aug. 5, 1999) (exception to the first-filed rule not made because first filer forum selection was not extraordinarily inconvenient or expensive and not distant). The cases in California should be stayed, not this one. *See Corwin v. Silverman*, 1999 WL 499456 (Del. Ch. June 30, 1999) (the court stayed a stockholder's case in favor of previously filed cases in federal court in NJ).

Defendants, citing *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del. 1984), say that plaintiffs will lose standing after the merger between the Company and the Bank of America. But *Blasband v. Rales*, 971 F.2d 1034, 1040 (3d Cir. 1992), establishes that Delaware law is to the contrary. *Blasband* observes that Delaware law allows a shareholder to prosecute a derivative suit "on behalf of one corporation (*e.g.* a parent) to enforce a cause of action in favor of a related corporation (*e.g.* its subsidiary)," *Blasband*, 971 F.2d at 1042-43, even though the stockholder of the parent is not a stockholder of the subsidiary. Delaware state courts have not actually rejected *Blasband*, they just are not "free to follow it" because it is "not consistent with the Delaware Supreme Court's [narrow] holding in *Lewis v. Anderson*." *Ash v. McCall*, 2000 WL 1370341 at *13 n.47 (Del. Ch. Sept. 15, 2000). Moreover, in *In re Caremark Derivative Litig.*, 698 A.2d 959, 972 n.30 (1996), after the fairness hearing for a proposed settlement, the company was acquired by another. The court decided that this does not mean that the plaintiffs have lost their standing to sue and that they "continue to have an equity interest in the entity that owns the claims." *Id.*

It has long been federal policy to favor resolution of actions "on their merits and not on procedural defaults." *Hewlett v. Davis*, 844 F.2d 109 (3d Cir. 1988); *See also Victor v. Manning*, 128 F.2d 415, 417 (3d Cir. 1942). The Ninth Circuit does not have settled law regarding the effect of mergers on a derivative shareholder's standing. Therefore, these courts look to the law of Delaware for guidance. *See Leboyer v. Greenspan*, 2007 WL 4287646 at *3 (C.D. Cal. Jun. 13, 2007) (citing *Lewis v. Ward*, 852 A.2d 896, 900-01 (Del. 2004)). If this case is transferred to the Central District of California, the court might well follow the narrow, outdated holding in *Lewis v. Anderson* and dismiss this action purely on procedural grounds. *Prince v. Palmer*, 148 Fed.Appx. 249 (6th Cir. July 13, 2005). Further, "courts construing section 1404(a) have been strongly inclined to protect plaintiffs against the risk that transfer might be accompanied by a prejudicial change in applicable state laws." *Van Dusen v. Barrack*, 376 U.S. 612, 631 (1964). "[P]endency of similar actions in the proposed transferee district [] alone is not sufficient to justify a transfer." *Bayly Mfg. Co. v. Koracorp Industries, Inc.*, 298 F.Supp. 600, 603 (D. Colo 1969).

Defendants argue that the instant case should be absorbed into the other derivative actions pending in the Central District of California because the repurchase claim is being prosecuted there. The plaintiffs here are the first to raise the repurchase claim in the Consolidated Amended Complaint filed in September, 2007. The claim also takes up the entire Complaint, while the repurchase claim in *New England Teamsters, et al. v. Mozilo, et al.*, Case No. BC379944, filed in the Superior Court of California, County of Los Angeles, the first complaint after the September 2007 Amended Consolidated Complaint to allege a repurchase claim, contains only one paragraph on the subject. The complaint in the California Derivative Action also only barely touched on the repurchase claim, making up only eight pages out of two hundred and one pages

(CDC Complaint ¶¶ 328-342).   In fact, the California Derivative Action Complaint is larded with conclusory claims that are not part of plaintiff's complaint.

The California Derivative Action will face many problems moving forward.  First, the California complaint relies on the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which stays discovery.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999).  In contrast, the parties in this case have been authorized to begin discovery.  Second, the claim at bar is much larger than the claim asserted by the California Derivative Action.  They are alleging that the Individual Defendants secured $848 million dollars, which is substantially less than the $3 billion repurchase claim.  Third, California Derivative Action's allegations of insider trading are very difficult to survive any possible motions to dismiss, for proof of scienter is required for each of these assertions.  *In re Oracle Corp.*, 867 A.2d 904, 931-32 (Del.Ch. 2004).  Lastly, the California complaint alleges that the defendants failed to disclose deficiencies in financial reporting, compensation and lending policies in the 2008 Proxy Statement.  But the defendants have no duty to disclose such deficiencies.  "[O]nly actual or threatened litigation against potential indemnities need be disclosed."  *General Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 934 n.13 (3d 1992).

Overall, consideration of the private and public interest factors makes it clear that Movants have failed to meet their burden of strongly demonstrating that transfer to the Central District of California or a stay is warranted under 28 U.S.C. §1404(a).  According, this motion should be denied.  The factors that weigh against transfer also militate against a stay.

## CONCLUSION

The Consolidated Complaint states a claim for breach of the duty of loyalty in the classic sense, *i.e.*, a majority of the directors preferred their own interests to those of the Company. The Complaint alleges in particular detail that pre-suit demand is excused. The case at bar should not be transferred or stayed. Therefore, the defendants' motions should be denied in all respects.

Dated: April 4, 2008

Respectfully submitted,

BIGGS & BATTAGLIA

ROBERT D. GOLDBERG (#631)
921 North Orange Street
Wilmington, DE 19899
Tel: (302) 655-9677
Fax: (302) 655-7924
goldberg@batlaw.com
*Attorneys for plaintiffs*

*Of Counsel:*

Barrack, Rodos & Bacine
Alexander Arnold Gershon
Regina M. Calcaterra
Gloria Kui Melwani
1350 Broadway, Suite 1001
New York, New York 10018
(212) 688-0782

Barrack, Rodos & Bacine
Daniel E. Bacine
William J. Ban
Two Commerce Square
2001 Market Street B Suite 3300
Philadelphia, Pennsylvania 19103
(215) 963-0600