UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION DERIVATIVE LITIGATION | ) ) ) | Master Docket No. 1:07-cv-00372(SLR)(MPT) |
| _____ | ) | (Consolidated Action) |
| | ) | |
| THIS RELATES TO ALL ACTIONS | ) | |
| _____ | ) | |

**DECLARATION OF ALEXANDER ARNOLD GERSHON
IN OPPOSITION TO MOTIONS
TO DISMISS, TRANSFER, AND STAY**

I, ALEXANDER ARNOLD GERSHON, hereby declare under penalty of perjury under the laws of the

United States of America, that the following is true and correct..

     1.     I am a member of the bar of the State of New York and an inactive member of the bar

of the State of Georgia. I am a partner in the firm of Barrack, Rodos & Bacine, and we are of counsel

to the plaintiffs in this action.

     2.     I make this declaration in opposition to defendants' motion to dismiss, transfer, and

stay this action.

     3.     Attached hereto as Exhibit 1 is a true copy of a Memorandum dated March 6, 2008 of

the Committee on Oversight and Government Reform of the House of Representatives of the

Congress of the United States. I obtained it online from http://oversight.house.gov.

Dated: New York, New York
       April 4, 2008

Alexander Arnold Gershon

HENRY A. WAXMAN, CALIFORNIA,
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
    DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

TOM DAVIS, VIRGINIA,
RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
JIM JORDAN, OHIO

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 Rayburn House Office Building

Washington, DC 20515–6143

Majority    (202) 225–5051
Facsimile    (202) 225–4784
Minority    (202) 225–5074

www.oversight.house.gov

## MEMORANDUM

### March 6, 2008

**To:**    **Members of the Committee on Oversight and Government Reform**

**Fr:**    **Majority Staff, Committee on Oversight and Government Reform**

**Re:**    **Supplemental Information on CEO Pay and the Mortgage Crisis**

On Friday, March 7, 2008, at 10 a.m. in room 2154 of the Rayburn House Office Building, the Oversight Committee will hold a hearing to examine the compensation and retirement packages awarded to the CEOs of three companies implicated in the mortgage crisis: Angelo Mozilo of Countrywide Financial Corporation, E. Stanley O'Neal of Merrill Lynch, and Charles Prince of Citigroup.

In preparation for the Committee's hearing, the Committee has received thousands of pages of documents from the three companies, including board minutes and internal company e-mails. The Committee staff also has reviewed hundreds of public Securities and Exchange Commission (SEC) filings and consulted with leading experts in executive compensation. This memorandum summarizes some of the questions raised by the materials reviewed by the Committee staff.

## I.    EXECUTIVE SUMMARY

The March 7 hearing provides Committee members the opportunity to examine three case studies in CEO compensation. A common element in the case studies is that each of the CEOs presided over multi-billion dollar losses in the mortgage market. Collectively, the companies run by Mr. Mozilo, Mr. O'Neal, and Mr. Prince lost more than $20 billion in the last two quarters of 2007 alone as a result of investments in subprime and other risky mortgages.

While Countrywide, Merrill Lynch, and Citigroup prospered, Mr. Mozilo, Mr. O'Neal, and Mr. Prince received lucrative pay packages. During the five-year period from January 2002 through December 2006, the stock of Countrywide, Merrill Lynch, and Citigroup appreciated, and the three CEOs collectively received more than $460 million in compensation.

Any alignment between the compensation of the CEOs and their shareholders' interests appears to breakdown in 2007, however. Despite steep declines in the performance and stock price of the three companies resulting from the mortgage crisis, Mr. Mozilo, Mr. O'Neal, and Mr. Prince continued to be well rewarded: Mr. Mozilo received over $120 million in compensation and sales of Countrywide stock; Mr. O'Neal was allowed to leave Merrill Lynch with a $161 million retirement package; and Mr. Prince was awarded a $10 million bonus, $28 million in unvested stock and options, and $1.5 million in annual perquisites upon his departure from Citigroup.

## A.    Questions about Mr. Mozilo's Compensation

In the case of Mr. Mozilo, the Committee received and analyzed information about both his 2001 and his 2006 employment contracts. Both contracts raise issues about the level of compensation Mr. Mozilo received. In addition, Mr. Mozilo's decision to sell almost $150 million in Countrywide stock from November 2006 through the end of 2007 also raises questions, particularly as many of these sales occurred at the same time the company was borrowing $1.5 billion to repurchase its shares.

Under Mr. Mozilo's 2001 contract, which governed his pay from 2002 through 2006, Mr. Mozilo received total compensation of $185 million in cash, stock, and stock options. In 2004, a compensation consultant hired by the board, Pearl Meyer, raised concerns about the compensation package Mr. Mozilo would receive after his planned retirement as CEO at the end of 2006. The board appears to have accepted some of Pearl Meyer's recommendations and rejected others; it then ended its relationship with the consultant. In 2006, a new compensation consultant, Exequity, raised new questions about Mr. Mozilo's compensation package. According to Exequity, Mr. Mozilo's compensation was based on a flawed "peer group" of companies that inflated his pay and inappropriately placed him at the top of this peer group in terms of salary and bonus.

Countrywide renegotiated and extended Mr. Mozilo's employment contract in the fall of 2006, effective January 2007. The new contract revised Mr. Mozilo's peer group and reduced his compensation. Yet despite these steps, the 2006 contract and the negotiations that defined its terms contain unusual components. Key questions about the 2006 contract include:

- **The Retention of Towers Perrin.** After the board's compensation consultant, Exequity, recommended significant reductions in Mr. Mozilo's compensation, Countrywide management hired a second compensation consultant, Towers Perrin, to review the Exequity proposal. Although the company retained Towers Perrin, internal e-mails show that the consultant appeared to serve as Mr. Mozilo's personal advisor with the goal of achieving "maximum opportunity" for Mr. Mozilo. The final contract was significantly more generous to Mr. Mozilo than Exequity originally recommended.

- **Mr. Mozilo's Separation Package.** Under the "change in control" provisions in Mr. Mozilo's contract, Mr. Mozilo was entitled to a $36 million cash severance. The terms of this agreement appeared to heavily favor Mr. Mozilo. Under the contract, Mr. Mozilo

could terminate his employment and receive severance if the board took an action that "results in the diminution of Executive's status, title, position and responsibilities" or that "results in the Executive not being able to travel by private aircraft at Company expense." In contrast, the board could terminate Mr. Mozilo without paying him cash severance only if Mr. Mozilo is convicted of a felony or acts in "bad faith."

- **The $10 Million Pension Replacement Award.** Under the contract, Mr. Mozilo received $10 million in restricted stock units to compensate him for payments he would have received under his retirement plan if he had retired at the end of 2006. It is unusual to include compensation for not retiring in the pay package of an actively employed CEO.

- **The Calculation of the Cash Bonus.** Under the terms of the 2006 contract, Mr. Mozilo is entitled to a cash bonus (not to exceed $10 million) calculated as a percentage of Countrywide's net income if the company's return on equity (ROE) exceeds 10%. At the time the contract was negotiated, Countrywide was regularly achieving a ROE of over 20%, so the 2006 contract provided Mr. Mozilo with a large bonus even if the company's ROE dropped significantly. One Countrywide official wrote in an internal e-mail: "I can't believe how low the ROE measures are. ... [S]hareholders or newspapers might comment all over this evident fact."

Mr. Mozilo's pattern of stock sales in late 2006 and 2007 raise additional questions. During this period, Mr. Mozilo made three revisions to his stock trading plan, in each case increasing the amount of stock he was authorized to sell. In total, Mr. Mozilo sold 5.8 million shares between November 2006 and December 2007 for almost $150 million. Mr. Mozilo made the first change in his stock trading plan three days after Countrywide announced a $2.5 billion plan to buy back Countrywide stock, which was financed in part by $1.5 billion in new debt. The Countrywide board knew of the changes to Mr. Mozilo's stock trading plan but did not act to prevent Mr. Mozilo's sales. Several board members also made large stock sales during this period.

Particularly in 2007, the discrepancy between Mr. Mozilo's compensation and Countrywide's performance is striking. In 2007, Countrywide announced a $1.2 billion loss in the third quarter and an additional loss of $422 million in the fourth quarter. By December 31, 2007, the company's stock had plummeted 80% from its five-year peak in February. During the same period, Mr. Mozilo was paid $1.9 million in salary, received $20 million in stock awards contingent upon performance, and sold $121 million in stock.

Countrywide's losses have continued in 2008. In SEC filings last week, Countrywide reported a large increase in delinquencies on its pay option adjustable-rate mortgages. Its stock is now trading at $5.70 per share, a drop of more than 87% from its high of $45.03 per share during the stock buyback in early 2007.

3

**B.    Questions about Mr. O'Neal's Compensation**

The major questions about Mr. O'Neal's compensation surround the terms of his retirement as CEO of Merrill Lynch in October 2007. During 2007, Merrill Lynch reported $18 billion in write-downs related to subprime and other risky mortgages. By the end of 2007, the company's stock had fallen 45% from its five-year peak in January. Yet when Mr. O'Neal departed the company in October, Merrill Lynch awarded him a retirement package worth $161 million.

The largest component of Mr. O'Neal's retirement package was the award of $131 million in unvested stock and options. If the Merrill Lynch board had terminated Mr. O'Neal for cause, he would have forfeited these stock and options because they had not yet vested. Allowing Mr. O'Neal to retire instead of terminating his employment for poor performance significantly inflated the value of Mr. O'Neal's retirement package. It is unclear why this decision was in the interests of Merrill Lynch shareholders.

The Merrill Lynch board also decided to loosen the non-competition restrictions in Mr. O'Neal's retirement contract. An agreement that Mr. O'Neal signed in 2004 prohibited Mr. O'Neal from working for a competitor of Merrill Lynch for approximately three years after his retirement. In October 2007, the Merrill Lynch board approved a new non-competition agreement that cut the duration of the non-competition clause in half and significantly narrowed the companies to which it applied. Only one board member raised an objection to this revision in the agreement.

**C.    Questions about Mr. Prince's Compensation**

After Mr. Prince left Citigroup in November 2007, he received a cash bonus worth $10.4 million. The board also allowed him to retain more than $28 million in unvested restricted stock and stock options. It is unclear how these decisions were related to Mr. Prince's performance or benefited Citigroup shareholders. During 2007, Citigroup announced more than $18 billion in write-downs related to subprime and other risky mortgages, and its stock dropped by 48% from its five-year peak in December 2006. Unlike Mr. Prince, neither Mr. Mozilo nor Mr. O'Neal received a performance bonus in 2007.

The board also awarded Mr. Prince perquisites, worth $1.5 million annually, upon his retirement in November 2007. These perquisites included an office, an administrative assistant, and a car and driver for five years, as well as a commitment to pay taxes associated with the award of these benefits. Mr. Prince had no employment contract entitling him to these benefits upon his retirement from Citigroup.

Earlier this week, Citigroup's stock fell to a nine-year low after foreign investors predicted more losses for the company. Citigroup's stock has now fallen 61% since its high in December 2006.

## II.   BACKGROUND

By any measure, executive pay is rising rapidly and dramatically.  According to *Forbes* magazine, CEOs of the largest 500 U.S. companies received an average of $15.2 million each in 2006, a collective raise of 38% over 2005.[1]  Many experts believe there is a growing disconnect between CEO pay and performance, as increases in executive pay cannot be explained by factors such as changes in firm size or performance.[2]  In a recent survey of more than 1,000 directors at large U.S. companies, 67% said that they believe boards are having difficulty controlling the size of CEO pay packages.[3]

The large increases in executive compensation also have widened the gulf between CEO pay and that of the average worker.  In 1980, CEOs in the United States were paid 40 times the average worker.[4]  In 2006, the average Fortune 250 CEO was paid over 600 times the average worker.[5]  While CEO pay has soared, employees at the bottom of the pay scale have seen their real wages decline by more than 10% over the past decade.[6]

Last year, the Oversight Committee initiated an investigation into rising executive compensation.  In a December hearing, the Committee examined the role played by compensation consultants in setting CEO pay.  At the hearing, Chairman Waxman released a report that analyzed conflicts of interest among compensation consultants.  This report found that more than 100 large publicly traded companies hired compensation consultants in 2006 with significant conflicts of interest.  In many cases, the consultants hired to advise on executive pay were simultaneously receiving millions of dollars from the corporate executives whose compensation they were supposed to assess.[7]

Tomorrow's hearing continues the Committee's inquiry into executive compensation.  It will allow the Committee to examine three case studies of executive compensation:  the compensation and separation packages awarded to Angelo Mozilo, the Chairman and CEO of Countrywide Financial Corporation; E. Stanley O'Neal, the former Chairman and CEO of Merrill Lynch; and Charles Prince, the former Chairman and CEO of Citigroup.

---

[1] *Big Paychecks*, Forbes (May 3, 2007).

[2] Lucian Bebchuk and Yaniv Grinstein, *The Growth of Executive Pay*, Oxford Review of Economic Policy, Vol. 21, 283-303 (2005).

[3] Corporate Board Member and Pricewaterhouse Coopers, *What Directors Think:  Annual Board of Directors Survey* (Oct. 2007).

[4] Institute for Policy Studies and United for a Fair Economy, *Executive Excess 2007:  The Staggering Social Cost of U.S. Business Leadership* (Aug. 2007).

[5] *Id.*

[6] The current minimum wage is $5.85 — adjusted for inflation, $4.49 in 1997 dollars. The actual minimum wage in 1997 was $5.15.

[7] Majority Staff, House Committee on Oversight and Government Reform, *Executive Pay:  Conflicts of Interest Among Compensation Consultants* (Dec. 2007).

The three CEOs are linked by their involvement in the mortgage crisis. Countrywide, Merrill Lynch, and Citigroup all profited enormously in the short term from their investments in subprime and other risky mortgages, and all three companies are suffering now as a result of these investments. Collectively, the three companies recorded losses of more than $20 billion in the last two quarters of 2007: Countrywide lost $1.6 billion;[8] Merrill Lynch lost $10.3 billion;[9] and Citigroup lost $9.8 billion.[10]   The hearing provides a lens through which to examine whether the executive compensation and severance arrangements at these companies provided appropriate incentives to protect shareholders from these losses.

In preparation for the hearing, the Committee requested that each company provide internal documents related to the compensation and severance packages of their CEOs. The Committee staff reviewed thousands of pages of company e-mails, board minutes, and other internal documents. The staff also reviewed public SEC filings and interviewed dozens of experts regarding executive pay practices. This memorandum summarizes the compensation and retirement packages awarded to each CEO and identifies questions about whether the terms of the packages advanced the shareholders' interests.

## III.    MR. MOZILO'S COMPENSATION

Angelo Mozilo co-founded Countrywide in 1969, becoming its CEO in February 1998 and Chairman of the Board in March 1999. Table 1 summarizes the compensation that Mr. Mozilo received while serving as Chairman and CEO.

Mr. Mozilo has been richly compensated by Countrywide, receiving almost $250 million in total compensation since becoming CEO. He also has collected an additional $406 million from the sale of his Countrywide stock. The company prospered during the first ten years Mr. Mozilo served as CEO. Since February 2007, however, Countrywide's stock has fallen by 87% to $5.70 per share.

Three aspects of Mr. Mozilo's compensation raise the most concerns. These are (1) the terms of his 2001 compensation agreement; (2) the terms and negotiation of his 2006 compensation agreement; and (3) his stock sales since October 2006. In each area, there are questions whether the actions of Mr. Mozilo and the board advanced the interests of Countrywide's shareholders.

---

[8] Countrywide Financial Corporation, *Countrywide Reports 2007 Fourth Quarter & Year-End Results* (Jan. 29, 2008).

[9] Merrill Lynch, *Merrill Lynch Reports Full Year 2007 Net Loss from Continuing Operations of $8.6 Billion* (Jan. 17, 2008).

[10] Citigroup, *Citi Reports Fourth Quarter Net Loss of $9.83 Billion, Loss Per Share of $1.99* (Jan. 15, 2008).

**Table 1.  Compensation Awarded to Angelo Mozilo, 1998-2007[11]**

| Year | Base Salary | Cash Bonus | Other Compensation | Restricted Stock/SARs* | Grant Date Value of Options* | Total Compensation |
|------|-------------|------------|--------------------|------------------------|-------------------------------|---------------------|
| 1998 | $1,400,000 | $3,935,821 | $707,804 | $0 | $0 | $6,043,625 |
| 1999 | $1,400,000 | $4,210,970 | $509,031 | $0 | $0 | $6,120,001 |
| 2000 | $1,650,000 | $3,756,377 | $570,227 | $0 | $5,344,850 | $11,321,454 |
| 2001 | $1,458,333 | $4,653,601 | $570,368 | $0 | $12,732,305 | $19,414,607 |
| 2002 | $2,041,667 | $7,763,976 | $733,394 (Includes $133,524 in personal use of company aircraft and related gross-up payments, $37,627 for country club dues, and $26,034 for car use.) | $0 | $4,341,295 | $14,880,332 |
| 2003 | $2,266,667 | $19,890,455 | $641,589 (Includes $78,192 in personal use of company aircraft and related gross-up payments, $95,135 for country club dues, and $27,072 for car use.) | $1,072,827 | $9,116,597 | $32,988,135 |
| 2004 | $2,466,667 | $17,273,290 | $621,241 (Includes $155,542 in personal use of company aircraft and related gross-up payments, $31,249 for country club dues, and $27,150 for car use.) | $2,826,900 | $29,806,000 | $52,994,098 |
| 2005 | $2,666,667 | $19,557,361 | $726,314 (Includes $230,452 in personal use of company aircraft and related gross-up payments, $40,282 for country club dues, and $26,660 for car use.) | $0 | $18,360,300 | $41,310,642 |
| 2006 | $2,866,667 | $20,461,473 | $643,205 (Includes $89,939 for personal use of company aircraft, $15,481 for country club dues, and $27,010 for car use.) | $0 | $19,012,000 | $42,983,345 |
| 2007 | $1,900,000 | $0 | Unknown | $20,000,000 | $0 | $21,900,000 |
| TOTAL | $20,116,668 | $101,503,324 | $5,723,173 | $23,899,727 | $98,713,347 | $249,956,239 |

*The value of stock awards and option awards is based on grant date fair value.  Stock awards would be worth less today given decline in stock price.  Unexercised options are currently underwater.*

### A.    The 2001 Compensation Agreement

The terms of Mr. Mozilo's compensation, retirement, and severance are defined in compensation agreements with Countrywide.  In March 2001, Mr. Mozilo and Countrywide entered into an agreement that specified the terms of his compensation through February 2006.[12]  In 2004, this agreement was extended with modest modifications through December 2006.

In 2004, as Countrywide was considering the extension of Mr. Mozilo's compensation agreement, the board retained the services of Pearl Meyer, a leading compensation consultant.  Pearl Meyer raised concerns about the provisions of the contract that governed the pay Mr. Mozilo would receive if he stepped down as CEO at the end of 2006 but retained his position as Chairman of Board, as the company's succession plan anticipated.  Pearl Meyer recommended

---

[11] Salary, bonus, and equity data are extracted from Countrywide proxy statements and confirmed by Countrywide documents provided to the Committee (CFC BATES No. 0001016-0001017).  "Other compensation" data are extracted from Countrywide proxy statements.

[12] Countrywide Financial Corporation, 2007 Proxy Statement, Form DEF14A (Apr. 27, 2007), 50-54. (hereinafter "Countrywide 2007 Proxy").

reducing Mr. Mozilo's salary and bonus as a "non-employee" chairman. The consultants wrote that Mr. Mozilo should not receive a $1 million base salary but "should be compensated the same as the Company's other outside Board members, plus an annual retainer as Chairman."[13] Pearl Meyer also argued that Mr. Mozilo should not be eligible for severance as a non-employee chairman: "While severance protection may be appropriate for the period in which Mr. Mozilo serves as Employee Chairman, we do not advise protecting his term as an outside Board member of Countrywide."[14]

In the final 2004 extension agreement, the board aligned Mr. Mozilo's pay as non-employee chairman of the board with the pay of other outside directors but declined to address Mr. Mozilo's potential compensation as an employee chairman.[15] The board subsequently ended its relationship with Pearl Meyer.

In 2006, as the board was renegotiating Mr. Mozilo's compensation, the board hired Ross Zimmerman from the firm Exequity as a compensation consultant. Mr. Zimmerman's analysis raised multiple questions about the terms of the 2001 compensation agreement. He questioned the "peer group" that the board had used in establishing Mr. Mozilo's compensation. He also objected to paying Mr. Mozilo at the 90th percentile of this peer group.[16]

## B.    The 2006 Compensation Agreement

In 2006, Mr. Zimmerman recommended several specific changes to Mr. Mozilo's pay package to address increasing public scrutiny and shareholder activism concerning executive compensation. First, he proposed revising the peer group of companies used to target Mozilo's compensation by removing investment banks and focusing instead on diversified financial institutions, which represented a more appropriate comparison to Countrywide's business areas. Second, he proposed reducing Mr. Mozilo's compensation from the 90th percentile to between the 50th and 75th percentile of CEO compensation at peer group companies. Third, he proposed tying Mr. Mozilo's cash and equity bonuses to attainment of objective financial metrics and setting maximum awards. In dollar terms, these recommendations would have targeted Mr. Mozilo's annual compensation at $14,250,000 and set a maximum of $27,250,000.[17]

After Mr. Zimmerman and the compensation committee proposed cuts in Mr. Mozilo's compensation, Countrywide management hired a competing compensation consultant, John

---

[13] Fax from Claude Johnson and Garry Rogers to Michael Dougherty and Harley Snyder, *Countrywide CEO Employment Agreement* (June 11, 2004) (CFC BATES No. 0000786).

[14] *Id. at 788.*

[15] Countrywide Form 8-K, *Entry into a Material Definitive Agreement* (Oct. 20, 2006).

[16] *Revised Pay Proposal for Angelo Mozilo* (Sept. 19, 2006) (CFC BATES No. 0011023-0001035).

[17] *Revised Pay Proposal for Angelo Mozilo* (Sept. 19, 2006) (CFC BATES No. 0011023-0001035).

England of Towers Perrin, to evaluate the board's proposal. In an e-mail from Mr. England to Mr. Zimmerman, Mr. England asserted:

> Towers Perrin has been retained by Countrywide Financial, not by any individual at Countrywide. ... To Towers Perrin, it is irrelevant who hires us — our role is to provide appropriate counsel for decision-making, independent of influence.[18]

Mr. Mozilo, however, regarded Mr. England as his personal representative, even though he was being paid by Countrywide. In an e-mail to Susan Bow, the Senior Managing Director, General Counsel and Corporate Secretary of Countrywide, Mr. Mozilo wrote: "Approximately two weeks ago, [the head of the compensation committee] and I agreed that it would be best if I obtained a compensation consultant. Since that time I brought in John England (consultant-Towers Perrin) and Jim Barrall (attorney-Latham Watkins)."[19]

Other documents appear to substantiate Mr. England's role as personal advisor to Mr. Mozilo. Mr. England and his colleagues at Towers Perrin appear to have discussed the terms of a possible counter-proposal only with Mr. Mozilo, rather than with other Countrywide management. Mr. England submitted his preliminary proposal to Mr. Mozilo on October 4, 2006, copying only Mr. Mozilo's attorney and other Towers Perrin employees and no members of Countrywide's management.[20] In an October 15, 2006, e-mail, Mr. Mozilo noted that Mr. England transmitted the revised proposal to the Countrywide board only after being "instructed" to do so by Mr. Mozilo.[21]

In the counter-proposal to the board, Mr. England proposed multiple changes to Mr. Zimmerman's original compensation proposal. On the issue of the peer group against which Mr. Mozilo's compensation should be measured, Mr. England suggested dropping Sun Trust, BB&T, and Fifth Third Bancorp, all of which better matched Countrywide's size and had lower paid CEOs, and replacing them with Goldman Sachs, Merrill Lynch, and Bank of America, all of which are large investment banks with higher paid CEOs.[22] He also proposed that Mr. Mozilo receive a $15 million "sign-on equity award."[23]

---

[18] E-mail from John England to Ross Zimmerman (Sept. 28, 2006) (CFC BATES No. 0000798).

[19] E-mail from Angelo Mozilo to Susan Bow (Oct. 15, 2006) (CFC BATES No. 0000660).

[20] E-mail from John England to Angelo Mozilo (Oct. 4, 2006) (CFC BATES No. 0000803).

[21] E-mail from Angelo Mozilo to Susan Bow (Oct. 15, 2006) (CFC BATES No. 0000660).

[22] Towers Perrin, *Countrywide Financial: Competitive Compensation Arrangement for the Chairman of the Board and CEO* (Oct. 4, 2007) (CFC BATES No. 0000858).

[23] *Id.* at CFC BATES No. 0000848.

In the end, the board made a number of revisions to accommodate Mr. Mozilo and Mr. England. On the issue of the appropriate peer group, the board dropped BB&T and Fifth Third Bancorp and added Merrill Lynch.[24] Noting its discomfort with giving Mr. Mozilo a $15 million "contract renewal" bonus, as Mr. England advocated, the board instead gave Mr. Mozilo $10 million and positioned it as reimbursement for retirement payments he could have received had he retired.[25]

After receiving the board's final proposal, Mr. England e-mailed Mr. Mozilo:

My primary unhappiness with what the Board has put forth is that it lowers your maximum opportunity significantly. That's been accomplished by lowering the target bonus and reducing the maximum bonus. …

That being said, given your desire to sign an agreement today, the Board's proposal is not unreasonable. It's a significant enhancement from what Zimmerman had the first time around.[26]

In response, Mr. Mozilo e-mailed Mr. England:

I appreciate your input but at this stage in my life at Countrywide this process is no longer about money but more about respect and acknowledgement of my accomplishments. … Boards have been placed under enormous pressure by the left wing anti business press and the envious leaders of unions and other so called "CEO Comp Watchers" and therefore Boards are being forced to protect themselves irrespective of the potential negative long term impact on public companies. I strongly believe that a decade from now there will be a recognition that entrepreneurship has been driven out of the public sector resulting in underperforming companies and a willingness on the part of Boards to pay for performance.[27]

The final 2006 compensation agreement reflected an effort by the Countrywide board to reduce Mr. Mozilo's compensation. Even so, several components of the final agreement appear to benefit Mr. Mozilo while offering little value to Countrywide and its shareholders. These include the $81 million separation package, the $10 million pension replacement award, the calculation of the cash bonus, and the perquisites.

---

[24] *Countrywide Financial Corporation, Overview of Pay Package for Angelo Mozilo, as Approved by Countrywide's Board of Directors* (Oct. 20, 2006)) (CFC BATES No. 0000883-886).

[25] *Id.*

[26] E-mail from John England to Angelo Mozilo (Oct. 20, 2006) (CFC BATES No. 0000888).

[27] E-mail from Angelo Mozilo to John England (Oct. 20, 2006) (CFC BATES No. 0000888).

### 1.    The $81 Million Separation Package

Mr. Mozilo's 2006 employment agreement outlines the terms of his compensation in the event of his resignation, termination, or a "change in control" at the company. The company has estimated the value of his benefits upon separation at $81 million, including $37.5 million in severance and benefits. Table 2 summarizes the components of Mr. Mozilo's separation package.

**Table 2. Estimated Value of Angelo Mozilo's Separation Package[28]**

| Type of benefit | Value |
| --- | --- |
| Cash severance | $36,392,209 |
| Pension/retirement benefits (SERP) | $22,340,419 |
| Deferred compensation | $20,604,877 |
| Equity acceleration (at $7 per share) | $1,609,148 |
| Consulting agreement (per year) | $400,000 |
| Perquisites* | $45,651 |
| **Estimated Benefits for Separation of Employment** | **$81,392,304** |

*\* The value for perquisites only includes the value of "health and welfare" benefits. Under the contract, Mr. Mozilo is also entitled to other perquisites, including use of the company airplane, payment of country club dues, office space, and other benefits. The monetary value of these perquisites is unknown.*

The separation terms of the employment agreement heavily favor Mr. Mozilo. Under the agreement, Mr. Mozilo can terminate his employment under a wide range of circumstances and receive cash severance. According to the agreement, Mr. Mozilo can terminate his employment and still receive cash severance and other benefits if Countrywide "takes any action … which results in the diminution of Executive's status, title, position and responsibilities."[29] He can even terminate his employment with severance if the company "takes an action that results in Executive not being able to travel by private aircraft at Company expense."[30]

On the other hand, Countrywide appears to have little, if any, authority to reduce the size of Mr. Mozilo's separation package for poor performance. The compensation agreement does authorize the board to revoke certain components of the separation package "for cause."[31] But "cause" is defined so narrowly that it does not appear to include poor performance. Under the contract, "cause" is defined as a conviction for a felony or a material breach of the employment

---

[28] Based on data provided in Countrywide documents provided to the Committee (CFC BATES No. 0000672) and Countrywide's 2007 Proxy.

[29] Countrywide Form 8-K, *Compensatory Arrangements of Certain Officers*, 13 (Dec. 26, 2006).

[30] *Id.*

[31] *Id at 12.*

agreement "committed in bad faith or without a reasonable belief that such breach is in the best interests of the Company."[32]

In his prepared testimony, Harley Snyder, the current chair of Countrywide's compensation committee, asserts that Mr. Mozilo's compensation agreement "aligned Mr. Mozilo's interests with that of the shareholders."[33] But the terms of Mr. Mozilo's compensation agreement appear to sever this purported alignment during periods of declining stock value. Under the agreement, the Countrywide board does not appear to have had the authority to terminate Mr. Mozilo's employment and revoke his cash severance for poor performance.

On January 11, 2008, Bank of America announced plans to acquire Countrywide.[34] Under the terms of Mr. Mozilo's compensation agreement, this change in control entitles Mr. Mozilo to a large cash severance. On January 28, after the Committee informed Mr. Mozilo that he would be called as a witness, Mr. Mozilo announced he would forfeit his cash severance and the consulting agreement and perquisites following the anticipated Bank of America merger. The value of his forfeited severance and benefits is $37.5 million.[35]

## 2.    The $10 Million Pension Replacement Award

Mr. England proposed giving Mr. Mozilo a one-time $15 million grant of restricted stock to provide an incentive for the new three-year term and recognize his "significant concessions" in target compensation.[36] The board agreed to a $10 million annual equity award but resisted giving Mr. Mozilo $15 million and indicated that it was not "comfortable" with the positioning of the award proposed by Mr. Mozilo; instead, it opted to offer Mr. Mozilo a one-time equity award of $10 million to reimburse him for foregone retirement benefits.[37] This payment was to be made in addition to the other components of Mr. Mozilo's compensation, including his salary and any bonus.

After realizing that he was eligible to collect $3 million per year under his Supplemental Executive Retirement Plan (SERP), Mr. Mozilo suggested to Mr. England in an e-mail that

---

[32] *Id.*

[33] House Committee on Oversight and Government Reform, Testimony of Harley Snyder, *Executive Compensation II: CEO Pay and the Mortgage Crisis,* 110th Cong. (Mar. 7, 2008).

[34] Bank of America, *Bank of America Agrees to Purchase Countrywide Financial Corp* (Jan. 11, 2008).

[35] Countrywide Financial Corporation, *Countrywide CEO Angelo Mozilo Announces Decision to Voluntarily Relinquish Rights to Approximately $37.5 Million in Cash Severance Payments, Consulting Fees and Perquisites* (Jan. 28, 2008).

[36] Towers Perrin, *Countrywide Financial: Competitive Compensation Arrangement for the Chairman & CEO* (Oct. 24, 2006) (CFC BATES No. 0000861).

[37] Countrywide Financial Corporation, *Overview of Pay Package for Angelo Mozilo, as Approved by Countrywide's Board of Directors* (CFC BATES No. 0000883-0000886).

"[a]lthough it may be unusual," he wanted to collect these retirement payments while continuing his employment with Countrywide.[38] Mr. England did not believe this was a good idea. He wrote: "We can troll through proxy statements but I have never heard of a CEO receiving a pension payment in addition to earning salary, bonus, and long-term incentives."[39] In the end, Mr. Mozilo agreed to accept the $10 million pension replacement award offered by the board.

### 3. The Calculation of the Cash Bonus

Another noteworthy component of the 2006 compensation agreement is the formula used for calculating Mr. Mozilo's cash bonus. According to the agreement, Mr. Mozilo would receive a cash bonus calculated as a percentage of net income based on the company's return on equity (ROE). If Countrywide's ROE was lower than 10%, he would not receive a cash bonus. If ROE was between 10% and 12%, he would receive a bonus calculated as 0.44% of the company's net income over 10% ROE. If ROE exceeded 12%, he would receive a cash bonus equivalent to 0.44% of Countrywide's net income over 10% ROE, plus 0.64% of Countrywide's net income over 12% ROE, with a maximum value of $10 million.[40]

Through the second quarter of 2007, Countrywide's ROE was 23% over the previous five years, nearly double the threshold set in the agreement.[41] As a result, the new formula had the effect of rewarding Mr. Mozilo even if ROE declined significantly. One member of Countrywide's human resources department wrote in an e-mail: "I can't believe how low the ROE measures are. Over the past three years CFC's ROE has been in excess of 17%. ... [S]hareholders or newspapers might comment all over this evident fact."[42]

### 4. The Perquisites

One point of contention during the contract negotiations was the level of perquisites Mr. Mozilo would receive. Mr. Mozilo emphasized on several occasions that he expected his new contract to provide explicitly for reimbursement of any taxes owed when his wife traveled with him on the Countrywide jet. In one e-mail to Mr. England, Mr. Mozilo wrote: "in order to avoid extraordinary travel expenses to be incurred by [the President and Chief Operating Officer] and me the spouses would have to travel commercial or not at all, which is not right nor wise."[43]

---

[38] E-mail from Angelo Mozilo to John England (Nov. 24, 2006) (CFC BATES No. 0000953).

[39] E-mail from John England to Angelo Mozilo (Nov. 24, 2006) (CFC BATES No. 0000953).

[40] Countrywide Form 8-K, *Compensatory Arrangements of Certain Officers* (Dec. 26, 2006).

[41] *Mozilo Wins Even if Countrywide's Profits Plummet*, Reuters (July 25, 2007).

[42] E-mail from Tara Nadaf to Chuck Quon (Nov. 17, 2006) (CFC BATES No. 0000650).

[43] E-mail from Angelo Mozilo to John England (Nov. 23, 2006) (CFC BATES No. 0000952).

At the end of this e-mail, Mr. Mozilo raised the possibility of retiring if the board did not address this and other concerns:

> The Board must understand that if I were to retire today I would be receiving the SERP, receive approx. $15 million in deferred comp., get Directors fees and be able to liquidate my 12 million shares without restriction.  More importantly I wouldn't have to continuously travel all over the world on behalf of the shareholders.[44]

The final compensation agreement obligated Countrywide to pay any taxes due when Mr. Mozilo's wife accompanied him on business trips on the corporate jet.[45]

**C.**    **Mr. Mozilo's Stock Sales**

In addition to his compensation in the form of salary, bonuses, and other compensation, Mr. Mozilo has made hundreds of millions of dollars by exercising stock options and selling shares.  In total, as shown in Table 3, he has made more than $400 million by exercising stock options and selling shares since he became CEO in 1998.

**Table 3.  Money Earned Upon Exercise of Stock Options, 1998-2007[46]**

| Year | Value Realized Upon Option Exercise | Year | Value Realized Upon Option Exercise |
|------|------|------|------|
| 1998 | $0 | 2004 | $48,591,496 |
| 1999 | $0 | 2005 | $119,024,772 |
| 2000 | $416,823 | 2006 | $72,214,959 |
| 2001 | $0 | 2007 | $121,726,054 |
| 2002 | $10,420,372 | | |
| 2003 | $34,361,357 | **Total** | **$406,755,833** |

Mr. Mozilo's transactions in 2006 and 2007 raise particular questions because during this period, Mr. Mozilo made three changes to his stock trading plan, called a "10b5-1 plan," to increase the volume of shares he could sell.  The Securities and Exchange Commission (SEC) authorizes the use of 10b5-1 stock trading plans by corporate executives as an affirmative defense or "safe harbor" against insider trading allegations.  Under these plans, executives must

---

[44] *Id.*

[45] Countrywide Form 8-K, *Compensatory Arrangements of Certain Officers*, 10 (Dec. 26, 2006).

[46] Data for 1998-2006 extracted from Countrywide proxy statements; data for 2007 calculated based Committee analysis of Countrywide Form 4 filings with the SEC for Jan. 4, 2007 through Oct. 12, 2007, the date of Mr. Mozilo's last sale.

set the dates or prices of their trades in advance and cannot set up a plan when they possess material knowledge not available to the public.[47]

On October 24, 2006, Mr. Mozilo announced that the company would execute a board-approved plan to repurchase up to $2.5 billion in Countrywide stock.[48]  The day after, Countrywide's stock price jumped $1.41, almost 4%.[49]  Just three days later, on October 27, 2006, Mr. Mozilo adopted a new 10b5-1 plan allowing him to sell 350,000 shares a month.[50]  In November, the company repurchased 38.6 million shares of its common stock for $1.5 billion, financed through the issuance of new debt.[51]

On December 12, 2006, Mr. Mozilo filed another stock trading plan to increase his sale of shares.[52]  On February 2, 2007, Mr. Mozilo amended this new trading plan to increase once again the number of shares he could sell.  He now was allowed to sell 580,000 shares each month.[53]  On the same day of this last change, Countrywide shares reached an all-time high of $45.03 per share.

On May 16, 2007, Countrywide announced plans to buy back 23 million more shares for about $1 billion.[54]  The company executed this buy back immediately in May.[55]  Countrywide's stock prices increased by almost $1 per share the day after the announcement.[56]

In total, Mr. Mozilo sold approximately 5.8 million shares between November 2006 and the end of 2007, realizing almost $150 million.[57]

The Countrywide board was aware of the revisions to Mr. Mozilo's stock trading plan, but took no steps to prevent Mr. Mozilo from selling shares while the company implemented its share buyback plan.  In fact, several board members also sold millions of dollars worth of shares

---

[47] 17 C.F.R. Section 240.10b5-1(c)(2006); Jesse M. Fried, *Insider Abstention*, 113 YALE L.J. 455, 487 (2003).

[48] Countrywide, *Countrywide Reports 2006 Third Quarter Results* (Oct. 24, 2006).

[49] Committee analysis of Merrill Lynch's stock prices, obtained from www.nasdaq.com.

[50] Committee analysis of Countrywide Form 4 filings with the SEC.

[51] Countrywide Form 10-K, 42 (Mar. 1, 2007).

[52] Committee analysis of Countrywide Form 4 filings with the SEC.

[53] *Id.*

[54] *Countrywide Financial rises on plan to buy back 23 million shares*, Associated Press (May 17, 2007).

[55] Countrywide Form 10-Q, 103 (Aug. 9, 2007).

[56] Committee analysis of Merrill Lynch's stock prices, obtained from www.nasdaq.com.

[57] Committee analysis of Countrywide Form 4 filings with the SEC between Nov. 1, 2006 and Oct. 12, 2007.

during the same period.[58]  Harley Snyder, the current chair of the compensation committee, was among the board members making stock sales during this period.[59]

## IV.  MR. O'NEAL'S COMPENSATION

Stanley O'Neal joined Merrill Lynch in 1986, rising to CEO in December 2002 and Chairman in 2003; he resigned in October 2007.  He did not have an employment agreement while serving as CEO and Chairman.

Mr. O'Neal was well compensated by Merrill Lynch.  During Mr. O'Neal's six-year tenure as CEO, he received more than $163 million in cash, stock, and stock options.  Table 4 summarizes the details of Mr. O'Neal's compensation during this period.

**Table 4.  Compensation Awarded to Stanley O'Neal, 2002-2007[60]**

| Year | Base Salary | Cash Bonus | Other Compensation | Restricted Stock* | Stock Options* | Total Compensation |
|------|-------------|------------|--------------------|-------------------|----------------|--------------------|
| 2002 | $500,000 | $7,150,000 | $77,553 | $5,355,000 | $2,295,000 | $15,377,553 |
| 2003 | $500,000 | $13,500,000 | $312,299 (Includes $114,158 in personal aircraft use and $167,838 for car use) | $11,200,000 | $2,800,000 | $28,312,299 |
| 2004 | $700,000 | $0 | $334,517 (Includes $119,395 in personal aircraft use and $185,033 for car use) | $31,300,000 | 0 | $32,334,517 |
| 2005 | $700,000 | $14,100,000 | $500,294 (Includes $163,685 in personal aircraft use and $198,394 in car use.) | $22,200,000 | 0 | $37,500,294 |
| 2006 | $700,000 | $18,500,000 | $375,298 (Includes $149,133 in personal aircraft use and $212,505 in car use.) | $28,800,000 | 0 | $48,375,298 |
| 2007 | $584,000 | $0 | $593,691 (Details will be revealed in 2008 proxy.) | $0 | 0 | $1,177,691 |
| Total | $3,684,000 | $53,250,000 | $2,193,652 | $98,855,000 | $5,095,000 | $163,077,652 |

*The value of stock awards and option awards is based on the grant date fair value.  Stock awards would be worth less today given the decline in stock price.  Some unexercised options are currently underwater.*

---

[58] *Id.*

[59] *Id.*

[60] Salary, bonus, and equity data are extracted from Merrill Lynch proxy statements and confirmed by a Merrill Lynch document provided to the Committee, "E. Stanley O'Neal Six Year Total Compensation History" (No BATES number).  "Other compensation" data are extracted from Merrill Lynch proxy statements.

For most of Mr. O'Neal's term as CEO, Merrill Lynch prospered. In the fourth quarter of 2007, however, Merrill Lynch reported a net loss of $10.3 billion, the largest quarterly loss in the company's history. [61] The company also recorded write-downs of $7.9 billion in the third quarter and $11.5 billion in the fourth quarter. [62] These losses were related to sub-prime mortgage exposure accumulated under Mr. O'Neal's leadership. By the end of 2007, the company's stock had fallen 45% to $53.68 per share from its five-year peak of $97.53 per share in January 2007. [63] Merrill Lynch stock closed at $49.32 per share on March 5, 2008. [64]

When Mr. O'Neal departed Merrill Lynch in October 2007, the board faced four key issues: (1) whether to allow Mr. O'Neal to retire; (2) whether to renegotiate his noncompetition agreement; (3) whether to offer him continuing perquisites; and (4) whether to pay him any special severance. The decisions the board made significantly enriched Mr. O'Neal at a time when Merrill Lynch and its shareholders were absorbing large losses. It is questionable whether these decisions served the interests of Merrill Lynch and its shareholders.

## A.    The Award of $131 Million in Unvested Stock and Stock Options

In dollar terms, the biggest decision the board made upon Mr. O'Neal's departure was its decision to allow him to retire rather than to terminate him for cause. [65] In total, Mr. O'Neal's retirement package was worth $161 million at the time of his departure, which included $24.6 million in pension, retirement, and annuity benefits. This total also included $5.4 million in deferred compensation, which he stood to collect regardless of the circumstances of his termination. [66] By far the largest component of Mr. O'Neal's retirement package was $131 million in unvested stock and options. [67] If the board had terminated Mr. O'Neal for cause, he would have been required to forfeit these unvested stock and options.

The terms of Merrill Lynch's equity grants to employees provide that the board has "sole, absolute, and unreviewable discretion" to cancel unvested grants by terminating employees for cause. [68] During the Committee's investigation, Merrill Lynch's representatives told staff that the company could have been subject to litigation if the board had dismissed Mr. O'Neal for

---

[61] Merrill Lynch, *Merrill Lynch Reports Full Year 2007 Net Loss from Continuing Operations of $8.6 Billion* (Jan. 17, 2008).

[62] *Id.*

[63] Committee analysis of Merrill Lynch's stock prices, obtained from www.nasdaq.com.

[64] *Id.*

[65] Document provided to the Committee entitled "ESO Holdings and Valuation" (value as of Oct. 29, 2007) (No BATES number).

[66] *Id.*

[67] Merrill Lynch estimates that Mr. O'Neal's package is now worth about $107.7 million, as of Mar. 3, 2008, as a drop in the company's stock price has lowered the value of his equity holdings. E-mail from Raymond S. Calamaro to Committee staff (Mar. 4, 2008).

[68] Policy language provided to Committee by Merrill Lynch (Feb. 8, 2008).

cause and canceled his unvested stock and options because Mr. O'Neal's actions did not meet the company's definition of "cause." The document authorizing certain equity grants defines termination for cause as follows:

> "Cause" shall mean a determination by a committee ... that in its sole, absolute, and un-reviewable discretion: (i) at the time of the termination of your employment, you had committed: a) any violation of Merrill Lynch's rules, regulations, policies, practices, and/or procedures; b) any violation of the laws, rules, or regulations of any governmental entity or regulatory or self-regulatory organization, applicable to Merrill Lynch; or c) criminal, illegal, dishonest, immoral, or unethical conduct reasonably related to your employment; and (ii) as a result of such conduct, it is appropriate to disqualify you from Career Retirement treatment with respect to the Restricted Shares covered by this Grant Document.[69]

It is unclear how this definition would be interpreted in litigation, and it is also unclear what role, if any, legal considerations played in the board's decisions. No documents were provided to the Committee that indicated that the board ever debated terminating Mr. O'Neal for cause or considered withholding all or part of Mr. O'Neal's $131 million in unvested stock and options. From a shareholder perspective, there appears to be no justification for precluding the board from recouping unvested stock and options in cases of poor performance.

## B.     Reduction in Noncompetition Provisions

Another action taken by the board at Mr. O'Neal's departure was the renegotiation of his noncompetition agreement. A covenant agreement Mr. O'Neal signed in 2004 prohibited him from working for any Merrill Lynch competitor, defined broadly, until all of his stock and options had vested or expired.[70] This is estimated to be three to four years from the time of his retirement.[71]

According to company documents, Mr. O'Neal's attorneys proposed reducing the noncompetition term to one year and limiting the scope to a specific list of companies.[72] Ultimately, the board and Mr. O'Neal agreed to modify his noncompetition agreement to apply

---

[69] *Id.*

[70] Merrill Lynch Form 8-K, *Entry into a Material Definitive Agreement*, 4 (Sept. 17, 2004).

[71] According to company documents provided to the Committee entitled "ESO Holdings and Valuation" (value as of Oct. 29, 2007) (No BATES number), the last of Mr. O'Neal's restricted stock vests in Jan. 2011.

[72] Draft separation agreement sent as an attachment via e-mail from Joseph E. Bachelder to Robert D. Joffe at Cravath, Swaine & Moore LLP (Oct. 27, 2007) (Merrill Lynch BATES No. 0001353-0001372).

to only nine specific companies for a period of 18 months. These new terms superseded and replaced all prior noncompetition obligations.[73]

These changes in the noncompetition agreement were approved at a special meeting of the compensation committee on October 29, 2007, and at a meeting of the full board the next day. Only one board member, Aulana Peters, raised any objection to loosening Mr. O'Neal's noncompetition restrictions.[74] The documents the Committee received provide no explanation why the narrowing of Mr. O'Neal's noncompetition agreement was determined to be in the interests of Merrill Lynch and its shareholders.

### C.   Post-Retirement Perquisites

Because Mr. O'Neal had no employment agreement with Merrill Lynch, Mr. O'Neal was not entitled to continued perquisites after his departure. Nonetheless, the board agreed to provide Mr. O'Neal with office space in New York City for his personal use and the full-time services of an executive assistant for up to three years.[75] The monetary value of this benefit is unknown. The documents do not reflect what shareholder value the board hoped to obtain by providing these perquisites to Mr. O'Neal.

### D.   Severance Payment

At the time of his retirement, Mr. O'Neal's attorneys proposed that Mr. O'Neal receive a $45 million cash severance payment.[76] The final separation agreement did not include the cash severance payment sought by Mr. O'Neal.

## V.   MR. PRINCE'S COMPENSATION

Charles Prince worked for Citigroup or its predecessor companies for 29 years, becoming CEO in October 2003 and Chairman in April 2006. He did not have an employment agreement while Chairman and CEO.  Table 5 summarizes the details of Mr. Prince's compensation during his time as Chairman and CEO.

---

[73] Merrill Lynch Form 8-K, *Compensatory Arrangements of Certain Officer*, 3-4 (Oct. 30, 2007). In notable contrast, Mr. Prince's termination agreement includes a significant non-competition and non-solicitation clause, saying Mr. Prince will not solicit certain Citigroup employees and clients or engage in any competition with the company for a period of five years.

[74] Merrill Lynch document provided to the Committee, *Excerpts from Meeting Minutes from the Merrill Lynch and Management Development and Compensation Committee and the Merrill Lynch Board of Directors* (No BATES number).

[75] Merrill Lynch Form 8-K, *Compensatory Arrangements of Certain Officers*, 3 (Oct. 30, 2007).

[76] Draft separation agreement sent as an attachment via e-mail from Joseph E. Bachelder to Robert D. Joffe at Cravath, Swaine & Moore LLP (Oct. 27, 2007) (Merrill Lynch BATES No. 0001353-0001372).

**Table 5.  Compensation Awarded to Charles Prince, 2003-2007**[77]

| Year | Base Salary | Cash Bonus | Other Compensation | Stock Awards* | Option Awards* | Total Compensation |
|---|---|---|---|---|---|---|
| 2003 | $638,636 | $6,965,375 | < $50,000 | $19,207,706 | $2,396,634 | $29,208,351 |
| 2004 | $983,333 | $9,690,000 | $123,290 (Includes $108,208 in transportation expenses, such as personal use of company aircraft.) | $7,805,833 | $1,320,485 | $19,922,941 |
| 2005 | $1,000,000 | $12,000,000 | $328,062 (Includes $133,114 in transportation expenses, such as personal use of company aircraft.) | $9,666,667 | $0 | $22,994,729 |
| 2006 | $1,000,000 | $13,200,000 | $395,779 (Includes $258,338 for personal use of company aircraft.) | $10,633,333 | $746,607 | $25,975,719 |
| 2007 | $1,000,000 | $10,400,958 | $234,643 (Details to be reported in 2008 proxy). | $0 | $337,367 | $11,972,968 |
| TOTAL | $4,621,969 | $52,256,333 | $1,081,774 | $47,313,539 | $4,801,093 | $110,074,708 |

*\* The value of stock awards and option awards is based on grant date fair value.  Stock awards would be worth less today given decline in stock price.  Unexercised options are currently underwater.*

Mr. Prince's compensation history is similar to Mr. Mozilo's and Mr. O'Neal's.  Mr. Prince was well paid by Citigroup, receiving more than $110 million in cash, stock, and stock options during his five years as CEO.  For most of this period, there is no obvious disconnect between the compensation Mr. Prince received and the performance of the company.

In 2007, however, Mr. Prince's compensation and the performance of Citigroup diverged. Mr. Prince continued to be well compensated in 2007, even receiving a lucrative bonus for that performance year.  Yet Citigroup's performance suffered.  In 2007, Citigroup's net income dropped by more than $17 billion from 2006.[78]  The company was forced to write off more than $18 billion in losses due to its exposure to the subprime mortgage market.[79]  By the end of 2007, the company's stock had fallen to $29.44 per share, a 48% decline from its peak of $56.41 per share in December 2006.[80]  Citigroup stock closed at $22.15 per share on March 5, 2008.[81]

The Citigroup board made three decisions in November 2007 that significantly enriched Mr. Prince despite the poor performance of the company under his leadership:  (1) the board

---

[77] Obtained from Citigroup proxy statements and confirmed by a document provided to the Committee by Citigroup, *Chuck Prince:  Compensation 2003-2007* (No BATES number).

[78] Citigroup, *Citi Reports Fourth Quarter Net Loss of $9.83 Billion, Loss Per Share of $1.99* (Jan. 15, 2008).

[79] *Id.*

[80] Committee analysis of Citigroup's stock prices, obtained from www.nasdaq.com.

[81] *Id.*

awarded him a pro-rata cash bonus for the 2007 performance year, amounting to $10.4 million; (2) the board allowed him to retain almost $28 million in unvested stock and stock options by letting him retire rather than terminating him for cause; and (3) the board granted him perquisites worth $1.5 million annually. Questions can be raised whether these decisions were in the interests of Citigroup and its shareholders.

### A.    The $10 Million Bonus

Because Mr. Prince had no employment contract with Citigroup, he had no contractual entitlement to a bonus when he stepped down as CEO in November 2007. The board, however, decided to award Mr. Prince a pro-rata cash bonus for the 2007 performance year. This award, paid in early 2008, amounted to $10.4 million.[82] The amount of the bonus was equal to his 2006 compensation pro-rated for the date of his departure and decreased by the total shareholder return percentage for 2007.[83]

Of the three CEOs who will testify before the Committee, Mr. Prince is the only one to receive a performance bonus for 2007. The documents provided to the Committee do not explain why the board determined that awarding Mr. Prince a $10 million bonus advanced shareholder interests.

### B.    Award of Unvested Stock and Stock Options

When Mr. Prince became CEO in 2003, he was given a "retention award" of restricted stock valued at $15 million. This "retention award" did not vest until July 2008 and was therefore valueless at the time of Mr. Prince's resignation.[84] According to the company's 2007 proxy statement, if Mr. Prince had voluntarily resigned at the end of the year, he would have forfeited the entire 2003 retention award.[85]

Nevertheless, the board elected to grant Mr. Prince a pro-rata portion of the retention award on his retirement in November 2007. The value of the retention award the Board gave him was $10.7 million.[86]

In addition, Citigroup's board treated Mr. Prince's departure as a retirement as opposed to a termination for cause. This had an effect similar to the decision of the Merrill Lynch board to treat Mr. O'Neal's departure as a retirement rather than a termination: it gave Mr. Prince

---

[82] *COP Tally Sheet, Estimate of Termination of Employment Obligations* (calculated as of Nov. 2, 2007) (Citigroup BATES No. 00000001-00000002).

[83] Citigroup Form 8-K (Nov. 4, 2007).

[84] *COP Tally Sheet, Estimate of Termination of Employment Obligations* (calculated as of Nov. 2, 2007) (Citigroup BATES No. 00000001-00000002).

[85] Citigroup *Form Def 14A*, 58 (Mar. 13, 2007).

[86] *COP Tally Sheet, Estimate of Termination of Employment Obligations* (calculated as of Nov. 2, 2007) (Citigroup BATES No. 00000001-00000002).

ownership of about $16 million in previously unvested stock and $1.3 million in unvested options.[87]

If Citigroup had terminated Mr. Prince for cause, he would have lost all unvested equity positions, and he would not have been eligible to receive the additional retirement awards provided by the board.  As with Merrill Lynch, however, Citigroup restricted its own ability to revoke Mr. Prince's unvested stock.[88]

### C.    Post-Retirement Perquisites

In November 2007, the Citigroup board agreed to provide Mr. Prince with an office, an administrative assistant, and a car and driver for five years or until he finds another full-time job. The company also agreed to pay Mr. Prince's taxes associated with these post-termination benefits.  The company estimates the value of these perquisites at $1.5 million annually.[89]

Because Mr. Prince had no employment contract with Citigroup at the time of his departure, Mr. Prince was not entitled to these perquisites.  None of the documents provided to the Committee by Citigroup explain why providing $1.5 million in annual perquisites to Mr. Prince in retirement benefited Citigroup shareholders.

## VI.    CONCLUSION

The three case studies reveal important differences in the compensation packages and actions of Mr. Mozilo, Mr. O'Neal, and Mr. Prince.  Mr. Mozilo stands out as the only CEO who sold large numbers of shares in his company while the company was engaged in a stock buyback plan.  Mr. O'Neal stands out for the size of his retirement package, $161 million.  And Mr. Prince stands out for the $10 million performance bonus he received for a performance year in which the company's stock floundered.

---

[87] *Id.*  The value of the stock and option awards is based on the value as of the retirement date.  Under the Citigroup plan, these equity awards vest immediately upon retirement.  The stock awards would be worth less today given a decline in the stock price.  Unexercised options are currently underwater.

[88] Under the company's Capital Accumulation Program, employees terminated for "gross misconduct" lose any unvested stock and stock options they hold.  The Capital Accumulation Program prospectus defines "gross misconduct" as follows:

The Committee determines what constitutes competition and gross misconduct. Gross misconduct includes, but is not limited to, conduct that is in competition with the Company's business operations, that breaches any obligation to the Company or duty of loyalty, or that is materially injurious to the Company, monetarily or otherwise.

Definition provided by Citigroup via e-mail to Committee staff (Mar. 4, 2008) (citing CAP Prospectus, 32 (Oct.1, 2006)).

[89] *COP Tally Sheet, Estimate of Termination of Employment Obligations* (calculated as of Nov. 2, 2007) (Citigroup BATES No. 00000001-00000002).

At the same time, there are also striking similarities in the three case studies.  In 2007, as the mortgage crisis developed, Countrywide, Merrill Lynch, and Citigroup all suffered major losses.  Yet Mr. Mozilo, Mr. O'Neal, and Mr. Prince continued to receive lucrative pay and retirement packages.  The financial benefits realized by the CEOs as the subprime mortgage crisis unfolded do not appear to have been aligned with the interests of the shareholders.

At the hearing tomorrow, members may want to explore the causes of this disconnect between pay and performance and examine what steps company boards could take to address the issue.