IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION DERIVATIVE LITIGATION | C.A. No. 1:07-372 SLR (MPT) |
| ——————————————— | (Consolidated Action) |
| THIS RELATES TO ALL ACTIONS | |

**DEFENDANTS ANGELO R. MOZILO, HENRY G. CISNEROS,
ROBERT J. DONATO, HARLEY W. SNYDER, JEFFREY M. CUNNINGHAM,
MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON,
KEITH P. RUSSELL, AND NOMINAL DEFENDANT
COUNTRYWIDE FINANCIAL CORPORATION'S
<u>REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS</u>**


OF COUNSEL:

Brian E. Pastuszenski
Stuart M. Glass
Brian C. Devine
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
617.570.1000


Thomas A. Beck (#2086)
beck@rlf.com
Steven Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19801
302.651.7700


*Attorneys for Defendants Angelo R. Mozilo,
Henry G. Cisneros, Robert J. Donato, Harley
W. Snyder, Jeffrey M. Cunningham, Martin R.
Melone, Robert T. Parry, Oscar P. Robertson,
Keith P. Russell, and Nominal Defendant
Countrywide Financial Corporation*


Dated: May 12, 2008

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ................................................................................................................................ 5

I.     NO PARTICULARIZED FACTS EXCUSING DEMAND HAVE BEEN PLED ............ 5

      A.     Plaintiffs Have Not Satisfied *Aronson's* First Prong. ............................................... 6

            1.     Plaintiffs Do Not Argue Lack Of Independence ........................................... 6

            2.     Plaintiffs Have Not Shown Lack Of Disinterestedness ................................. 6

                   a.     Defendants Were Not On Both Sides Of The Stock Repurchases ... 7

                   b.     A Majority of Directors Did Not Even Sell Shares At The Same Time Countrywide Repurchased Shares ......................................... 8

      B.     Plaintiffs Have Not Shown The Stock Repurchase Was Anything Other Than A Valid Exercise Of Business Judgment, And Thus Have Failed To Satisfy *Aronson's* Second Prong ............................................................................................. 11

II.    A DUTY OF LOYALTY CLAIM HAS NOT BEEN STATED ....................................... 17

III.   PLAINTIFF IBEW SHOULD BE DISMISSED FOR LACK OF STANDING ............... 19

CONCLUSION ............................................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Applebaum v. Avaya,*
    812 A.2d 880 (Del. 2002) ................................................................................4, 13, 17

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984) ................................................................................ *passim*

*ATR-Kim Eng Fin. Corp. v. Araneta,*
    2006 WL 3783520 (Del. Ch. Dec. 21, 2006) ..............................................................8

*Bell Atl. Corp. v. Twombly,*
    127 S. Ct. 1955 (2007) ................................................................................................19

*Boyer v. Wilmington Materials, Inc.,*
    754 A.2d 881 (Del. Ch. 1999) ....................................................................................8

*Brehm v. Eisner,*
    746 A.2d 244 (Del. 2000) ..............................................................................6, 12, 16

*In re Coca-Cola Enters., Inc., S'holders Litig.,*
    2007 WL 3122370 (Del. Ch. Oct. 17, 2007) ............................................................18

*In re Computer Scis. Corp. Deriv. Litig.,*
    244 F.R.D. 580 (C.D. Cal. 2007) ............................................................................5, 6

*Copland v. Grumet,*
    88 F. Supp. 2d 326 (D.N.J. 1999) ............................................................................11

*Crocker v. Carrier Access Corp.,*
    2006 WL 2035366 (D. Colo. July 18, 2006) ..........................................................11

*Emerald Partners v. Berlin,*
    787 A.2d 85 (Del. 2001) ..............................................................................................8

*In re Emerging Commc'ns, Inc. S'holders Litig.,*
    2004 WL 1305745 (Del. Ch. May 3, 2004) ..............................................................8

*In re Exxon Mobil Corp. Secs. Litig.,*
    500 F.3d 189 (3d Cir. 2007) ......................................................................................18

*In re Fed. Nat'l Mortgage Ass'n Sec., Deriv. & ERISA Litig.,*
    503 F. Supp. 2d 25 (D.D.C. 2007) ............................................................................11

*In re Fuqua Indus., Inc. S'holders Litig.,*
    1997 WL 257460 (Del. Ch. May 13, 1997)...................................................................9

*Gagliardi v. Tri-Foods Int'l, Inc.,*
    683 A.2d 1049 (Del. Ch. 1996)...................................................................18

*Grobow v. Perot,*
    539 A.2d 180 (Del. 1988) ...................................................................12

*Guttman v. Huang,*
    823 A.2d 492 (Del. Ch. 2003)...................................................................7, 19

*Harris v. Carter,*
    582 A.2d 222 (Del. Ch. 1990)...................................................................9

*Highland Legacy Ltd. v. Singer,*
    2006 WL 741939 (Del. Ch. Mar. 17, 2006)...................................................................12

*Krasner v. Moffett,*
    826 A.2d 277 (Del. 2003) ...................................................................8

*Lewis v. Vogelstein,*
    699 A.2d 327 (Del. Ch. 1997)...................................................................12, 17

*In re MAXXAM, Inc./Federated Dev. S'holders Litig.,*
    1997 WL 187317 (Del. Ch. Apr. 4, 1997)...................................................................8

*In re Merck & Co. Sec., Deriv. & ERISA Litig.,*
    493 F.3d 393 (3d Cir. 2007)...................................................................12

*Norte & Co. v. Huffines,*
    304 F. Supp. 1096 (S.D.N.Y. 1968)...................................................................19

*O'Neill v. Maytag,*
    339 F.2d 764 (2d Cir. 1964)...................................................................19

*In re Primedia, Inc., Deriv. Litig.,*
    910 A.2d 248 (Del. Ch. 2006)...................................................................19

*In re Radiology Assocs., Inc. Litig.,*
    1990 WL 67839 (Del. Ch. May 16, 1990)...................................................................8

*Ryan v. Tad's Enters., Inc.,*
    709 A.2d 682 (Del. Ch. 1996)...................................................................8

*In re Silicon Graphics Inc. Sec. Litig.,*
    1996 WL 664639 (N.D. Cal. Sept. 25, 1996) ...................................................................12

*In re Silicon Graphics Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) ........................................................................12

*Spiegel v. Buntrock,*
    571 A.2d 767 (Del. 1990) .............................................................................5

*Stepak v. Ross,*
    1985 WL 21137 (Del. Ch. Sept. 5, 1985) ...................................................19

*In re Suprema Specialties, Inc. Secs. Litig.,*
    438 F.3d 256 (3d Cir. 2006) .......................................................................18

*Tansey v. Oil Producing Royalties, Inc.,*
    133 A.2d 141 (Del. Ch. 1957) ......................................................................8

*Tripp v. IndyMac Bancorp, Inc.,*
    2007 U.S. Dist. LEXIS 95445 (C.D. Cal. Nov. 29, 2007) ..........................17

*Valeant Pharms. Int'l v. Jerney,*
    921 A.2d 732 (Del. Ch. 2007) ......................................................................8

*In re Walt Disney Co. Deriv. Litig.,*
    906 A.2d 27 (Del. 2006) .............................................................................18

*Weinberger v. UOP, Inc.,*
    457 A.2d 701 (Del. 1983) .............................................................................8

*White v. Panic,*
    783 A.2d 543 (Del. 2001) ...........................................................................12

## Rules

Fed. R. Civ. P. 9(b) ..........................................................................4, 18, 19

iv

## PRELIMINARY STATEMENT

In their Opposition brief ("Opp.") plaintiffs accuse Countrywide of having written "a pretty good brief" that supposedly addresses a case different from the one plaintiffs brought. Opp. at 1 (D.I. 52). What defendants addressed, however, was the latest complaint plaintiffs filed -- which, of course, bears no similarity to the initial complaint they filed in this case (which challenged proxy disclosures concerning executive compensation). Despite the allegations that the Countrywide directors sold shares on the basis of material non-public information that appear throughout their Complaint (Compl. ¶¶ 4,10, 23, 26, 30-31 (D.I. 37)), plaintiffs now say (Opp. at 3, 15) they are not claiming that these individuals traded on the basis of such information. Despite alleging throughout their Complaint that the Company failed to disclose the impact of material adverse information (including information about loan delinquencies) on its financial condition (Compl. ¶¶ 10, 13, 23, 26), plaintiffs now say (Opp. at 3, 14) they are not accusing Countrywide's officials of having failed to disclose or misleadingly disclosed information to shareholders. Defendants demonstrated how these allegations fail both to state the particularized facts needed to excuse demand on the Board of Directors and to state a substantive claim on which relief can be granted. Unable to point to any facts indicating that a single director sold his shares with scienter, plaintiffs now have abandoned their insider trading allegations; unable to point to any facts that show Countrywide failed to disclose or incorrectly disclosed a single fact about its financial condition, plaintiffs likewise have now abandoned those allegations.

So, what's left? Plaintiffs now say that they are alleging only that the directors were on "both sides" of an open market stock repurchase transaction they approved in the fall of 2006, and that they somehow knew that the shares being repurchased were worth less than their market price -- *i.e.*, less than what the stock market valued them at. Opp. at 2, 15-17. From this

1

factually unsupported premise, plaintiffs contend demand should be excused because a majority of the directors are allegedly not disinterested for demand purposes and the transaction could not have been a reasonable business judgment. Plaintiffs' arguments -- assuming they do not try to change them yet again -- are dead on arrival.

Because they challenge a transaction approved by the entire Board, whether demand should have been made prior to filing this litigation is governed by the *Aronson* test. Under this test, demand is not excused unless in its complaint a plaintiff alleges *particularized facts* giving rise to a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814-15 (Del. 1984). Plaintiffs have alleged no particularized facts whatsoever meeting this standard.

Plaintiffs have chosen to premise their demand arguments on the directors supposedly being on "both sides" of the repurchase transaction. But, the absence of any facts whatsoever supporting this allegation -- indeed, plaintiffs' own Complaint contradicts and undermines this very argument -- is fatal and dispositive of both prongs of the *Aronson* demand test. The Court need proceed no further, and Defendants' motion to dismiss should be granted on that basis alone. More specifically:

- Although plaintiffs argue that the directors were on "both sides" of the stock repurchase transaction, plaintiffs allege no facts showing that Countrywide entered into any transaction with any of the directors. To the contrary, plaintiffs do not deny that Countrywide repurchased its shares not from any of the directors personally, but in the open market;

- Moreover, not only did Countrywide repurchase its shares in the open market, but plaintiffs' own allegations demonstrate that *a majority of the directors did not even sell any shares during either of the months (November 2006 and May 2007) when Countrywide is alleged to have repurchased its shares.*

2

In addition, a separate and independent ground for dismissal is that plaintiffs have not alleged any facts -- let alone facts pled with the required particularity -- calling into question whether the stock repurchase transaction was the product of reasonable business judgment. Under *Aronson*, absent such particularized facts, a board decision is presumed to have been reasonable under the Business Judgment Rule. Plaintiffs contend that the directors knew that the shares Countrywide repurchased in November 2006 and May 2007 were not worth what the stock market thought they were worth, as reflected in the share price on the New York Stock Exchange. In other words, plaintiffs accuse the directors of "waste" (Compl. ¶¶ 13(a) and (b)). Waste is an extraordinarily difficult claim to establish and requires a plaintiff to demonstrate that the corporation received such disproportionately small value in the transaction that no rational person would have approved it. Plaintiffs, however, have not pleaded a single fact even remotely suggesting that the share price at the time of the stock repurchases did not reflect the true value of Countrywide stock at the time -- *i.e.*, that the share price failed to reflect material information about the direction of the housing market or about how the housing market would affect Countrywide's business operations that Countrywide's shareholders and the stock market as a whole did not know but that the directors somehow knew.

In that regard, plaintiffs do not even try to challenge Countrywide's Opening Brief in which it demonstrated that information during the relevant period about the direction of housing prices was publicly available and published in a variety of sources. Plaintiffs likewise have not alleged any facts suggesting that the directors knew of any secret metrics about how housing market conditions would affect Countrywide's business operations that the institutional and other investors, securities analysts, and entire stock market were not privy to. Indeed, plaintiffs do not dispute the discussion in Countrywide's Opening Brief in which it demonstrated that

3

Countrywide regularly disclosed to the investing public information about borrower delinquencies and the effect over time of housing market conditions on Countrywide's lending operations. To the contrary, plaintiffs concede that they are not claiming that Countrywide's disclosures were inaccurate, incomplete, or misleading in any way. *See* Opp. at 3, 14.

In short, plaintiffs have not pleaded a single fact showing that the stock market was not privy to information relevant to valuing Countrywide's common stock that the directors themselves somehow had. In other words, plaintiffs have not alleged any particularized facts showing that the market price of the stock was not an accurate gauge of its value during the relevant period, much less that the directors knew that. As the Delaware Supreme Court said in *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 889-90 (Del. 2002), a case cited by plaintiffs themselves (Opp. at 14), "a well-informed, liquid trading market will provide a measure of fair value superior to any estimate the court could impose."

In addition to plaintiffs' failure to make demand, the Complaint should be dismissed because it fails to state a claim for breach of the duty of loyalty. Plaintiffs premise this claim on the factually unsupported allegation that the directors were selling while the Company was buying at inflated prices. The Complaint itself, however, demonstrates that a majority of the directors did not sell their shares at the times the Company repurchased stock in the open market. Moreover, because plaintiffs claim that the directors were aware of material non-public information at the time they allegedly sold their shares, plaintiffs are accusing these directors of fraud, regardless of what label plaintiffs choose to put on these allegations. As such, plaintiffs' allegations "sound in fraud" and are subject to the factual particularity requirements of Federal Rule 9(b). Plaintiffs, however, do not allege any particularized facts showing that any of the directors sold a single share of stock while aware of and on the basis of material information that

4

the market did not also then know. For all of these reasons, the Complaint should be dismissed in its entirety and with prejudice.

## ARGUMENT

## I.    NO PARTICULARIZED FACTS EXCUSING DEMAND HAVE BEEN PLED.

Making pre-suit demand before commencing a shareholder derivative lawsuit is a bedrock principle of Delaware corporate governance. *Aronson*, 473 A.2d at 811. Delaware law presumes that a company's board of directors is in the best position to judge whether litigation on behalf of the company would benefit the corporation and its shareholders and should be pursued. *Id.* at 812; *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990). As a result,

> the balance of power between derivative plaintiffs and the corporation (or its directors) in a derivative action is purposefully asymmetric, and the pleading standards more exacting because of this presumption and the fact that a derivative plaintiff seeks to vindicate the corporation's interests, not just its own. Absent particularized allegations showing the board is unworthy of this deference, a derivative plaintiff must first make a demand on the board to investigate its claims.

*In re Computer Scis. Corp. Deriv. Litig.*, 244 F.R.D. 580, 590 (C.D. Cal. 2007) (applying Delaware law). A shareholder seeking to usurp the board's decision-making power and circumvent demand thus must plead particularized facts demonstrating that a majority of the directors are incapable of making an objective determination as to a demand were one made.

Because plaintiffs here challenge a decision by the Countrywide Board -- the stock repurchase program -- the *Aronson* test applies and demand will not be excused unless the Complaint alleges *particularized facts* creating a reasonable doubt that a majority of "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." 473 A.2d at 814-15; Opening Br. at 13; Opp. at 10. Plaintiffs' allegations concerning the Board's approval of the stock repurchase program, however, come nowhere close to meeting their "stringent," "onerous," and "exacting" pleading

burden under *Aronson. Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000); *In re Computer Scis.*
*Corp. Deriv. Litig.*, 244 F.R.D. at 585-86 & 591.[1]

### A.    **Plaintiffs Have Not Satisfied *Aronson's* First Prong.**

#### 1.    **Plaintiffs Do Not Argue Lack Of Independence.**

Plaintiffs do not argue in their Opposition that the directors lack independence. Nor
could they, as the Complaint contains no facts whatsoever suggesting that any of the directors is
under the economic control or domination of any of the defendants. *See* Opening Br. at 14-15
(citing cases). Instead, the Complaint contains only the conclusory allegation that a majority of
the directors "lack independence." Compl. ¶ 10. The "stringent requirements of factual
particularity," however, "d[o] not permit a stockholder['s] . . . pursuit of a purported corporate
claim based solely on conclusions, opinions or speculation." *Brehm*, 746 A.2d at 255.

#### 2.    **Plaintiffs Have Not Shown Lack Of Disinterestedness.**

Under *Aronson*, there are two ways to show that directors can be interested: (1) if they
"appear on both sides of a transaction" and receive a "personal benefit from it in the sense of
self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders
generally"; or (2) if plaintiffs plead particularized facts showing that the directors face a
"substantial likelihood" of liability on the claims alleged. *Aronson*, 473 A.2d at 812-15.

---

[1] Plaintiffs concede that to excuse demand they must satisfy strict pleading requirements, but
they nonetheless argue that this burden is not a heavy one. *See* Opp. at 11. Citing *Brehm*,
plaintiffs claim the demand requirement "is designed to create a balanced environment." *Id.*; 746
A.2d at 255. As noted above, however, plaintiffs ignore that "the balance . . . between derivative
plaintiffs and the corporation (or its directors) in a derivative action is *purposefully asymmetric.*"
*Computer Scis. Corp.*, 244 F.R.D. at 591. This is because "in a derivative case like this one, a
board of directors is entitled to a presumption that they can and should be allowed to manage the
business affairs of a corporation, including the decision of . . . whether ultimately to bring claims
on the corporation's behalf." *Id. Brehm* thus underscored the "*stringent* requirements of factual
particularity," and explained that the law "does not permit a stockholder['s] . . . pursuit of a
purported corporate claim based solely on conclusions, opinions or speculation." 746 A.2d at
255 (emphasis added).

Plaintiffs, however, do not argue that any director faces a "a substantial likelihood of liability" -- indeed, the phrase "substantial likelihood of liability" appears nowhere in the Complaint or in the Opposition. *See* Opp. at 10-15; Compl. ¶¶ 9-13. Instead, plaintiffs argue that Countrywide's directors are interested because some of the directors both approved the repurchase transaction and allegedly sold stock at the same time they were causing the Company to buy back stock. *See* Opp. at 12-14; Compl. ¶ 10. Plaintiffs thus claim that the repurchase transaction was akin to a "face-to-face transaction" where "the directors and the company are on opposite sides of the transaction." Opp. at 4, 13-14. This argument is meritless.

a.    **Defendants Were Not On Both Sides Of The Stock Repurchases.**

Countrywide repurchased certain of its shares in November 2006 and May 2007 in the open market at then prevailing share prices. Compl. ¶¶ 26-27. Plaintiffs do not allege -- nor could they -- that Countrywide repurchased any shares directly from any member of the Board. In fact, plaintiffs concede that Countrywide did not repurchase stock directly from its directors. *See* Opp. at 14 (directors did not engage in "face-to-face transactions" with the Company).

Absent particularized allegations that Countrywide purchased shares directly from its own directors, the stock repurchase transaction cannot be considered an "interested party transaction" that the directors were on both sides of. Opp. at 14. Indeed, plaintiffs do not cite a single case -- and Defendants are not aware of any -- holding that directors are "interested" if they sell shares on the open market while the company is buying shares on the open market. *See Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003) (where directors' alleged stock sales "not between the defendant-directors and [the company], but between the defendant-directors and marketplace buyers," plaintiff must show substantial likelihood of liability for illegal insider trading in order to demonstrate "interest" for demand futility purposes); *but see* Opp. at 15 ("this

7

is not a case alleging that the defendants traded on inside information"). To the contrary, the Delaware cases involving interested party transactions involve deals directly between a corporation and a corporate official or a company controlled by a director or officer.[2] Likewise, the Countrywide stock repurchases did not confer on the directors a "personal benefit" not shared by or equally available to the shareholders generally. Indeed, the repurchase program did not enable the directors to sell shares that they otherwise could not have sold. The market for Countrywide stock is very liquid, with millions of shares traded daily on the New York Stock Exchange. For example, during November 2006 (the month of the first stock repurchase), an average of 3-4 million shares were traded daily. *See* Supp. Fineman Decl. Ex. 44. Regardless of whether the repurchase program had occurred, the directors could have sold their Countrywide shares on the open market at any time, as any Countrywide shareholder could have done.

> **b.    A Majority of Directors Did Not Even Sell Shares At The Same Time Countrywide Repurchased Shares.**

Having conceded that Countrywide did not buy shares directly from any director, plaintiffs argue that certain directors were selling stock at the same time the Company was

---

[2] *See, e.g., Krasner v. Moffett*, 826 A.2d 277 (Del. 2003) (directors served on boards of both companies in merger transaction); *Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001) (director controlled both companies in merger transaction); *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) (directors served on boards of parent and majority-owned subsidiary in merger transaction); *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732 (Del. Ch. 2007) (directors paid large cash bonuses to themselves); *ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 3783520 (Del. Ch. Dec. 21, 2006) (controlling shareholder transferred assets to his immediate family); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745 (Del. Ch. May 3, 2004) (director had control of both parties in going-private transaction); *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881 (Del. Ch. 1999) (directors sold assets to company in which they held interest); *In re MAXXAM, Inc./Federated Dev. S'holders Litig.*, 1997 WL 187317 (Del. Ch. Apr. 4, 1997) (loan transaction between company and majority-owned subsidiary with common directors); *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682 (Del. Ch. 1996) (majority shareholders on both sides of going-private merger); *In re Radiology Assocs., Inc. Litig.*, 1990 WL 67839 (Del. Ch. May 16, 1990) (loan from company to a director); *Tansey v. Oil Producing Royalties, Inc.*, 133 A.2d 141 (Del. Ch. 1957) (loan from officer to company).

8

repurchasing and therefore "the economic effect was the same." Opp. at 14. Exhibit 7 to the Complaint itself, however, shows that of the nine Board members relevant to the demand analysis,[3] *a majority sold no shares whatsoever in November 2006 and May 2007*, the two months when Countrywide is alleged to have repurchased stock. Compl. ¶¶ 26-27; Opp at 5, 6-7. This is shown in the following chart, which is drawn from Exhibit 7 to the Complaint:

| **DIRECTOR** | **SHARES SOLD IN NOVEMBER 2006** |
|---|---|
| Henry G. Cisneros | *None* |
| Robert J. Donato | *None* |
| Martin R. Melone | *None* |
| Robert T. Parry | *None* |
| Keith P. Russell | *None* |
| Harley W. Snyder | *None* |

| **DIRECTOR** | **SHARES SOLD IN MAY 2007** |
|---|---|
| Jeffrey M. Cunningham | *None* |
| Robert J. Donato | *None* |

---

[3] The date for analyzing demand futility in this case is September 14, 2007, when the Complaint was amended to include the stock repurchase claim. *See* Opening Br. at 7 n.5; *Harris v. Carter*, 582 A.2d 222, 230 (Del. Ch. 1990) (where complaint amended to include claims "not already validly in litigation," demand analyzed as of date amended). Plaintiffs incorrectly argue (Opp. at 12 n.3) that *Harris* is limited to cases where there has been a change of control within the Board. To the contrary, *In re Fuqua Indus., Inc. S'holders Litig.*, 1997 WL 257460, at *13 (Del. Ch. May 13, 1997), which plaintiffs ignore, makes clear that the key factor is when the claim was made: "claims alleged in an amended complaint, *which were not already validly in litigation*, should be presented in the board in existence at the time of filing of the amended complaint or the plaintiff should state with particularity why demand upon that board would be futile."

9

| | |
|---|---|
| Martin R. Melone | *None* |
| Robert T. Parry | *None* |
| Oscar P. Robertson | *None* |
| Keith P. Russell | *None* |
| Harley W. Snyder | *None* |

As shown above, six of the nine directors sold *no shares in November 2006.* Likewise, seven of the nine directors sold *no shares in May 2007.* Indeed, a majority of the Board (Messrs. Donato, Melone, Parry, Russell and Snyder) sold no shares in either November 2006 or May 2007. What is more, three of the four members of the Audit Committee (Messrs. Melone, Parry, and Russell), which oversees the Company's financial reporting, sold no shares at all in either 2006 or 2007, a fact entirely at odds with plaintiffs' assertion that they were somehow aware of material non-public information about the effect of the direction of the housing market on Countrywide's financial condition. *See* Compl. Ex. 7. A clear majority of the Board therefore did not sell while the Company was effecting open market repurchases, thus refuting plaintiffs' unsupported assertion that "the economic effect" of the repurchase program was the same as "classic self-dealing." Opp. at 14.

Plaintiffs nowhere acknowledge that a majority of the directors sold no shares in either of the two months Countrywide is alleged to have repurchased shares. Rather, plaintiffs nebulously allege that the directors "sold shares while in possession of material non-public information" without mentioning when those sales occurred. *See* Compl. ¶ 31. Exhibit 7 to the Complaint, which lists stock sales over a two year period between July 2005 and July 2007, does not help the plaintiffs. To the extent any directors sold shares in months other than the two months in

10

which the repurchases are alleged to have occurred (November 2006 and May 2007), the sales would not be contemporaneous with the Company's purchases. For trading to be considered "contemporaneous," courts routinely require that the stock sale and stock purchase occur "*on the same day*." *Copland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999) (citing cases); *In re Fed. Nat'l Mortgage Ass'n Sec., Deriv. & ERISA Litig.*, 503 F. Supp. 2d 25, 46-47 (D.D.C. 2007) (same); *Crocker v. Carrier Access Corp.*, 2006 WL 2035366, at *14 (D. Colo. July 18, 2006) (same). Here, however, the overwhelming majority of directors did not even sell in the same *month* as the repurchases, let alone on the same day. Without such contemporaneous sales, there is no factual basis to support plaintiffs' theory that the directors sold shares at the same time that Countrywide repurchased shares. Opp. at 14.[4]

### B. Plaintiffs Have Not Shown The Stock Repurchase Was Anything Other Than A Valid Exercise Of Business Judgment, And Thus Have Failed To Satisfy *Aronson's* Second Prong.

The foundation for all of plaintiffs' demand arguments is that the directors allegedly were on both sides of the repurchase transaction. The absence of any allegations supporting that argument is dispositive, and the Court need go no further. On this basis alone Defendants' motion to dismiss should be granted.

In addition, a separate and independent ground for dismissal is that plaintiffs have not pleaded particularized facts showing that under *Aronson*'s second prong the stock repurchase program was anything other than a valid exercise of business judgment. Plaintiffs do not dispute that stock repurchase programs are expressly authorized by Delaware statutory law (8 DEL. C.

---

[4] Plaintiffs say they are not alleging that the directors sold their shares with "scienter" or committed illegal insider trading in violation of the federal securities laws or other laws. Opp. at 3. For that reason, defendants will not address here any of the Complaint's allegations that appear to question the bona fides of those sales even though the Complaint lacks any facts -- let alone particularized facts -- showing that any director traded while aware of, and because of, material non-public information. *See* Opening Br. at 23-26.

§ 160(a)). Plaintiffs also "fail[] to allege any defect in the Board's approval process, the terms of the [repurchase] plan, or the implementation of the plan. In fact, [the company] approved the plan pursuant to its authority under Delaware law to repurchase its own shares." *In re Silicon Graphics, Inc. Sec. Litig.*, 1996 WL 664639, at *16 (N.D. Cal. Sept. 25, 1996). The Opposition does not even explicitly address *Aronson*'s second prong. Rather, it simply asserts that Defendants, while "in possession of [non-public] facts concerning material adverse changes in Countrywide's business," caused the company to repurchase stock at a price that "did not reflect the diminished value of Countrywide's stock." Opp. at 1, 14. In effect, plaintiffs at most argue that demand should be excused because the stock repurchase program was waste, and therefore not a valid exercise of business judgment. *See* Compl. ¶¶ 10, 13.

Plaintiffs do not dispute that the test for waste is extremely difficult to overcome. Under the Business Judgment Rule, the Court "must *presume* that the Board had a legitimate business purpose when it repurchased [Countrywide] stock." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999). This is a "powerful presumption," *White v. Panic*, 783 A.2d 543, 551 (Del. 2001), that can be rebutted only in "extreme cases" where "the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Highland Legacy v. Singer*, 2006 WL 741939, at *7 (Del. Ch. Mar. 17, 2006); *In re Merck*, 493 F.3d 393, 403 (3d Cir. 2007). To show waste, plaintiffs must allege that Defendants caused Countrywide to purchase stock "for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Brehm*, 746 A.2d at 263 (Del. 2000); *Grobow v. Perot*, 539 A.2d 180, 189 (Del. 1988).[5]

---

[5] *See also Brehm*, 746 A.2d at 263 (waste is "confined to unconscionable cases where directors irrationally squander or give away corporate assets"); *Lewis v. Vogelstein*, 699 A.2d 327, 336

12

Here, plaintiffs do not come close to carrying this heavy burden. It is undisputed that the Company repurchased stock at market prices. *See* Opp. at 14; Compl. ¶¶ 26-27. As noted in *Applebaum*, 812 A.2d at 889-90, a case cited by plaintiffs themselves, *see* Opp. at 14, "a well-informed, liquid trading market will provide a measure of fair value superior to any estimate a court could impose" -- in other words, it is the exact opposite of a price at which no reasonable person would be willing to trade. Plaintiffs do not dispute this either; instead, they claim that Countrywide's directors had knowledge of material non-public information that the market did not. *See* Opp. at 1, 6, 14, 17. But that allegation is wholly conclusory. In both the Complaint and the Opposition, plaintiffs do not point to any *particularized facts* showing that at the time of the repurchases the Board knew any material adverse information about the direction of the housing market or the effect of housing price movements on its financial condition that was not also available to the stock market as a whole.

Plaintiffs do not dispute that the Court can take judicial notice of the public records that defendants submitted with their Opening Brief, and do not dispute that these records show that the information about "material adverse changes in the housing market" referenced in the Complaint (Compl. ¶ 26) was *publicly-available information*. *See* Opening Br. at 16-19. Information about the decline in home price appreciation (and later, home price depreciation) was published and made publicly available by government agencies (Office of Federal Housing Enterprise Oversight House Price Index; U.S. Census Bureau home price data; Federal Housing Finance Board home price data), private companies (S&P/Case-Shiller Home Price Index; Freddie Mac Conventional Mortgage Home Price Index; National Association of Realtors home price data), and the media ("Home-Price Rises Slow the Most in Over 30 Years," "New Signs of

---

(Del. Ch. 1997) (waste is "a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received . . . . in effect a gift").

Cooling in Housing," "House Prices Slide as Property Glut Grows"). *See id.*; D.I. 48 Exs. 3-21. Between September 2006 and May 2007, the message to the market was unmistakable: there was "a substantial slowdown in home-value appreciation," the "largest deceleration in three decades," with home price gains "cooling in a very significant way," "flat or declining," "wearing away," "shrinking," "showing no signs of turnaround," and in later months, "plummeting into negative terrain." *Id.* Clearly, this information was not uniquely in the possession of Countrywide or its Board.

Plaintiffs also do not dispute that Countrywide made extensive public disclosures during the relevant period (in its SEC filings and otherwise) regarding the effect of the softening housing market on borrower delinquencies and its mortgage lending business overall. *See* Opening Br. at 19-22. Plaintiffs do not dispute that through these documents Countrywide regularly disclosed that because of "worsening real estate market conditions," Countrywide would experience "continued pressure on margins," a "mortgage origination volumes decline," and "increased borrower delinquencies and continued credit deterioration." *Id.*; D.I. 48 Exs. 23-32. Indeed, *every single month* the Company publicly disclosed detailed financial and operational statistics that covered a rolling 13-month period. *See* D.I. 48 Exs. 22, 23, 27, 29, 30. These monthly reports included the dollar amount of Countrywide's loan originations, and percentages of payment delinquencies and loan foreclosures.

For example, Countrywide's disclosures of the effect of the housing market on its business operations included the following:

- "The year-over-year increase in delinquencies and foreclosures are primarily the result of portfolio seasoning, product mix and changing economic and housing market conditions." D.I. 48 Ex. 24.

- "Factors which could cause actual results to differ . . . [include] competitive and general economic conditions in each of our business segments such as slower or negative home price appreciation. . ." D.I. 48 Ex. 27.

14

- "With the current contraction in the U.S. housing market and the resulting slowdown in price appreciation (or price depreciation in some markets), along with worsening economic conditions, the credit losses we experience may increase in the future." D.I. 48 Ex. 28.

- "Aggressive industry underwriting guidelines and lower home price appreciation have resulted in increasing delinquencies and defaults." D.I. 48 Ex. 29.

- "The year-over-year increase in total delinquencies and foreclosures is generally the result of softening housing market conditions." D.I. 48 Ex. 31.

See also Opening Br. at 19-22.

Plaintiffs do not contend that any of the Company's disclosures were materially false or misleading or omitted material information. See Opp. at 3 ("[n]or does the Complaint allege that the directors made false or misleading statements and omitted material facts under the federal securities laws"). Instead, they argue that all these disclosures were somehow "worthless" because they do not contain the "six pages" of Exhibits 1-4 to the Complaint, which are portions of a Countrywide presentation to securities analysts given on July 24, 2007. Opp. at 15. This argument is non-sensical.

Exhibits 1-4 to the Complaint include the transcript of a conference call with investors held on July 24, 2007, almost a year after the stock repurchase transaction was initially approved in the fall of 2006, and various charts used during that call. The information contained in these exhibits consists of cumulative historical data regarding home price appreciation and borrower delinquencies over a several year period. As an initial matter, to the extent these exhibits depict information for historical periods that occurred prior to Countrywide's alleged stock repurchases in November 2006 and May 2007, plaintiffs allege no facts -- let alone particularized facts -- showing that if the directors knew these facts at the time[6] the market did not also know those

---

[6] Plaintiffs' generic allegations that the Board must have had knowledge because they "were actively engaged in every significant issue facing the company" (Compl. ¶¶ 24-25; Opp. at 6)

facts. In other words, plaintiffs do not explain how the information for pre-November 2006 or May 2007 periods contained in these exhibits is any different from the information repeatedly disclosed by Countrywide throughout the relevant period or that otherwise was publicly available. Moreover, some of the information contained in these exhibits concerns housing price activity and delinquency experienced *after* November 2006 and May 2007, which the directors obviously could not have known at the time they effected the two stock repurchases.[7]

In short, plaintiffs have pleaded no facts showing that the information in Exs. 1-4 (if it was even in existence at the time of the stock repurchases) was known to the directors but had not been disclosed publicly by Countrywide or was otherwise not public information. Likewise, plaintiffs have not pleaded any particularized facts showing that the directors knew secret information about how this housing market data would affect Countrywide's financial condition or operations that was not also known to the institutional investors, securities analysts, and other market participants who followed and/or invested in Countrywide and other mortgage lenders.

The absence of any such facts is fatal to plaintiffs' claim that Defendants caused Countrywide to repurchase stock at a price that did not reflect its true value. Countrywide's stock price had been rising steadily during the months leading up to the repurchase in November 2006, and at that time, knowing the same information that the Board knew, the market valued Countrywide's stock at $38-40/share. D.I. 48 Ex. 36. In May 2007, again knowing the same

---

plainly does not satisfy "the stringent requirements of factual particularity" needed to excuse demand. *Brehm*, 746 A.2d at 254 (Del. 2000).

[7] For example, Exhibit 2 to the Complaint contains a statement that in May 2007 "national home prices actually declined by 0.4% year-over-year. This is the first national decline for the entire period shown on this chart." Exhibit 2 contains a similar statement regarding the percentage of MSAs (metropolitan statistical areas) "with year-over-year price decline is up to 50%" and noted that the "transition from practically no MSAs with declines to 50% of the MSAs with declines has been rather abrupt." Compl. Ex. 2 at 3; Compl. Ex 4. This information could not have been known to the Countrywide directors before it occurred.

information that the Board knew, the market valued Countrywide's stock at $37-41/share. D.I. 48 Ex. 37.[8]  Because plaintiffs have not alleged any facts showing that the Board knew anything about Countrywide's true value that the market did not know, the only inference that can be drawn is that the market price accurately reflected the stock's true value, and the repurchases were not waste.  *See Applebaum,* 812 A.2d at 889-90.[9]  In these circumstances, the "strong presumption" of the Business Judgment Rule applies (*Aronson,* 473 A.2d at 812), and plaintiffs have failed to demonstrate that demand should be excused under the second prong of *Aronson.*[10]

## II.    A DUTY OF LOYALTY CLAIM HAS NOT BEEN STATED.

The Complaint also should be dismissed because it fails to state a claim for breach of the duty of loyalty.  To state a duty of loyalty claim under Delaware law, the Complaint must allege facts showing that Defendants "either (1) stood on both sides of the transaction and dictated its

---

[8] Indeed, Countrywide's stock rose steadily throughout 2006 and into 2007, and continued to trade in the $25-40 range until mid-August 2007, when there was a sudden and unprecedented collapse in the capital markets, which affected Countrywide and the entire mortgage industry. *See* D.I. 48 Exs. 34, 38; *Tripp v. IndyMac Bancorp, Inc.,* 2007 U.S. Dist. LEXIS 95445, at *9-11 (C.D. Cal. Nov. 29, 2007) ("an even stronger inference is that Defendants were simply unable to shield themselves as effectively as they anticipated from the *drastic change in the housing and mortgage markets.*")  Plaintiffs fail to address this at all -- likely because it supports an inference that the decline in Countrywide's stock price was due to external macroeconomic forces, not pre-existing, known, undisclosed problems in Countrywide's lending business.

[9] Plaintiffs' counsel does not address the serious conflict of interest they face having filed both this case and the *Freedman* case in Chancery Court, which attacks the merger with BAC as grossly undervalued.  *See* Opening Br. at 29 n.20.  Exacerbating that conflict, plaintiffs' counsel submitted expert reports in *Freedman* last week arguing that Countrywide's stock at all times has been worth significantly more than the $7.06/share merger price BAC is paying; here, they continue to argue that the true value is roughly $6.50/share. *See* Opp. at 18; Compl. ¶ 34.

[10] Countrywide's public filings further confirm that the stock repurchase program was a valid exercise of the Board's business judgment.  The Company's retained earnings and shareholders' equity (the difference between assets and liabilities and, thus, a measure of the Company's excess capital) more than doubled between 2003 and 2006.  *See* Supp. Fineman Decl. Exs. 45-50.  Given this extraordinary growth in excess capital, and the steady long-term rise in Countrywide's stock price (which continued until the capital markets collapsed in August 2007), the Court can reasonably infer that the Board's decision to authorize the stock repurchase program served a legitimate corporate purpose. *See Lewis,* 699 A.2d at 336 (waste is "a transfer of corporate assets that serves no corporate purpose").

17

terms in a self-dealing way, or (2) received in the transaction a personal benefit that was not enjoyed by the shareholders generally." *In re Coca-Cola Enters., Inc. S'holders Litig.*, 2007 WL 3122370, at \*4 (Del. Ch. Oct. 17, 2007).  This claim fails for the same reasons why demand has not been excused -- plaintiffs have failed to plead any facts suggesting that any of the directors stood on both sides of the stock repurchase transaction, or received any "personal benefit" that Countrywide shareholders did not also enjoy.   In other words, the very essence of a duty of loyalty claim -- "preferring the adverse self-interest of the fiduciary . . . to the interest of the corporation," *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006) -- is entirely absent here.  Without that, plaintiffs' attack on the stock repurchase program amounts to nothing more than after-the-fact second-guessing of the Board's business judgment -- which is exactly what the Business Judgment Rule forbids.  *See Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) (to "allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect").

Moreover, this claim must be dismissed because it is subject to the particularized pleading requirements of Federal Rule 9(b).  Although plaintiffs claim they are not pursuing an insider trading claim (Opp. at 3, 15), they nonetheless accuse the directors of having caused the Company to buy back shares at a time they supposedly were also selling their Countrywide shares "while in possession of material inside adverse information."  Compl. ¶¶ 4, 10.  As such, they are accusing the directors of committing a fraud on investors, and their allegations "sound in fraud."  *See, e.g., In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 197 (3d Cir. 2007); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 271-74 (3d Cir. 2006).  As such, they must

18

allege with particularity facts showing that directors traded while in possession of inside information and "consciously acted to exploit such superior knowledge." *Guttman*, 823 A.2d at 505; *Stepak v Ross*, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985) ("it must be shown that *each sale* by *each individual defendant* was entered into . . . *on the basis of*, and *because of*, adverse material non-public information"). Plaintiffs nowhere have alleged any such facts, let alone facts pleaded with the requisite particularity. *See* Opening Br. at 23-26.[11]

Plaintiffs attempt to sustain their duty of loyalty claim by citing three cases (*Norte, O'Neill,* and *Primedia*) in which the directors caused their companies to acquire assets worth less than what the company paid for them. *See* Opp. at 15-17. These cases are all inapposite. First, the Complaint here alleges no facts that would support an inference that the market price of Countrywide's stock did not reflect its true value. *See supra*, at 13-17. Second, in *Norte, O'Neill,* and *Primedia*, the directors sought to personally profit, either through the transaction itself or by eliminating a threat to their control. *See Norte*, 304 F. Supp. at 1108-09; *O'Neill*, 339 F.2d at 767; *Primedia*, 910 A.2d at 261-62. Here, by contrast, a majority of directors did not sell stock while the Company was repurchasing shares, and the Complaint alleges no facts suggesting that the directors received any personal benefits not otherwise shared by shareholders generally.

## III.   PLAINTIFF IBEW SHOULD BE DISMISSED FOR LACK OF STANDING.

Nowhere in their Opposition do plaintiffs address Defendants' arguments concerning IBEW's lack of standing. *See* Opening Br. at 31-32. Rather, they argue that Blumberg has

---

[11] Even if Rule 9(b) did not apply, plaintiffs would be subject to *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), which requires that a plaintiff plead "enough facts to state a claim to relief that is *plausible* on its face." (emphasis added.) *Twombly* "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.* at 1964. Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. Plaintiffs here have not met even this less strict pleading burden.

standing. *See* Opp. at 9-10; D.I. 54. As there is nothing in the record demonstrating that IBEW

has been a Countrywide shareholder continuously from the time of the transactions, IBEW lacks

standing and should be dismissed from the case. *See* Opening Br. at 31-32 (citing cases).

## CONCLUSION

For all of the above reasons, Defendants respectfully request that the Consolidated,

Amended, and Supplemental Verified Complaint be dismissed with prejudice.

OF COUNSEL:

Brian E. Pastuszenski
Stuart M. Glass
Brian C. Devine
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
617.570.1000

Dated: May 12, 2008

Thomas A. Beck (#2086)
beck@rlf.com
Steven Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19801
302-651-7700
*Attorneys for Defendants Angelo R. Mozilo,
Henry G. Cisneros, Robert J. Donato, Harley
W. Snyder, Jeffrey M. Cunningham, Martin R.
Melone, Robert T. Parry, Oscar P. Robertson,
Keith P. Russell, and Nominal Defendant
Countrywide Financial Corporation*

20

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2008, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered to the following:

Robert D. Goldberg, Esquire
Biggs & Battaglia
921 North Orange Street
P.O. Box 1489
Wilmington, DE 19899

Edward P. Welch, Esquire
Edward B. Micheletti, Esquire
Skadden, Arps, Slate, Meagher & Flom
LLP
One Rodney Square, P.O. Box 636
Wilmington, DE 19899-0636

Steven J. Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger
One Rodney Square
PO Box 551
Wilmington, DE 19899